# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ONE PLACE CONDOMINIUM LLC, THE SOUTH LOOP SHOPS LLC, SOUTHBLOCK DEVELOPMENT LLC, C & K PARTNERSHIP, and SOUTHBLOCK MANAGEMENT, INC., <br><br>Plaintiffs, <br><br>v. <br><br>TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, <br><br>Defendant. | No. 11 C 2520 <br><br> Magistrate Judge Finnegan |

## MEMORANDUM OPINION AND ORDER

Plaintiffs One Place Condominium LLC, The South Loop Shops LLC, Southblock Development LLC, C & K Partnership, and Southblock Management, Inc. (collectively, "Plaintiffs" or "One Place"), are owners, developers, and managers of certain property located in Chicago, Illinois. Defendant Travelers Property Casualty Company of America ("Defendant" or "Travelers") issued Plaintiffs a builder's risk insurance policy for the property that was in effect from November 2, 2006 to November 2, 2007. During that time, the property sustained damage, leading to a dispute as to Defendant's coverage obligations under the policy and, ultimately, this diversity lawsuit.[1]

As part of its discovery obligations, Defendant produced to Plaintiffs a privilege log that included some 97 documents relating to Murray Sacks, who at all relevant times worked for Travelers as Senior Counsel with the Claim Legal Property Group. Mr. Sacks consulted on the One Place insurance claim file, communicating most frequently

---
[1] The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

with Rick Sarff, a General Adjuster with the Travelers Business Insurance Property Major Case Unit, and with Barclay M. ("Skip") Roberts III, an Executive General Adjuster and Mr. Sarff's direct supervisor. Defendant asserted the attorney-client and work product privileges over these communications, but Plaintiffs believe that Mr. Sacks served more as a claims adjuster than an attorney, and filed a motion to compel Defendant to produce the documents and to make Mr. Sacks available for a deposition. Plaintiffs objected to the "generic descriptions" found on the privilege log, arguing that they "betray[ed] the capacity in which Mr. Sacks' position was largely if not completely within the common business practices of Travelers claims handlers." (Doc. 72, at 8, 10).

In response to Plaintiffs' motion, Defendant submitted a revised log providing "a more detailed description of each of the documents at issue."[2] (Doc. 79, at 3). Defendant also produced affidavits from Mr. Sacks and Mr. Sarff certifying that Mr. Sacks provided strictly legal advice and analysis on the One Place file. At the Court's request, Defendant further submitted a randomly-selected sampling of the disputed documents for *in camera* review. This review raised some questions as to whether Defendant was claiming privilege over communications and email strings that had either been copied to, or sent from individuals besides Mr. Sacks, Mr. Sarff and Mr. Roberts. Defendant thus submitted a second supplemental privilege log, along with redacted versions of some previously withheld documents. Plaintiffs believe that these documents provide further support for their motion to compel, as they "shed specific

---

[2] The Court rejects Plaintiffs' argument that the amended privilege log should be disregarded as untimely. *Compare United Auto. Ins. V. Veluchamy*, No. 09 C 5487, 2010 WL 749980, at *5 (N.D. Ill. Mar. 4, 2010) (privilege waived where the defendant "has simply chosen not to provide even the semblance of" a privilege log).

light on the critical role that Mr. Sacks played" and "suggest that Travelers utilized Mr. Sacks as another cog in the adjustment of the One Place claim." (Doc. 88, at 2). The Court has thoroughly reviewed all of the parties' submissions, and now finds that the documents in question are privileged and there is no basis for deposing Mr. Sacks. Plaintiffs' motion to compel is therefore denied.

## DISCUSSION

**A.      Legal Framework**

Where, as here, the basis for jurisdiction is diversity of citizenship, state law governs questions of attorney-client privilege. *Reid v. Neighborhood Assistance Corp. of Am.*, No. 11 C 8683, 2012 WL 5995752, at *3 (N.D. Ill. Nov. 30, 2012). In Illinois, as under federal law, "where legal advice of any kind is sought from a professional legal advisor in his capacity as such, the communications relating to that purpose, made in confidence by the client, are protected from disclosure by himself or the legal advis[o]r, except the protection be waived." *Fischel & Kahn, Ltd. v. van Straaten Gallery, Inc.*, 189 Ill. 2d 579, 584, 727 N.E.2d 240, 243 (2000). *See also Wielgus v. Ryobi Techs., Inc.*, No. 08 C 1597, 2010 WL 3075666, at *3 (N.D. Ill. Aug. 4, 2010). The purpose of the privilege is to "encourage and promote full and frank consultation between a client and a legal advisor by removing the fear of compelled disclosure of information." *Id.*

