UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ONE PLACE CONDOMINIUM LLC,<br>THE SOUTH LOOP SHOPS LLC,<br>SOUTHBLOCK DEVELOPMENT LLC,<br>C & K PARTNERSHIP, and<br>SOUTHBLOCK MANAGEMENT, INC., | )<br>)<br>)<br>)<br>) | |
| | ) | Case No. 1:11-cv-02520 |
| Plaintiffs, | )<br>) | |
| vs. | )<br>) | |
| TRAVELERS PROPERTY CASUALTY<br>COMPANY OF AMERICA, | )<br>) | Honorable Sheila M. Finnegan |
| Defendant. | )<br>)<br>) | |

**TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA'S STATEMENT OF
UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL
SUMMARY JUDGMENT AS TO CERTAIN CLAIMED COSTS AND LOSSES**

Defendant Travelers Property Casualty Company of America ("Travelers"), by

counsel, pursuant to Local Rule 56.1, sets for the following undisputed material facts in

support of its Motion for Partial Summary Judgment as to Certain Claimed Costs and

Losses.

**Jurisdiction and Venue**

1.      This Court has subject matter jurisdiction over this case because there is

complete diversity of citizenship and the amount in controversy exceeds $75,000.

(Complaint *[Tab # 1[1]]*, ¶ 4; Answer *[Tab # 2]*, ¶ 4).

2.      Plaintiffs are citizens of Illinois.  Plaintiffs, One Place Condominium LLC,

The South Loop Shops LLC, Southblock Development LLC and C&K Partnership are

---

[1]  References to "Tab" numbers herein refer to the attached Index of Documents.

each comprised of partners who are citizens of Illinois. Plaintiff Southblock Management, Inc. is incorporated and has its principal place of business in Illinois. (Complaint *[Tab # 1]*, ¶ 1; Joint Jurisdictional Status Report *[Tab # 3]*.) (Plaintiffs will be referred to as Plaintiffs or collectively as "One Place".)

3.     Travelers is a citizen of Connecticut. Travelers is incorporated in Connecticut and has its principal place of business in business in Hartford, Connecticut. (Answer *[Tab # 2]*, ¶ 2; Joint Jurisdictional Status Report *[Tab # 3]*.)

4.     Venue is proper pursuant to 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to this action occurred in this judicial district. In addition, the property that is the subject of this action is located in this judicial district. (Complaint *[Tab # 1]*, ¶ 5; Answer *[Tab # 2]*, ¶ 5; Joint Jurisdictional Status Report *[Tab # 3]*.)

**The Project and The Policy**

5.     Plaintiffs are the owners, developers, and managers of the property located at One East 8th Street, Chicago, Illinois (the "Property"). (Complaint *[Tab # 1]*, ¶ 2.)

6.     Starting in late 2006, One Place began construction of a project on the Property (the "Project"). The Project was a 10-story building plus a one-story basement. The Project contained retail space, a parking garage and residential condominium units on floors 3 through 10. Substantial Completion of the Project was December 10, 2008. (Charlie Shenk[2] Dep. *[Tab # 97]*, pp. 67-68; Dep. Ex. 310 *[Tab # 28]*.) Total construction costs on the Project were in excess of $44 million.

---

[2]     Mr. Shenk was the project manager for One Place.

7.     Levine Construction, Inc. ("Levine") was the original general contractor on the Project.  In April 2007, Wight Construction ("Wight") replaced Levine as the general contractor.  (James Nagle[3] Dep. *[Tab # 95]*, pp. 23-25; Dep. Ex. 194 *[Tab # 27]*.)  Key subcontractors of the Project included:  (1) Concrete Structures of the Midwest, Inc. (concrete); (2) Budron Excavating (excavation); (3) Bonus Electric (electrical); (4) D-Three Construction (carpentry); (5) Crouch-Seranko (masonry); and (6) Hayward-Baker (the earth retention system).

8.     Travelers issued to One Place a builder's risk insurance policy, number QT6600203L858TIL06 ("the Policy"), which provided coverage for the building for the period starting on November 2, 2006 and ending November 2, 2007.  (Complaint *[Tab # 1]*, ¶ 7; Policy *[Tab # 4]*; Travelers Answer *[Tab # 2]*, ¶  7.)

9.     The Policy provides:

### A. Coverage

We will pay for "loss" to Covered Property from any Covered Causes of Loss.

\*   \*   \*

### 1. Covered Causes of Loss

Covered Causes of Loss means RISKS OF DIRECT PHYSICAL "LOSS" except those causes of "loss" listed in the Exclusions.

(Policy *[Tab # 4]*, Form CM T1 43 08 96, Section A, page 1 of 18.)

10.     The Policy states:  "16.  'Loss' means accidental loss or damage."  (Policy *[Tab # 4]*, Form CM T1 43 08 96, Section F, page 15 of 18.)

11.     The Policy provides that, if there is coverage, the insured is entitled to recover the costs of reasonably restoring or replacing the damaged property:

---

[3]     Mr. Nagle is with Wight Construction, the second general contractor on the Project.

F.    **Valuation**

The value of property will be the least of the following amounts:

1.  The actual cash value of that property:

2.  The cost of reasonably restoring that property to its condition immediately before loss or damage; or

3.  The cost of replacing that property with substantially identical property.

In the event of loss or damage, the value of property will be determined as of the time of loss or damage.

(Policy *[Tab # 4]*, Commercial Inland Marine Conditions, Form CM 00 01 09 04, page 3 of 3; see also Form CM T1 43 08 96, Section E. 4. Valuation.)

One Place's public adjuster, Craig Becker, considers himself to be an expert on policy coverage for all first party property policies. (Becker Dep. *[Tab # 89]*, pp. 38-39.) He opines that the language is unambiguous and concedes "that property" refers to the damaged property.  (Becker Dep. *[Tab # 89]*, p. 63.)

12.    The Policy also provides Additional Coverage for "Expediting Costs and Additional Cost of Construction Materials and Labor", with the most that Travelers will pay under this Additional Coverage being $100,000.  In particular, the Policy states:

(1)  We will pay for the following costs made necessary by a Covered Cause of Loss to Covered Property at the "job site":

(a) Your costs to expedite repair of Covered Property;

(b) Your increased costs of construction materials and labor.

(Policy *[Tab # 4]*, Form CM T 1 43 08 96, Section A.5.h., page 5 of 18.)

Mr. Becker opines that the language is unambiguous and concedes "increased costs of construction materials and labor" refers to the increased costs to complete the project.  (Becker Dep. *[Tab # 89]*, p. 73.)