The privilege covers communications with corporate in-house counsel, except those that address "business matters, management decisions, or business advice." *Breneisen v. Motorola, Inc.*, No. 02 C 50509, 2003 WL 21530440, at *3 (N.D. Ill. July 3, 2003). In addition, "under Illinois law the attorney-client privilege extends only to communications between counsel and the corporate 'control group,' which consists of

3

final decision makers and top advisers whose opinions form the basis for a final decision." *Jentz v. ConAgra Foods*, No. 10-CV-0474-MJR-PMF and 10-CV-0952-MJR-PMF, 2011 WL 5325669, at *2 (S.D. Ill. Nov. 3, 2011) (citing *Consolidation Coal Co. v. Bucyrus-Erie Co.*, 89 Ill. 2d 103, 119-20, 432 N.E.2d 250, 257-58 (1982)). The party claiming a privilege "carries the burden of presenting facts that give rise to the privilege." *Janousek v. Slotky*, 2012 IL App 113432, 980 N.E.2d 641, 650 (1st Dist. 2012).

Unlike the attorney-client privilege, the work product privilege is governed by federal law. It protects documents prepared by an attorney "in anticipation of litigation for the purpose of analyzing and preparing a client's case." *Sandra T.E. v. South Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2010) (citing Fed. R. Civ. P. 26(b)(3)). "Precautionary documents 'developed in the ordinary course of business' with the 'remote prospect of litigation' in mind are not subject to protection." *Underhill v. Coleman Co.*, No. 3:12-CV-129-JPG-DGW, 2012 WL 4388572, at *3 (S.D. Ill. Sept. 25, 2012) (quoting *Sandra T.E.*, 600 F.3d at 622). In the insurance context, "much of the paperwork generated . . . is prepared with an eye toward a possible legal dispute over a claim." *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 977 (7th Cir. 1996). To be protected as work product, that paperwork must have been prepared because "some articulable claim, likely to lead to litigation . . . ha[s] arisen." *Id.* (quoting *Binks Mfg. Co. v. National Presto Indus., Inc.*, 709 F.2d 1109, 1120 (7th Cir. 1983)). As with the attorney-client privilege, the party asserting the work product doctrine bears the burden of showing that it applies. *Itex, Inc. v. Workrite Uniform Co.*, No. 08 C 1224, 2011 WL 1224920, at *1 (N.D. Ill. Mar. 31, 2011).

**B.     Analysis**

   **1.     The Documents**

Defendant's initial privilege log indicated that Mr. Sacks communicated with Mr. Sarff and Mr. Roberts regarding a wide variety of topics, including "coverage issues," "loan receipt issues," "expert findings," "draft correspondence," "soft costs," the "delay claim," an "insured advance request," a "response letter to public adjuster," "expense to reduce loss," the "ERS claim," "caisson and water claims," Plaintiffs' "preliminary partial claim," "possible cost classifications," draft communications with the insured and the public adjuster, "engineering reports," and "the claim" in general.  (Doc. 72-1).

   **a.     First Revised Log**

In the first revised log, Defendant provided clarification as to the scope of these communications.  For example, "coverage issues" includes such matters as "the coverage arguments made by the public adjuster," "advi[c]e as to why costs to investigate are not covered under the policy," "exclusions and reservations of right," "coverage in light of [an] ESI report," "preliminary claim spreadsheet and questions about items and coverage," "the earth movement limits, settlement issues and settlement value," coverage for "caisson squeeze . . . including property not covered [and] testing and expense to reduce the loss," "question regarding advances and caisson claim issues," "fortuity and knowledge of caisson issues prior to policy inception," and "damage to frost wall and earth movement coverage issues."  (Doc. 73-2, at 4, 5, 8, 10, 16, 17, 23, 46, 47, 59).

Defendant also expanded its descriptions of other emails, which involved:  "drafts of the loan receipt agreement and edits to the same"; "draft of denial letter for Sacks

5

review and comment"; "possible expert to review ESI reports"; "the tolling agreement"; "soft costs analysis, construction loan modification agreement and questions to Sacks regarding same"; "claim analysis and exposure, soft costs and loan renegotiation"; "settlement offer, tolling and retention of outside counsel"; "response letter to public adjuster" regarding "the coverage position argument of the public adjuster" and the "2006 caisson squeeze claim"; "period of delay coverage and settlement"; "spreadsheets for settlement meeting"; "items for which coverage will need to be determined"; "possible geotech expert"; "underground water problem" and "ERS and caissons and regarding position on coverage." (*Id.* at 5, 9, 10, 15, 16, 27, 29-37, 41, 45, 66, 69).