13.    The Policy also provides Additional Coverage for "Expense to Reduce 'Amount of Loss'":

4

> We will pay the necessary expense you incur during the "post-loss period of construction" if you would not have incurred such expense had there not been "loss" to Covered Property from any of the Covered Causes of Loss which delayed the completion of the "project" beyond the "planned completion date". But we will not pay more for your expense than the amount by which such expense reduces the "amount of loss" we would have otherwise paid.

(Policy *[Tab # 4]*, Form CM T1 43 08 96, Section A.5.k, page 6 of 18.)

Under the Policy, "'Amount of Loss' means the sum of your actual 'soft costs' and 'rental value', as covered by this policy." (Policy *[Tab # 4]*, Form CM T1 43 08 96, Section A.5.k, page 6 of 18.)

Mr. Becker opines that the expense to reduce "amount of loss" provision is unambiguous. (Becker Dep. *[Tab # 89]*, p. 75.)

14. The Policy also provides:

2. We will not pay for "loss" caused by or resulting from any of the following:

   a. Delay, loss of use or loss of market.

(Policy *[Tab # 4]*, Form CM T1 43 08 96, Section B.2.a., page 7 of 18.)

Mr. Becker opines that this exclusion is unambiguous. (Becker Dep. *[Tab # 89]*, p. 75.)

15. The Policy provides coverage for "Soft Costs" and "Rental Value."

   a. "Soft Costs"

   > We will pay your "soft costs" during the "period of delay in completion". Such "soft costs" must result from "loss" to Covered Property from any of the Covered Causes of Loss which delays the completion of the "project" beyond the "planned completion date".

   b. "Rental Value"

   > We will pay the amount by which your "rental value" is actually reduced during the "period of delay in completion". Such reduction in "rental value" must result from "loss" to Covered Property form any of the Covered Causes of Loss which delays

the completion of the "project" beyond the "planned completion date".

(Policy *[Tab # 4]*, Form CM T1 43 08 96, Section B.2.a., page 7 of 18.)

16. The Policy contains the following Definitions:

    25. "Rental value" means the sum of:

        a. The total rental income from the tenant occupancy of the completed "project", as furnished and equipped by you;

        b. The amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be your obligations; and

        c. The fair rental value of any portion of the completed "project" which would have been occupied by you.

    28. "Soft cost" means your actual and necessary business costs in excess of your budgeted amount for the "project" consisting only of the type shown in the Declarations."

(Policy *[Tab # 4]*, Form CMT 1 43 08 96, Section F.25 and F.28, page 16 of 18.)

17. Soft Costs in Declarations are as follows:

    a. Interest on money borrowed to finance construction

    b. Advertising expenses

    c. Realty Taxes and other assessments

    d. Costs resulting from the renegotiation of your lease(s) or construction loans

(Policy *[Tab # 4]*, Form CMT 1 43 08 96, Section A.3, page 1 of 18.)

Mr. Becker agrees that, if there is a delay in completion on the project, the only four types of soft costs that the Policy covers are the four listed. (Becker Dep. *[Tab # 89]*, p. 69.)

18. One Place and Travelers have agreed that the amount of "soft costs" and rental value" is $10,254.10 per day. (Becker Dep. *[Tab # 89]*, pp. 85-86.) Included in that total are the increased costs of interest on money borrowed to finance the construction loans for the Project from Republic Bank, Chicago Community Bank and C

& K Partnership. (One Place's Revised Supplement Answers to Travelers Interrogatories *[Tab # 7]*, attachment G.)

### The Foundation And The Earth Retention System

19.     The foundation for the building included drilled shafts or piers, known as caissons. (Larry Goldman[4] Dep. *[Tab # 91]*, pp. 68-69; Robert Lukas[5] Dep. *[Tab # 94]*, pp. 33-35.) The caissons supported the load of the building. The caisson foundation consisted of over 90 concrete columns constructed in cylindrical shafts excavated under the proposed structural column locations. (Lukas Dep. *[Tab # 94]*, pp. 33-35.)

20.     Construction also included concrete foundation walls that only go to frost depth of approximately 42 inches (as opposed to a full basement wall, which was 20 plus feet deep). These are referred to as frost walls. The frost walls sit on top of the caisson caps, which are also made of concrete. (Nagle Dep. *[Tab # 95]*, pp. 149-151; see Shane Farr[6] Dep. *[Tab # 90]*, pp. 30-31; Dep. Ex. 171 *[Tab # 8]*, photos A and B showing frost wall on west side, photos C, D and E showing frost wall on top part of photo and top of earth retention system sheet piling on the bottom part of photo.)

21.     Construction also included the installation of an earth retention system by contractor Hayward Baker to enable the excavation for the basement and below-grade structures. (Farr Dep. *[Tab # 90]*, p. 16.) The earth retention system consisted of steel sheet piling that was driven partially into the ground and held back the soil on the perimeter of the Project. Soil is located on both sides of the sheet piling walls. (Goldman Dep. *[Tab # 91]*, p. 77; Dep. Ex. 64 *[Tab # 17]*, Earth Retention Plan Drawing,

---

[4]  Mr. Goldman was with Levine Construction, the first general contractor on the Project.

[5]  Mr. Lukas is an expert retained by One Place.

[6]  Mr. Farr is with Hayward Baker, the company that designed and installed the earth retention system.

ERS-1, dated 11/27/2006; Farr Dep. *[Tab # 90]*, pp. 50-55; Dep. Exs. 176 *[Tab # 18]* and 177 *[Tab # 19]*, Drawings ERS-2 and ERS-3, Earth Retention Section and Details.) These sheet pile walls were installed on the south side, east side and west side of the Project. On the south side, the sheet piling was braced by circular steel pipes, referred to as rakers, which were connected to the sheet piling on one end and into a concrete grade beam on the other end. (Farr Dep. *[Tab # 90]*, pp. 16-20; Goldman Dep. *[Tab # 91]*, pp. 73-78, 82, 179; Dep. Ex. 64 *[Tab # 17]*; Dep. Exs. 97 *[Tab # 9]* and 98 *[Tab # 10]*, photos of the sheet piling on the west side, including certain rakers.)

### Earth Retention System Issues And Repairs

22. On February 26, 2007, Levine Construction, the general contractor at the time, observed that sheeting along the west side of the Project had moved significantly to the east. This movement was along grid line C.5 on the design drawings, which runs north to south along the west side of the Project. Grid line C.5 is a few feet east of grid line D; accordingly, some witnesses and documents refer to the sheeting as the D Line sheeting. (Goldman Dep. *[Tab # 91]*, pp. 174-181; Dep. Ex. 64 *[Tab # 17]*, Earth Retention Plan Diagram, with Goldman drawing arrows to the location of the sheeting that moved as well as the D Line caissons; Dep. Ex. 96 *[Tab # 22]*, Daily Construction Report; Dep. Ex. 97 *[Tab # 9]*, photo of sheeting taken on February 27, 2007; Dep. Ex. 98 *[Tab # 10]*, photo of the retaining wall; Farr Dep. *[Tab # 90]*, pp. 33-37.)