In addition to the revised privilege log, Defendant produced affidavits from Mr. Sarff and Mr. Sacks certifying that since March 2007, Mr. Sarff alone "has been responsible for investigating, evaluating and adjusting One Place's claim against Travelers," under the direct supervision of Mr. Roberts. (*Id.* at 4; Sarff Aff. 1, Doc. 79-1, ¶¶ 2, 3; Sacks Aff. 1, Doc. 79-2, ¶ 8). Mr. Sarff maintains that he made all "decisions as to coverage and the amounts due under the policy," (Sarff Aff. 1 ¶ 5), and only consulted with Mr. Sacks "in his capacity as legal counsel." (*Id.* ¶ 9). Mr. Sacks echoes these statements, confirming that he conferred with Mr. Sarff (and Mr. Roberts) "in [his] capacity as a legal advisor," (Sacks Aff. ¶ 5), and "did not act as an adjuster, claims handler or investigator on the claim." (*Id.* ¶ 8). Mr. Sacks stresses that he never: went to the loss site; met or communicated with the insured or its public adjuster; wrote, signed or sent letters to the insured or its public adjuster regarding coverage decisions; worked with Travelers' experts; reviewed documents submitted by the insured or its

6

public adjuster; prepared statements of loss or schedules regarding amounts due under the policy; or instructed Travelers to issue payments to the insured or to consultants. (*Id.* ¶¶ 9-14).

In a second affidavit, Mr. Sarff affirms that as of early August 2009, Travelers "reasonably anticipated that there may be litigation between the parties." (Sarff. Aff. 2, Doc. 79-4, ¶ 16). He notes that Plaintiffs' counsel, Katherine Dedrick, contacted him in January 2008 requesting a meeting, (*Id.* ¶ 4), and that in October 2008, she sent him a letter stating that "her client 'intends to hold Travelers responsible for any and all damages that result from the financial hardship created for its failure to pay the insured.'" (*Id.* ¶ 6 (quoting Ex. 1 to Doc. 79-4)). In December 2008, Ms. Dedrick sent Mr. Sarff another letter noting that her client was "experiencing severe financial difficulty due to the failure of Travelers to make payment of any substance on the insured's claim," and again stressing that "the insured intends to hold Travelers fully responsible." (*Id.* ¶ 7; Ex. 3 to Doc. 79-4). By early August 2009, Mr. Sarff says, it was clear that the parties had a significant difference of opinion as to how much Travelers should pay on One Place's claim, and as to the extent the construction project was delayed due to damage to the so-called ERS and D-Line. (*Id.* ¶ 14, 15).

Plaintiffs maintain that these revised log entries still demonstrate that "Mr. Sacks provided regular business advice to Mr. Sarff during Travelers' handling and adjusting of the One Place claim." (Doc. 80, at 2). As Plaintiffs see it, any "legal counseling" provided by Mr. Sacks "overlaps and is coterminous with the coverage evaluation duties of [Travelers'] claims handlers." (*Id.* at 5). Thus, by Plaintiffs' estimation, "at least one third of [Mr. Sacks's] responsibilities was to provide business advice in the form of

7

assisting with the coverage determinations arrived at by Travelers' claims adjusters." (*Id.* at 4).

It is true that "insurance companies, which are in the business of reviewing, processing and adjusting claims, should not be permitted to insulate the factual findings of [their] claims investigation by the involvement of an attorney to perform such work." *Chicago Meat Processors, Inc. v. Mid-Century Ins. Co.*, No. 95 C 4277, 1996 WL 172148, at *3 (N.D. Ill. Apr. 10, 1996). *See also Acosta v. Target Corp.*, 281 F.R.D. 314, 321 (N.D. Ill. 2012) ("funneling [non-legal] communications past an attorney will not make them privileged."). At the same time, "[i]n Illinois, the general rule holds that communications between an insurer and its coverage counsel are privileged" as long as the attorney is acting as a legal advisor. *Lagestee-Mulder, Inc. v. Consolidated Ins. Co.*, No. 09 C 7793, 2010 WL 4781461, at *1 (N.D. Ill. Nov. 17, 2010) (citing *Illinois Emcasco Ins. Co. v. Nationwide Mut. Ins. Co.*, 393 Ill. App. 3d 782, 786-89, 913 N.E.2d 1102, 1106-08 (1st Dist. 2009)).