23. Levine notified One Place, Hayward Baker and others about the movement of the sheeting on the west side of the Project. (Goldman Dep. *[Tab # 91]*, pp. 187-188; Dep. Ex. 99 *[Tab # 23]*, Levine letter dated February 28, 2007; Farr Dep. *[Tab # 90]*, pp. 34-35; Dep. Ex. 173 *[Tab # 26]*.)

24.     A Stop Work Order on the Project was issued on March 8, 2007. (Goldman Dep. *[Tab # 91]*, pp. 205-207; Dep. Ex. 104 *[Tab # 25]*.)  Safety concerns about a large construction crane in the vicinity of the earth retention system precipitated the shut down.  (Goldman Dep. *[Tab # 91]*, pp. 206-208.)

25.     The sheeting movement along the west side was investigated and a revision to the earth retention system, which involved bracing the sheeting along the west side, was designed and approved.  (Farr Dep. *[Tab # 90]*, p. 46.)

26.     The sheet piling itself was never removed or replaced.  The following was done to brace or reinforce the sheeting on the west side:

   a. Steel H-piles were driven on the inside (east) of the sheeting;

   b. To the extent there were gaps between the edges of the H-piles and sheeting, shims (steel plates) were welded to bridge the gap;

   c. A horizontal steel beam called a whaler was installed on top of the H-piles and sheeting to tie the two together;

   d. Concrete grade beams were installed at Columns 12, 13, 14 and 15;

   e. Five new rakers were installed, which went from the whaler on one end to the concrete grade beams on the other; and

   f. Certain soil excavation to create room for equipment and certain backfilling (placing soil into a hole that is dug).

(Goldman Dep. *[Tab # 91]*, pp. 192-200; Dep. Ex. 102 *[Tab # 24]*; Dep. Ex. 103 *[Tab # 20]*, drawing of the redesign, with items listed above circled and labeled by Goldman;  Farr Dep. *[Tab # 90]*, pp. 46-59; see also photo dated April 16, 2007, showing completed work, ONEPLACE022340 *[Tab # 11]*.)

27.     Hayward Baker prepared the new design and installed the H-piles, whalers and rakers.  Budron handled the excavation and backfilling.  Sherry K did the

concrete work. The H-piles, rakers and whalers were in stock in the sizes needed for the project. (Nagle Dep. *[Tab # 95]*, pp. 200-204; Farr Dep. *[Tab # 90]*, pp. 49-50.) Concretes Structures did no work in connection with repairing or restoring the earth retention system. (Neo Lorenzo[7] Dep. *[Tab # 93]*, p. 69.)

28.     The total cost for this work was $263,259.04, as follows: Hayward Baker - $189,359; Sherry K - $46,620.73; Budron - $27,279.31. (Farr Dep. *[Tab # 90]*, pp. 64-65; Dep. Ex. 185 *[Tab # 38]* and 186 *[Tab # 39]*; Dep. Ex. 246 *[Tab # 42]*, Levine Change Order 6 – Budron; Sherry K Invoice, Travelers 14531 *[Tab # 44]*.) Travelers has paid these costs, as well as certain costs to expedite the repair of the damaged property. Travelers has also paid for costs incurred by One Place to investigate the scope of damage and determine the necessary repair.

29.     Construction activities to reinforce the sheeting were completed by April 13, 2007. (Plaintiffs' Answers To Travelers' Interrogatory No. 4 *[Tab # 5]*; Goldman Dep. *[Tab # 91]*, p. 217; Dep. Ex. 111 *[Tab # 35]*.)

30.     The Stop Work Order was lifted on April 13, 2007, and construction on the Project resumed on Monday, April 16, 2007. (Goldman Dep. *[Tab # 91]*, p. 217; Dep. Ex. 111 *[Tab # 35]*.)

### West Side (D Line) Frost Wall And Caisson Issues And Repairs

31.     In late February and early March 2007, concerns were raised by Concrete Structures about the fact that soils under the frost walls and caisson caps along the D Line were undermined, i.e., had moved away from concrete creating voids. (Goldman Dep. *[Tab # 91]*, pp. 187-192; Dep. Exs. 99 *[Tab # 33]*, 100 *[Tab # 34]* and 101 *[Tab # 12]*; Lorenzo Dep. *[Tab # 93]*, pp. 61-68.) Charlie Shenk, who was the project

---

[7]   Mr. Lorenzo is with Concrete Structures.

manager for One Place, also raised these concerns. (Shenk Dep. *[Tab # 97]*, pp. 73-76; Dep., Exs. 94 *[Tab # 32]* and 171 *[Tab # 8]*: noting concern about the fact that due to the movement of the sheeting on the west side, the soil settled away from the bottom of the frost beams.) Apparently, there was no follow up regarding the frost walls and caisson caps at that time.

32.     In late July 2007, it was discovered that the frost wall on the west side along the D Line (between columns 11-14) had moved or shifted, along with the possibility that the tops of the caissons (the caisson caps) had moved as well. (Nagle Dep. *[Tab # 95]*, pp. 149-156; Dep. Ex. 237 *[Tab # 40]*; Dep. Ex. 238 *[Tab # 41]*; Lorenzo Dep. *[Tab # 93]*, pp. 105-107; Dep. Ex. 156 *[Tab # 36]*; Shenk Dep. *[Tab # 97]*, pp. 78-79; Dep. Ex. 312 *[Tab # 43]*.)

33.     An investigation was conducted, and it was determined that the frost wall and caisson caps moved or shifted at approximately the same time as the earth retention system sheet piling on the west side had moved. In other words, it was clear that the D Line frost wall and caisson issues occurred because of the movement of the sheeting on the west side. (Shenk Dep. *[Tab # 97]*, pp. 81-82.)

34.     No stop work order was issued in connection with the repairs to the D Line frost wall and caissons. Other work on the project continued throughout the repair period. (Nagle Dep. *[Tab # 95]*, pp. 153, 159.)

35.     A repair to the D Line frost wall and caisson caps was designed and approved. The following was done in connection with the repairs:

a.  Backfilling of soil between the C and D lines;

b.  The frost wall and caisson caps were demolished;

c.  New concrete grade beams were formed;

d. A new frost wall was poured; and

e. Certain areas were backfilled with soil.