The descriptions set forth on Defendant's revised privilege log, together with the affidavits from Mr. Sacks and Mr. Sarff, fairly support upholding the assertion of privilege in this case. All of the communications involve matters that could give rise to the need for legal analysis and advice, and both Mr. Sacks and Mr. Sarff have certified that the purpose of the communications was in fact to secure legal counsel: Mr. Sacks served only in his capacity as an attorney; Mr. Sarff alone performed any general claims handling functions. Mr. Sarff has also affirmed facts indicating that he is within Travelers' control group. Specifically, he has the authority to make final decisions as to coverage and amounts due under One Place's policy "based on my review and analysis

8

of the facts, investigation of the claim, review of the policy provisions, my review of the opinions provided by the experts I retained, and consultation with my managers."[3] (Sarff Aff. 1 ¶ 5). In addition, though Plaintiffs did not file this lawsuit until April 2011, Mr. Sarff's affidavit reflects that Travelers reasonably anticipated litigation as of August 2009 based on specific meetings and correspondence with Plaintiffs' counsel and the public adjuster.

Plaintiffs object that these affidavits are self-serving and conclusory and "should be disregarded." (Doc. 80, at 3) (citing *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002)) ("[C]onclusory and self-serving affidavits, without support in the record, do not create a triable issue of fact."). Plaintiffs direct the Court to *Metamorfyx, L.L.C. v. Belkin Components*, No. 02 C 771, 2002 WL 1308633 (N.D. Ill. June 14, 2002), in which the plaintiff sought to disqualify the law firm of Bryan Cave L.L.C. from representing the defendant in the case. *Id.* at *1. The plaintiff claimed that one of its corporate directors, Robert Granadino, asked his wife Gloria, an administrative assistant at Bryan Cave, to seek representation for the company regarding some patent infringement matters. *Id.* Gloria claimed that she approached attorney Leslie Helmer, who agreed to act as the plaintiff's attorney and to keep all conversations confidential. *Id.*

Robert and Gloria submitted affidavits setting forth their version of events, but the court found them lacking in credibility. Though the affidavits attested to "one-on-one private conversations which by their nature cannot be corroborated," there was no evidence that Gloria was involved in running the business of Metamorfyx, or that Robert

---

[3] *See Illinois Emcasco Ins. Co.*, 89 Ill. 2d at 120, 432 N.E.2d at 258 (control group includes those with final decision-making authority, and employees "whose advisory role to top management in a particular area is such that a decision would not normally be made without his advice or opinion, and whose opinion in fact forms the basis of any final decision by those with actual authority.").

9

had authority to engage counsel on behalf of the company, much less "dispatch Gloria to do so." *Id.* at *2. In addition, Ms. Helmer submitted her own affidavit denying that she or her firm ever agreed to represent the plaintiff, and noting that she was an employment attorney with no expertise in patent law. *Id.* at *1.

Unlike *Metamorfyx*, this case does not involve dueling affiants who cannot agree on the nature of their private conversations. Nor is there any question that Mr. Sacks and Mr. Sarff worked for Travelers and were acting on its behalf. The affidavits of these men contain detailed and consistent statements made with personal knowledge, and there is no basis to disregard them. Under the circumstances presented here, the Court finds that Defendant has satisfied its burden of demonstrating that communications with Mr. Sacks are protected from disclosure. *Compare Smithkline Beecham Corp. v. Apotex Corp.*, 193 F.R.D. 530, 540-41 (N.D. Ill. 2000) (plaintiffs offered "almost nothing in the way of evidence to suggest a threat of litigation or a resolve to litigate" except "a single statement in [an] affidavit" to that effect; such "exceedingly brief, conclusory, unsupported statements fall far short of establishing just when plaintiffs began creating work product in anticipation of litigation.").

      **b.     Second Revised Log**

Despite all this evidence, in an abundance of caution, the Court also conducted a thorough *in camera* review of a randomly-selected sampling of the 97 disputed log entries, followed by another hearing. *See Kerr v. U.S. Dist. Ct. for N. Dist. Of Cal.*, 426 U.S. 394, 405 (1976) ("[A]n *in camera* review of the documents is a relatively costless and eminently worthwhile method to insure that the balance between petitioners' claims of . . . privilege and plaintiffs' asserted need for the documents is correctly struck.").

This resulted in a second supplemental privilege log and the production of redacted versions of certain previously withheld documents. Plaintiffs claim that this latest production now indicates that "Mr. Sacks made a critical coverage decision which resulted in the denial of a $1.25 million dollar advance to One Place which was advocated by . . . Mr. Sarff." (Doc. 88, at 2-3).