(Nagle Dep. *[Tab # 95]*, pp. 160-172; Dep. Ex. 241 *[Tab # 16]*, drawing with repairs highlighted and labeled by Nagle; Dep. Exs. 242 *[Tab # 13]*, 243 *[Tab # 14]* and 244 *[Tab # 15]*, photos of the repair; Dep. Ex. 158 *[Tab # 21];* Lorenzo Dep. *[Tab # 93]*, pp. 108-113; Dep. Ex. 159 *[Tab # 37]*.)

36. Cobra Concrete demolished the frost wall. Budron did backfilling and some demolition. Concrete Structures formed and poured the new grade beams and frost wall. (Lorenzo Dep. *[Tab # 93]*, pp. 108-113.) D-Three provided carpentry work. Toltec Services provided some steel rebar for the grade beams. Allied Waste provided dumpsters.

37. Total costs for this work was $208,038.65 as follows: Cobra Concrete – $4,332; Budron – $11,919.77; Concrete Structures – $133,635.70; D-Three – $32,521.09; Toltec – $22,673; Allied Waste – $2,957.08. Travelers has paid these costs, as well as certain costs to expedite the repair of the damaged property. Travelers has also paid for costs incurred by One Place to investigate the scope of damage and determine the necessary repair.

38. Construction activities relating to this repair were completed by August 18, 2007. (Plaintiffs' Answers To Travelers' Interrogatory No. 8 *[Tab # 5]*.)

**One Place's Claim: Overview**

39. One Place's claim is reflected in the April 29, 2013 expert report of Craig Becker, One Place's public adjuster. These same claim numbers are also contained in One Place's Revised Supplemental Answers to Travelers Interrogatories. Certain purported losses are also contained in the April 2013 expert report of Mark Robinson.

12

One Place is not paying Mr. Becker by the hour.  Instead, Mr. Becker's public adjusting firm will be paid 10% of any recovery, with Mr. Becker personally receiving 3.5% of the 10% as a commission.  (Becker Dep. *[Tab # 89]*, pp. 10-13.)

40.    As set forth in the Becker Report and Revised Supplemental Answers, One Place claims the "total amount of loss covered under the Policy for loss or damage" is $5,879,062.80.  (Becker Report, Dep. Ex. 355 *[Tab # 29]*.)  Of this amount, One Place allocates $983,308.54 to the earth retention system, $631,483.84 to the D Line frost wall and caissons and the remaining amount of $4,264,270.42 cannot be further allocated.  One Place also categorizes $1,474,340.50 of the $5,879,062.80 as "Expenses to Reduce Amount Of Loss."  (*Id.*)  Mr. Becker groups these particular costs into "Winter Conditions", "Acceleration" and "Period of Delay Costs Incurred to Reduce Loss."  (*Id.*)  One Place also seeks to recover soft costs and rental value of $10,254.10 per day, with a delay in completion of 178 days for a total soft cost and rental value claim of $2,027,058.40.  One Place also seeks to recover $346,278 for additional soft costs for fees in renegotiating loans.

41.    Based on the report of Mark Robinson, another One Place expert, One Place also seeks to recover "Economic Losses Associated with Condo Sales" of $2,450,495" and "Excess Financing on Claim Amount" of (depending on the period of delay) $1,173,667 (118 days), $1,295,853 (178 days) or $1,350,782 (8 months).  (Dep. Ex. 354 *[Tab # 30]*.)

**General Conditions**

42.     As part of the $5.8 million claim, One Place seeks to recover $1,564,031 in General Conditions.  (Becker Report, Exhibit A, Dep. Ex. 355 *[Tab # 29]*; Becker Dep. *[Tab # 89]*, pp. 88-96.)

43.     General Conditions are out-of-pocket expenses the general contractor incurs on the job.  (Harlan Karp[8] Dep. *[Tab # 92]*, pp. 119-120.)  They are for costs that are not attributable to the construction in place, i.e., payments for things that do not end up being a built item.  (Shenk Dep. *[Tab # 97]*, p. 109.)  On the One Place Project, these included a number of types of costs, including street cleaning, general cleaning, dumpsters, reproductions and copies, photos, postage and mail, small tools, portable toilets, field office and supplies.  (Shenk Dep. *[Tab # 97]*, pp. 109-110; Dep. Exs. 318 *[Tab # 45]* and 319 *[Tab # 46]*.)

44.     Mr. Becker, in his report, refers to the Wight Contract and four (4) contractor draws in support of the amount claimed for General Conditions.  (Becker Report, Exhibit A, Dep. Ex. 355 *[Tab # 29]*; Dep. Exs. 362-366 *[Tab # 47-51]*.) However, based on the documents, it appears that the total general conditions on the entire project were approximately $2.6 million.  Mr. Becker, at his deposition, admitted that he was unable to determine how the $1,564,031 amount was calculated or on what it was based.  (Becker Dep. *[Tab # 89]*, pp. 88-96.)  Mr. Becker promised to attempt to make that determination and provide that information to Travelers through counsel for One Place. (Becker Dep. *[Tab # 89]*, p. 152.)  The information was never provided.

45.     Prior to the Becker Report, One Place's claim for General Conditions was $1,120,280.     (Plaintiffs' Supplemental Answers To Defendant's First Set of

---

[8]  Mr. Karp is one of the owners and developers of the Project.

Interrogatories, attachments H and I; Dep. Ex. 255 *[Tab # 6]*.)  One Place calculated this based on a daily amount for general conditions and multiplying that by the number of days One Place contended the project was delayed by the earth retention and D Line frost wall damage to arrive at a total.  (Karp Dep. *[Tab # 92]*, pp. 127-128; Becker Dep. *[Tab # 89]*, pp. 90-91.)

**Construction Management**

46.     As part of the $5.8 million claim, One Place seeks to recover $238,602.12 for "Construction Management."  Mr. Becker calculates the amount by taking 5% of his "invoices sub-total" of $4,772,042.33 contained in his report.  (Becker Dep. *[Tab # 89]*, p. 96.)

47.     The 5% is based on an April 2, 2007 agreement between One Place Condominiums, LLC and The South Loop Shops, LLC (referred to as the "Owner") and Southblock Development, LLC (referred to as the "Manager.")  In the agreement, the Owner promises to pay the Manager a fee of 5% of the additional construction costs for services relating to the damage to the property.  (Becker Dep. *[Tab # 89]*, pp. 96-98; Dep. Ex. 367 *[Tab # 52]*.)