Plaintiffs base this theory on a series of emails between Mr. Sarff and Mr. Roberts dated September 1, 2009, where Mr. Sarff indicated that the covered damages from the One Place loss would exceed $2 million, and "request[ed] authority of $2,000,000 to facilitate issuance of an advance of $1,250,000." (Doc. 88-5, at 2). Plaintiffs stress that Mr. Sarff's request was denied, and say they now "suspect" that Mr. Sacks was responsible for the decision to "overrule" that coverage determination. (Doc. 88, at 5). Plaintiffs did not ask Mr. Sarff about these emails during his deposition, but it appears that the request for an advance was based on the "period of delay" reflected in an August 17, 2009 preliminary draft report prepared by Travelers' consultant, Madsen Kneppers & Associates ("MKA"), to assist with settlement discussions. (Doc. 91, at 2, 4; Sarff Aff., Doc. 91-3, ¶ 5; Doc. 91-4, Lambda Dep., at 123-24). Defendant gave Plaintiffs a copy of that draft report during the parties' August 18, 2009 settlement conference (notably attended by Ms. Dedrick). As the conference proceeded, however, Mr. Sarff "lost confidence in MKA's scheduling consultant because of his inability . . . to answer questions presented or explain his methodology and conclusions." (*Id.* at 4-5; Sarff Dep., Doc. 91-1, at 44-46). Travelers thus retained Held Enloe to conduct an independent assessment of the period of delay. Based on that November 24, 2009 report (which has also been produced to Plaintiffs), Travelers determined that the MKA

11

estimate was not valid and declined to advance the $2 million. (Sarff Aff., Doc. 91-3, ¶¶ 6, 9, 10).

In light of this explanation, and considering the record as a whole combined with the *in camera* review, the Court remains satisfied that communications between Mr. Sacks, Mr. Sarff and Mr. Roberts are privileged. There is no evidence that Mr. Sacks interfered with coverage decisions or acted as a claims adjuster with respect to the One Place file, and Plaintiffs' suspicions to the contrary have no factual support. The Court also rejects Plaintiff's new assertion that messages Bates labeled 9291-9292 and 18906-18907, which are "to and from Mr. Sarff and Mr. Roberts with Mr. Sacks merely cc'd on the email," are not privileged. (Doc. 88, at 5). Plaintiffs cite no authority for this proposition, and Defendant has produced redacted versions of both documents, deleting only those portions constituting legal advice. Mr. Sacks was clearly an intended recipient of those messages, and the mere fact that his email address was typed in the "cc" field rather than the "to" field is irrelevant.[4]

### 2. The Deposition

Having determined that Defendant has satisfied its burden of showing that communications with Mr. Sacks are protected by attorney-client privilege and the work product doctrine, the Court finds no basis for allowing his deposition in this case. Plaintiffs claim that they need to speak to Mr. Sacks about a variety of topics, including: (1) "the circumstances surrounding Travelers' decision to remove MKA, Travelers'

---

[4] The Court similarly finds no basis for Plaintiffs' request that Defendant be sanctioned for "abuse of its discovery obligations" and "foot dragging." (Doc. 88, at 6). Defendant's privilege logs were somewhat sloppy, but there is no evidence of any improper conduct that merits sanctions, much less that has prejudiced Plaintiff in this case. *See Commonwealth Ins. Co. v. Titan Tire Corp.*, 398 F.3d 879, 888 (7th Cir. 2004) ("A district court enjoys broad discretion in declining to impose discovery sanctions.").

designated experts, from handling this loss"; "[t]he identity and reasons for the change in Travelers' coverage positions from declination to coverage and then the length of time it took Travelers to pay funds to Plaintiffs"; and "[t]he identity of individuals involved in the claim handling and peer review process." (Doc. 72, at 4-5). These are all matters that Plaintiffs either did – or could have – raised with Mr. Sarff during his deposition. Contrary to Plaintiffs' suggestion, the mere fact that Defendant never moved for a protective order regarding the Sacks deposition is insufficient to justify subjecting him to questioning in this case, particularly since he functioned at all times as an attorney. *See Hunt v. DaVita, Inc.*, 680 F.3d 775, 780 (7th Cir. 2012) ("District courts have broad discretion in supervising discovery."). Plaintiffs' motion to compel Mr. Sacks's deposition is denied.

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion to Compel the Production of Documents and Production of Witness for Deposition Testimony (Doc. 72, 74) is denied.

ENTER:

Dated: March 1, 2013

_____
SHEILA FINNEGAN
United States Magistrate Judge

13