48.     As to the Owners, Harlan Karp has an ownership interest in One Place. Linda Karp (Harlan's step mother), and Roselyn Chertow (the husband of Wayne Chertow, who started the business with Harlan's father, Jerry Karp), via C & K Partnership, have the remainder of the ownership interests in One Place and South Loop.  As to the Manager, Harlan Karp owns 50% and Wayne Chertow owns 50%. (Karp. Dep. *[Tab # 92]*, pp. 9-11.)  The Owners have never paid the 5% to the Manager. (Karp Dep. *[Tab # 92]*, pp. 138-139.)

**Overhead and Profit**

49.     As part of the $5.8 million claim, One Place seeks to recover $715,806.35 in overhead and profit.  (Becker Report, Exhibit A *[Tab # 29]*.)  Mr. Becker calculates the overhead and profit by taking 15% of the "Invoices Sub-Total" of $4,772,042.33 in his report.  (Becker Dep. *[Tab # 89]*, p. 89.)  Mr. Becker refers to the Wight Contract as support.  (Becker Report, Dep. Ex. 355 *[Tab # 29]*.)

50.     One Place did not pay overhead and profit to Levine in connection with the work that was done to restore and reinforce the earth retention system.  (Inguagiato Affidavit *[Tab # 53]*, ¶ 4.)  Further, there is no evidence that One Place paid overhead and profit to Wight for any work it did on the Project, including work to repair the D Line frost wall and caissons.  (Inguagiato Affidavit *[Tab # 53]*, ¶ 5.)

**Project Management**

51.     As part of the $5.8 million claim, One Place seeks to recover $120,000 for "Project Management."  Mr. Becker bases this on a contract for $15,000 per month and multiplies that by 8 months, which is the amount One Place contends the project was delayed by the earth retention system and D line frost wall damage.  (Becker Dep. *[Tab # 89]*, pp. 98-99.)  In other words, One Place contends that because of the delay on the Project, it had to incur the $120,000. (Becker Dep. *[Tab # 89]*, p. 101.)

**Extra Insurance**

52.     As part of the $5.8 million claim, One Place seeks to recover $32,612 for "Extra Insurance."  (Becker Report, Dep. Ex. 355 *[Tab # 29]*.)  Mr. Becker states that this is the insurance costs One Place incurred because of the delay on the Project due

to the earth retention system and D Line frost wall damage.  (Becker Dep. *[Tab # 89]*, pp. 100-101.)

**Permit Extensions**

53.     As part of the $5.8 million claim, One Place seeks to recover $90,476 for "Permit Extensions".  (Becker Report, Dep. Ex. 355 *[Tab # 29]*.)  Mr. Becker states that these were extensions required by the City of Chicago because the Project was delayed by the earth retention system and D Line frost wall damage.  (Becker Dep. *[Tab # 89]*, pp. 121-122.)

**CTA Flaggers**

54.     As part of the $5.8 million claim, One Place seeks to recover $218,031 for "Additional Flaggers".  (Becker Report, Dep. Ex. 355 *[Tab # 29]*.)

55.     Since a CTA elevated line was directly to the east of the Project, the City of Chicago required flaggers to be present during construction to signal trains to slow down.  (Goldman Dep. *[Tab # 91]*, pp. 245-246; Karp Dep. *[Tab # 92]*, pp. 120-121.) Since the Project was shutdown, there were no CTA flaggers present during the time period in which the earth retention system was being restored and reinforced. (Goldman Dep. *[Tab # 91]*, p. 246; Dep. Ex. 128 *[Tab # 54]*.)  The Project was never shut down during the time period in which the D Line frost wall and caissons were being repaired; there was other work on the Project going on at the same time.  (Nagle Dep. *[Tab # 95]*, pp. 153, 159.)

**Certain Concrete Structures Change Orders and Claims**

56.     As part of the $5.8 million claim, One Places seeks to recover for certain Concrete Structures change orders and claims.

17

57.     One Place seeks to recover $412,876.  (Becker Report, Dep. Ex. 355 *[Tab # 29]*.)  The supporting document is Concrete Structures Change Order CSM-010 dated June 2007.  (Dep. Exs. 144 *[Tab # 56]*, 145 *[Tab # 57]*; see also Dep. Ex. 370 *[Tab # 66]*; see also Dep. Ex. 119 *[Tab # 55]*, proposed change order with supporting documents for line items.)   The title of the Change Order is Earth Retention Delay.  These are Concrete Structure's costs related to the temporary shut down and delay on the project due to the earth retention system issues.  (Lorenzo Dep. *[Tab # 93]*, pp. 74-76.)

58.     Items that are part of the One Place claim are line items 1 through 8: (1) additional formwork rental; (2) tower crane foundation monitoring; (3) additional concrete work at rakers; (4) direct impact of rakers on 1st floor shoring; (5) direct impact of rakers on foundation work; (6) labor escalation; (7) winter conditions allowance and (8) general conditions during work stoppage and remobilization period.  (Lorenzo Dep. *[Tab # 93]*, pp. 73-85; Dep. Exs. 144 *[Tab # 56]* and 145 *[Tab # 57]*.)  Mr. Lorenzo of Concrete Structures testified as to each line item.  (Lorenzo Dep. *[Tab # 93]*, pp. 76-82.) The first item is Concrete Structures' cost to rent fabricated panels during the temporary shutdown, even though they were not being used.  The second item is for labor costs to monitor the crane.   The third item is for costs to reorder certain material, and also included labor costs.  The fourth and fifth items are for labor and material. The sixth item is for an increase in labor prices.  The sixth item is for labor and material.  The seventh item is for general conditions, which included labor and some equipment.

59.     One Place seeks to recover $253,722 for another Concrete Structures change order. (Becker Report, Exhibit A *[Tab # 29]*.)   The supporting document is

Concrete Structures Proposed Change Order No. 4.1, dated October 2017. (Lorenzo Dep. *[Tab # 93]*, pp. 114-118, 121-128; Dep. Exs. 160 *[Tab # 60]*, 161 *[Tab # 61]*.) One Place is seeking to recover only $253,722 of the amounts set forth in the line items. The title of the Change Order is Impact Costs from Caisson D. These are Concrete Structures' impact costs due to the delay in the Project because of the D Line frost wall issues. (Lorenzo Dep. *[Tab # 93]*, pp. 117-119.)

60. The items which are part of claim are (1) extended general conditions; (2) loss of productivity; (3) additional formwork and equipment rental; (4) additional crane charges during authorized OT and Extra Work; (5) Material Escalation and (6) Winter Conditions. *Id.* Mr. Lorenzo testified about each of these items. (Lorenzo Dep. *[Tab # 93]*, pp. 122-125; Dep. Exs. 160 *[Tab # 60]*, 161 *[Tab # 61]*.) The first item is for extended general conditions and includes labor and material. The second item is a labor cost which was incurred because Concrete Structures had to do work out of sequence. The amount is based on a "lost labor productivity" calculation. (See Dep. Ex. 160 *[Tab # 60]*, attachment F.) The third item is for rental costs, but Mr. Lorezno states it also includes labor costs. The fourth item is a rental costs. The fifth item is a material escalation cost. The sixth item is material and labor.

61. One Place seeks to recover $29,490 for another Concrete Structures change order. (Becker Report, Exhibit A *[Tab # 29]*.) The support document is Concrete Structures Change Order No. 3, item 6. (Shenk Dep. *[Tab # 97]*, pp. 96-100; Dep. Exs. 153 *[Tab # 58]*, 154 *[Tab # 59]*.) The claim is for delay impact costs due to raker interference based on 6 working days. (*Id.*) These are extended general conditions, and include both labor and material costs. (Lorenzo Dep. *[Tab # 93]*, pp. 99-

100, see also Dep. Exs. 154 *[Tab # 59]*, page 2, with extended general conditions calculation.)

62.     One Place seeks to recover $769,132 for another Concrete Structures claim.  (Becker Report, Exhibit A *[Tab # 29]*.)  The supporting documentation is CSM's delay claim of $1,428,373, of which One Place seeks to recover $769,132.  (Dep. Ex. 368 *[Tab # 64]*; Dep. Ex. 167 *[Tab # 62]*, CSM delay claim, with all attachments to same.)  Categories of costs in the delay claim are:  (a) general conditions escalation; (b) labor escalation; (c) material escalation; (d) equipment escalation; (d) City and County Sales Tax Increases; (e) insurance escalation; and (f) winter conditions escalation. (See Dep. Ex. 368 *[Tab # 64],* page OP-GM/AI001889; Dep. Ex. 167 *[Tab # 62],* attachments B through H for back up; Lorenzo Dep. *[Tab # 93]*, pp. 136-150.)

63.     Concrete Structures $1,428,373 claim relates only to impact costs due to 52 working days of weather delays on the Project.  As testified to by Mr. Lorenzo, the impact costs due to the earth retention system and D Line caisson delays had already been approved and paid by One Place to Concrete Structures.  Accordingly, those impact costs were subtracted to arrive at the claim of $1,428,373.  (Lorenzo Dep. *[Tab # 93]*, pp. 136-150.)

64.     Concrete Structures sued One Place to recover $1,739,862.24, which included the $1,428,373.  (Dep. Ex. 168 *[Tab # 63]*, Answer To Second Amended Complaint filed in Concrete Structures lawsuit, ¶¶ 20, 49-59.)  One Place did not pay any of the $1,428,373 and denied it owed any of the money.  (Dep. Ex. 168 *[Tab # 64]*, Answer to ¶¶ 78-88.)

65.     Concrete Structures and One Place settled their lawsuit, ▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌   ▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌.

**Costs for Attempts to Accelerate the Schedule**

66.     One Place seeks to recover $260,377.60 for costs it claims it incurred to attempt to accelerate the construction schedule, that is, make up for any delay to the overall completion of the project due to the earth retention system and D Line frost wall damage and repairs.   (Becker Report *[Tab # 29]*, see Exhibit B to the report, "Acceleration")

67.     The Becker Report lists seven subcontractors, including Concrete Structures, Universal Construction Testing, Bonus Electric and D-Three, as well as invoice amounts, and a reference to back up documentation.  In general, the amounts relate to weekend, premium and overtime work done by these subcontractors.

68.     There is no evidence that these costs accelerated the overall schedule, that is, shortened the overall completion date of the project.  Jim Nagle of Wight, the general contractor at the time these costs were incurred, concluded that Concrete Structures overtime work did not, in fact, improve the schedule at all.  (Nagle Dep. *[Tab # 95]*, pp. 80-85; Dep. Ex. 209 *[Tab # 67]*.)   After consultation with One Place, Wight suspended all overtime work by Concrete Structures.  *(Id.)*

69.     Travelers' expert, Held Enloe, has concluded that because of other delays on the project, including later than planned installations of the exterior envelope, acceleration work did not mitigate the overall delay to the Substantial Completion date

of the project. (Held Enloe Report *[Tab # 31]*, pp. 2, 21-30, regarding Other Events Causing Delay to the Project, including an analysis of the exterior masonry and window delays.)

### Certain Costs Incurred After August 2007

70.     As part of the $5.8 million claim, One Place seeks to recover certain costs which were incurred after the restoration and repair of both the earth retention system and D Line frost wall and caissons. The earth retention system restoration was completed by April 13, 2007 and the D Line frost wall and caissons on August 18, 2007. Many of the claimed costs already listed in this Statement were, in fact, incurred after August 2007. (See, e.g., General Conditions, Permit Extensions, Acceleration Costs.) With one exception, the purported costs listed below are those which have not been previously addressed in this Statement.

71.     The first group of these claimed costs is set forth as "Winter Conditions" on Exhibit B of the Becker Report. (Becker Report *[Tab # 29]*.) The amount totals $110,629.07 and Mr. Becker lists invoices from Crouch-Seranko, D-Three, RKD, R & J Construction, Rankin, Ashland Propane, Home Depot and Wight. The line items are for the following:

a.  Crouch-Seranko

1.  $67,779: Pricing for enclosure of the hydro scaffolding for winter protection (Dep. Ex. 252 *[Tab # 68]*; Nagle Dep. *[Tab # 95]*, pp. 190-191)

2.  $ 4,518: Costs for propane gas, January and February 2008 (Dep. Ex. 253 *[Tab # 69]*; Nagle Dep. *[Tab # 95]*, p. 191)

b.  D-Three

1.  $10,410: Labor costs for carpentry work during December 2007 and January 2008. (OP-GM/AI 432-436 *[Tab # 70]*.)

    c.  RKD

        1.  $1,033.87:  Invoices for materials; part of Wight General Conditions

        2.  $1,672:  Invoices for materials;  part of Wight General Conditions

        3.  $2,436:  Invoices for materials; part of Wight General Conditions

        (OP-GM/AI 480, 2063-2065, 2066-2071 *[Tab # 71]*.)

    d.  R & J

        1.  $1,760:  Propane and heaters; part of Wight General Conditions

        2.  $1,983:  Propane and heaters; part of Wight General Conditions

        (OP-GM/AI 2072-2077, 2082-2091 *[Tab # 72]*.)

    e.  Rankin

        1.  $1,696:  Rental of heaters from 2/21/09 to 3/19/08  (OP-GM/AI 2078-2079 *[Tab # 73]*.)

    f.  Ashland Propane

        1.  $85:  Propane, April 2008  (OP-GM/AI 2080-2081 *[Tab # 74]*.)

    g.  Home Depot

        1.  $1,789:   Receipts for purchases of materials   (Travelers 14827-14834 *[Tab # 75]*.)

    h.  Wight

        1.  $15,447:  Costs submitted as part of the Wight General Conditions, and include costs from Home Depot, R & J, RKD, Ashland and Rankin (Travelers014835-14863 *[Tab # 76]*.)

72.    One Place describes these "Winter Conditions" as follows:

    Certain concrete, masonry and subsequent mechanical, electrical, plumbing and elevator work which was weather sensitive per the original schedule was scheduled to be completed prior to the onset of the 2007/2008 winter or be performed in a fully enclosed, weather protected structure.  The loss resulted in lost construction days, delays in construction, work-arounds on site to accommodate loss related repairs and other schedule impacting construction

inefficiencies directly attributable to the loss, all of which caused some of these construction activities to be performed in the following winter. If the loss had not occurred, these activities would have been performed before the onset of winter. As a result, additional unanticipated costs were incurred to provide protection from the elements so that work could continue.

(Revised Supplemental Answer To Interrogatory No. 16 *[Tab # 7]*.)

73. The second group of these claimed costs are set forth as "Period of Delay Costs Incurred to Reduce Loss" on Exhibit B of the Becker Report. (Becker Report, Dep. Ex. 355 *[Tab # 29]*.) Mr. Becker lists three items submitted by Concrete Structures and one by Nadolna Brothers. The line items are for the following:

a. Concrete Structures

   1. $225,000: The backup is the same as $769,132 claim made for impact costs due to weather delays as noted above. (Dep. Ex. 368 *[Tab # 64]*.)

   2. $5,994.91: Change order from May 2008 for snow removal done in February 2008 and to pour concrete in April 2008 to allow chiller units on roof to be placed ahead of schedule (OP-GM/AI 1894-1905 *[Tab # 77]*.)

   3. $22,958: Change order from July 2008 for March and April 2008 work to hoist scaffolding and materials for Crouch-Seranko. (OP-GM/AI 1906-1931 *[Tab # 78]*.)

b. Nadolna

   1. $59,533: December 2008 letter from Nadolna stating that per original schedule they were to be done in May 2008, but, due to delays, they worked longer. Nadolna quantifies labor hours from June 4, 2008 to the end of November 2008. (OP/GMAI 2186-2190 *[Tab # 79]*.)

74. One Place describes these "Period of Delay Costs" as follows:

. . . the lost construction days, delays in construction, work-arounds on site to accommodate the loss related repairs and other schedule impacting construction inefficiencies directly attributable to the loss caused inefficiencies which resulted in the insured incurring significant additional costs in contact labor. . . [the costs are] primarily from the concrete and plumbing sub-contractors for

increased period of construction costs as a result of the covered loss."

(Revised Supplemental Answer to Interrogatory No. 16 *[Tab # 7]*.)

75. The third group of these claimed costs are listed in different sections in Exhibit A of the Becker Report.

   a. Crouch-Seranko: $7,790. Added costs for labor escalation as of 6/1/08 (OP-GM/AI 2003-2008 *[Tab # 80]*.)

   b. D-Three:

      1. $45,442: Carpentry work; labor costs. Interior winter protection. December 2007 and January 2008 (OP-GM/AI 437-467 *[Tab # 81]*.)

      2. $47,370: Carpentry work; labor costs. Interior winter protection. January and February 2008 (OP-GM/AI 2011-2034 *[Tab # 82]*.)

      3. $38,679: Carpentry work, labor costs. Interior winter protection. February and March 2008. (OP-GM/AI 2035-2050 *[Tab # 83]*.)

      4. $15,010: Carpentry work, labor costs. Interior winter protection. March 2008 (OP-GM/AI 2051-2062 *[Tab # 84]*.)

   c. PES: $18,072: Added costs for labor escalation costs in 2008. (OP-GM/AI 2111-2117 *[Tab # 85]*.)

76. One Place seeks to recover certain costs for "Engineering" and "Testing" (Dep. Ex. 355 *[Tab # 29]*, Becker Report, Exhibit A.)

77. Certain services were provided by Jim Hauk of Wiss Janney Elsner, who provided certain consulting services:

   a. $2,280.20    Services relating to additional monitoring and testing

   b. $350:    Conference call with client. March 12, 2008

   c. $700    Meeting with client and Bob Lukas. February 27, 2008

   (OP-GM/AI 22-23, 1727-1730 *[Tab # 86]*.)

78.    Certain services were provided by Bob Lukas of Geotechnical Consultants, who is One Place's expert witness regarding causation:

    a.  $5,265:         Reviewing files and drafting report.  August 2007

    b.  $1,875:         Conference call and geotechnical calculations.  12/2007

    c.  $2,147          Review of files/meeting at Southblock.  February 2008

    d.  $1,125          Review of Hayward Baker sheet pile calculations.  4/2008

    e.  $750            Sheet pile calculations.  April 2008

    f.  $1,177          Meeting and lawyers office and file review.  May 2008

(OP-GM/AI 25-29, 1737-1743 *[Tab # 87]*.)

79.    Certain services were provided by Professionals Associated:

    a.  $7,040          Monitoring.  September/October 2007

    b.  $6,336          No invoice or back up.  One Place claim chart says 12/07

    c.  $4,224          Monitoring.  December 2007 and January 2008

    d.  $10,560         No invoice; only general conditions sheet.  Scope unclear

    e.  $3,736          Monitoring.  June 2007 (after ERS repair and before D Line) repair)

    f.  $668            Monitoring.  Change order.

    g.  $334            Monitoring.    Change order.

    h.  $704            Services.  April 2008

All of these were for monitoring settlement on the project.

(OP-GM/AI 70-78, 81-84 and 1786-1787 *[Tab # 88]*.)

**Economic Losses On Condominium Sales**

80.　　One Place expert Mark Robinson issued a report in April 2013 which quantified "Economic Losses" on condominium sales, purportedly due to the delay on the project due to the earth retention system and D Line frost wall and caisson issues. (Robinson Report, Dep. Ex. 354 *[Tab # 30]*.) The amount of this purported loss is $2,450,495. (Robinson Report *[Tab # 30]*, p. 19.)

81.　　During 2005 and 2006, One Place was able to obtain sales contracts for the purchase of 81 condominium units, which included escrow deposits. (Robinson Report *[Tab # 30]*, p. 9; Robinson Dep. *[Tab # 96]*, pp. 58-59.) Of these original contracts, approximately 33 of the buyers backed out or defaulted on the contract. (Robinson Report *[Tab # 30]*, Schedule 4, Date Default Letter Received Column.)

82.　　Mr. Robinson states that One Place was unable to close on the contracts in a timely fashion due to the status of the Project, that is, it was not substantially complete. (Robinson Report *[Tab # 30]*, p. 9; Robinson Dep. *[Tab # 96]*, p. 59.) Mr. Robinson assumes that One Place would have closed on the 81 sales contracts, at the price specified, and that these closings would have occurred on June 20, 2008 but for the delays associated with the earth retention system and D Line issues. (Robinson Report *[Tab # 30]*, p. 16; Robinson Dep. *[Tab # 96]*, pp. 59-62.) Mr. Robinson assumes that 15% of the pre-sold contracts would not have closed. (Robinson Report *[Tab # 30]*, p. 15; Robinson Dep. *[Tab # 96]*, pp. 51-54, 63-64.)

83.　　Mr. Robinson states that One Place has suffered "economic damages" in two forms related to the inability to close on these pre-sold contracts. The first is an economic loss based on the reduction in the sales price. Mr. Robinson calculates this

purported loss by taking the sales price in the pre-sold contract for each unit and subtracting the actual sales price the units were eventually sold at. (Robinson Report *[Tab # 30]*, p. 15; Robinson Dep. *[Tab # 96]*, pp. 71-74.) If the price in the pre-sold contract was $350,000, and the unit was later sold for only $200,000, Mr. Robinson calculates the economic loss at $150,000. Mr. Robinson's Economic Loss on Price is $1,812,142. (Robinson Report *[Tab # 30]*, Schedule 1; Robinson Dep. *[Tab # 96]*, p. 71.)

84.     The second form of economic damages related to the purported inability to close on the pre-sold contracts in a timely fashion. Mr. Robinson states this is an economic loss associated with carrying the project financing longer and in a larger amount than had the pre-sold condos closed in a timely fashion and One Place were able to reduce its borrowings. (Robinson Report *[Tab # 30]*, p. 16.) Mr. Robinson also refers to this as "Excess Financing Associated with Condo Sales." (Robinson Report *[Tab # 30]*, Schedule 1.)

85.     Mr. Robinson assumes that One Place would have had a certain amount of money had the pre-sold contracts closed at the contract price and on June 20, 2008. He then assumes that money would have been used on June 20, 2008 to pay down One Place's bank loans, which had an interest rate of 5% (the marginal costs of funds). (Robinson Report *[Tab # 30]*, p. 16 and Schedule 3; Robinson Dep. *[Tab # 96]*, pp. 109-115, using unit 608 as an example and discussing the 5%.) In other words, One Place would have used that money to pay down principal and reduce its financing costs.

86.     Mr. Robinson then calculates the reduction in financing costs One Place actually obtained considering the actual sales price and closing dates, as well as the

28

mitigating effect of escrow deposits One Place retained and rental income on certain units. (Robinson Report *[Tab # 30]*, p. 16, Schedule 4.)

87. Mr. Robinson's economic loss as to financing is the difference between the reduction in financing costs One Place would have obtained less the reduction in financing costs One Place did obtain. (Robinson Report *[Tab # 30]*, p. 16, Schedule 2.) Mr. Robinson's calculation totals $2,342,099.

88. Mr. Robinson takes the economic loss on price, $1,812,142, subtracts the escrow money retained and rental income ($606,817 and $646,849), and adds the excess financing loss of $2,324,099. Mr. Robinson's subtotal is $2,882,935. To take into account the 15% default rate he assumes, he takes 85% of the subtotal, for a total claimed economic loss of $2,450,495. (Robinson Report *[Tab # 30]*, Schedule 1.)

**Excess Debt Costs On Unpaid Claims Amount**

89. Mr. Robinson also claims that One Place incurred economic losses associated with the costs for One Place to finance the total amount allegedly remaining unpaid on the claim. (Robinson Report *[Tab # 30]*, p. 9.) Depending on which One Place period of delay position is accepted, Mr. Robinson's economic loss calculation is $1,173,667 (118 days), $1,295,853 (178 days) and $1,350,782 (8 months). (Robinson Report *[Tab # 30]*, pp. 18-19, Schedule 1.)

90. Mr. Robinson assumes that One Place's claim submission July 14, 2009 should have been paid in full on August 13, 2009. (Robinson Report *[Tab # 30]*, pp. 17-18.) For the amount that he believes remains unpaid, he uses the unpaid claim amounts set forth in Mr. Becker's report, which vary depending on the length of the period of delay in completion as contended by One Place. (Robinson Report *[Tab #*

29

30], p. 17; $5,901,217.51 (118 days); $6,515,571.51 (178 days); $6,791,750.96 (8 months).

91.     Mr. Robinson then takes the amounts remaining unpaid on the claim, factors in the daily financing rate for the construction loans of the Project based on a 5% interest rate, and then takes that by the number of days he contends Travelers is "tardy" in making payment, that is, from August 13, 2009 to May 1, 2013. (Robinson Report *[Tab # 30]*, pp. 18-19; Robinson Dep. *[Tab # 96]*, pp. 115-117.)   In other words, Mr. Robinson assumes that had Travelers paid the remaining amounts in August 2009, One Place would have used that money to pay down the principal on the construction loans to Republic Bank, Chicago Community Bank and C & K Partnership, thereby reducing its interest obligations. Mr. Robinson's economic loss calculation is $1,173,667 (118 days), $1,295,853 (178 days) and $1,350,782 (8 months). (Robinson Report *[Tab # 30]*, pp. 18-19, Schedule 1.)

Dated: August 30 , 2013

                                        Respectfully submitted,

                                        Butler Pappas Weihmuller Katz Craig, LLP

                                         /s/  K. Clark Schirle
                                        K. Clark Schirle
                                        ARDC No. 6199270
                                        cschirle@butlerpappas.com
                                        Jonathan K. Barger
                                        ARDC No. 6277079
                                        jbarger@butlerpappas.com
                                        115 S. LaSalle Street, Suite 3200
                                        Chicago, Illinois 60603
                                        (312) 456-0900
                                        (312) 456-0909 fax

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 30, a copy of the foregoing is being served on all counsel of record identified on the below Service List via Electronic Mail.

Michael Duffy
mduffy@childresslawyers.com
Katherine Smith Dedrick
kdedrick@childresslawyers.com
Childress Duffy, Ltd.
500 North Dearborn Street, Suite 1200
Chicago, Illinois 60654
Attorneys for Plaintiffs

      /s/ K. Clark Schirle
K. Clark Schirle
Jonathan K. Barger
Butler Pappas Weihmuller Katz Craig, LLP
115 South LaSalle Street
Suite 3200
Chicago, IL 60603