# TAB 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ONE PLACE CONDOMINIUM LLC, )
THE SOUTH LOOP SHOPS LLC )
SOUTHBLOCK DEVELOPMENT LLC, )    Case No.
C & K PARTNERSHIP, and )
SOUTHBLOCK MANAGEMENT, INC., )
                                        )
     Plaintiffs, )
                                        )
vs. )
                                        )
TRAVELERS PROPERTY CASUALTY )
COMPANY OF AMERICA, )
                                        )
     Defendant. )
                                        )

## COMPLAINT

Plaintiffs, One Place Condominium LLC, The South Loop Shops LLC, Southblock Development LLC, C & K Partnership, and Southblock Management, Inc. (collectively referred to as "One Place") by its attorney, Katherine Smith Dedrick of Childress Duffy, Ltd., and for their Complaint against Defendant, Travelers Property Casualty Company of America ("Travelers"), state as follows:

## PARTIES

1.    Plaintiffs One Place Condominium LLC, The South Loop Shops LLC, and Southblock Development LLC are each comprised of members who are citizens of Illinois; Plaintiff C & K Partnership is comprised of partners who are citizens of Illinois; and Plaintiff Southblock Management, Inc. is incorporated and has its principle place of business in Illinois.

2.    Plaintiffs are owners, developers, and managers of the property located at 1 E. 8th Street, Chicago, Illinois ("the insured premises").

3.     Defendant Travelers is a citizen of Connecticut as it is incorporated, and has its principle place of business in, Connecticut and is engaged in the business of underwriting and issuing builder's risk insurance policies for certain owners and developers of property.

## JURISDICTION AND VENUE

4.     This court has subject matter jurisdiction over this matter pursuant to Title 28 U.S.C. § 1332(c)(1) because there is complete diversity of citizenship of the parties and the amount in controversy exceeds $75,000.00.

5.     Venue is proper in this court pursuant to Title 28, U.S.C. § 1391, in that a substantial part of the events or omissions giving rise to this action occurred in this judicial district.  In addition, the property that is the subject of this action is situated in this judicial district.

## COUNT I – BREACH OF CONTRACT

6.     Plaintiff realleges paragraphs 1 through 5 of the Complaint as and for paragraph 6 of Count I.

7.     Travelers issued to One Place an "all-risk" builder's risk insurance policy (Policy no.: QT6600203L858TIL06) for the period November 2, 2006 to November 2, 2007 ("the Policy).  Attached as Exhibit "A" is a true and accurate copy of the Policy.

8.     The Policy issued to One Place covers loss or damage to the Covered Property during the construction project from any risks of direct physical accidental loss or damage unless excluded.

9.     The Policy denotes $33 million as its "basic limit of insurance."

10.     The Policy issued to One Place also covers "soft costs" and provides, in part:

"We will pay your 'soft costs' during the 'period of delay in completion'.
Such 'soft costs' must result from 'loss' to Covered Property from any of

2

the Covered Causes of Loss which delays the completion of the 'project' beyond the 'planned completion date'."

11.     The Policy denotes the limit of "soft costs" as $3.3 million.

12.     The Policy also contains a section called "additional coverages," which provides for a number of additional types of insurance coverage to One Place for the project, including coverage for "expediting costs and additional costs of construction materials and labor," as well as "expense to reduce amount of loss."

13.     While the Policy was in full force and effect, the insured premises sustained physical loss or damage of the type insured against.

14.     One Place further experienced "soft costs," "expediting costs and additional costs of construction materials and labor", and "expense to reduce the amount of loss," among other additional damage.

15.     One Place timely reported the covered loss and damage to Travelers.

16.     One Place substantially performed all conditions precedent required by the Policy to be performed by it and complied with the tolling agreement.

17.     As a result, it is Travelers' duty to pay for One Places losses and damages; but, although requested to do so, Travelers has failed and refused and still fails and refuses to pay One Place for all of its losses and damages taking the position, in part, that it owes no more than $2.5 million under the Policy.

18.     As a direct, proximate and foreseeable consequence of Travelers' breach of contract, One Place has sustained loss and damage in excess of $75,000.00 including, but not limited to, increased interest expense, interest rate increase and loan termination fees.

19.     This is an action based on a "written instrument" within the meaning of the Illinois Interest Act and, therefore, One Place is entitled to prejudgment interest.

3

WHEREFORE, Plaintiffs, One Place Condominium LLC, The South Loop Shops LLC, Southblock Development LLC, C & K Partnership, and Southblock Management, Inc., respectfully pray for judgment in their favor and against Defendant, Travelers Property Casualty Company of America, in an amount in excess of $75,000.00, including damages for breach and consequential damages plus prejudgment and post-judgment interest and costs, and for other and further relief this Court deems just and proper.

## COUNT II – SECTION 155 RELIEF

20.     Plaintiff realleges paragraphs 1 through 19 of Count I of the Complaint as and for paragraph 20 of Count II of the Complaint.

21.     As of the time of loss in question, Travelers internal claim policies, practices, and procedures included compliance with the regulations promulgated by the Illinois Director of Insurance within section 919 of Illinois Administrative code as well as compliance with sections 154.5 and 154.6 of the Illinois Insurance Code.

22.     One Place is entitled to an award of taxable costs under section 155 of the Illinois Insurance Code (215 ILCS 5/155) by virtue of Defendant engaging in the following vexatious and unreasonable conduct including, but not limited to:

(a)     failing to pay One Place amounts due under the insurance policy within 40 days of the loss, which constitutes an unreasonable delay in paying the claim as a matter of law, in violation of the regulations promulgated by the Illinois Director of Insurance within section 919.80(d)(7)(A) of the Illinois Administrative Code;

(b)     failing to advise One Place in writing within 75 days from the date the loss was reported of the reason for the delay in not resolving their claim, in violation of the regulations promulgated by the Illinois Director of Insurance within section 919.80(d)(7)(B) of the Illinois Administrative Code;

(c)     failing to provide One Place with  a reasonable written explanation for the delay in resolving their claim, in violation of the regulations promulgated by the Illinois Director of Insurance within section 919 of the Illinois Administrative Code;

(d)     not attempting in good faith to effectuate a prompt, fair, and equitable settlement of One Place's claim, a claim in which liability was reasonably clear, in violation of section 154.6 of the Illinois Insurance Code and the regulations promulgated by the Illinois Director of Insurance within section 919.50 of the Illinois Administrative Code;

(e)     failing to acknowledge with reasonable promptness pertinent communications with respect to One Place's claim, in violation of the regulations promulgated by the Illinois Director of Insurance within section 919.40 of the Illinois Administrative Code;

(f)     forcing One Place to retain legal counsel to investigate their claim and to file this lawsuit to recover all of the benefits that should have been immediately forthcoming under the insurance policy;

(g)     refusing to pay for all of One Place's claim without conducting a full, fair and prompt investigation based on all available information, in violation of its internal claims polices, practices, and procedures and in violation of section 154.6 of the Illinois Insurance Code;

(h)     delaying payment and/or failing to pay for all of One Place's losses and damages based on an unreasonable and erroneous interpretation of its own policy provisions;

(i)     refusing to pay One Place's claim despite knowing the extent of damage; and

(j)     refusing to pay One Place's claim despite knowing that Travlers' own experts agreed to a period of delay of at least 105 days or 3 and ½ months.

WHEREFORE, Plaintiffs, One Place Condominium LLC, The South Loop Shops LLC, Southblock Development LLC, C & K Partnership, and Southblock Management, Inc., respectfully pray for an award of taxable costs under section 155 of the Illinois Insurance Code, including reasonable attorneys' fees, in their favor and against Defendant, Travelers Property Casualty Company of America, and for other and further relief this Court deems just and proper.

### **DEMAND FOR A JURY TRIAL**

The Plaintiff demands trial by jury on all issues so triable.

Dated: April 14, 2011

5

Respectfully Submitted,

One Place Condominium LLC, The South Loop Shops LLC, Southblock Development LLC, C & K Partnership, and Southblock Management, Inc.

**/s/Katherine Smith Dedrick**
Katherine Smith Dedrick, Esq.
Illinois Bar No. 6185314
Childress Duffy, Ltd.
500 North Dearborn Street, Suite 1200
Chicago, Illinois 60654
(312) 494-0200
(312) 494-0202 fax
kdedrick@childresslawyers.com

# TAB 2

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ONE PLACE CONDOMINIUM LLC, | ) | |
| THE SOUTH LOOP SHOPS LLC, | ) | |
| SOUTHBLOCK DEVELOPMENT LLC, | ) | |
| C & K PARTNERSHIP, and | ) | |
| SOUTHBLOCK MANAGEMENT, INC., | ) | Case No. 1:11-cv-02520 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Hon. Samuel Der-Yeghiayan |
| | ) | |
| TRAVELERS PROPERTY CASUALTY | ) | Magistrate Sheila Finnegan |
| COMPANY OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S ANSWER AND
AFFIRMATIVE DEFENSES TO PLAINTIFFS' COMPLAINT**

Defendant, Travelers Property Casualty Company of America ("Travelers"), for its Answer and Affirmative Defenses to the Complaint of Plaintiffs, One Place Condominium LLC, The South Loop Shops LLC, Southblock Development LLC, C & K Partnership, and Southblock Management, Inc. (collectively referred to as "One Place"), states as follows:

**ANSWER**

**PARTIES**

1.     Plaintiffs One Place Condominium LLC, The South Loop Shops LLC, and Southblock Development LLC are each comprised of members who are citizens of Illinois; Plaintiff C & K Partnership is comprised of partners who are citizens of Illinois;

and Plaintiff Southblock Management, Inc. is incorporated and has its principle [sic] place of business in Illinois.

**ANSWER:**    Travelers lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 1 and therefore denies the same.

2.    Plaintiffs are owners, developers, and managers of the property located at 1 E. 8th Street, Chicago, Illinois ("the insured premises").

**ANSWER:**    Travelers admits that under the policy attached as Exhibit A to the Complaint the insured location is 1 E. 8th Street, Chicago, Illinois and admits one or more of the plaintiffs are owners, developers or managers of the property. Travelers lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 2 and therefore denies the same.

3.    Defendant Travelers is a citizen of Connecticut as it is incorporated, and has its principle [sic] place of business in Connecticut and is engaged in the business of underwriting and issuing builder's risk insurance policies for certain owners and developers of property.

**ANSWER:**    Travelers admits the allegations contained in Paragraph 3.

**<u>JURISDICTION AND VENUE</u>**

4.    This court has subject matter jurisdiction over this matter pursuant to Title 28 U.S.C. § 1332(c)(1) because there is complete diversity of citizenship of the parties and the amount in controversy exceeds $75,000.00.

**ANSWER:**    Travelers lacks knowledge or information sufficient to form a belief as to the truth of the allegations about the citizenship of the plaintiffs.  Travelers admits the amount in controversy exceeds $75,000.00.

5.    Venue is proper in this court pursuant to Title 28, U.S.C. § 1391, in that a substantial part of the events or omissions giving rise to this action occurred in this

judicial district.  In addition, the property that is the subject of this action is situated in this judicial district.

**ANSWER:**    Travelers admits the allegations contained in Paragraph 5.

## COUNT I – BREACH OF CONTRACT

6.    Plaintiff realleges paragraphs 1 through 5 of the Complaint as and for paragraph 6 of Count I.

**ANSWER:**    Travelers realleges its answers to Paragraphs 1 through 5 above for its answer to Paragraph 6.

7.    Travelers issued to One Place an "all-risk" builder's risk insurance policy (Policy no.: QT6600203L858TIL06) for the period November 2, 2006 to November 2, 2007 ("the Policy").  Attached as Exhibit "A" is a true and accurate copy of the Policy.

**ANSWER:**    Travelers denies that the policy is an "all-risk" policy, as it is subject to all of its terms, conditions, limitations, requirements, deductibles, exclusions and not otherwise. Travelers admits the remaining allegations contained in Paragraph 7.

8.    The Policy issued to One Place covers loss or damage to the Covered Property during the construction project from any risks of direct physical accidental loss or damage unless excluded.

**ANSWER:**    Travelers states that the policy is subject to all of its terms, conditions, limitations, requirements, deductibles, exclusions and not otherwise. Travelers admits that the policy provides, in part, that Travelers will pay for loss to Covered Property from any of the Covered Causes of Loss. Travelers admits that the policy provides, in part, that Covered Causes of Loss means Risks Of Direct Physical "Loss" except those causes of "loss" listed in the Exclusions.  Travelers admits that the policy provides, in part, that "Loss" means accidental loss or damage. Travelers denies the remaining allegations contained in Paragraph 8.

9.    The Policy denotes $33 million as its "basic limit of insurance."

**ANSWER:**    Travelers states that the policy is subject to all of its terms, conditions, limitations, requirements, deductibles, exclusions and not otherwise. Travelers admits that the policy provides, in part, that the "Basic Limit of

3

Insurance+ is $33 million. Travelers denies the remaining allegations contained in Paragraph 9.

10.     The Policy issued to One Place also covers "soft costs+ and provides, in part:

> "We will pay your ‑soft costsq during the ‑period of delay in completionq  Such ‑soft costsq must result from ‑lossq to Covered Property from any of the Covered Causes of Loss which delays the completion of the ‑projectq beyond the ‑planned completion dateq+

**ANSWER:**     Travelers states that the policy is subject to all of its terms, conditions, limitations, requirements, deductibles, exclusions and not otherwise. Travelers admits that the policy contains, in part, the provision contained in Paragraph 10.  Travelers denies that One Place is entitled to recover any more money under the policy for "soft costs.+

11.     The Policy denotes the limit of "soft costs+ as $3.3 million.

**ANSWER:**     Travelers states that the policy is subject to all of its terms, conditions, limitations, requirements, deductibles, exclusions and not otherwise. Travelers admits that the policy provides, in part, that the limit for "Soft Cost+ and Special Time Element is $3.3 million. Travelers also states that the policy contains an "Earth Movement Limit of Insurance+ of $2.5 million and an "Earth Movement Annual Aggregate Limit Of Insurance+ of $2.5 million. Travelers denies the remaining allegations contained in Paragraph 11.

12.     The Policy also contains a section called "additional coverages,+ which provides for a number of additional types of insurance coverage to One Place for the project, including coverage for "expediting costs and additional costs of construction materials and labor,+as well as "expense to reduce amount of loss.+

**ANSWER:**     Travelers states that the policy is subject to all of its terms, conditions, limitations, requirements, deductibles, exclusions and not otherwise. Travelers admits that the policy contains the sections identified in Paragraph 12.  Travelers denies that One Place is entitled to recover any more money under the policy for these coverages.

13.     While the Policy was in full force and effect, the insured premises sustained physical loss or damage of the type insured against.

**ANSWER:**     Travelers admits that during the term of the policy the ERS and D-Line sustained physical damage which was caused by "earth movement," which is a Covered Cause of Loss under the policy. Travelers denies the remaining allegations contained in Paragraph 13.

14.     One Place further experienced "soft costs," "expediting costs and additional costs of construction materials and labor," and "expense to reduce the amount of loss," among other additional damage.

**ANSWER:**     Travelers admits that One Place incurred "soft costs" during the policy period and that Travelers has paid One Place in full for all such "soft costs." Travelers admits that One Place incurred "expediting costs and additional costs of construction materials and labor" during the policy period, which is subject to a limit of $100,000, and that Travelers has paid One Place the entire limit for those costs. Travelers denies that One Place incurred "expense to reduce the amount of loss" which is covered under the policy. Travelers denies the remaining allegations contained in Paragraph 14.

15.     One Place timely reported the covered loss and damage to Travelers.

**ANSWER:**     Travelers admits the allegations of Paragraph 15.

16.     One Place substantially performed all conditions precedent required by the Policy to be performed by it and complied with the tolling agreement.

**ANSWER:**     Travelers admits that One Place complied with the tolling agreement. Travelers denies all remaining allegations contained in Paragraph 16.

17.     As a result, it is Travelers' duty to pay for One Place's losses and damages; but, although requested to do so, Travelers has failed and refused and still fails and refuses to pay One Place for all of its losses and damages taking the position, in part, that it owes no more than $2.5 million under the Policy.

**ANSWER:**     Travelers admits that, in part, the "Earth Movement Limit of Insurance" of $2.5 million and the "Earth Movement Annual Aggregate Limit of Insurance" of $2.5 million limit Travelers' total liability under the policy. Travelers states that it has already paid One Place $1,345,549.69 and owes One Place no more money under the policy. Travelers denies the remaining allegations contained in Paragraph 17.

5

18.     As a direct, proximate and foreseeable consequence of Travelers'breach of contract, One Place has sustained loss and damage in excess of $75,000.00 including, but not limited to, increased interest expense, interest rate increase and loan termination fees.

**ANSWER:**     Travelers denies the allegations contained in Paragraph 18.

19.     This is an action based on a "written instrument" within the meaning of the Illinois Interest Act and, therefore, One Place is entitled to prejudgment interest.

**ANSWER:**     Travelers states that the allegations of Paragraph 19 are legal conclusions to which an answer is not required.  To the extent an answer is required, Travelers denies the allegations contained in Paragraph 19.

## COUNT II – SECTION 155 RELIEF

20.     Plaintiff realleges paragraphs 1 through 19 of Count I of the Complaint as and for paragraph 20 of Count II of the Complaint.

**ANSWER:**     Travelers realleges its answers to Paragraphs 1 through 19 above for its answer to Paragraph 20.

21.     As of the time of loss in question, Travelers internal claim policies, practices, and procedures included compliance with the regulations promulgated by the Illinois Director of Insurance within section 919 of Illinois Administrative code as well as compliance with sections 154.5 and 154.6 of the Illinois Insurance Code.

**ANSWER:**     Travelers states that the allegations of Paragraph 21 are legal conclusions to which an answer is not required.  Travelers states that it did, in fact, comply with the stated regulations and codes.  Travelers denies it committed any improper claim practices.

22.     One Place is entitled to an award of taxable costs under section 155 of the Illinois Insurance Code (215 ILCS 5/155) by virtue of Defendant engaging in the following vexatious and unreasonable conduct including, but limited to:

(a)     failing to pay One Place amounts due under the insurance policy within 40 days of the loss, which constitutes an unreasonable delay in paying the claim as a matter of law, in violation of the regulations promulgated by the Illinois Director of Insurance within section 919.80(d)(7)(A) of the Illinois Administrative Code;

(b)     failing to advise One Place in writing within 75 days from the date the loss was reported of the reason for the delay in not resolving their claim, in violation of the regulations promulgated by the Illinois Director of Insurance within section 919.80(d)(7)(B) of the Illinois Administrative Code;

(c)     failing to provide One Place with a reasonable written explanation for the delay in resolving their claim, in violation of the regulations promulgated by the Illinois Director of Insurance within section 919 of the Illinois Administrative Code;

(d)     not attempting in good faith to effectuate a prompt, fair, and equitable settlement of One Place's claim, a claim in which liability was reasonably clear, in violation of section 154.6 of the Illinois Insurance Code and the regulations promulgated by the Illinois Director of Insurance within section 919.50 of the Illinois Administrative Code;

(e)     failing to acknowledge with reasonable promptness pertinent communications with respect to One Place's claim, in violation of the regulations promulgated by the Illinois Director of Insurance within section 919.40 of the Illinois Administrative Code;

(f)     forcing One Place to retain legal counsel to investigate their claim and to file this lawsuit to recover all of the benefits that should have been immediately forthcoming under the insurance policy;

(g)     refusing to pay for all of One Place's claim without conducting a full, fair and prompt investigation based on all available information, in violation of its internal claims policies, practices, and procedures and in violation of section 154.6 of the Illinois Insurance Code;

(h)     delaying payment and/or failing to pay for all of One Place's losses and damages based on an unreasonable and erroneous interpretation of its own policy provisions;

(i)     refusing to pay One Place's claim despite knowing the extent of damage; and

(j)     refusing to pay One Place's claim despite knowing that Travelers' own experts agreed to a period of delay of at least 105 days or 3 and ½ months.

**ANSWER:**    Travelers denies the allegations contained in Paragraph 22, including all of the allegations contained in the subsections of Paragraph 22.

WHEREFORE, Travelers prays that this Court dismiss Plaintiffs' Complaint with prejudice, enter judgment in Travelers' favor, and award Travelers its attorneys' fees, costs, disbursements and expenses and for such other further relief as the Court shall deem just and equitable.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Travelers did not breach any obligations or duties under the policy.

### THIRD AFFIRMATIVE DEFENSE

Under the policy and as a matter of law, One Place is not entitled to recover consequential damages.

### FOURTH AFFIRMATIVE DEFENSE

The Valuation provision under the Policy limits the amount that One Place can recover for the loss or damage to the ERS and D-Line.  (Policy, Form CM T1 43 08 96, page 10 of 18.)

### FIFTH AFFIRMATIVE DEFENSE

Under the Policy, the amount that One Place can recover for expediting and additional costs of construction materials and labor is $100,000.

### SIXTH AFFIRMATIVE DEFENSE

The Policy provides that Travelers will not pay for loss caused by or resulting from delay.  (Policy, Form CM T1 43 08 96, page 7 of 18).

## SEVENTH AFFIRMATIVE DEFENSE

1.  The Policy provides:

    "Earth Movement" means any movement of the earth (other than "sinkhole collapse"), including but not limited to:

    a.  earthquake;

    b.  landslide;

    c.  earth sinking, rising or shifting;

    d.  volcanic eruption, explosion or effusion.

2.  The Policy provides an "Earth Movement Limit of Insurance" of $2.5 million.  The Policy states:

    10.  "Earth Movement Limit of Insurance" means the most we will pay for "loss" in any one occurrence caused directly or indirectly by "earth movement", regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

3.  The Policy provides an "Earth Movement Aggregate Limit of Insurance" of $2.5 million.  The Policy states:

    "Earth Movement Annual Aggregate Limit of Insurance" means the most we will pay for all covered "earth movement" occurrences in any one policy year.

    a.  Begins with the inception date or anniversary date of this policy; and

    b.  Ends at the next anniversary date or the expiration date of the policy.

4.  The loss to the ERS and D-Line was caused directly or indirectly by "earth movement."

5.  Travelers paid One Place for other losses caused directly or indirectly by "earth movement" during the policy year.

6.     The "Earth Movement Limit of Insurance" and "Earth Movement Annual Aggregate Limit of Insurance" limit One Place's overall potential recovery under the Policy.

## EIGHTH AFFIRMATIVE DEFENSE

Travelers reserves the right to offer and rely upon additional affirmative defenses under further investigation and discovery and up to trial as justice permits.

Dated:  May 31, 2011

Respectfully submitted,

Butler Pappas Weihmuller Katz Craig, LLP

   /s/ K. Clark Schirle

K. Clark Schirle
ARDC No. 6199270
cschirle@butlerpappas.com
115 S. LaSalle Street, Suite 3200
Chicago, Illinois 60603
(312) 456-0900
(312) 456-0909 fax

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2011, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.  I also certify that the foregoing is being served this day on all counsel of record identified on the below Service List via U.S. Mail.

Edward Eshoo, Jr.
Katherine Smith Dedrick
Coleman J. Braun
Childress Duffy, Ltd.
500 North Dearborn Street, Suite 1200
Chicago, Illinois 60654
Attorneys for Plaintiffs

   /s/ K. Clark Schirle

K. Clark Schirle
Butler Pappas Weihmuller Katz Craig, LLP
115 South LaSalle Street
Suite 3200
Chicago, IL 60603
(312) 456-0900

11

**TAB 3**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ONE PLACE CONDOMINIUM LLC, | ) | |
| THE SOUTH LOOP SHOPS LLC | ) | |
| SOUTHBLOCK DEVELOPMENT LLC, | ) | Case No.: 1:11-cv-02520 |
| C & K PARTNERSHIP, and | ) | |
| SOUTHBLOCK MANAGEMENT, INC., | ) | Honorable Samuel Der-Yeghiayan |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| TRAVELERS PROPERTY CASUALTY | ) | |
| COMPANY OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## JOINT JURISDICTIONAL STATUS REPORT

Plaintiffs, One Place Condominium LLC, The South Loop Shops LLC, Southblock Development LLC, C & K Partnership, and Southblock Management, Inc. (collectively referred to as "One Place"), by its attorneys, Childress Duffy, Ltd., and Defendant, Travelers Property Casualty Company of America (hereafter "Travelers"), by and through its attorneys, Butler Pappas Weihmuller Katz Craig, LLP., for their Joint Jurisdictional Status Report, hereby state as follows:

## I.    Subject Matter Jurisdiction

This court has subject matter jurisdiction over this matter pursuant to Title 28 U.S.C. § 1332(c)(1) because there is complete diversity of citizenship of the parties and the amount in controversy exceeds $75,000.00.  All of the Plaintiffs are citizens of the state of Illinois:

   a.   Plaintiff, One Place Condominium LLC, has been an Illinois limited liability company since April 13, 2005.  All members of which are and have been at all relevant times residents of the State of Illinois.  (*See* "LLC File Detail Report"

attached as Exhibit "A"; *see also* Affidavit of Wayne I. Chertow attached as Exhibit "B".

b. Plaintiff, The South Loop Shops LLC, has been an Illinois limited liability company since April 13, 2005. All members of which are and have been at all relevant times residents of the State of Illinois. *See* "LLC File Detail Report" attached as Exhibit "C"; *see also* Exhibit B.

c. Plaintiff, Southblock Development LLC, has been an Illinois limited liability company since September 11, 2006. All members of which are and have been at all relevant times residents of the State of Illinois. *See* "LLC File Detail Report" attached as Exhibit "D"; *see also* Affidavit of Harlan Karp attached as Exhibit "E".

d. Plaintiff, C & K Partnership, is active partnership consisting of two partners: Linda Karp and Roselyn Chertow. Linda Karp is a citizen of the State of Illinois, her residence being 222 East Chestnut, Chicago, Illinois 60611. Roselyn Chertow is a citizen of the State of Illinois, her residence being 6430 N. Leroy, Lincolnwood, Illinois 60712. *See* Affidavit of Linda Karp, attached as Exhibit "F"; *See* Affidavit of Roselyn Chertow, attached as Exhibit "G".

e. Plaintiff, Southblock Management, Inc., is an Illinois corporation, incorporated on October 31, 2005. At all times relevant, its principal place of business has been 828 S. Wabash, #200, Chicago, Illinois 60605. *See* "Corporation File Detail Report" attached as Exhibit "H"; *see also* Exhibit E.

Travelers is a citizen of the state of Connecticut. Travelers was incorporated in the State of Connecticut. Travelers maintains its principal place of business and domicile in Hartford, Connecticut. *See* Affidavit of Murray D. Sacks and "Business Inquiry Report" attached as Exhibit "I".

The amount of controversy in this action exceeds $75,000. *See* Exhibit E; *see also* exceprt of claim correspondence dated October 29, 2010, attached as Exhibit "J".

## II. <u>Venue (Plaintiff's Position)</u>

Venue is proper in this court pursuant to Title 28, U.S.C. § 1391, in that a substantial part of the events or omissions giving rise to this action occurred in this judicial district. In addition, the property that is the subject of this action, 1 East 9th Street, Chicago IL, 60605, is situated in

this judicial district.

Dated: June 2, 2011.

CHILDRESS DUFFY, LTD.                    BUTLER PAPPAS, LLP.

By: /s/ Katherine Smith Dedrick          By: /s/ K. Clark Schirle
    Attorneys for Plaintiff                  Attorneys for Defendant

    Katherine Smith Dedrick                K. Clark Schirle
    Coleman J. Braun                       Butler Pappas Weihmuller Katz Craig, LLP.
    Childress Duffy, Ltd.                   115 South LaSalle Street, Suite 3200
    500 North Dearborn Street, Suite 1200  Chicago, Illinois 60603
    Chicago, IL 60654                       Tel: (312) 456-0900
    Tel: (312) 494-0200                     Fax: (312) 456-0909
    Fax: (312) 494-0202

# TAB 4



**TRAVELERS**

## COMMERCIAL INSURANCE

A Custom Insurance Policy Prepared for:

ONE PLACE CONDOMINIUM, LLC
828 S. WABASH   SUITE 200
CHICAGO IL 60605

Presented by: ACORDIA OF ILLINOIS INC

008901



EXHIBIT
A

 **TRAVELERS**

One Tower Square, Hartford, Connecticut 06183

COMMERICAL INLAND MARINE
COMMON POLICY DECLARATIONS
ISSUE DATE : 01/12/07

POLICY NUMBER : QT-660-0203L858-TIL-06

INSURING COMPANY:
TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA

1. NAMED INSURED AND MAILING ADDRESS:
   ONE PLACE CONDOMINIUM, LLC  (AS PER IL T8 00)
   828 S. WABASH   SUITE 200
   CHICAGO, IL 60605

2. POLICY PERIOD: From 11/02/06 to 11/02/07 12:01 A.M. Standard Time at
   your mailing address.

3. LOCATIONS
   Premises   Bldg.
   Loc. No.  No.  Occupancy          Address

   SEE IL TO 03

4. COVERAGE PARTS FORMING PART OF THIS POLICY AND INSURING COMPANIES:
   COMMERCIAL INLAND MARINE COV PART DECLARATIONS        CM TO 01 07 86 TIL

5. NUMBERS OF FORMS AND ENDORSEMENTS
   FORMING A PART OF THIS POLICY:   SEE IL T8 01 10 93

6. SUPPLEMENTAL POLICIES: Each of the following is a separate policy
   containing its complete provisions:
   Policy                    Policy No.              Insuring Company

7. PREMIUM SUMMARY:
   Provisional Premium    $ 24,793
   Due at Inception       $ 24,793
   Due at Each            $

NAME AND ADDRESS OF AGENT OR BROKER:              COUNTERSIGNED BY:
   ACORDIA OF ILLINOIS INC (F5620)
   650 E ALGONQUIN RD
   STE 300                                        Authorized Representative
   SCHAUMBURG, IL 60173
                                                  DATE:

IL TO 02 11 89    PAGE 1 OF 1
OFFICE: NAPERVILLE IL

008002

 **TRAVELERS**

POLICY NUMBER: QT-660-0203L858-TIL-06

EFFECTIVE DATE: 11-02-06

ISSUE DATE: 01-12-07

LISTING OF FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS

THIS LISTING SHOWS THE NUMBER OF FORMS, SCHEDULES AND ENDORSEMENTS
BY LINE OF BUSINESS.

```
IL TO 02 11 89    COMMON POLICY DECLARATIONS
IL T8 01 10 93    FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS
IL TO 01 05 03    COMMON POLICY CONDITIONS
IL TO 03 04 96    LOCATION SCHEDULE
IL T8 00          GENERAL PURPOSE ENDORSEMENT
```

INLAND MARINE

```
CM AO 28 08 96    IMPAK COVERAGE PART DECLARATIONS
CM T3 71 08 96    IM PAK COVERAGE SUMMARY
CM TO 11 08 05    TABLE OF CONTENTS
CM OO 01 09 04    COMMERCIAL INLAND MARINE CONDITIONS
CM T1 43 08 96    IMPAK COVERAGE FORM
CM T8 00          GENERAL PURPOSE ENDORSEMENT
CM T3 98 01 06    TERRORISM RISK INS ACT 2002 DISCLOSURE
CM T4 33 05 04    FUNGUS,WET ROT, DRY ROT & OTHER CAUSES
CM 01 28 03 99    ILLINOIS CHANGES - INTENTIONAL ACTS
CM 02 04 07 05    ILLINOIS CHANGES
```

INTERLINE ENDORSEMENTS

```
IL T3 79 01 06    CAPS ON LOSSES FROM CERT ACTS OF TERROR
```

LOCATION SCHEDULE                          POLICY NUMBER: QT-660-0203L858-TIL-06

This Schedule of Locations and Buildings applies to the Common Policy Declarations for the period
11-02-06 to 11-02-07.

| Loc. No. | Bldg. No. | Address | Occupancy |
|---|---|---|---|
| 1 | 1 | 1 E. 8TH STREET CHICAGO, IL 60605 | SEE IM PAK DECLARATIONS |

IL T0 03 04 96                                              Page    1  (END)

008605

POLICY NUMBER: QT-660-0203L858-TIL-06          GENERAL PURPOSE ENDORSEMENT

ƚ

ONE PLACE CONDOMINIUM LLC
THE SOUTH LOOP SHOPS LLC
SOUTHBLOCK DEVELOPMENT LLC
SOUTHBLOCK MANAGEMENT INC.
C & K PARTNERSHIP
GENERAL CONTRACTOR AND ALL SUB & SUB-SUB CONTRACTORS

# COMMERCIAL INLAND MARINE



**TRAVELERS**

One Tower Square, Hartford, Connecticut 06183

**COMMERCIAL INLAND MARINE**
**COVERAGE PART DECLARATIONS**

**POLICY NUMBER:** QT-660-0203L858-TIL-06
**ISSUE DATE:** 01-12-07

**INSURING COMPANY:**
TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA

Declarations Period: From 11-02-06 to 11-02-07 12:01 A.M. Standard Time at your mailing address shown in the Common Policy Declarations.

The Commercial Inland Marine Coverage Part consists of these Declarations, the Commercial Inland Marine Conditions Form and the Coverage Forms shown below.

**I. COVERED PROPERTY AND LIMITS OF INSURANCE**

**IM PAK COVERAGE**

**"BUILDERS' RISK"**

We cover only the buildings and structures shown below:

LOCATION, DESCRIPTION AND COINSURANCE PERCENTAGE

| "Job site" | Building Number | Description | Coinsurance Percentage |
|---|---|---|---|
| 1 | 1 | NEW CONSTRUCTION OF A THREE STORY FIRE RESISTIVE RETAIL AND CONDOMINIUM BUILDING LOCATED AT 1 E. 8TH STREET, CHICAGO, IL 60605 | 100% |

LIMITS OF INSURANCE
| "Job site": | 1 | Building Number : | 1 |
|---|---|---|---|

| | | |
|---|---|---|
| "Basic Limit of Insurance" | $ | 33,000,000 |
| "Earth Movement Limit of Insurance" | $ | 2,500,000 |
| "Earth Movement Annual Aggregate Limit of Insurance" | $ | 2,500,000 |
| "Flood Limit of Insurance" | $ | 2,500,000 |
| "Flood Annual Aggregate Limit of Insurance" | $ | 2,500,000 |
| "Specified Machinery Limit of Insurance" | $ | 33,000,000 |
| Temporary Storage Limit of Insurance: | $ | 100,000 |
| Transit Limit of Insurance: | $ | 100,000 |
| "Maximum Amount of Payment": | $ | 33,000,000 |

**"SOFT COSTS" AND SPECIAL TIME ELEMENT**

| "Job Site": | 1 | Building Number: | 1 |
|---|---|---|---|

Type of Coverage:
"Soft Costs"
    Interest on money borrowed to finance construction
    Advertising expenses
    Realty taxes and other assessments
    Costs resulting from the renegotiation of your lease(s) or construction loans
"Rental Value"

LIMITS OF INSURANCE
| "Job Site": | 1 | Building Number: | 1 |
|---|---|---|---|

The most we will pay for your "amount of loss" under
"Soft Costs" and Special Time Element is: $    3,300,000

CM T0 01 07 86                                                                    Page    1
Order # CM A0 28 08 96

PRODUCER: ACORDIA OF ILLINOIS INC          F5620          OFFICE: NAPERVILLE IL          888

005908

 **TRAVELERS**

One Tower Square, Hartford, Connecticut 06183

**COMMERCIAL INLAND MARINE**
**COVERAGE PART DECLARATIONS**
**INSURING COMPANY:**
TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA

POLICY NUMBER: QT-660-0203L858-TIL-06
ISSUE DATE: 01-12-07

Declarations Period: From 11-02-06 to 11-02-07 12:01 A.M. Standard Time at your mailing address shown in the Common Policy Declarations.

The Commercial Inland Marine Coverage Part consists of these Declarations, the Commercial Inland Marine Conditions Form and the Coverage Forms shown below.

**II. DEDUCTIBLE**

"BUILDERS' RISK"
"Job                                          Building
site":              1                         Number  :        1

| | | |
|---|---|---|
| "Basic Deductible": | $ | 10,000 |
| "Earth Movement Deductible": | $ | 50,000 |
| "Flood Deductible": | $ | 50,000 |
| "Specified Machinery Deductible:" | $ | 10,000 |

"SOFT COSTS" AND SPECIAL TIME ELEMENT

"Job Site":     1                    Building Number:        1

"Soft Costs" and Special Time Element
Deductible:                          14  Days

**III. PREMIUM SUMMARY**

The policy premium includes the premiums shown below. Deposit Premiums are subject to adjustment as specified in the Reporting Provisions.

|  | REPORTING PROVISIONS |  | Premium |
|---|---|---|---|
| "BUILDERS' RISK", AND "SOFT COSTS" AND SPECIAL TIME ELEMENT | Not Applicable | $ | 24,793 |
|  | PREMIUM: | $ | 24,793 |
|  | "MINIMUM EARNED PREMIUM": | $ | 24,793 |

NUMBERS OF FORMS, SCHEDULES AND ENDORSEMENTS FORMING PART OF THIS COVERAGE PART ARE ATTACHED AS A SEPARATE LISTING.

POLICY NUMBER: QT-660-0203L858-TIL-06

COMMERCIAL INLAND MARINE
ISSUE DATE: 01-12-07

# IM PAK® COVERAGE SUMMARY

This Coverage Part covers the following:

"Builders' Risk" and
    "Soft Costs" and Special Time Element

This Coverage Part includes the following coverage form:

IM PAK® COVERAGE FORM

IZ 032 05 0477 0440 0067 0554 0555 0467

This Coverage Part includes the following modifiers:

| | |
|---|---|
| 0477 | Programming Errors G |
| 0440 | Minimum Earned Premium |
| 0067 | Soft Costs and RV W/ Occupancy |
| 0554 | Earth Movement Annual Aggregate Limit |
| 0555 | Flood Annual Aggregate Limit |
| 0467 | "Specified Machinery" Incl. Production Mach.-BR |

# TABLE OF CONTENTS

# COMMERCIAL INLAND MARINE COVERAGE PART

The following indicates the contents of the principal forms which may be attached to your policy.

It contains no reference to the Declarations or Endorsements which also may be attached.

Beginning on Page

## COMMERCIAL INLAND MARINE CONDITIONS

Loss Conditions

| | | |
|---|---|---|
| A. | Abandonment | 1 |
| B. | Appraisal | 1 |
| C. | Duties In The Event Of Loss | 1 |
| D. | Insurance Under Two Or More Coverages | 1 |
| E. | Loss Payment | 1 |
| F. | Other Insurance | 2 |
| G. | Pair, Sets Or Parts | 2 |
| H. | Recovered Property | 2 |
| I. | Reinstatement Of Limit After Loss | 2 |
| J. | Transfer Of Rights Of Recovery Against Others To Us | 2 |

General Conditions

| | | |
|---|---|---|
| A. | Concealment, Misrepresentation Or Fraud | 2 |
| B. | Control Of Property | 2 |
| C. | Legal Action Against Us | 2 |
| D. | No Benefit To Bailee | 3 |
| E. | Policy Period, Coverage Territory | 3 |
| F. | Valuation | 3 |

## INLAND MARINE COVERAGE FORM(S)

A. Coverage

| | | |
|---|---|---|
| 1. | Covered Property | |
| 2. | Property Not Covered | Page |
| 3. | Covered Causes Of Loss | |
| 4. | Additional Coverage – Collapse (If Applicable) | No. |
| 5. | Coverage Extensions (If Any) | |
| | | Varies |
| B. | Exclusions | |
| C. | Limits of Insurance | By |
| D. | Deductible | |
| E. | Additional Conditions | Form |
| F. | Definitions | |

COMMERCIAL INLAND MARINE

# COMMERCIAL INLAND MARINE CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and applicable Additional Conditions in Commercial Inland Marine Coverage Forms:

## LOSS CONDITIONS

### A. Abandonment

There can be no abandonment of any property to us.

### B. Appraisal

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

1. Pay its chosen appraiser; and

2. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

### C. Duties In The Event Of Loss

You must see that the following are done in the event of loss or damage to Covered Property:

1. Notify the police if a law may have been broken.

2. Give us prompt notice of the loss or damage. Include a description of the property involved.

3. As soon as possible, give us a description of how, when and where the loss or damage occurred.

4. Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible,

set the damaged property aside and in the best possible order for examination.

5. You will not, except at your own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent.

6. As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

7. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

8. Send us a signed, sworn proof of loss containing the information we request to settle the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

9. Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or suit.

10. Cooperate with us in the investigation or settlement of the claim.

### D. Insurance Under Two Or More Coverages

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

### E. Loss Payment

1. We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

2. We will not pay you more than your financial interest in the Covered Property.

3. We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claim against us for the owners' property. We will not pay the owners more than

COMMERCIAL INLAND MARINE

their financial interest in the Covered Property.

4. We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

5. We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss if you have complied with all the terms of this Coverage Part and:

   a. We have reached agreement with you on the amount of the loss; or

   b. An appraisal award has been made.

6. We will not be liable for any part of a loss that has been paid or made good by others.

F. Other Insurance

1. You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

2. If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

G. Pair, Sets Or Parts

1. Pair Or Set

   In case of loss or damage to any part of a pair or set we may:

   a. Repair or replace any part to restore the pair or set to its value before the loss or damage; or

   b. Pay the difference between the value of the pair or set before and after the loss or damage.

2. Parts

   In case of loss or damage to any part of Covered Property consisting of several parts when complete, we will only pay for the value of the lost or damaged part.

H. Recovered Property

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

I. Reinstatement Of Limit After Loss

The Limit of Insurance will not be reduced by the payment of any claim, except for total loss or damage of a scheduled item, in which event we will refund the unearned premium on that item.

J. Transfer Of Rights Of Recovery Against Others To Us

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

1. Prior to a loss to your Covered Property.

2. After a loss to your Covered Property only if, at time of loss, that party is one of the following:

   a. Someone insured by this insurance; or

   b. A business firm:

      (1) Owned or controlled by you; or

      (2) That owns or controls you.

This will not restrict your insurance.

GENERAL CONDITIONS

A. Concealment, Misrepresentation Or Fraud

This Coverage Part is void in any case of fraud, intentional concealment or misrepresentation of a material fact, by you or any other insured, at any time, concerning:

1. This Coverage Part;

2. The Covered Property;

3. Your interest in the Covered Property; or

4. A claim under this Coverage Part.

CM 00 01 09 04

COMMERCIAL INLAND MARINE

### B. Control Of Property

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

### C. Legal Action Against Us

No one may bring a legal action against us under this Coverage Part unless:

1. There has been full compliance with all the terms of this Coverage Part; and

2. The action is brought within 2 years after you first have knowledge of the direct loss or damage.

### D. No Benefit To Bailee

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

### E. Policy Period, Coverage Territory

We cover loss or damage commencing:

1. During the policy period shown in the Declarations; and

2. Within the coverage territory.

### F. Valuation

The value of property will be the least of the following amounts:

1. The actual cash value of that property;

2. The cost of reasonably restoring that property to its condition immediately before loss or damage; or

3. The cost of replacing that property with substantially identical property.

In the event of loss or damage, the value of property will be determined as of the time of loss or damage.

COMMERCIAL INLAND MARINE
ISSUE DATE: 01-12-07
POLICY NUMBER:QT-660-0203L858-TIL-06          TRANSACTION EFFECTIVE DATE: 11-02-06

# IM PAK® COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section F - DEFINITIONS.

## A. COVERAGE

We will pay for "loss" to Covered Property from any of the Covered Causes of Loss.

### 1. Covered Property

Covered Property, as used in this Coverage Part, means "Builders' Risk".

### 2. Covered Causes of Loss

Covered Causes of Loss means RISKS OF DIRECT PHYSICAL "LOSS" except those causes of "loss" listed in the Exclusions.

### 3. Soft Costs and Special Time Element

a. "Soft Costs"

We will pay your "soft costs" during the "period of delay in completion". Such "soft costs" must result from "loss" to Covered Property from any of the Covered Causes of Loss which delays the completion of the "project" beyond the "planned completion date".

b. "Rental Value"

We will pay the amount by which your "rental value" is actually reduced during the "period of delay in completion". Such reduction in "rental value" must result from "loss" to Covered Property from any of the Covered Causes of Loss which delays the completion of the "project" beyond the "planned completion date".

If the building or structure was occupied for its intended purpose at the time of "loss", we will pay the amount by which your "rental value" is actually reduced during the "post-loss period of construction".

### 4. Coverage Extensions

We will pay for "loss" from a Covered Cause of Loss for each of the following Coverage Extensions:

a. Fire Protective Systems

If your fire protective equipment discharges accidentally or to control a Covered Cause of Loss, we will pay for your expense to:

(1) Recharge or refill your fire protective systems; and

CM T1 43 08 96                                          PAGE    1   of   18
IZ 032 05 0477 0440 0067 0554 0555 0467

COMMERCIAL INLAND MARINE
ISSUE DATE: 01-12-07
POLICY NUMBER:QT-660-0203L858-TIL-06                TRANSACTION EFFECTIVE DATE: 11-02-06

   (2) Replace or repair faulty valves or controls which caused the discharge.

The most we will pay in any one "loss" under this extension is $75,000.

### b. Construction Equipment, Landscaping and Signs

   (1) We will pay up to the applicable "Basic Limit of Insurance" for "loss" to fencing, cribbing, scaffolds, construction forms and office trailers and their "contents" used at the "job site".

   (2) We will pay for trees, plants, shrubs, lawns, and signs located at the "job site". We will only cover "loss" to this property that is caused by or results from fire, lightning, explosion, riot, civil commotion, aircraft, vandalism, theft, vehicles, "sinkhole collapse", or volcanic action.

The most we will pay for "loss" to this property is:

   (a) The "Basic Limit of Insurance" for the "job site" shown in the Declarations for the value of such property included in the "Basic Limit of Insurance" for the "job site" shown in the Declarations.

   (b) $10,000 for the value of such property not included in the "Basic Limit of Insurance" for the "job site" shown in the Declarations.

Any payment under this Coverage Extension will not increase the applicable "Basic Limit of Insurance".

### c. Valuable Papers and Records

We will pay your costs to research, replace, or restore lost or damaged valuable papers and records, including those which are on computer software, for which there are no duplicates. The most we will pay for "loss" to this property is $50,000.

But we will not pay for "loss" to accounts, bills, deeds, evidences of debt, currency, money, notes or securities.

## 5. Additional Coverages

### a. "Builders' Risk" Site Preparation

If:

   (1) The cost of excavation, site preparation, land grading and similar work is included in the "Basic Limit of Insurance" for the "job site" shown in the Declarations; and

   (2) You incur expenses to reexcavate the site, reprepare the site, regrade the land, or reperform similar work because of "loss" by a Covered Cause of Loss to Covered Property,

you may extend the applicable limit of insurance for that "job site" to pay for such expense.

### b. Ordinance or Law

   (1) In the event of a "loss" to Covered Property from any of the Covered Causes of Loss we will pay:

     (a) For loss or damage caused by any enforcement of any ordinance or law that:

       (i)   Requires the demolition of parts of the same Covered Property not damaged by a Covered Cause of Loss;

CM T1 43 08 96                                                                              PAGE    2  of  18
IZ 032 05 0477 0440 0067 0554 0555 0467

008913

COMMERCIAL INLAND MARINE
ISSUE DATE: 01-12-07
POLICY NUMBER:QT-660-0203L858-TIL-06        TRANSACTION EFFECTIVE DATE: 11-02-06

    (ii)   Regulates the construction, or repair of buildings, or establishes zoning or land use requirements at the "job site"; and

    (iii)  Is in force at the time of "loss".

(b) The increased cost to repair, rebuild or construct Covered Property caused by enforcement of building, zoning or land use ordinance or law. If the Covered Property is repaired or rebuilt, it must be intended for similar occupancy as the current Covered Property, unless otherwise required by zoning or land use ordinance or law.

(c) The cost to demolish and clear the "job site" of undamaged parts of the Covered Property caused by enforcement of the building, zoning or land use ordinance or law.

(2) We will not pay for increased costs under this Additional Coverage:

(a) Until the Covered Property is actually repaired or replaced, at the same "job site" or elsewhere; and

(b) Unless the repairs or replacement are made as soon as reasonably possible after the "loss", not to exceed 2 years. We may extend this period in writing during the 2 years.

(3) We will not pay under this Additional Coverage for costs associated with the enforcement of any ordinance or law that requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

(4) The most we will pay under this Additional Coverage is:

(a) If the Covered Property is repaired or replaced at the same "job site", the amount you actually spend to:

    (i)   Demolish and clear the "job site"; and

    (ii)  The increased cost to repair, rebuild or construct the Covered Property but not for more than property of the same height, floor area and style at the same "job site".

(b) If the Covered Property is not repaired or replaced at the same "job site":

    (i)   The amount you actually spend to demolish and clear the "job site"; and

    (ii)  The increased cost to replace, at the same "job site", the damaged or destroyed Covered Property with other property:

      - Of comparable material and quality;

      - Of the same height, floor area and style; and

      - Used for the same purpose.

The most we will pay under this Additional Coverage is $250,000 in any one occurrence.

COMMERCIAL INLAND MARINE
ISSUE DATE: 01-12-07
POLICY NUMBER:QT-660-0203L858-TIL-06          TRANSACTION EFFECTIVE DATE: 11-02-06

c. **Debris Removal**

   (1) We will pay for your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of the "loss".

   (2) The most we will pay under this Additional Coverage is 25% of the amount we pay for direct "loss" to Covered Property plus the deductible in this Coverage Part applicable to that "loss". Any payment will not increase the applicable Limit of Insurance. But, if the debris removal expense exceeds the amount calculated above, or if the sum of our payments for direct "loss" and debris removal exceeds the applicable Limit of Insurance shown elsewhere in this Coverage Part, we will pay up to $75,000 in any one occurrence as an additional amount of insurance.

   (3) We will not pay under this Additional Coverage for:

       (a) Your expense to extract "pollutants" from land or water, or to remove, restore, or replace polluted land or water; or

       (b) Your additional expenses to clean up, repair, replace or dispose of Covered Property damaged or or contaminated by "pollutants" as result of a "machinery accident" to "specified machinery".

d. **Construction Contract Penalty**

   If your construction contract contains a clause that requires you to pay a penalty as a direct result of a Covered Cause of Loss to "Builders' Risk", we will pay up to $25,000 during each separate 12 month period of this policy for all such expenses.

e. **Fire Department Service Charge**

   When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $25,000 for your liability for Fire Department Service Charges:

   (1) Assumed by contract or agreement prior to "loss"; or

   (2) Required by local ordinance.

   No deductible applies to this Additional Coverage.

f. **Pollutant Clean Up and Removal** .

   (1) We will pay your expense to extract "pollutants" from land or water if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss to Covered Property that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of the "loss".

   (2) This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

   (3) The most we will pay under this Additional Coverage for each "job site" is $25,000 for the sum of all such expenses arising out of a Covered Cause of Loss to Covered Property occurring during each separate 12 month period of this policy.

CM T1 43 08 96                                                    PAGE    4    of    18
IZ 032 05 0477 0440 0067 0554 0555 0467

COMMERCIAL INLAND MARINE
ISSUE DATE: 01-12-07
POLICY NUMBER:QT-660-0203L858-TIL-06                    TRANSACTION EFFECTIVE DATE: 11-02-06

**g. Pollutant Expenses**

(1) "Pollutants" Other Than Ammonia

If as a result of a "machinery accident" covered by this Coverage Part, Covered Property is damaged or contaminated by "pollutants", other than ammonia, we will pay up to $100,000 of your additional expenses to clean up, repair, replace or dispose of such Covered Property for each "job site" during each separate 12 month period of the policy.

As used here, additional expenses mean expenses beyond those you would have incurred had no "pollutants" been involved.

(2) Ammonia

If as a result of a "machinery accident" covered by this Coverage Part, Covered Property is contaminated by ammonia, we will pay up to $25,000 for such damage, including salvage charges, at each "job site" during each separate 12 month period of the policy.

(3) Any amount payable under this Additional Coverage:

(a) Is included in the applicable "Specified Machinery Limit of Insurance"; and

(b) Will be paid only if reported to us in writing within 180 days of the date on which the "machinery accident" occurs.

(4) This Additional Coverage does not apply to or limit our payment for expenses resulting from any of the "specified causes of loss" that are caused by or result from a "machinery accident".

**h. Expediting Costs and Additional Cost of Construction Materials and Labor**

(1) We will pay for the following costs made necessary by a Covered Cause of Loss to Covered Property at the "job site":

(a) Your costs to expedite repair of Covered Property;

(b) Your increased cost of construction materials and labor; and

(c) Your costs to make changes in construction specifications.

But we will only pay for costs to make changes in construction specifications when:

(i) The "loss" by a Covered Cause of Loss results in a total loss to Covered Property; and

(ii) The costs to make changes in construction specifications are not otherwise covered by the Ordinance or Law Additional Coverage provided under this policy.

(2) The most we will pay under this Additional Coverage is the least of:

(a) 5% of the applicable "Basic Limit of Insurance"; or

(b) $100,000.

**CM T1 43 08 96**                                         PAGE    5  of  18
IZ 032 05 0477 0440 0067 0554 0555 0467

COMMERCIAL INLAND MARINE
ISSUE DATE: 01-12-07
POLICY NUMBER:QT-660-0203L858-TIL-06          TRANSACTION EFFECTIVE DATE: 11-02-06

i. **Inventory, Appraisals, and Loss Adjustment Expenses**

We will pay the reasonable expenses you incur at our request to assist us in determination of the amount of the covered "loss", including the extra wages necessarily incurred by your employees for preparing inventories and other "loss" information for completion of your proof of "loss".

But we will not pay for:

(1) Expenses to prove that the "loss" is covered;

(2) Expenses incurred under the Appraisal section of the Commercial Inland Marine Conditions;

(3) Expenses incurred for examinations under oath, even if required by us;

(4) Expenses incurred for public adjusters or any legal fees. —

The most we will pay for "loss" under this Additional Coverage is $5,000.

j. **Reward Coverage**

We will reimburse you for reward(s) expense you have incurred leading to:

(1) The successful return of undamaged stolen articles to a law enforcement agency; or

(2) The arrest and conviction of any person(s) who have damaged or stolen any of your Covered Property.

We will pay 25% of the covered loss, prior to the application of any Deductible and recovery, up to a maximum of $2,500 in any one occurrence for the reward payments you make. These reward payments must be documented. The amount payable is in addition to the Limits of Insurance shown in the Declarations.

No Deductible applies to this Additional Coverage.

k. **Expense to Reduce "Amount of Loss"**

We will pay the necessary expense you incur during the "post-loss period of construction" if you would not have incurred such expense had there not been "loss" to Covered Property from any of the Covered Causes of Loss which delayed the completion of the "project" beyond the "planned completion date". But we will not pay more for your expense than the amount by which such expense reduces the "amount of loss" we would have otherwise paid.

No deductible applies to this Additional Coverage.

l. **Civil Authority**

We will pay the "amount of loss" you incur you during the first two consecutive weeks after the "planned completion date" when a civil authority prohibits access to your "job site". The denied access must result from "loss" from a Covered Cause of Loss to property other than at the "job site".

No deductible applies to this Additional Coverage.

CM T1 43 08 96                                               PAGE    6   of   18
IZ 032 05 0477 0440 0067 0554 0555 0467

006815

COMMERCIAL INLAND MARINE
ISSUE DATE: 01-12-07
POLICY NUMBER:QT-660-0203L858-TIL-06        TRANSACTION EFFECTIVE DATE: 11-02-06

### B. EXCLUSIONS

1. We will not pay for "loss" caused directly or indirectly by any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

   a. **Governmental Action**

   Seizure or destruction of property by order of governmental authority. But we will pay for acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this policy.

   b. **Nuclear Hazard**

   Nuclear reaction or radiation, or radioactive contamination, however caused.

   But if "loss" by fire results, we will pay for the resulting "loss".

   c. **War and Military Action**

   (1) War, including undeclared or civil war;

   (2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

   (3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

   d. **Ordinance or Law**

   Except as may be provided under the Additional Coverages, the enforcement of any ordinance or law:

   (1) Regulating the construction, use or repair of any property; or

   (2) Requiring the tearing down of any property, including the cost of removing its debris.

2. We will not pay for "loss" caused by or resulting from any of the following:

   a. Delay, loss of use or loss of market.

   b. Dishonest or criminal acts by you, any of your partners, directors, trustees or officers:

   (1) Acting alone or in collusion with others; or

   (2) Whether or not occurring during the hours of employment.

   c. Shortage found when taking inventory.

   d. Except as may be provided under the Additional Coverages, the discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if "loss" by any of the "specified causes of loss" results, we will pay for that resulting "loss" caused by the "specified causes of loss".

   e. Programming errors, including but not limited to:

CM T1 43 08 96                                                PAGE    7  of  18
IZ 032 05 0477 0440 0067 0554 0555 0467

COMMERCIAL INLAND MARINE
ISSUE DATE: 01-12-07
POLICY NUMBER:QT-660-0203L858-TIL-06          TRANSACTION EFFECTIVE DATE: 11-02-06

    (1) The inability of Covered Property to correctly recognize, process, distinguish, interpret or accept dates,times or other data; or

    (2) Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems due to the inability of Covered Property to correctly recognize, process, distinguish, interpret or accept dates times or other data.

But if "loss" by "specified causes of loss" results, we will pay for that resulting "loss".

We will not pay for repair, replacement or modification of Covered Property to correct any deficiencies or change any features.

3. We will not pay for "loss" caused by or resulting from any of the following. But if "loss" by a Covered Cause of Loss results, we will pay for that resulting "loss".

  a. Hidden or latent defect, mechanical breakdown or failure (including rupture or bursting caused by centrifugal force), or any quality in the property that causes it to damage or destroy itself.

    This exclusion does not apply to "loss" to "specified machinery" from a "machinery accident".

  b. Corrosion, rust or dampness.

  c. Wear and tear, gradual deterioration.

  d. Omission in, or faulty, inadequate or defective:

    (1) Planning, zoning, development, surveying, siting, design or specifications; or

    (2) Materials, workmanship or maintenance.

  e. Settling, cracking, shrinking or expanding.

  f. Weather conditions. But this exclusion only applies if weather conditions contribute concurrently or in sequence with:

    (1) "Flood", unless an amount is shown under "Flood Limit of Insurance" in the Declarations for the "job site" where the "loss" occurred;

    (2) "Earth movement", unless an amount is shown under "Earth Movement Limit of Insurance" in the Declarations for the "job site" where the "loss" occurred; or

    (3) "Loss" excluded in Section B - Exclusions parts 1.a., 1.b., 1.c. and 1.d.

4. We will not pay the "amount of loss" that is directly or indirectly due to an increase in the "post-loss period of construction" caused by any of the following. Such "amount of loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the following:

  a. Interference by strikers or other persons affecting:

    (1) Construction or repair of the Covered Property; or

    (2) Operation or use of the "project" if the building or structure was occupied for its intended purpose at the time of "loss".

CM T1 43 08 96                                                      PAGE    8  of  18
IZ 032 05 0477 0440 0067 0554 0555 0467

008916

COMMERCIAL INLAND MARINE
ISSUE DATE: 01-12-07
POLICY NUMBER:QT-660-0203L858-TIL-06          TRANSACTION EFFECTIVE DATE: 11-02-06

b. Irregularities in production, shipment, or transportation of any property to be used in the construction or repair of the Covered Property.

c. Suspension, lapse, or cancellation of any lease, permit, license, contract or order.

d. Breach of contract, late or noncompliance with orders, or penalties of any nature.

e. Weather conditions.

f. Deficiencies in the original designs, specifications, materials or construction;

g. Enforcement of any law that:

   (1) Regulates the construction, use or repair, or requires the tearing down of any property;

   (2) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of "pollutants".

h. Lack of funds or lack of work force.

## C. LIMITS OF INSURANCE

The most we will pay for "loss" in any one occurrence is the applicable Limit of Insurance shown in the Declarations. But in the event coverage for "loss" is provided under the Coverage Extensions or Additional Coverages, the Limits of Insurance stated within the specific Coverage Extension or Additional Coverage will apply as additional amounts of insurance, unless otherwise stated within the Coverage Extension or Additional Coverage.

If a title for a Limit of Insurance appears in quotations in the Declarations, that limit has a special meaning and may act to reduce or eliminate coverage under some circumstances. Refer to Section F - Definitions.

## D. DEDUCTIBLE

1. "Builders' Risk"

   We will not pay for "loss" in any one occurrence until the amount of the adjusted "loss" exceeds the applicable Deductible shown in the Declarations. We will then pay the amount of the adjusted "loss" in excess of the Deductible, up to the applicable Limit of Insurance.

   If a title for a Deductible appears in quotations in the Declarations, that Deductible has a special meaning and may act to reduce or eliminate coverage under some circumstances. Refer to Section F - Definitions.

2. Soft Costs and Special Time Element

   We will not pay the "amount of loss" until the applicable Deductible shown in the Declarations is exceeded. We will then pay for that part of the "amount of loss" incurred by you in excess of such deductible, up to the Limit of Insurance.

## E. ADDITIONAL COVERAGE CONDITIONS

The following conditions apply in addition to the Commercial Inland Marine Conditions and the Common Policy Conditions.

COMMERCIAL INLAND MARINE
ISSUE DATE: 01-12-07
POLICY NUMBER:QT-660-0203L858-TIL-06          TRANSACTION EFFECTIVE DATE: 11-02-06

1. **Where Coverage Applies**

   We cover property that is in:

   a. The United States of America;

   b. Puerto Rico; or

   c. Canada.

   But we do not cover property in transit to or from Hawaii or Puerto Rico.

2. **Coinsurance**

   The "Basic Limit of Insurance" for each "job site" shown in the Declarations must equal the "completed value" at that "job site" times the "Builders' Risk" Coinsurance Percentage for that "job site" shown in the Declarations or you will incur a penalty.

   The penalty is that we will only pay the proportion of the "loss" that the applicable "Basic Limit of Insurance" bears to the "completed value" at that "job site" times the "Builders' Risk" Coinsurance Percentage for that "job site".

   This Additional Coverage Condition does not apply to Softs Costs and Special Time Element Coverage.

3. **When Coverage Will End**

   Coverage for will end when any one of the following first occurs:

   a. This policy expires or is cancelled; or

   b. Your interest ceases.

4. **Valuation**

   In the event of "loss", the value of your Covered Property at the time of "loss" will be determined as follows:

   a. All Covered Property Except Property Directly Damaged By A "Machinery Accident"

      The value of Covered Property will be the least of the following:

      (1) The actual cash value of that property, including your labor, reasonable profit and delivery charges;

      (2) The cost of reasonably restoring that property to its condition immediately before "loss";

      (3) The cost of replacing that property with substantially identical property; or

      (4) Your legal liability for property of others.

   b. All Covered Property Directly Damaged By A "Machinery Accident"

      (1) We will pay you the amount you spend to repair or replace your Covered Property directly damaged by a "machinery accident". Our payment will be the least of the following:

COMMERCIAL INLAND MARINE
ISSUE DATE: 01-12-07
POLICY NUMBER:Q7-660-0203L858-TIL-06          TRANSACTION EFFECTIVE DATE: 11-02-06

    (a) The applicable "Specified Machinery Limit of Insurance";

    (b) The cost at the time of the "machinery accident" to repair the damaged property with property of like kind, capacity, size and quality;

    (c) The cost at the time of the "machinery accident" to replace the damaged property on the same site with other property:

        (i)    Of like kind, capacity, size and quality; and

        (ii)   Used for the same purpose;

    (d) The amount you actually spend that is necessary to repair or replace the damaged property.

  (2) As respects any "specified machinery", if the cost of repairing or replacing only a part of the "specified machinery" is greater than:

    (a) The cost of repairing the "specified machinery"; or

    (b) The cost of replacing the entire "specified machinery" on the same "job site";

  we will pay only the lesser of (1) (a) or (1) (b).

  The repair parts or replacement "specified machinery" must be:

    (c) Of like kind, capacity, size and quality; and

    (d) Used for the same purpose.

  The cost of repair or replacement in (1) and (2) above does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

  (3) We will not pay you:

    (a) If the "loss" is to property that is obsolete or useless to you, or

    (b) For any extra cost if you decide to repair or replace the damaged property with property of a better kind or quality or of larger capacity.

  (4) If you do not repair or replace the damaged property within 18 months after the date of the "machinery accident", then we will pay only the lesser of the:

    (a) Cost it would have taken to repair; or

    (b) Actual cash value;

  at the time of the "machinery accident".

  But this limitation does not apply to any time period beyond the 18 months that we agree to in writing.

## 5. Duties In The Event Of Loss

You must see that the following are done in the event of "loss" to Covered Property:

COMMERCIAL INLAND MARINE
ISSUE DATE: 01-12-07
POLICY NUMBER:QT-660-0203L858-TIL-06          TRANSACTION EFFECTIVE DATE: 11-02-06

a. Make every effort to meet the "planned completion date". This includes, but is not limited to:

   (1) Resumption of, as soon as possible, all or any part of the construction or repair;

   (2) Use of other machinery, equipment, supplies or materials that could reduce the "period of delay in completion"; and

   (3) Resumption of, as soon as possible, the operation or use of any part of the "project", if the building or structure was occupied for its intended purpose at the time of "loss".

   If you do not make every effort to meet the "planned completion date", or you do not resume the operation or use of any part of the "project" as soon as possible, we will only pay the "amount of loss" that we would have otherwise paid if you had complied with the above conditions.

b. Notify us of any payment you receive from others due to a delay in the completion of construction beyond the "planned completion date".

### 6. Determining the "Amount of Loss"

The "amount of loss" will be determined based on:

a. Your budgeted costs for the project had "loss" to Covered Property from any of the Covered Causes of Loss not occurred.

b. Either;

   (1) Your likely "rental value" during the "period of delay in completion" had "loss" to Covered Property from any of the Covered Causes of Loss not occurred; or

   (2) Your likely "rental value" during the "post-loss period of construction" had "loss" to Covered Property from any of the Covered Causes of Loss not occurred, if the building was occupied for its intended purpose at the time of "loss".

c. Other relevant sources of information that you must provide including, but not limited to:

   (1) Your financial records and accounting procedures;

   (2) Bills, invoices and other vouchers; and

   (3) Deeds, liens and contracts.

d. Any amounts by which the "amount of loss" is reduced due to your failure to perform the Duties In The Event Of Loss outlined in this policy.

### 7. Liquidated Damages

If the construction contract for the "project" contains a clause that requires payments to you because of a delay in the completion of the "project" beyond the "planned completion date", we will subtract the amount due from others, whether you have collected it or not, from the "amount of loss" we would have otherwise paid.

CM T1 43 08 96                                              PAGE    12  of  18
IZ 032 05 0477 0440 0067 0554 0555 0467

008915

COMMERCIAL INLAND MARINE
ISSUE DATE: 01-12-07
POLICY NUMBER:QT-660-0203L858-TIL-06          TRANSACTION EFFECTIVE DATE: 11-02-06

**8. Reinstatement Of Limit After Loss**

The Limit of Insurance will not be reduced by the payment of any claim except for total "loss" of a building or structure, in which event we will refund the unearned premium on that building or structure.

**9. Suspension**

Whenever "specified machinery" is found to be in, or exposed to, a dangerous condition, any of our representatives may immediately suspend the insurance against "loss" from a "machinery accident" to that "specified machinery". This can be done by delivering or mailing a written notice of suspension to:

a. Your last known address; or

b. The address where "specified machinery" is located.

Once suspended in this way, your insurance can be reinstated only by an endorsement for that "specified machinery". If we suspend your insurance, you will get a pro rata refund of premium for that "specified machinery". But the suspension will be effective even if we have not yet made or offered a refund.

## F. DEFINITIONS

1. "Amount of loss" means the sum of your actual "soft costs" and "rental value", as covered by this policy.,

2. "Basic Limit of Insurance" means the most we will pay for "loss" in any one occurrence unless a more specific Limit of Insurance for the applicable "loss" is shown in the Declarations or elsewhere in the policy.

   If a more specific Limit of Insurance for the applicable "loss" is shown, the "Basic Limit of Insurance" will not apply.

3. "Basic Deductible" means the Deductible applicable in any one occurrence of "loss" unless a more specific Deductible for the applicable Covered Cause of Loss is shown in the Declarations or elsewhere in the policy.

4. "Builders' Risk" means:

   Property described in the Declarations under "Builders' Risk" owned by you or for which you are legally liable consisting of:

   a. Buildings or structures including temporary structures while being constructed, erected or fabricated at the "job site";

   b. Property that will become a permanent part of the buildings or structures at the "job site":

      (1) While in transit to the "job site" or temporary storage location;

      (2) While at the "job site" or at a temporary storage location.

   "Builders' Risk" does not include:

   a. Contraband, or property in the course of illegal transit or trade;

   b. Buildings or structures that existed at the "job site" prior to the inception of this policy;

   c. Land (including land on which the property is located) or water.

**CM T1 43 08 96**
IZ 032 05 0477 0440 0067 0554 0555 0467

PAGE/ 13 of 18

COMMERCIAL INLAND MARINE
ISSUE DATE: 01-12-07
POLICY NUMBER:QT-660-0203L858-TIL-06       TRANSACTION EFFECTIVE DATE: 11-02-06

5. "Completed value" means the finished value of the "Builders' Risk" at the date of completion of construction, including your labor, reasonable profit and delivery charges.

6. "Contents" means business personal property and home furnishings.

7. "Earth movement" means any movement of the earth (other than "sinkhole collapse"), including but not limited to:

   a. earthquake;

   b. landslide;

   c. earth sinking, rising or shifting;

   d. volcanic eruption, explosion or effusion.

8. "Earth Movement Annual Aggregate Limit of Insurance" means the most we will pay for all covered "earth movement" occurrences in any one policy year.

   Each policy year:

   a. Begins with the inception date or anniversary date of this policy, and

   b. Ends at the next anniversary date or the expiration date of this policy.

9. "Earth Movement Deductible" means the Deductible applicable in any one occurrence of "loss" from "earth movement".

10. "Earth Movement Limit of Insurance" means the most we will pay for "loss" in any one occurrence caused directly or indirectly by "earth movement", regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

    But if "loss" by fire, explosion or "volcanic action" results from "earth movement", the "Earth Movement Limit of Insurance" will not apply to the resulting "loss". Instead, we will pay up to the applicable Limit of Insurance shown in the Declarations that would otherwise apply to "loss" by fire, explosion or "volcanic action". We will also pay up to such applicable Limit of Insurance for "loss" by building glass breakage resulting from volcanic eruption, explosion or effusion.

    All "earth movement" that occurs within any 168 - hour period will constitute a single occurrence. The expiration of this policy will not reduce the 168 - hour period.

    Any payment under the "Earth Movement Limit of Insurance" will not increase the applicable Limit of Insurance shown elsewhere in this policy.

11. "Flood" means:

    a. Surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

    b. Mudslide or mudflow;

    c. Water that backs up from a sewer or drain; or

    d. Water under the ground surface pressing on, or flowing or seeping through:

CM T1 43 08 96                                                PAGE   14  of   18
IZ 032 05 0477 0440 0067 0554 0555 0467

008918

COMMERCIAL INLAND MARINE
ISSUE DATE: 01-12-07
POLICY NUMBER:QT-660-0203L858-TIL-06          TRANSACTION EFFECTIVE DATE: 11-02-06

(1) Foundations, walls, floors or paved surfaces;

(2) Basements, whether paved or not; or

(3) Doors, windows or other openings.

12. "Flood Annual Aggregate Limit of Insurance" means the most we will pay for all covered "flood" occurrences in any one policy year.

Each policy year:

a. Begins with the inception date or anniversary date of this policy, and

b. Ends at the next anniversary date or the expiration date of this policy.

13. "Flood Deductible" means the Deductible applicable in any one occurrence of "loss" from "flood".

14. "Flood Limit of Insurance" means the most we will pay for "loss" in any one occurrence caused directly or indirectly by "flood", regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

But if "loss" by fire, explosion, or leakage or discharge from an automatic sprinkler system results from "flood", the "Flood Limit of Insurance" will not apply to the resulting "loss". Instead, we will pay up to the applicable Limit of Insurance shown in the Declarations that would otherwise apply to "loss" by fire, explosion, or leakage or discharge from an automatic sprinkler system.

Any payment under the "Flood Limit of Insurance" will not increase the applicable Limit of Insurance shown elsewhere in this policy.

15. "Job site" means the premises where the "Builders' Risk" will be permanently located at completion of the construction, installation, erection or fabrication.

16. "Loss" means accidental loss or damage.

17. "Machinery accident" means a sudden and accidental breakdown of "specified machinery" or part of "specified machinery". At the time the "machinery accident" occurs, the "machinery accident" must manifest itself by physical damage to the "specified machinery" that necessitates repair or replacement.

None of the following is a "machinery accident":

a. Depletion, deterioration, corrosion or erosion;

b. Wear and tear;

c. Leakage at any valve, fitting, shaft seal, gland packing, joint or connection;

d. Breakdown of any vacuum tube, gas tube or brush;

e. The functioning of any safety or protective device;

f. Cracking of any part of a gas turbine when such part was exposed to the products of combustion.

18. "Maximum Amount of Payment" means the most we will pay in any one occurrence of "loss".

CM T1 43 08 96                                                              PAGE   15  of  18
IZ 032 05 0477 0440 0067 0554 0555 0467

COMMERCIAL INLAND MARINE
ISSUE DATE: 01-12-07
POLICY NUMBER:QT-660-0203L858-TIL-06          TRANSACTION EFFECTIVE DATE: 11-02-06

19. "One accident" means:

   If an initial "machinery accident" causes other "machinery accidents", all will be considered "one accident".
   All "machinery accidents" at any one "job site" which manifest themselves at the same time and are the
   result of the same cause will be considered "one accident".

20. "Minimum Earned Premium" means the minimum amount of premium you must pay as specified in the
   Declarations whether you cancel or make other premium adjustments under this Coverage Part.

21. "Period of delay in completion" means the period of time that:

   a. Begins with the "planned completion date"; and

   b. Ends on the date when the "project" should be completed using reasonable speed and similar materials
      and workmanship.

22. "Planned completion date" means the date the "project" would be put into operation or use in the normal
   course of construction if "loss" to Covered Property from any of the Covered Causes of Loss had not
   occurred.

23. "Post-loss period of construction" means the period of time that:

   a. Begins with the date of the "loss" to Covered Property from any Covered Cause of Loss; and

   b. Ends on the date the "project" should be completed using reasonable speed and similar materials and
      workmanship.

24. "Project" means the total construction of all Covered Property at the "job site".

25. "Rental value" means the sum of:

   a. The total rental income from the tenant occupancy of the completed "project", as furnished and
      equipped by you;

   b. The amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be
      your obligations; and

   c. The fair rental value of any portion of the completed "project" which would have been occupied by you.

26. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor,
   soot, fumes, acids, alkalis, chemicals or waste. Waste includes materials to be recycled, reconditioned or
   reclaimed.

27. "Sinkhole collapse" means the sudden sinking or collapse of land into underground empty spaces created
   by the action of water on limestone or dolomite. "Sinkhole collapse" does not mean the cost of filling
   sinkholes or the sinking or collapse of land into man-made underground cavities.

28. "Soft costs" means your actual and necessary business costs in excess of your budgeted amount for the
   "project" consisting only of type shown in the Declarations.

29. "Specified causes of loss" means fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles;
   riot or civil commotion; vandalism; leakage from fire extinguishing equipment; "sinkhole collapse";
   "volcanic action"; falling objects; weight of snow, ice or sleet; "water damage".

CM T1 43 08 96                                              PAGE    16  of   18
IZ 032 05 0477 0440 0067 0554 0555 0467

008920

COMMERCIAL INLAND MARINE
ISSUE DATE: 01-12-07
POLICY NUMBER:QT-660-0203L858-TIL-06          TRANSACTION EFFECTIVE DATE: 11-02-06

    a. Falling objects does not include loss or damage to:

        (1) Personal property in the open; or

        (2) The interior of a building or structure or personal property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

    b. "Water damage" means accidental discharge or leakage of water or steam as the direct result of the breaking or cracking of any part of a system or appliance containing water or steam.

30. "Specified machinery" means:

    a. Boilers, fired vessels, unfired vessels normally subject to vacuum or internal pressure other than weight of its contents, refrigerating and air conditioning vessels, and any metal piping and its accessory equipment;

    b. Mechanical or electrical machines or apparatuses used for the generation, transmission or utilization of mechanical or electrical power; and

    c. The following vessels when used with machinery stated in a. and b.:

        (1) Condensate return tank;

        (2) Cushion or expansion tank used with a hot water heating boiler;

that are Covered Property under "Builders' Risk" and are in use or connected ready for use at the "job site".

"Specified machinery" does not mean any:

    a. Part of a boiler, fired vessel or electric steam generator that does not contain:

        (1) Steam or water; or

        (2) Other heat transfer medium or its vapors;

    b. Insulating or refractory material;

    c. Non-metallic vessel, unless it is constructed and used in accordance with the American Society of Mechanical Engineers Code (A.S.M.E.);

    d. Catalyst;

    e. Buried vessel or piping;

    f. Sewer piping, piping forming a part of a fire protection system or water piping other than:

        (1) Feed water piping between any boiler and its feed pump or injector; or

        (2) Boiler condensate return piping; or

        (3) Water piping forming a part of refrigerating and air-conditioning vessels and piping used for cooling, humidifying or space heating purposes;

    g. Part of a vessel that is not under:

CM T1 43 08 96                                                          PAGE    17 of 18
IZ 032 05 0477 0440 0067 0554 0555 0467

COMMERCIAL INLAND MARINE
ISSUE DATE: 01-12-07
POLICY NUMBER:QT-660-0203L858-TIL-06          TRANSACTION EFFECTIVE DATE: 11-02-06

    (1)  Pressure of the contents of the vessel; or

    (2)  Internal vacuum;

h. Oven, stove, furnace, incinerator, pot or kiln;

i. Structure, foundation, cabinet or compartment containing or supporting the "specified machinery";

j. Machine or apparatus that is used for research, medical, diagnostic, surgical, dental or pathological purposes;

k. Felt, wire, screen, die, extrusion, plate, swing hammer, grinding disc, cutting blade, cable, chain, belt, rope, clutch plate, brake pad, non- metallic part or any part or tool subject to frequent, periodic replacement.

31. "Specified Machinery Deductible" means the Deductible applicable in any one occurrence of "loss" to "specified machinery" from a "machinery accident".

32. "Specified Machinery Limit of Insurance" means the most we will pay for "loss" to "specified machinery" that results from "one accident", regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

33. "Volcanic action" means direct "loss" resulting from the eruption of a volcano when the "loss" is caused by:

a. Airborne volcanic blast or airborne shock waves;

b. Ash, dust or particulate matter; or

c. Lava flow.

"Volcanic action" does not mean the cost to remove ash, dust or particles that do not cause direct physical loss or damage.

All volcanic eruptions that occur within any 168 - hour period will constitute a single occurrence.

CM T1 43 08 96                                              PAGE   18   of   18
IZ 032 05 0477 0440 0067 0554 0555 0467

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions:

### A. CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.
2. We may cancel this policy or any Coverage Part by mailing or delivering to the first Named Insured written notice of cancellation at least:
   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or
   b. 30 days before the effective date of cancellation if we cancel for any other reason.
3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.
4. Notice of cancellation will state the effective date of cancellation. If the policy is cancelled, that date will become the end of the policy period. If a Coverage Part is cancelled, that date will become the end of the policy period as respects that Coverage Part only.
5. If this policy or any Coverage Part is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.
6. If notice is mailed, proof of mailing will be sufficient proof of notice.

### B. CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us as part of this policy.

### C. EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

### D. INSPECTIONS AND SURVEYS

We have the right but are not obligated to:
1. Make inspections and surveys at any time;

2. Give you reports on the conditions we find; and
3. Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:
1. Are safe or healthful; or
2. Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

### E. PREMIUMS

1. The first Named Insured shown in the Declarations:
   a. Is responsible for the payment of all premiums; and
   b. Will be the payee for any return premiums we pay.
2. We compute all premiums for this policy in accordance with our rules, rates, rating plans, premiums and minimum premiums. The premium shown in the Declarations was computed based on rates and rules in effect at the time the policy was issued. On each renewal continuation or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

### F. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have rights and duties but only with respect to that property.

IL T0 01 05 03     Includes copyrighted material of Insurance Services Office, with its permission. Copyright, Insurance Services Office, 1989     Page 1 of 2

006804

This policy consists of the Common Policy Declarations and the Coverage Parts and endorsements listed in that declarations form.

In return for payment of the premium, The Travelers agrees with the Named Insured to provide the insurance afforded by a Coverage Part forming part of this policy. That insurance will be provided by the

company indicated as insuring company in the Common Policy Declarations by the abbreviation of its name opposite that Coverage Part.

The companies listed below (each a stock company) have executed this policy, but it is valid only if countersigned on the Common Policy Declarations by our authorized representative.

The Travelers Indemnity Company (IND)
The Phoenix Insurance Company (PHX)
The Charter Oak Fire Insurance Company (COF)
Travelers Property Casualty Company of America (TIL)
* The Travelers Indemnity Company of Connecticut (TCT)
The Travelers Indemnity Company of America (TIA)

*Formerly known as the Travelers Indemnity Company of Rhode Island (TRI)

General Counsel & Secretary

Chairman of the Board & Chief Executive Officer

IL T0 01 05 03

POLICY NUMBER: QT-660-0203L858-TIL-06

COMMERCIAL INLAND MARINE
GENERAL PURPOSE ENDORSEMENT

SPECIFIED MACHINERY TESTING ENDORSEMENT

WITH REGARD TO LOSS OF OR DAMAGE TO "SPECIFIED MACHINERY" FROM A
"MACHINERY ACCIDENT" ONLY, WE WILL NOT PAY FOR LOSS OF OR DAMAGE
TO ANY "SPECIFIED MACHINERY" WHILE UNDERGOING A TEST WHICH SUBJECTS
SUCH "SPECIFIED MACHINERY" TO GREATER THAN MAXIMUM ALLOWABLE OPERATING
CONDITIONS AS IDENTIFIED BY THE MANUFACTURER OF THE "SPECIFIED MACHINERY".

COMMERCIAL INLAND MARINE

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TERRORISM RISK
# INSURANCE ACT OF 2002 DISCLOSURE

This endorsement applies to the insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART

On November 26, 2002, the President of the United States signed into law the Terrorism Risk Insurance Act of 2002 (the "Act"). The Act establishes a program under which the Federal Government will partially reimburse *"Insured Losses"* caused by certain *"Acts of Terrorism"* (each as defined in the Act).

The Federal Government's share of compensation for *Insured Losses* in each year up to and including calendar year 2006 is 90% of the amount of *Insured Losses* in excess of each *Insurer's* statutorily established deductible for that year, subject to the *"Program Trigger"* (as defined in the Act). For calendar year 2007 the Federal Government's share is 85% of the amount of *Insured Losses* in excess of each

*Insurer's* deductible, subject to the *Program Trigger*. In no event, however, will the Federal Government or any *Insurer* be required to pay any portion of the amount of aggregate *Insured Losses* occurring in any one year that exceeds $100,000,000,000, provided that such *Insurer* has met its deductible.

The charge for *Insured Losses* under this Coverage Part is included in the Coverage Part premium. The charge that has been included for this Coverage Part is indicated below, and does not include any charge for the portion of losses covered by the federal government under the Act:

• 1% of your total Commercial Inland Marine Coverage Part premium.

CM T3 98 01 06

Page 1 of 1

POLICY NUMBER: QT-660-0203L858-TIL-06

COMMERCIAL INLAND MARINE
ISSUE DATE: 01-12-07

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# "FUNGUS", WET ROT, DRY ROT, "BACTERIA" AND OTHER CAUSES OF LOSS CHANGES

This endorsement modifies insurance provided under the **IM PAK COVERAGE FORM.**

A. The following changes are made to the Additional Coverages section:

1. The following Additional Coverage is added:

   **"Fungus", Wet Rot, Dry Rot And "Bacteria"**

   (1) We will pay for "loss" to "Builders' Risk" caused by "fungus", wet or dry rot or "bacteria" only when the "fungus", wet or dry rot or "bacteria" is the result of one or more of the following causes of loss that occurs during the policy period and only if all reasonable means were used to save and preserve the "Builders' Risk" from further damage at the time of and after the occurrence of any such cause of loss:

      (a) A "specified cause of loss" other than fire or lightning;

      (b) "Flood", if "flood" coverage applies at the affected "job site" or temporary storage location; or

      (c) "Earth movement", if "earth movement" coverage applies at the affected "job site" or temporary storage location.

   (2) If there is a delay in completion of the "project" beyond the "planned completion date" that results from a "loss" covered in (1) above and that satisfies all terms and conditions of this policy, we will pay the "amount of loss" sustained during the delay (regardless of when such a delay occurs during the "period of delay in completion").

   (3) We will also pay for the following in connection with "loss" covered in (1) above:

      (a) The cost of removal of the "fungus", wet or dry rot or "bacteria";

      (b) The cost to tear out and replace any part of the covered building or other covered property as needed to gain access to the "fungus", wet or dry rot or "bacteria"; and

      (c) The cost of testing performed after removal, repair, replacement or restoration of the damaged covered property is completed, provided there is a reason to believe that "fungus", wet or dry rot or "bacteria" is present.

   (4) The most we will pay under this Additional Coverage in each separate 12 month period of this policy beginning with the effective date shown in the Declarations is $25,000 unless an increased Limit of Insurance is indicated in Section D., below. This is the most we will pay for the total of all "loss" covered in (1), (2) and (3) above regardless of the:

      (a) Number of insureds, claims, "job sites" or temporary storage locations;

      (b) Occurrences during each separate 12 month period of this policy; or

      (c) Types of coverages provided under this policy.

      This $25,000 limit applies even if the "fungus", wet or dry rot or "bacteria" connected to any particular occurrence continues to be present or active, or recurs, in a later 12 month period of this policy.

   (5) Any payment under this Additional Coverage will not increase the applicable Limit of Insurance on:

      (a) Any "Builders' Risk", or

      (b) "Soft Costs", "Business Income" or "Rental Value" as may be covered under this Coverage Form.

2. Part (3) of the Ordinance or Law Additional Coverage is deleted and replaced by:

   (3) We will not pay under this Additional Coverage for any costs associated with the enforcement of any ordinance or law which requires:

COMMERCIAL INLAND MARINE

    (a) The demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or "bacteria"; or

    (b) Any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or "bacteria".

**B.** The following changes are made to Section B – EXCLUSIONS:

    **1.** The following exclusion is added to Part 1.:

    "Fungus", Wet Rot, Dry Rot And "Bacteria"

    Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or "bacteria".

    But if "fungus", wet or dry rot or "bacteria" results in a "specified cause of loss", we will pay for "loss" caused by that "specified cause of loss".

    This exclusion does not apply:

    **a.** When "fungus", wet or dry rot or "bacteria" results from fire or lightning; or

    **b.** To the extent that coverage is provided in the "Fungus", Wet Rot, Dry Rot And "Bacteria" Additional Coverage.

    **2.** The following exclusions are added to Part 2.:

    **a.** Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor,

that occurs over a period of 14 days or more.

**b.** Rain, snow, sleet or ice, whether driven by wind or not. This exclusion applies only to the following property:

    **(1)** Personal property left in the open;

    **(2)** The interior of any building or structure, or to personal property in the building or structure unless:

        **(a)** The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet or ice enters; or

        **(b)** The "loss" is caused by or results from thawing of snow, sleet or ice on the building or structure.

    Any portion of a building or structure that is within the exterior-facing surface material of a building or structure shall constitute the interior of that building or structure.

**C.** The following changes are made to Section F – DEFINITIONS:

    **1.** "Bacteria" means any type, kind or form of bacterium.

    **2.** "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

**D.** If an amount is shown below, the \$25,000 Limit of Insurance shown in A.1.(4), above, is replaced by the amount shown:

Increased Limit of Insurance \$

COMMERCIAL INLAND MARINE

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ILLINOIS CHANGES – INTENTIONAL ACTS

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART

The following exclusion is added:

A. We will not pay for loss or damage arising out of any act committed:

1. By or at the direction of any insured; and

2. With the intent to cause a loss.

B. However, this exclusion will not apply to deny payment to an innocent co-insured who did not cooperate in or contribute to the creation of the loss if:

1. The loss arose out of a pattern of criminal domestic violence; and

2. The perpetrator of the loss is criminally prosecuted for the act causing the loss.

C. If we pay a claim pursuant to Paragraph B., our payment to the insured is limited to that insured's insurable interest in the property less any payments we first made to a mortgagee or other party with a legal secured interest in the property. In no event will we pay more than the Limit of Insurance.

          Copyright, Insurance Services Office, Inc., 1998

COMMERCIAL INLAND MARINE

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART

A. **Cancellation** (Common Policy Conditions) is replaced by the following:

**CANCELLATION**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing to us advance written notice of cancellation.

2. a. We may cancel this policy by mailing to you written notice stating the reason for cancellation.

   b. If we cancel for nonpayment of premium, we will mail the notice at least 10 days prior to the effective date of cancellation.

   c. If we cancel for a reason other than nonpayment of premium, we will mail the notice at least:

      (1) 30 days prior to the effective date of cancellation if the policy has been in effect for less than 60 days.

      (2) 60 days prior to the effective date of cancellation if the policy has been in effect for more than 60 days.

3. If this policy has been in effect for more than 60 days, we may cancel only for one or more of the following reasons:

   a. Nonpayment of premium;

   b. The policy was obtained through a material misrepresentation;

   c. Any insured has violated any of the terms and conditions of the policy;

   d. The risk originally accepted has measurably increased;

   e. Certification to the Director of Insurance of the loss of reinsurance by the insurer that provided coverage to us for all or a substantial part of the underlying risk insured; or

   f. A determination by the Director of Insurance that the continuation of the policy could place us in violation of the insurance laws of this State.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund will be less than pro rata. The cancellation will be effective even if we have not offered a refund.

6. A copy of the notice will also be sent to your agent or broker.

B. The following is added and supersedes any provision to the contrary:

**NONRENEWAL**

If we decide not to renew or continue this policy, we will mail you and your agent or broker written notice, stating the reason for nonrenewal, at least 60 days before the end of the policy period. If we offer to renew or continue and you do not accept, this policy will terminate at the end of the current policy period. Failure to pay the required renewal or continuation premium when due shall mean that you have not accepted our offer.

If we fail to mail proper written notice of nonrenewal and you obtain other insurance, this policy will end on the effective date of that insurance.

C. **Mailing Of Notices**

We will mail cancellation and nonrenewal notices to the last addresses known to us. Proof of mailing will be sufficient proof of notice.

D. General Condition **C. Legal Action Against Us** in the Commercial Inland Marine Conditions is replaced by the following:

**C. Legal Action Against Us**

No one may bring a legal action against us:

1. Until there has been full compliance with all terms of this Coverage Part; and

2. More than 2 years after you first have knowledge of the direct loss or damage. But we will extend this 2 year period by

© ISO Properties, Inc., 2004

COMMERCIAL INLAND MARINE

the number of days between the date
proof of loss is filed and the date the
claim is denied in whole or in part.

© ISO Properties, Inc., 2004                    CM 02 04 07 05

# INTERLINE
# ENDORSEMENTS

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
DELUXE PROPERTY COVERAGE PART

## A. Cap On Certified Terrorism Losses

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The criteria contained in that Act for a "certified act of terrorism" include the following:

1. The act resulted in aggregate losses in excess of $5 million; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

With respect to any one or more "certified acts of terrorism" under the federal Terrorism Risk Insurance Act of 2002, we will not pay any amounts for which we are not responsible under the terms of that Act (including subsequent action of Congress pursuant to the Act) due to the application of any clause which results in a cap on our liability for payments for terrorism losses.

## B. Application Of Exclusions

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

IL T3 79 01 06    Includes the copyrighted material of Insurance Services Office, Inc. with its permission.    Page 1 of 1

006928

# POLICYHOLDER NOTICES

# IMPORTANT NOTICE REGARDING INDEPENDENT AGENT AND BROKER COMPENSATION

For information about how St. Paul Travelers compensates independent agents and brokers, please visit www.StPaulTravelers.com, or you may request a written copy from Marketing at One Tower Square, 2GSA, Hartford, Connecticut 06183.

PN T4 54 03 06

Page 1 of 1

008925

# TAB 5

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ONE PLACE CONDOMINIUM LLC, | ) | |
| THE SOUTH LOOP SHOPS LLC, | ) | |
| SOUTHBLOCK DEVELOPMENT LLC, | ) | Case No. 1:11-cv-02520 |
| C & K PARTNERSHIP, and | ) | |
| SOUTHBLOCK MANAGEMENT, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| TRAVELERS PROPERTY CASUALTY | ) | |
| COMPANY OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFFS' ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Plaintiffs, One Place Condominium LLC, The South Loop Shops LLC, Southblock Development LLC, C & K Partnership, and Southblock Management, Inc., state as follows for their obejctions and answers to Travelers' First Set of Interrogatories:

## GENERAL OBJECTIONS

Plaintiffs object to Travelers' Instructions and Definitions to the extent they seek to impose or create obligations not authorized by the Federal Rules of Civil Procedure or any other applicable law.

## ANSWERS TO INTERROGATORIES

**INTERROGATORY NO. 1:** Identify all Persons consulted or who assisted in the preparation of the answers to these Interrogatories.

**ANSWER:** Harlan Karp and counsel for Plaintiffs.

**INTERROGATORY NO. 2:**  Identify all Persons with knowledge or information relating to the Claim and allegations in the Complaint and, for each Person, provide a summary of the substance of each Person's knowledge.

**ANSWER:**  *See* Plaintiffs Rule 26(a)(1) Initial Disclosures.  Additionally, Plaintiffs' investigation into the Defendant's claims handling and coverage decisions continues and Plaintiffs will supplement their Answer to Interrogatory No. 2 as necessary.

**INTERROGATORY NO. 3:**  Identify the cause of the damage to the earth retention system at the One Place Project.

**ANSWER:**  Plaintiffs object to Interrogatory No. 3 as it is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, is vague and ambiguous as far as calling for the "cause of the damage to the earth retention system," and to the extent is seeks a legal conclusion.  Further objecting, it calls for an expert opinion and plaintiff will provide such relevant opinions as required under the Court's scheduling order.  Without waiving the aforementioned objections and subject thereto, the policy purchased by One Place is a broad  "all risk" policy which means it provides coverage for all risks of loss to One Place's mixed commercial use project.  With "all risk" policies, the insured need not prove the cause of the damage to be entitled to coverage; but rather, only that loss or damage occurred.

**INTERROGATORY NO. 4:**  Identify the date on which the earth retention system was repaired, replaced or restored to its condition immediately before the loss.

**ANSWER:**  Plaintiffs object to Interrogatory No. 4 as it is vague and ambiguous particularly as it requests information regarding "its condition immediately before the loss."  Without waiving the aforementioned objections and subject thereto, *see* documents provided to Travelers pre-litigation which include documents regarding the earth retention system and the work that was done regarding same.  These documents are again being provided to Travelers as part of this

litigation. Per the documents, the earth retention system was repaired/restored on or about April 13, 2007.

**INTERROGATORY NO. 5:** Identify, with specificity, the costs (and associated scope of work) Plaintiffs are seeking to recover under the Valuation provision of the Policy for the costs to repair, replace or restore the earth retention system.

**ANSWER:** Plaintiffs object to Interrogatory No. 5 as it is vague and ambiguous as the "Valuation" provision of Travelers' policy provides for a method of determining the "value of property" and the word, "property" is not defined in the policy. Instead, the policy covers, "loss to Covered Property from any of the Covered Causes of Loss." "Covered Property" is defined in the policy as "Builders' Risk" which is further defined to mean, "buildings or structures including temporary structures while being constructed, erected or fabricated." Plaintiffs are seeking coverage per the policy for items such as "Covered Property" and "Soft Costs." Without waiving the aforementioned objections and subject thereto, and assuming the interrogatory is requesting Plaintiffs' claimed amount, plaintiffs provide the following based based on the policy language: Damage from the loss (ERS/D-Line): $3,973,447.82; damages for soft costs: $2,985,897.85; damages for escalation: $100,000; and damages for expenses to reduce the amount of the loss: $1,554,252.94. Total claim under the policy at present: $8,613,598.61. Travelers has paid only $1,345,549.60 of this claim. Investigation continues. Plaintiffs refer Travelers to documents provided to it pre-litigation including the Preliminary Claim binder, and Final Revised Claim binders I, II and III. *See* bates numbered documents, OP-GM/AI000001 to OP-GM/AI002260.

**INTERROGATORY NO. 6:** Identify the cause of the damage to the D-Line caissons and frost line at the One Place Project.

**ANSWER:** Plaintiffs object to Interrogatory No. 6 as it is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence and it is vague and ambiguous as far as

3

calling for the "cause of the damage to the earth retention system," and to the extent is seeks a legal conclusion. Further objecting, it calls for an expert opinion and plaintiff will provide such relevant opinions as required under the Court's scheduling order. Without waiving the aforementioned objections and subject thereto, the policy purchased by One Place is a broad "all risk" policy which means it provides coverage for all risks of loss to One Place's mixed commercial use project. With "all risk" policies, the insured need not prove the cause of the damage to be entitled to coverage; but rather, only that loss or damage occurred.

**INTERROGATORY NO. 7:** Identify the date on which One Place discovered the loss or damage to the D-Line caissons and frost line.

**ANSWER:** On or about the end of June, 2007.

**INTERROGATORY NO. 8:** Identify the date on which the D-Line caissons and frost line was repaired, replaced or restored to its condition immediately before the loss.

**ANSWER:** Plaintiffs object to Interrogatory No. 8 as it is vague and ambiguous particularly as it requests information regarding "its condition immediately before the loss." Without waiving the aforementioned objections and subject thereto, *see* documents provided to Travelers pre-litigation which include documents regarding the caissons and the work that was done regarding same. These documents are again being provided to Travelers as a part of this litigation. Per the documents, the caissons were repaired/restored on or about August 18, 2007.

**INTERROGATORY NO. 9:** Identify, with specificity, the costs (and associated scope of work) Plaintiffs are seeking to recover under the Valuation provision of the Policy for the costs to repair, replace or restore the D-Line caissons and frost line.

**ANSWER:** See Plaintiffs' answer toto Interrogatory No. 5.

**INTERROGATORY NO. 10:** Identify, with specificity, the costs (and associated scope of work) Plaintiffs are seeking to recover under any other provision of the Policy for the costs to repair, replace or restore the earth retention system and/or D-Line caissons and frost-line and identify the specific provision of the Policy pursuant to which Plaintiffs are seeking recovery.

**ANSWER:** See Plaintiffs' answer to Interrogatory No. 5.

**INTERROGATORY NO. 11:** Identify, with specificity, the costs incurred (and associated scope of work) to expedite the repair of the earth retention system.

**ANSWER:** See Plaintiffs' answer to Interrogatory No. 5.

**INTERROGATORY NO. 12:** Identify, with specificity, the costs incurred (and associated scope of work) to expedite the repair of the D-Line caissons and frost line.

**ANSWER:** See Plaintiffs' answer to Interrogatory No. 5.

**INTERROGATORY NO. 13:** Identify, with specificity, the increased cost of construction materials and labor (and associated scope of work) made necessary by the damage to the earth retention system and/or damage to the D-Line caissons and frost line.

**ANSWER:** See Plaintiffs' answer to Interrogatory No. 5.

**INTERROGATORY NO. 14:** Identify the exact number of calendar days Plaintiffs contend the loss to the earth retention system delayed the completion of the One Place Project beyond the "planned completion date" as well as the project schedule(s) used in determining the days of delay and its affect on the "planned completion date."

**ANSWER:** Plaintiffs object to Interrogatory No. 14 to the extent it is seeking a response that is different from the method of determining the number of days, than is provided for in the policy, as such is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Further objecting, to the extent it calls for an expert opinion it is premature and said information will be provided in accord with the Court's scheduling order. Without waiving said objections and subject thereto, Plaintiffs' respond that based on the policy language: "'Period of delay in completion' means the period of time that: a) Begins with the 'planned completion date'; and b) Ends on the date when the 'project' should be completed using reasonable speed and similar materials and workmanship." "'Planned completion date' means the date the 'project' would be put into operation or use in the normal course of construction if 'loss' to Covered Property from any of the Covered Causes of Loss had not occurred." "'Project' means the total construction of all Covered Property at the 'job site.'" Accordingly, per the policy language, Plaintiffs' original planned completion date was April 3, 2008, but the project was not

5

completed until late April, 2009. Per the policy language, a delay of 12 months. The number of days total: 365. Travelers allocated 4 months to a water loss to the Covered Property, leaving 8 months delay for the ERS/D line loss. It is also Plaintiffs' position that the number of delay days are also supported and/or may be increased due to Travelers' failure to pay policy benefits in a timely manner. *See* bates no. OP-GM/AI005092 to OP-GM/AI005094 noting Travelers' engineers, Madsen, Kneppers & Associates, Inc. ("MKA"), finding 3.5 months of delay. MKA later agreed to 4 months of delay. It was soon thereafter that MKA was removed from the loss by Travelers, and Travelers, without explanation, hired Held Enloe & Associates ("Held Enloe"), who opined, without having ever been to the loss site, to a total number of 37 delay days; clearly a much lesser period of delay than what was determined by MKA, who were physically at the Covered Property and actually saw and investigated the loss. Investigation continues.

**INTERROGATORY NO. 15:** Identify the exact number of calendar days Plaintiffs contend the loss to the D-Line caissons and frost-line delayed the completion of the One Place Project beyond the "planned completion date" as well as the project schedule(s) used in determining the days of delay and its affect on the "planned completion date."

**ANSWER:** See Plaintiffs' response to Interrogatory No. 14.

**INTERROGATORY NO. 16:** Identify, with specificity, the expenses to reduce the amount of loss (and associated scope of work) Plaintiffs are seeking to recover under Section A.5.k. of the Policy.

**ANSWER:** See Plaintiffs' response Interrogatory No. 5.

**INTERROGATORY NO. 17:** Identify the amount of retainage currently held on the One Place Project and/or any other amounts of current money held on the One Place Project.

**ANSWER:** Plaintiffs object to Interrogatory No. 17 on the grounds that it is vague and ambiguous and neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Without waiving said objections and subject thereto, none.

**INTERROGATORY NO. 18:** As to the amounts Plaintiffs are seeking to recover from Travelers relating to labor, services, materials or other items provided by Concrete Structures of

the Midwest, identify how much has been paid to date to Concrete Structures of the Midwest, and how much do Plaintiffs still owe and have not paid to Concrete Structures of the Midwest.

**ANSWER**: Plaintiffs incorporate their response to Interrogatory No. 5. Further responding, the total amount paid to date to Concrete Structures is $14,072,471.78. Of that amount, $1,846,092.02 is included in Plaintiffs'claim to Travelers. Further and as Travelers is aware, litigation is currently pending between Concrete Structures of the Midwest and One Place and there is no final resolution to the liability or damages in that litigation. Moreover, Plaintiffs previously provided the information regarding the amount requested from Travelers involving Concrete Structures of the Midwest and said amounts were set forth in  in its Preliminary Claim binder, and Final Revised Claim binders I, II and III. Plaintiffs will again produce these documents. *See* bates numbered documents, OP-GM/AI000001 to OP-GM/AI002260.

**INTERROGATORY NO. 19:** Do Plaintiffs contend that Concrete Structures of the Midwest provided defective or poor quality work on the One Place Project? If yes, describe the delays that were caused by the work of Concrete Structures of the Midwest as well as the exact number of calendar days the overall completion of the One Place Project was delayed by that work.

**ANSWER:** Plaintiffs object to Interrogatory No. 19 as it is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Without waiving the aforementioned objection and subject thereto,  yes. Plaintiffs further object to the portion of the interrogatory regarding the "delays that were caused by the work of Concrete Structures …" as it seeks a legal conclusion and as to the extent it requires the opinion of an expert.


**INTERROGATORY NO. 20:** Identify, in detail, all facts support Plaintiffs' allegations in Paragraph 22 of their Complaint that Travelers, engaged in vexatious and unreasonable conduct.

**ANSWER:** Travelers failed to provide coverage for the loss and on November 12, 2007, Travelers denied coverage for this claim. More than one year later, on December 22, 2008, travelers "withdrew" its denial letter and admitted coverage for the claim. *See* Letters from

Travelers dated November 12, 2007, December 22, 2008, bates stamped nos. OP-GM/AI004959 to OP-GM/AI004963 and OP-GM/AI005068 to OP-GM/AI005069 respectively. Nonetheless, despite its admission of coverage and the passage of more than four and one-half years, Travelers has failed to pay the insurance benefits due Plaintiffs under the policy despite having access to all necessary information. This conduct, among others, caused Plaintiffs to retain various individuals and lawyers to assist it in obtaining the funds that Travelers' owes under the "all risk" policy it issued to Plaintiffs. Even so, Travelers has thus far paid Plaitiffs only $1,345,549.60 of the claimed amount. Travelers also failed to adjust the loss and review its own policy langue, leaving the insured to fend for itself in adjusting the loss, contary to the policy language and standard insurance industry practice.

In addition, on one of the significant issues between the parties, the delay, Travelers' original engineers, MKA, agreed that the delay was substantially longer than they had originally opinied and that the delay was at least 3.5 months[1] equalling soft costs of at least $823,782.05 owed to Plaintiffs (the amount owed to Plaintiffs for soft costs is more than this, at least in part, because the daily soft cost rate used by MKA of $9,052.55 has since been increased to $10,254.10). *See* bates no. OP-GM/AI005092 to OP-GM/AI005094. MKA later increased their opinion regarding the delay caused by the loss to 4.0 months. A four month delay at $10,254.10/day in soft costs would equal at least $1,230,492. Accordingly, Travelers currently owes at least $1,230,492 to Plaintiffs in soft costs.

Immediately after MKA issued its opinion, and without notice or reason to Plaintiffs, and despite the fact that MKA had been involved in the loss since its inception and spent hundreds of hours on site, Travelers removed MKA from the loss, never to be heard from again. Travelers

---

[1] There is a 14 day deductible in the policy.

then retained Held Enloe, an engineering firm known to work primarily for insurance companies. Held Enloe then, without even having seen the site and after only ten weeks of reviewing the tens of thousands of pages of documentation about the loss and claim, provided an opinion in direct contradiction to that of Travler's previously retained engineers, MKA. Held Enloe opined that the delay from the loss was only 37 days (before applying the 14 day deductible). Travelers refused to provide back-up for Held Enloe's opinion and, instead, the insured received only a terse phone call with Held Enloe answering a few questions. Additionally, Travelers denied Plaintiffs' claim based upon biased an incomplete claims investigation. Investigation continues.

**INTERROGATORY NO. 21:** Identify the date that One Place retained legal counsel.

**ANSWER:** Plaintiffs retained Childress Duffy, Ltd., on or about January 21, 2008.

**INTERROGATORY NO. 22:** Identify all facts supporting Plaintiffs' contention in Paragraph 22(j) of their Complaint that "Travelers own experts agreed to a period of delay of at least 105 days or 3 and ½ months" and also identify the date of said agreement and persons who made that agreement.

**ANSWER:** See Plaintiffs' response to Interrogatory No. 20. In addition, the date of said agreement was on or about June 4, 2009. Investigation continues.

**INTERROGATORY NO. 23:** Identify each fact witness Plaintiffs intend to call to testify at trial, and for each such person, identify the subject matters about which he/she is expected to testify.

**ANSWER:** Plaintiffs object to Interrogatory No. 23 on the grounds that it seeks premature disclosure of Plaintiffs' intended witnesses. Subject to and without waiving said objection, *see* Plaintiffs Rule 26(a)(1) Initial Disclosures. Additionally, Plaintiffs may call any of the witnesses listed in Defendant's Rule 26(a)(1) Initial Disclosures. Plaintiffs reserve the right to supplement their answer.

**INTERROGATORY NO. 24:** Identify, in detail, all losses, damages, fees, costs, or expenses Plaintiffs seek to recover from Travelers and, for each category of loss, damage, fee, cost or expense, identify the amount the Plaintiffs seeks to recover, the associated scope of work, the

specific provision in the Policy pursuant to which the Plaintiffs believes they are entitled to recover said losses, damages, fees, costs or expenses, and all Persons with knowledge of said losses, damages, fees, costs or expenses, and/or who will testify with will testify with regard to your claim for losses, damages, fees, costs or expenses.

**ANSWER:** Plaintiffs object to Interrogatory No. 24 on the grounds that it seeks premature disclosure of Plaintiffs' intended fact witnesses and expert witnesses. Subject to and without waiving said objections, *see* Plaintiffs Rule 26(a)(1) Initial Disclosures. Additionally, Plaintiffs refer to all previously disclosed claims documents provided to Travelers over the course of Travelers four year claim investigation. Plaintiffs will again produce these documents. See also, Plaintiffs' response to Interrogatory No. 5.

Plaintiffs' damages include: Policy Benefits: about $8,613,598.61; prejudgment interest at 5% per annum $1,197,971.59 (as of 9.15.11); consequential damages for breach of contract to be determined as they continue to grow; penalties pursuant to section 155 of the Illinois Insurance Code of $60,000; and, attorneys fees and costs pursuant to section 155 of the Illinois Insurance Code and postjudgment interest.

Dated: September 16, 2011.

Respectfully submitted,

One Place Condominium LLC, The South Loop Shops LLC, Southblock Development LLC, C & K Partnership, and Southblock Management, Inc.

By:

Coleman J. Braun, Esq.
Illinois Bar No. 6295961
cbraun@childresslawyers.com
Katherine Smith Dedrick, Esq,
Illinois Bar No. 6185314
kdedrick@childresslawyers.com
Childress Duffy, Ltd.
500 North Dearborn Street
Suite 1200

Chicago, Illinois 60654
Tel: (312) 494-0200
Fax: (312) 494-0202
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I, the undersigned, a non-attorney, on oath state I served the above referenced documents by mailing a copy of the same in an envelope properly addressed, sealed and stamped and depositing in the U.S. Mail at 500 North Dearborn Street, Suite 1200, Chicago, Illinois 60654 on the 16th day of September, 2011.

K. Clark Schirle
Butler Pappas Weihmuller Katz Craig, LLP.
115 South LaSalle Street, Suite 3200
Chicago, Illinois 60603
Tel: (312) 456-0900
Fax: (312) 456-0909

Respectfully submitted,

One Place Condominium LLC, The South Loop Shops LLC, Southblock Development LLC, C & K Partnership, and Southblock Management, Inc.

By:

Coleman J. Braun, Esq.
Illinois Bar No. 6295961
cbraun@childresslawyers.com
Katherine Smith Dedrick, Esq,
Illinois Bar No. 6185314
kdedrick@childresslawyers.com
Childress Duffy, Ltd.
500 North Dearborn Street
Suite 1200
Chicago, Illinois 60654
Tel: (312) 494-0200
Fax: (312) 494-0202
Attorneys for Plaintiffs

**VERIFICATION**

BEFORE ME, the undersigned authority, a Notary Public on this day personally appeared Harlan Karp who being by me duly sworn on oath deposed and said that he has read the foregoing Plaintiffs' Answers to Defendant's First Set of Interrogatories and that every statement contained therein is based on information and belief, true and correct

HARLAN KARP

Subscribed and Sworn to before me, on this 15 day of September, 2011.

Notary Public in and for the state of Illinois

My commission Expires on:

12·10·12

"OFFICIAL SEAL"
Annette Lara
Notary Public, State of Illinois
My Commission Expires 12/10/2012

Signature

# TAB 6

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ONE PLACE CONDOMINIUM LLC,    )
THE SOUTH LOOP SHOPS LLC,    )
SOUTHBLOCK DEVELOPMENT LLC,    )    Case No. 1:11-cv-02520
C & K PARTNERSHIP, and    )
SOUTHBLOCK MANAGEMENT, INC.,    )
    )
    Plaintiffs,    )
    )
vs.    )
    )
    )
TRAVELERS PROPERTY CASUALTY    )
COMPANY OF AMERICA,    )
    )
    Defendant.    )
_____)

### PLAINTIFFS' SUPPLEMENTAL ANWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Plaintiffs, One Place Condominium LLC, The South Loop Shops LLC, Southblock Development LLC, C & K Partnership, and Southblock Management, Inc., state as follows for their Supplemental Answers to Travelers' First Set of Interrogatories per the Court's Order:

### INTERROGATORIES

**INTERROGATORY NO. 3:** Identify the cause of the damage to the earth retention system at the One Place Project.

**ANSWER:** Plaintiffs reserve the right to use experts regarding the cause and will supplement their answer upon further investigation and through the disclosure of expert opinions in accordance with the Federal Rules of Civil Procedure and the Court's scheduling Order.

**INTERROGATORY NO. 5:** Identify, with specificity, the costs (and associated scope of work) Plaintiffs are seeking to recover under the Valuation provision of the Policy for the costs to repair, replace or restore the earth retention system.

1



**ANSWER:**    Plaintiffs object to interrogatory no. 5 as being neither relevant nor reasonably calculated to lead to the discovery of admissible evidence as the Valuation provision of the Policy does not contain the language set forth by Defendant regarding "the costs to repair, replace or restore" the earth retention system.    Without waiving said objection, Plaintiffs respond as follows:    The policy provides $33 million in coverage limits under the IM PAK COVERAGE FORM CM T1 43 08 96 for " 'loss' to Covered Property from any of the Covered Causes of Loss."  Covered Causes of Loss means "RISKS OF DIRECT PHYSICAL 'LOSS' except those causes of 'loss' listed in the Exclusions."  Policy form CM T1 43 08 96 p. 1.  Loss is defined under section F on page 15, paragraph 16 as "accidental loss or damage."  Covered property is identified in the same section as "Builders' Risk" which is defined on page 13 par. 4 and includes buildings and structures including temporary structures while being constructed and property that will become a permanent part of the building or structure.  Thus, the Policy pays for, in part: accidental loss or damage to Covered Property from any of the risks of direct physical accidental loss or damage.  Based on the policy language, Plaintiffs are seeking to recover a total of $3,973,447.82. Some of these amounts can currently be allocated as follows: $984,521.38 for earth retention system;  $756,539.44 for D-Line caissons; and the remaining amount of $2,232,387.00 cannot yet be allocated and Plaintiffs reserve the right to supplement this answer with expert opinion, if necessary. *See* Attachment A for the breakdown for the aforementioned allocations.

**INTERROGATORY NO. 6:** Identify the cause of the damage to the D-Line caissons and frost line at the One Place Project.

2

**ANSWER:**  Plaintiffs reserve the right to use experts regarding the cause and supplement their answer upon further investigation and through the disclosure of expert opinions in accordance with the Federal Rules of Civil Procedure and the Court's scheduling Order.

**INTERROGATORY NO. 9:** Identify, with specificity, the costs (and associated scope of work) Plaintiffs are seeking to recover under the Valuation provision of the Policy for the costs to repair, replace or restore the D-Line caissons and frost line.

**ANSWER:**  *See* Plaintiffs response to interrogatory no. 5 which is incorporated herein by reference.

**INTERROGATORY NO. 11:**  Identify, with specificity, the costs incurred (and associated scope of work) to expedite the repair of the earth retention system.

**ANSWER:**  Plaintiffs object to interrogatory no. 11 as being neither relevant nor reasonably calculated to lead to the discovery of admissible evidence as the Policy does not contain language which provides that it will pay for only "the costs incurred (and associated scope of work) to expedite the repair" of damaged property, such as the earth retention system. Without waiving said objection, Plaintiffs respond as follows:

The policy provides coverage under the "Additional Coverage" section (see form CM T1 43 08 96, p. 2, par. 5) for "Expediting Costs and Additional Cost of Construction Materials and Labor" as follows: "We will pay for the following costs made necessary by a Covered Cause of Loss to Covered Property at the 'job site': (a) Your costs to expedite repair of Covered Property; (b) Your increased cost of construction material and labor" up to a policy limit of $100,000." See form CM T1 43 08 96, p. 5, par. h. Plaintiffs assume and understand that this is the Policy provision referred to in this interrogatory and answer based on that assumption and provide that Plaintiffs incurred $215,604 in costs. *See* Attachment B for the breakdown.

3

Plaintiffs reserve the right to supplement this answer upon further investigation and through the disclosure of expert opinions in accordance with the Federal Rules of Civil Procedure and the Court's scheduling Order.

**INTERROGATORY NO. 12:** Identify, with specificity, the costs incurred (and associated scope of work) to expedite the repair of the D-Line caissons and frost line.

**ANSWER:** Plaintiffs object to interrogatory no. 12 as being neither relevant nor reasonably calculated to lead to the discovery of admissible evidence as the Policy does not contain language which provides that it will pay for "the costs incurred (and associated scope of work) to expedite the repair" of damaged property, such as the earth retention system. Without waiving said objection, Plaintiffs respond as follows:

The policy provides coverage under the "Additional Coverage" section (see form CM T1 43 08 96, p. 2, par. 5) for "Expediting Costs and Additional Cost of Construction Materials and Labor" providing, in part: "We will pay for the following costs made necessary by a Covered Cause of Loss to Covered Property at the "job site: (a) Your costs to expedite repair of Covered Property; (b) Your increased cost of construction material and labor" up to a policy limit of $100,000. " Form CM T1 43 08 96, p. 5, par. h. Plaintiffs assume and understand that this is the Policy provision referred to in this interrogatory and answer based on that assumption that Plaintiffs incurred $215,604 in costs. *See* Attachment B for the breakdown.

Plaintiffs reserve the right to supplement the answer upon further investigation and through the disclosure of expert opinions in accordance with the Federal Rules of Civil Procedure and the Court's scheduling Order.

**INTERROGATORY NO. 13:** Identify, with specificity, the increased cost of construction materials and labor (and associated scope of work) made necessary by the damage to the earth retention system and/or damage to the D-Line caissons and frost line.

4

**ANSWER:**    Plaintiffs object to interrogatory no. 13 as being neither relevant nor reasonably calculated to lead to the discovery of admissible evidence as the Policy does not contain language which provides that it will pay for "the increased cost of construction materials and labor (and associated scope of work) made necessary by" the damage to the earth retention system and/or damage to the D—Line caissons and frost line. Without waiving said objection, Plaintiffs respond as follows:

The policy provides coverage under the "Additional Coverage" section (see form CM T1 43 08 96, p. 2 par. 5) for "Expediting Costs and Additional Cost of Construction Materials and Labor" providing, in part: "We will pay for the following costs made necessary by a Covered Cause of Loss to Covered Property at the 'job site': (a) Your costs to expedite repair of Covered Property; (b) Your increased cost of construction material and labor up to a policy limit of $100,000. " (see form CM T1 43 08 96, p. 5, par. h). Plaintiffs assume and understand that this is the Policy provision referred to in this interrogatory and answer based on that assumption that Plaintiffs incurred $215,604 in costs. *See* Attachment B for the breakdown.

Plaintiffs reserve the right to supplement the answer upon further investigation and through the disclosure of expert opinions in accordance with the Federal Rules of Civil Procedure and the Court's scheduling Order.

**INTERROGATORY NO. 14:**  Identify the exact number of calendar days Plaintiffs contend the loss to the earth retention system delayed the completion of the One Place Project beyond the "planned completion date" as well as the project schedule(s) used in determining the days of delay and its affect on the "planned completion date."

**ANSWER:**    Plaintiffs are currently unable to provide the exact number of calendar days the "loss" to the earth retention system delayed the completion of the One Place Project as it has yet to disclose its expert opinions. Plaintiffs reserve the right to supplement the answer upon further

investigation and through the disclosure of expert opinions in accordance with the Federal Rules of Civil Procedure and the Court's scheduling Order.

Without waiving the aforementioned reservation, Plaintiffs respond that there were at least 46 days that the project was shut down for the earth retention system. Plaintiffs further respond that the project was originally scheduled to be completed by April 3, 2008 as detailed on the Baseline Construction Schedule (Attachment C). This "Planned Completion Date" is not in dispute. A partial certificate of occupancy was not obtained until December 10, 2008 (Attachment D), and construction did not fully conclude until April of 2009 when all construction activity ended (Attachment E) for a total period of delay as defined by the policy of 12 months. Four of these months have been previously allocated to a separate loss that has been paid to Plaintiffs by Travelers (Attachment F). Traveler's has determined that the daily incurred soft costs during the period of delay were $10,254.10 (Attachment G). This calculation does not include the $300,000 payoff penalty on the original construction loan that was applied as a result of the extended loan period.

**INTERROGATORY NO. 15:** Identify the exact number of calendar days Plaintiffs contend the loss to the D-Line caissons and frost-line delayed the completion of the One Place Project beyond the "planned completion date" as well as the project schedule(s) used in determining the days of delay and its affect on the "planned completion date."

**ANSWER:** Plaintiffs are currently unable to provide the exact number of calendar days the "loss" to the earth retention system delayed the completion of the One Place Project as it has yet to disclose its expert opinions. Plaintiffs reserve the right to supplement the answer upon further investigation and through the disclosure of expert opinions in accordance with the Federal Rules of Civil Procedure and the Court's scheduling Order.

Without waiving the aforementioned reservation, Plaintiffs respond that there were at least 15 days that the project was shut down for the D-Line caissons. Plaintiffs further respond that the project was originally scheduled to be completed by April 3, 2008 as detailed on the Baseline Construction Schedule (Attachment C). This "Planned Completion Date" is not in dispute. A partial certificate of occupancy was not obtained until December 10, 2008 (Attachment D), and construction did not fully conclude until April of 2009 when all construction activity ended (Attachment E), for a total period of delay as defined by the policy of 12 months. Four of these months have been previously allocated to a separate loss that has been paid to Plaintiffs by Travelers (Attachment F). Traveler's has determined that the daily incurred soft costs during the period of delay were $10,254.10 (Attachment G). This calculation does not include the $300,000 payoff penalty on the original construction loan that was applied as a result of the extended loan period.

**INTERROGATORY NO. 16:** Identify, with specificity, the expenses to reduce the amount of loss (and associated scope of work) Plaintiffs are seeking to recover under Section A.5.k. of the Policy.

**ANSWER:** The Policy provides "Additional Coverages" for "Expense to Reduce 'Amount of Loss.' Form CM T1 43 08 96, p. 2. The coverage provides: "We will pay the necessary expense you incur during the 'post-loss period of construction' if you would not have incurred such expense had there not been 'loss' to Covered Property from any of the Covered Causes of Loss which delayed the completion of the 'project' beyond the "planned completion date." But we will not pay more for your expense than the amount by which such expense reduces the "amount of loss" we would have otherwise paid. No deductible applies to this Additional Coverage." Form CM T1 43 08 96, p. 6, par. k.

The expense to reduce the amount of loss totals $1,554,252.94. This is comprised of three subcategories. First, $110,629 is for what we refer to as winter conditions (See Attachment I). Certain concrete, masonry and subsequent mechanical, electrical, plumbing and elevator work which was weather sensitive per the original schedule was scheduled to be completed either prior to the onset of the 2007/08 winter or to be performed in a fully enclosed, weather protected structure. The loss resulted in lost construction days, delays in construction, work-arounds on site to accommodate loss related repairs and other schedule impacting construction inefficiencies directly attributable to the loss, all of which caused some of these construction activities to be performed in the following winter. If the loss had not occurred, these activities would have been performed before the onset of the winter. As a result, additional unanticipated costs were incurred to provide protection from the elements so that work could continue. The $110,629 of costs were incurred to allow for work to be performed during winter conditions. If such winter condition related costs were not paid for by Plaintiffs, the alternative would have been to shut down the jobsite from late November through April, 2008 as evidenced by the letter from the Masonry Contractor (Attachment J). Such a shutdown would have added additional soft costs of at least 5-months and at the agreed daily amount of $10,254.10 (Attachment G), excluding back end penalties and interest charges, $1,538,115 of additional soft costs were averted. (Attachment K).

Second, Plaintiffs incurred $320,311.94 of expenses after to the loss which were necessary to attempt to get the project back on line with the critical path schedule. Each lost day on the critical path would have at least a daily impact on soft costs, although some accelerated work improved the schedule on a better than 1:1 ratio. There were 82 days of accelerated work performed which is equal to $840,836.20 of averted costs. (See Attachment L).

8

Third, similar to the winter conditions above, the lost construction days, delays in construction, work-arounds on site to accommodate the loss related repairs and other schedule impacting construction inefficiencies directly attributable to the loss caused inefficiencies which resulted in the insured incurring significant additional costs in contract labor. $1,123,312 in incurred costs (Attachment I) primarily from the concrete and plumbing sub-contractors for increased period of construction costs as a result of the covered loss.

Plaintiffs reserve the right to supplement the answer upon further investigation and through the disclosure of expert opinions in accordance with the Federal Rules of Civil Procedure and the Court's scheduling Order.

**INTERROGATORY NO. 19:** Do Plaintiffs contend that Concrete Structures of the Midwest provided defective or poor quality work on the One Place Project? If yes, describe the delays that were caused by the work of Concrete Structures of the Midwest as well as the exact number of calendar days the overall completion of the One Place Project was delayed by that work.

**ANSWER:** Yes. Plaintiffs allege that Concrete Structures did not complete its work until April 11, 2008, which was 66 days after the completion date set for Concrete Structures of February 4, 2008. However, Concrete Structures was affected by the delays due to the earth retention system and D-Line, and the Plaintiffs do not contend that the work defective or poor quality work done by Concrete Structures caused any delays to the overall completion of the One Place Project.

Plaintiffs reserve the right to supplement the answer upon further investigation and through the disclosure of expert opinions in accordance with the Federal Rules of Civil Procedure and the Court's scheduling Order.

**INTERROGATORY NO. 24:** Identify, in detail, all losses, damages, fees, costs, or expenses Plaintiffs seek to recover from Travelers and, for each category of loss, damage, fee, cost or expense, identify the amount the Plaintiffs seeks to recover, the associated scope of work, the specific provision in the Policy pursuant to which the Plaintiffs believes they are entitled to

recover said losses, damages, fees, costs or expenses, and all Persons with knowledge of said losses, damages, fees, costs or expenses, and/or who will testify with will testify with regard to your claim for losses, damages, fees, costs or expenses.

**ANSWER:**    Plaintiffs refer to their previous answer to interrogatory no. 24, and interrogatories

nos. 5, 9, 11 – 16, *supra*.  Further answering, Plaintiffs are seeking:

| | |
|---|---|
| Loss to covered property: | $3.973,449.82 |
| Escalation costs: | $100,000 (loss is $215,604) |
| Costs To Reduce Loss: | $1,554,252.94 |
| Soft Costs: | $2,985,897.54 |
| Total: | $8,613,600.30 |
| Minus amount paid by Travelers: | $1,345,550.70 |
| Total remaining amount of the claim: | $7,268,049.60 |

Prejudgment interest,  consequential loss including penalties and additional interest on loans, renegotiation costs, escalation fees for the loan, loss rental income and other market costs are still being investigated as the loans are still being serviced and continue to accrue.

Plaintiffs reserve the right to supplement the answer upon further investigation and through the disclosure of expert opinions in accordance with the Federal Rules of Civil Procedure and the Court's scheduling order, and to name expert witnesses.

Fact witnesses:  Robert Levin, Craig Becker, Jeffry Kolb, Harlan Karp, Jerry Karp, Rick Sarff, Murray Sacks.  Plaintiffs reserve the right to disclose additional witnesses.

Dated: April 5, 2012.

Respectfully submitted,

One Place Condominium LLC, The South Loop Shops LLC, Southblock Development LLC, C & K Partnership, and Southblock Management, Inc.

By: _____

Katherine Smith Dedrick, Esq,
Illinois Bar No. 6185314
kdedrick@childresslawyers.com
Coleman J. Braun, Esq.
Illinois Bar No. 6295961
cbraun@childresslawyers.com
Childress Duffy, Ltd.
500 North Dearborn Street
Suite 1200
Chicago, Illinois 60654
Tel: (312) 494-0200
Fax: (312) 494-0202
*Attorneys for Plaintiffs*

Case No. 1:11-cv-02520

## CERTIFICATE OF SERVICE

I, the undersigned, a non-attorney, on oath state I served the above referenced documents by mailing a copy of the same in an envelope properly addressed, sealed and stamped and depositing in the U.S. Mail at 500 North Dearborn Street, Suite 1200, Chicago, Illinois 60654 on the 5th day of April, 2012.

K. Clark Schirle, Esq.
cschirle@butlerpappas.com
Jonathan Barger, Esq.
jbarger@butlerpappas.com
Butler Pappas Weihmuller Katz Craig, LLP.
115 South LaSalle Street, Suite 3200
Chicago, Illinois 60603
Tel: (312) 456-0900
Fax: (312) 456-0909

By: _____
Katherine Smith Dedrick, Esq,
Illinois Bar No. 6185314
kdedrick@childresslawyers.com
Coleman J. Braun, Esq.
Illinois Bar No. 6295961
cbraun@childresslawyers.com
Childress Duffy, Ltd.
500 North Dearborn Street
Suite 1200
Chicago, Illinois 60654
Tel: (312) 494-0200
Fax: (312) 494-0202
*Attorneys for Plaintiffs*

12

## VERIFICATION

BEFORE ME, the undersigned authority, a Notary Public on this day personally appeared Harlan Karp who being by me duly sworn on oath deposed and said that he has read the foregoing Plaintiffs' Supplemental Answers to Defendant's First Set of Interrogatories and that every statement contained therein is based on information and belief, true and correct

HARLAN KARP

Subscribed and Sworn to before me, on this _4_ day of April, 2012.

_____

Notary Public in and for the state of Illinois

My commission Expires on:

August 2012

_Nicole Bellaria_

Signature

OFFICIAL SEAL
NICOLE BELLAVIA
NOTARY PUBLIC, STATE OF ILLINOIS
COUNTY OF COOK
COMMISSION EXPIRES AUGUST 2012

| | | | ERS | DLINE | Unseparated | Total | Difference |
|---|---|---|---|---|---|---|---|
| Total Direct Costs per October letter | | $ 2,871,048.76 | 984,521.38 | 756,539.44 | 1,129,987.94 | 2,871,048.76 | 0.00 |
| plus: | General Conditions not included by MKA or October Letter | 628,532.41 | | | 628,532.41 | 628,532.41 | - |
| plus: | Non bucketed invoices submitted to Travelers | 213,101.50 | | | 213,101.50 | 213,101.50 | - |
| plus: | Project Management not included in October Letter | 84,000.00 | | | 84,000.00 | 84,000.00 | - |
| plus: | Construction Management not included in October Letter | 177,387.79 | | | 177,387.79 | 177,387.79 | - |
| plus: | O&P not included in MKA or October Letter | 327,031.99 | | | 327,031.99 | 327,031.99 | - |
| plus: | Insurance not included in October Letter | 67,622.91 | | | 67,622.91 | 67,622.91 | - |
| less: | Amount to Reduce Loss | (220,311.94) | | | (220,311.94) | (220,311.94) | - |
| less: | MKA Verified Expenditing Loss | (100,000.00) | | | (100,000.00) | (100,000.00) | - |
| less: | MKA deemed "direct" which was part of Caisson Claim | (17,420.00) | | | (17,420.00) | (17,420.00) | - |
| less: | Difference between Mediaton Summary | (57,545.60) | | | (57,545.60) | (57,545.60) | - |
| | | $ 3,973,447.82 | | 756,539.44 | 2,232,387.00 | 2,988,926.44 | |

205096.72

**ERS Summary**

| | Amount | Workbook | ERS | DLINE | Unseparated | Total | Difference | |
|---|---|---|---|---|---|---|---|---|
| MKA Verified Direct Damage Loss ("Verified Loss") | $ 1,151,310.02 | A | 422,242.58 | 241,607.38 | 487,460.07 | 1,151,310.02 | 0.00 | |
| MKA Verified Expediting Loss (Policy Limit) | 100,000.00 | n/a | | | 100,000.00 | 100,000.00 | - | <--- removed from Total Direct |
| *Plus:* | | | | | | | - | |
| Direct Costs per "Claim Analysis" Not included in "Verified Loss" | 24,598.51 | B | $ 2,492.05 | $ 22,106.46 | | 24,598.51 | - | |
| Additional Costs Due Insured | 1,298,374.91 | C | $559,786.75 | $ 492,825.60 | $ 245,762.56 | 1,298,374.91 | - | |
| Testing Costs per "Claim Analysis" Not included in "Verified Loss" | 76,453.38 | | | | 76,453.38 | 76,453.38 | - | |
| Cost Spent to Reduce Loss | 220,311.94 | D | | | 220,311.94 | 220,311.94 | - | |
| | | | | | | - | | |
| Total Direct Costs | $ 2,871,048.76 | | 984,521.38 | 756,539.44 | 1,129,987.94 | 2,871,048.76 | 0.00 | |

One Place Condominiums and South Loop Shops
1 E 8th Street Chicago, IL 60605

| Vendor | Invoice Date | Per Insured / Verified Loss | Notes | ERS | Dline | Unseparated |
|---|---|---|---|---|---|---|
| NAC Corporation | March '07 | 7,082.50 | | 7,082.50 | | |
| Wiss, Janney, Elstner Associates, Inc. | August '07 | 7,500.00 | | | 7,500.00 | |
| Rada Architects | March '07 | 1,974.50 | | 1,974.50 | | |
| Professionals Associated | March '07 | 15,049.00 | | 15,049.00 | | |
| Professionals Associated | April '07 | 17,616.00 | | 17,616.00 | | |
| Professionals Associated | September '07 | 4,224.00 | Test costs are direct | | 4,224.00 | |
| Professionals Associated | June '07 | 1,336.00 | Test costs are direct | 1,336.00 | | |
| Professionals Associated | June '07 | 1,002.00 | Test costs are direct | 1,002.00 | | |
| Universal Construction Testing, Ltd. | May '07 | 4,810.00 | CS to review invoice and explain why direct | 4,810.00 | | |
| Universal Construction Testing, Ltd. | June '07 | 10,209.00 | CS to review invoice and explain why direct | 10,209.00 | | |
| Universal Construction Testing, Ltd. | July '07 | 14,378.00 | | 14,378.00 | | |
| CTI-Construction Testing & Instrumentation, Inc. | December-May | 3,965.00 | Charlie? --> looks like MKA gave partial | 3,965.00 | | |
| CTI-Construction Testing & Instrumentation, Inc. | May - July '07 | 3,050.00 | Charlie? | 3,050.00 | | |
| ASC American Surveying Consultants, P.C. | July - October | 6,016.78 | | 6,016.78 | | |
| Budron Excavating Company | January '07 | 17,420.00 | | 17,420.00 | | |
| Budron Excavating Company | March '07 | 27,279.31 | | 27,279.31 | | |
| Levine Construction | August '07 | 189,359.00 | | 189,359.00 | | |
| Sherry K Corporation | April '07 | 46,620.37 | | 46,620.37 | | |
| Concrete Structures of the Midwest | August '07 | 126,092.54 | Acceleration Costs to maintain schedule | | 126,092.54 | |
| Cobra Concrete Cutting | | 4,332.00 | | | 4,332.00 | |
| *Western Architectural* | *April '08* | 22,520.00 | D Line - Charlie to address Rick Comments | | 22,520.00 | |
| D Three Construction | June '07 | 6,350.00 | D Line - CS/PP to explain what activities were performed | | 6,350.00 | |
| D Three Construction | July '07 | 6,522.00 | D Line - CS/PP to explain what activities were performed | | 6,522.00 | |
| D Three Construction | 7.16.07 | 1,005.20 | D Line - CS/PP to explain what activities were performed | | 1,005.20 | |
| D Three Construction | 7.23.07 | 2,050.62 | D Line - CS/PP to explain what activities were performed | | 2,050.62 | |
| D Three Construction | November '07(2) | 2,708.00 | Acceleration | - | | 2,708.00 |
| RKD Construction Supplies | August '07 | 266.40 | ERS/ D Line tools | | | 266.40 |
| RKD Construction Supplies | August '07 | 1,066.76 | ERS/ D Line tools | | | 1,066.76 |
| RKD Construction Supplies | October '07 | 2,946.30 | ERS/ D Line tools | | | 2,946.30 |
| RKD Construction Supplies | November '07 | 3,866.93 | CS to explain what "foam back fill is" and why it is for D Line | 3,866.93 | | |
| RKD Construction Supplies | November '07 | 271.40 | ERS/ D Line tools | | | 271.40 |
| Toltec Services | September '07 | 22,673.00 | | | 22,673.00 | |
| Allied Waste Services | March/Aug '07 | 2,957.08 | CS to explain why dumpster were for D Line | | 2,957.08 | |
| General Contractors Partial General Conditions | | 416,619.46 | | | | 416,619.46 |
| | | 1,001,139.15 | | 367,167.46 | 210,093.37 | 423,878.32 |
| GC Overhead and Profit - 15% | | 150,170.87 | | 55,075.12 | 31,514.01 | 63,581.75 |
| | | 1,151,310.02 | | 422,242.58 | 241,607.38 | 487,460.07 | 1,151,310.02 |

One Place Condominiums and The South Loop

Direct Costs per "Claim Analysis" Not included in "Verified Loss"

| Vendor | Amount | Note | | | |
|---|---|---|---|---|---|
| Concrete Structures of the Midwest | $ 2,167.00 | C1 | ERS | $ | 2,492.05 |
| Concrete Structures of the Midwest | 19,223.01 | C2 | Dline | $ | 22,106.46 |
| | $ 21,390.01 | | | | |
| GC Overhead and Profit - 15% | 3,208.50 | | | | |
| | $ 24,598.51 | | | | |

One Place Condominiums and T|

**Direct Costs per "Claim Analysis" Not included in "Verified Loss"**

| Vendor | Amount | Note | ERS | Dline | Unseparated |
|---|---|---|---|---|---|
| Vibra-Tech | $ 5,800.00 | D1 | | | $ 5,800.00 |
| Universal Construction Testing, Ltd. | 525.00 | D2 | | 525.00 | |
| Universal Construction Testing, Ltd. | 16,000.00 | D3 | | 16,000.00 | |
| Universal Construction Testing, Ltd. | 2,188.00 | D4 | | 2,188.00 | |
| Budron Excavating Company | 4,140.00 | D5 | 4,140.00 | | |
| Budron Excavating Company | 3,808.00 | D6 | 3,808.00 | | |
| Budron Excavating Company | 4,376.00 | D7 | 4,376.00 | | |
| Budron Excavating Company | 4,140.00 | D8 | 4,140.00 | | |
| Budron Excavating Company | 7,658.96 | D9 | 7,658.96 | | |
| Concrete Structures of the Midwest | 4,065.00 | D10 | | 4,065.00 | |
| Concrete Structures of the Midwest | 412,876.00 | D11 | 412,876.00 | | |
| Concrete Structures of the Midwest | 367,490.00 | D12 | | 367,490.00 | |
| Concrete Structures of the Midwest | 29,490.00 | D13 | 29,490.00 | | |
| D Three Construction | 20,420.00 | D14 | | 20,420.00 | |
| General Conditions | 75,128.13 | D15 | | | 75,128.13 |
| CTA Flagging | 43,036.00 | D16 | | | 43,036.00 |
| Permits | 44,838.00 | D17 | | | 44,838.00 |
| Project Management | 36,000.00 | D18 | | | 36,000.00 |
| | 1,081,979.09 | | 466,488.96 | 410,688.00 | 204,802.13 |
| GC Overhead and Profit - 15% | 162,296.86 | D19 | 69,973.34 | 61,603.20 | 30,720.32 |
| Construction Management - 5% | 54,098.95 | D20 | 23,324.45 | 20,534.40 | 10,240.11 |
| | $ 1,298,374.91 | | $ 559,786.75 | $ 492,825.60 | $ 245,762.56 | $ 1,298,374.91 |

One Place Condominiums and The South Loop Shops

Acceleration Costs Incurred to Reduce Loss

| Vendor | Amount |
|---|---|
| Universal Construction Testing, Ltd. | $ 5,211.50 |
| Universal Construction Testing, Ltd. | 21,064.75 |
| Universal Construction Testing, Ltd. | 3,460.00 |
| Universal Construction Testing, Ltd. | 5,749.00 |
| Budron Excavating Company | 4,260.81 |
| Budron Excavating Company | 1,140.86 |
| Concrete Structures of the Midwest | 11,804.00 |
| Concrete Structures of the Midwest | 18,154.52 |
| Concrete Structures of the Midwest | 56,645.55 |
| Bonus Electric Co., LLC | 1,216.40 |
| Bonus Electric Co., LLC | 2,669.81 |
| Bonus Electric Co., LLC | 4,079.00 |
| D Three Construction | 4,902.92 |
| D Three Construction | 9,788.00 |
| D Three Construction | 2,708.00 |
| Crouch-Seranko Masonry | 4,757.00 |
| Crouch-Seranko Masonry | 32,591.00 |
| Crouch-Seranko Masonry | 30,986.00 |
| PES | 46,775.00 |
| PES | 10,568.00 |
| | 278,532.12 |
| GC Overhead and Profit - 15% | 41,779.82 |
| | 320,311.94 |

P-2011-0002374

One Place Condominiums and The South Loop Shops

Escalation

| Vendor | | Amount |
|---|---|---|
| Bonus Electric Co., LLC | $ | 135,822.00 |
| Arrigo Enterprises Incorporated | | 53,920.06 |
| Crouch-Seranko Masonry | | 7,790.00 |
| PES | | 18,072.00 |
| | $ | 215,604.06 |

EXHIBIT

**B**



EXHIBIT C

OP 003925

2011 00083756



**Levine Construction, Inc**
740 Waukegan Road Suite 400
Deerfield IL 60015

**One Place Condominiums & South Loop Shops**
Baseline Construction Schedule

| ID | | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 1 | | Project duration | 429 days? | Tue 8/1/06 | Thu 4/3/08 |
| 2 | | Pre Construction | 53 days? | Tue 8/1/06 | Thu 10/12/06 |
| 3 | | Contract award | 0 days | Tue 8/1/06 | Mon 8/21/06 |
| 4 | | Solicit sub contractors based on 7/30/06 drawing | 25 days | Tue 8/1/06 | Mon 9/4/06 |
| 5 | | Building permit issuance | 0 days | Fri 9/1/06 | Fri 9/1/06 |
| 6 | | Re-bid issued for construction drawings dated 9/8/06 | 20 days | Fri 9/1/06 | Thu 10/12/06 |
| 7 | | Submit and accept control estimate | 1 day? | Tue 8/1/06 | Tue 8/1/06 |
| 8 | | Submit and accept construction schedule | 1 day? | Mon 9/11/06 | Mon 9/11/06 |
| 9 | | Sub contract award | 131 days | Mon 8/21/06 | Fri 2/23/07 |
| 10 | | Survey | 10 days | Mon 8/21/06 | Fri 9/1/06 |
| 11 | | Fencing and barricades | 10 days | Mon 8/21/06 | Fri 9/1/06 |
| 12 | | Damage control | 10 days | Mon 8/21/06 | Fri 9/1/06 |
| 13 | | Excavation | 10 days | Mon 8/28/06 | Fri 9/8/06 |
| 14 | | Caissons | 10 days | Mon 8/28/06 | Fri 9/8/06 |
| 15 | | Earth retention | 10 days | Mon 8/28/06 | Fri 9/8/06 |
| 16 | | Concrete | 10 days | Mon 8/28/06 | Fri 9/8/06 |
| 17 | | Electrical | 10 days | Thu 11/16/06 | Fri 12/1/06 |
| 18 | | Plumbing | 10 days | Thu 11/16/06 | Fri 12/1/06 |
| 19 | | Elevator | 10 days | Thu 11/16/06 | Fri 12/1/06 |
| 20 | | HVAC | 10 days | Thu 11/16/06 | Fri 12/1/06 |
| 21 | | Masonry | 10 days | Thu 11/16/06 | Fri 12/1/06 |
| 22 | | Drywall | 10 days | Thu 11/16/06 | Fri 12/1/06 |
| 23 | | Metal panels | 10 days | Mon 11/27/06 | Fri 12/8/06 |
| 24 | | Miscellaneous Metals | 10 days | Mon 11/27/06 | Fri 12/8/06 |
| 25 | | Fire protection | 10 days | Mon 11/27/06 | Fri 12/8/06 |
| 26 | | Windows | 10 days | Mon 12/4/06 | Fri 12/15/06 |
| 27 | | Balcony railings | 10 days | Mon 12/4/06 | Fri 12/15/06 |
| 28 | | Storefronts, entrances and window wall | 10 days | Mon 12/4/06 | Fri 12/15/06 |

Legend:
| Task | | Summary | | Rolled Up Progress | | Project Summary |
| Progress | | Rolled Up Task | | Split | | Group By Summary |
| Milestone | | Rolled Up Milestone | | External Tasks | | |

Project: Baseline Construction Sched
Date: 1/29/06; Revised 1/29/07

1 of 17

P-2011-00025375



**City of Chicago**
Richard M. Daley, Mayor

Department of Zoning

Patricia A. Scudiero
Zoning Administrator

City Hall, Room 905
121 North LaSalle Street
Chicago, Illinois 60602
(312) 744-5777 (Voice)
(312) 744-6552 (FAX)
(312) 744-2950 (TTY)
http://www.cityofchicago.org

December 10, 2008

# AUTHORIZATION FOR THE ISSUANCE OF
# A CERTIFICATE OF OCCUPANCY

## DEPARTMENT OF ZONING

**ADDRESS OF PREMISES: 1 East 8th Street**

| | |
|---|---|
| **DX-12** | Zoning District |
| **96** | Number of Apartments |
| **X** | Number of Paved Parking Spaces |
| _____ | Zoning Board of Appeals Resolution |
| _____ | Court Order |
| **X** | Landscaping Security and Right of Entry |
| | Agreement (LOC exp. 03-30-09) |

A Certificate of Occupancy is authorized to be issued as follows:

| | |
|---|---|
| **X** | TEMPORARY |
| _____ | ENTIRE BUILDING |
| _____ | SPECIFIC LOCATION (Tenant Build-Out) |

The Department of Zoning hereby certifies that the use of occupancy for the above-referenced premises is in conformity with the plans and specifications pursuant to Permit No. **06-100134409** for:

Phase 1- Erect a 96 dwelling unit, 10 story mixed use residential building with interior parking garage. <u>Temporary occupancy to exclude the required landscaping.</u>

and is in conformance with the applicable provisions of Title 17 of the Municipal Code of Chicago, the Chicago Zoning Ordinance. Any certificate of occupancy issued in conflict with the provisions of the Chicago Zoning Ordinance shall be null and void.

The Department of Zoning shall issue a permanent certificate of occupancy upon completion of the required landscaping. Failure to complete the required landscaping within six months of the date of this certificate, shall result in the City of Chicago completing the landscaping using the funds on deposit in accordance with the Landscaping Security and Right of Entry Agreement. Please be advised that a new application is required for a permanent certificate of occupancy.

Michael Tinerella
Assistant Zoning Administrator

NEIGHBORHOODS

BUILDING CHICAGO TOGETHER



P-2011-00025375

## J.D.M.-LLC.

SOYOB

1701 W. Golf Road Tower III, Suite L24 • Rolling Meadows, IL 60008
Email: dutch@jdm-llc.com  Office: 847-466-5750  Fax: 847-466-5751

May 4, 2009

**Approved by:** _____  **Effective Date:** 5/5/09

**Project Name:** One Place

TO:
Mr. Bob Farkas
Wight Construction
2500 North Frontage Road
Darien, IL 60561

| Expense Code | Project Number | Bill Group | Phase/Cost Code | Cost Type | Amount | Retainage | N |
|---|---|---|---|---|---|---|---|
| GC | 5183-01 | 4 | 010-942 | RE | $600.00 | 0 | $600.00 |

RE: One Place: 5183
    Laborer Labor Cost

**Invoice Number 09-011B**

DESCRIPTION:

- Labor cost for Sergio Garcia (Laborer) for work completed.
- Week Ending 5/3/09.
- Work completed on regular time.

*(8) LABORER HOURS @ $75.00* ................................................................ *$600.00*

*TOTAL INVOICE* ..................................................................................... $600.00

*THANK YOU FOR YOUR BUSINESS!*

Cc:    Client Folder
       Accounts Receivables

P-2011-000253759

D THREE CONSTRUCTION
Weekly Time Sheet

| | Job Name | Job # | Work Description | Start Time | End Time | Hours | Total |
|---|---|---|---|---|---|---|---|
| 4/27/09 Monday | | | | | | | 0 |
| 4/28/09 Tuesday | ONE PLACE | 5183 | DEMOBILIZE | 7AM | 3:30 | 8 | 8 |
| 4/29/09 Wednesday | | | | | | | 0 |
| 4/30/09 Thursday | | | | | | | 0 |
| 5/1/09 Friday | | | | | | | 0 |
| 5/2/09 Saturday | | | | | | | 0 |
| 5/3/09 Sunday | | | | | | | 0 |
| | | | | | TOTAL | | 8 |

SERGIO GARCIA
EMPLOYEE NAME

SUPERVISOR SIGNATURE



December 10, 2008

## AUTHORIZATION FOR THE ISSUANCE OF
## A CERTIFICATE OF OCCUPANCY

### DEPARTMENT OF ZONING

**City of Chicago**
Richard M. Daley, Mayor

Department of Zoning

Patricia A. Scudiero
Zoning Administrator

City Hall, Room 905
121 North LaSalle Street
Chicago, Illinois 60602
(312) 744-5777 (Voice)
(312) 744-6552 (FAX)
(312) 744-2950 (TTY)
http://www.cityofchicago.org

**ADDRESS OF PREMISES:  1 East 8th Street**

__DX-12__ Zoning District
__96__  Number of Apartments
__X__  Number of Paved Parking Spaces
____  Zoning Board of Appeals Resolution
____  Court Order
__X__  Landscaping Security and Right of Entry
Agreement (LOC exp. 03-30-09)

A Certificate of Occupancy is authorized to be issued as follows:

__X__  TEMPORARY
____  ENTIRE BUILDING
____ SPECIFIC LOCATION (Tenant Build-Out)

The Department of Zoning hereby certifies that the use of occupancy for the above-referenced premises is in conformity with the plans and specifications pursuant to Permit No. __06-100134409__ for:

Phase 1- Erect a 96 dwelling unit, 10 story mixed use residential building with interior parking garage. Temporary occupancy to exclude the required landscaping.

and is in conformance with the applicable provisions of Title 17 of the Municipal Code of Chicago, the Chicago Zoning Ordinance. Any certificate of occupancy issued in conflict with the provisions of the Chicago Zoning Ordinance shall be null and void.

The Department of Zoning shall issue a permanent certificate of occupancy upon completion of the required landscaping. Failure to complete the required landscaping within six months of the date of this certificate, shall result in the City of Chicago completing the landscaping using the funds on deposit in accordance with the Landscaping Security and Right of Entry Agreement. Please be advised that a new application is required for a permanent certificate of occupancy.

_____
Michael Tinerella
Assistant Zoning Administrator

NEIGHBORHOODS





EXHIBIT

D

P-2011-00025376

# J.D.M.-LLC.

SDVOB

1701 W. Golf Road Tower III, Suite L24 • Rolling Meadows, IL 60008
Email: dutch@jdm-llc.com   Office: 847-466-5750   Fax: 847-466-5751

#17702

Approved by: _____   Effective Date: 5/5/09

Project Name: One Place

| Expense Code | Project Number | Bill Group | Phase / Cast Code | Cost Type | Amount | Retainage | Bal |
|---|---|---|---|---|---|---|---|
| GC | 5183-01 | 4 | 010-942 | RE | $600⁰⁰ | Ø | $600.00 |

May 4, 2009

TO:
Mr. Bob Farkas
Wight Construction
2500 North Frontage Road
Darien, IL 60561

RE: One Place: 5183
     Laborer Labor Cost

**Invoice Number 09-011B**

## DESCRIPTION:

- Labor cost for Sergio Garcia (Laborer) for work completed.
- Week Ending 5/3/09.
- Work completed on regular time.

*(8) LABORER HOURS @ $75.00* ................................................................. **$600.00**

*TOTAL INVOICE* ................................................................. **$600.00**

*THANK YOU FOR YOUR BUSINESS!*

Cc:     Client Folder
        Accounts Receivables

NOT Approved
OUTSIDE LABOR
WAS NOT
AUTHORIZED

**EXHIBIT**
**E**

P-2011-000253764

D THREE CONSTRUCTION
Weekly Time Sheet

| Job Name | Job # | Work Description | Start Time | End Time | Hours | Total |
|---|---|---|---|---|---|---|
| **4/27/09** Monday | | | | | | 0 |
| **4/28/09** Tuesday ONE PLACE | 5183 | DEMOBILIZE | 7AM | 3:30 | 8 | 8 |
| **4/29/09** Wednesday | | | | | | 0 |
| **4/30/09** Thursday | | | | | | 0 |
| **5/1/09** Friday | | | | | | 0 |
| **5/2/09** Saturday | | | | | | 0 |
| **5/3/09** Sunday | | | | | | 0 |
| | | | | | TOTAL | 8 |

SUPERVISOR SIGNATURE _____

SERGIO GARCIA _____
EMPLOYEE NAME

<u>RELEASE OF 2006 EARTH MOVEMENT CLAIM AND FLOOD CLAIM</u>

WHEREAS, the Travelers Property Casualty Company of America ("Travelers") issued Commercial Inland Marine Policy number QT-660-0203LS5S-TIL-06 (the "Policy") to One Place Condominiums, LLC ("One Place") and other Named Insureds;

WHEREAS, on or about November 2, 2006, and during the term of the Policy, a loss occurred resulting from earth movement into caisson holes and water infiltration into caisson holes at the building under construction at 1 E. 8th Street, Chicago, IL (the "Loss");

WHEREAS, One Place has made a claim under the Policy for the Loss ("the 2006 Earth Movement and Flood Claim");

WHEREAS, a dispute has arisen between Travelers and One Place regarding the amount of the 2006 Earth Movement and Flood Claim that is covered under the Policy;

WHEREAS, Travelers and One Place have agreed to compromise and settle their differences with respect to the 2006 Earth Movement and Flood Claim under the Policy, and this agreement ("Release"), the release contained herein, and payment to be made hereunder are in furtherance of that purpose;

NOW THEREFORE, for and in consideration of the payment at this time to One Place by Travelers of $425,000.00, with $329,050.00 allocated to the aggregate Flood limit and $95,950.00 allocated to the aggregate Earth Movement limit in the Policy, One Place does jointly and severally, for itself and for any and all persons, firms, corporations and entities claiming by or through them, and for its successors and assigns, hereby release, acquit, and forever discharge Travelers and its parent companies, successors, assigns, directors, agents, investigators, employees, and all other persons, firms, corporations and legal entities whomsoever which are associated with Travelers from any and every claim, demand, right or cause of action, of whatsoever kind or nature, arising out of the Earth Movement claim and Flood Claim.

AS A FURTHER CONSIDERATION for the making of the settlement and the payment of the sum $425,000 by Travelers, it is expressly agreed:

EXHIBIT

F

That this Release is limited to the 2006 Earth Movement and Flood Claim.

That this Release reflects a compromise of a disputed claim, and the payment is not to be construed as an admission of liability on the part of any Party, by whom liability is expressly denied.

Subject to the conditions set forth in this paragraph, One Place jointly and severally agrees to indemnify Travelers, its parent and affiliated companies, successors and assigns, and all of its officers, directors, agents, investigators, and employees, of and from any and every claim or demand of every kind or character which is asserted by any other Named Insured in the Policy because of Travelers' making the above-referenced payment for the Earth Movement Claim and the Flood Claim. However, One Place shall only be obligated to indemnify Travelers for all such claims or demands only to, and until, the amount being paid by Travelers to One Place of $425,000.00 is paid by One Place as indemnity, and only if Travelers immediately notifies One Place of the claim or demand via overnight and electronic mail to the address below and allows One Place to have control over the defense and resolution of the claim or demand, which control includes the retention of, and payment for, counsel to defend against said claim or demand. Travelers agrees that it shall not agree to, or make, any payments for such claim or demand unless and until One Place and Travelers agree in writing that such payment shall be made. Notice shall be sent to the following address and email:

        For One Place: Mr. Wayne Chertow at 828 S. Wabash,
                      Suite 200 Chicago, Il, 60605
                      wchertow@yahoo.com

        For Travelers: Mr. Rick Sarff
                      Mail Code 9275-NB08A
                      385 Washington Street
                      St. Paul, MN 55102
                      rsarff@travelers.com

**That the Terms and Conditions recited below are fully applicable to this agreement.**

Entire Agreement: This Release constitutes the entire understanding between and among the parties with regard to the matters herein set forth. The terms of this Release are contractual and not a mere recital. There are no representations, warranties, agreements, arrangements or undertakings, oral or written, between or among the parties hereto relating to the subject matter of this Release which are not fully expressed herein.

Binding Effect: This Release shall be binding upon and shall inure to the benefit of the signatories and their respective corporate parents, current and former subsidiaries, divisions, affiliated companies, and predecessor and successor companies; all of their present, past and future officers, directors, employees, stockholders, representatives, predecessors in interest, and successors in interest; and any and all persons, firms, associations, and/or corporations connected with them, including, without limitation, their insurers, sureties, and attorneys.

No Precedential Value No Waiver: This Release is without prejudice or value as precedent, and shall not be used in any proceeding or hearing to create, prove, or interpret the obligations under, or terms and conditions of, any other agreement, Policy QT-660-0203L858-TIL-06 or any other insurance policy, except to show payments made under the Earth Movement and Flood aggregate limits in Policy QT-660-0203L858-TIL-06. Moreover, this Release does not waive, and shall not be deemed as a waiver of any claim, defense or cause of action related to any other claims currently submitted or hereafter submitted by One Place to Travelers under the Policy or any other contract of insurance between One Place and Travelers.

**Attorneys' Fees**: The parties hereto acknowledge and agree that each of them will bear their own attorneys' fees, costs and expenses arising out of and/or connected to the dispute which is the subject of this Release and the negotiation, drafting and execution of this Release, and all matters arising out of or connected therewith. Should either party contest any part of this Release or any and all matters arising out of or connected therewith, the prevailing party shall be entitled to recover from the other its reasonable attorneys' fees and costs.

**Confidential**: Except as set forth in this paragraph, the patties and their respective attorneys understand and agree that the fact, amount and content of settlement and this Agreement shall remain confidential and that the parties to this Agreement, as well as their respective attorneys, shall not discuss, reveal, disclose or publicize either the fact, amount or content of this Agreement to any third party and shall preserve the confidentiality of this Agreement and its terms. However, the parties may disclose: 1) the subject matter and existence of this Agreement as required by law or regulation, or as necessary to advise their respective accountants, auditors, tax, legal, mortgagees, brokers, reinsurers, underwriters, government regulators and attorneys; or 2) the fact of settlement only (but not the amount of content of this Agreement), should the Named Insureds under the Policy request such information in writing from Travelers. Travelers' agrees to immediately notify One Place of any such request per the prior notification provision contained herein.

**Severability**: If any provision or any part of any provision of this Release is for any reason held to be invalid, unenforceable or contrary to any public policy, law, statute and/or ordinance, then the remainder of this Release shall not be affected thereby and shall remain valid and fully enforceable.

**Execution in Counterparts**: This Agreement may be executed in counterparts.

4

We understand and confirm that we are fully aware of the consequences of signing this Release and enter into it of our own free will.

IN WITNESS WHEREOF, the undersigned has executed this agreement as of this $\underline{73}$ day of December 2010

_As Authorized Agent to One Place Condominiums, LLC_

FOR ONE PLACE CONDOMINIUMS, LLC

IN WITNESS WHEREOF, the undersigned has executed this agreement as of this ___ day of _____ 2010

FOR TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA

**WITNESSED:**

STATE OF ILLINOIS
COUNTY OF COOK

Subscribed and sworn to before me this _23_ day of _December_ 2010.

Notary Public

OFFICIAL SEAL
NICOLE BELLAVIA
NOTARY PUBLIC, STATE OF ILLINOIS
COUNTY OF COOK
COMMISSION EXPIRES AUGUST 2012

5

DAILY SOFT COSTS ANALYSIS ONE PLACE CONDOMINIUM, LLC REVISED JANUARY 6, 2010

*APRIL 09*     *87,847.08*

| Soft Cost Item | Yearly Cost | Monthly Cost | Daily Cost |
|---|---|---|---|
| **Interest** | *MARCH 09* | *96,413.05* | |
| **Original construction loan** | *FEB .09* | *88,710.87* | |
| *NEED ALL PAYMENTS* | *JAN .09* | *93,412.85* | |
| *FROM APRIL 08 thru 4/09* | Dec-08 | 114,287.80 | |
| | Nov-08 | 108,543.31 | |
| | Oct-08 | 190,388.78 | |
| Total for three months at end of project | *APRIL* *7843.67* | 413,219.89 | |
| **Average daily interest original loan** | *MARCH 72.91.66* | | **4,491.52** |
| | *FEB 8266.67* | | |
| | *JAN 09 · 8266.67* | | |

**Construction loan 11541524 Chicago Community Bank**

| | | | |
|---|---|---|---|
| *LOAN 4/07 1,008,185 Pd.9/8* | Dec-08 | 8,059.84 ✓ | |
| *" 5/08 1.6* | Nov-08 | 8,098.01 ✓ | |
| | Oct-08 | 7,836.79 ✓ | |
| Total for three months at end of project | *APRIL 7398.72.* | 23,994.64 | |
| **Average daily interest original loan** | *MARCH 7640.41* | | **260.81** |
| | *FEB 7599.38* | | |
| | *JAN.09 7997.72* | | |

**Construction loan 11541527 Chicago Community Bank** *57*

| | | | |
|---|---|---|---|
| | Dec-08 | 7,449.93 ✓ | |
| | Nov-08 *JOURNAL ENTRY* | 7,605.77 ✓ | |
| | Oct-08 *+ 1,241.68* | 4,970.52 ✓ | |
| Total for three months at end of project | | 20,026.22 | |
| **Average daily interest original loan** | *APRIL 11,965.18* | | **217.68** |
| | *MARCH 11,912.91* | | |
| | *FEB 20,649.40* | | |

**Construction loan C&K Partnership**    *JAN 20,552.46*

| | | | |
|---|---|---|---|
| *3.8 MIL* | Dec-08 | 20,455.98 ✓ | |
| | Nov-08 | 20,359.95 ✓ | |
| | Oct-08 | 20,264.37 ✓ | |
| Total for three months at end of project | | 61,080.30 | |
| **Average daily interest original loan** | | | **663.92** |

| | | | |
|---|---|---|---|
| **Daily interest on Construction Loans, Total** | | | **5,633.92** |

**Rent**

| | | | |
|---|---|---|---|
| Starbucks | | 86,950.00 | 238.22 |
| X-Port | | 892,000.00 | 2,443.84 |
| U&C Foods | | 87,296.00 | 239.17 |
| Parking | | 587,736.00 | 1,610.24 |
| **Average Daily Rent** | | | **4,531.46** |

| | | | |
|---|---|---|---|
| **Real Estate Taxes** | | 10,795.00 | 29.58 |

| | | | |
|---|---|---|---|
| **Daily Soft Costs** | | | **10,194.96** |

*REVISED TO*

*$10,254.10 ⟵*

*360 X 5,633*   *1.8*

*( INTEREST pd on water loss)*



EXHIBIT

**G**

P-2011-000253766

**One Place Condominium, LLC**
**Mediation Summary**
**ERS/D-Line Claim**

| Category | | Owners submitted costs as of May 2010 | | Travelers accepted costs as of Aug 2010 | Notes |
|---|---|---|---|---|---|
| Engineering | $ | 32,218.61 | $ | 16,557.00 | |
| Testing | $ | 195,140.83 | $ | 81,655.78 | |
| | | | | | |
| Excavating | $ | 57,825.00 | $ | 44,699.31 | |
| ERS repairs | $ | 189,359.00 | $ | 189,359.00 | |
| Concrete Sherry K | $ | 46,620.73 | $ | 46,620.37 | |
| Concrete CSM | $ | 1,846,083.62 | $ | 126,092.54 | |
| Concrete cutting | $ | 4,332.00 | $ | 4,332.00 | |
| Electric | $ | 143,787.21 | $ | - | |
| Arrigo | $ | 53,920.06 | $ | - | |
| Masonry | $ | 170,961.00 | $ | 22,520.00 | |
| Carpentry | $ | 210,657.89 | $ | 18,635.82 | |
| Imaging | $ | 750.00 | $ | - | |
| Materials & supplies | $ | 19,083.66 | $ | 8,417.79 | |
| Wight | $ | 39,909.20 | $ | 22,673.00 | |
| Dumpsters | $ | 2,957.08 | $ | 2,957.08 | |
| Temporary Emerg. Work | $ | 28,976.00 | $ | - | |
| Elevators | $ | 75,415.00 | $ | - | |
| Plumbing | $ | 59,533.00 | $ | - | |
| Permit extensions | $ | 87,188.00 | $ | 17,437.50 | |
| Additional Flaggers | $ | 218,254.00 | $ | 43,036.00 | |
| Sidewalk repairs | $ | 1,744.00 | $ | - | |
| Barricades | $ | 21,451.00 | $ | - | |
| Barricade permits | $ | 3,288.00 | $ | - | |
| General conditions | $ | 1,120,280.00 | $ | 191,235.24 | |
| | $ | 4,629,734.89 | $ | 836,228.43 | |
| | | | | | |
| Project management | $ | 120,000.00 | $ | - | |
| Const. management | $ | 231,486.74 | $ | - | |
| O & P | $ | 694,460.22 | $ | 125,434.26 | |
| Insurance | $ | 67,622.91 | $ | - | |
| **Builders Risk Loss expediiting (included)** | $ | 5,743,304.76 | $ | 961,662.69 | |
| **Policy limit** | $ | (115,604.00) | $ | 100,000.00 | |
| **Claim data** | | Included | $ | 5,000.00 | |
| Less Deductibles | | Absorbed | $ | - | |
| **Builders Risk Claim** | $ | 5,627,700.76 | $ | 1,066,662.69 | |
| | | | | | |
| **Soft Cost** | $ | 3,742,746.50 | $ | 379,401.70 | |
| Less prior paid | $ | (959,570.25) | | Not considered in this claim | |
| Less 14 day deductible | $ | (143,557.40) | $ | (143,557.40) | |
| Loan termination fee | $ | 300,000.00 | $ | - | |
| Renogotiation legal fees | $ | 46,279.00 | $ | - | |
| | | | | | |
| **Soft Cost Claim** | $ | 2,985,897.85 | $ | 235,844.30 | |
| **Totals** | $ | 8,613,598.61 | $ | 1,302,506.99 | |
| | | | $ | 1,250,000.00 | |



EXHIBIT
H


EXHIBIT

**ERS Summary**

| | | Amount |
|---|---|---|
| Total Direct Costs per October letter | $ | 2,871,048.76 |
| plus: General Conditions not included by MKA or October Letter | | 628,532.41 |
| plus: Non-bucketed invoices submitted to Travelers | | 213,101.50 |
| plus: Project Management not included in October Letter | | 84,000.00 |
| plus: Construction Management not included in October Letter | | 177,387.79 |
| plus: O&P not included in MKA or October Letter | | 327,031.99 |
| plus: Insurance not included in October Letter | | 67,622.91 |
| less: Amount to Reduce Loss | | (220,311.94) |
| less: MKA Verified Expending Loss | | (100,000.00) |
| less: MKA deemed "direct" which was part of Caisson Claim | | (17,420.00) |
| less: Difference between Mediation Summary | | (57,545.60) |
| | $ | 3,973,447.82 |
| | | |
| Escalation | | |
| less: policy limit | $ | 215,604.00 |
| | $ | (115,604.00) |
| | $ | 100,000.00 |
| | | |
| Costs to Reduce Loss | | |
| Winter Conditions | $ | 110,629.00 |
| Acceleration | $ | 320,311.94 |
| Period of Delay (removed $43,036 of Flagging included as "direct") | $ | 1,123,312.00 |
| | $ | 1,554,252.94 |
| | | |
| | | 5,627,700.76 |
| Total per Mediation Summary | $ | 5,743,304.76 |
| Policy Limit | $ | (115,604.00) |
| | $ | 5,627,700.76 |
| | | |
| Difference | $ | (0.00) |

| General Conditions | |
|---|---|
| Mediation Summary | 1,120,280.00 |
| MKA | (416,619.46) |
| October Letter (D15) | (75,128.13) |
| | 628,532.41 |
| | |
| **Project Management** | |
| Mediation Summary | 120,000.00 |
| October Letter (D18) | (36,000.00) |
| | 84,000.00 |
| | |
| **Construction Management** | |
| Mediation Summary | 231,485.74 |
| October Letter (D20) | (54,098.95) |
| | 177,387.79 |
| | |
| **O&P** | |
| Mediation Summary | 694,460.22 |
| MKA | (150,170.87) |
| October Letter (C) | (3,208.50) |
| October Letter (D19) | (162,296.86) |
| October Letter (E) | (9,972.18) |
| October Letter (F) | (41,779.82) |
| | 327,031.99 |

P-2011-00025874

*3.a.6.IV*

# CROUCH - SERANKO MASONRY

## C O N T R A C T O R S    I N    M A S O N R Y

1307 W. WRIGHTWOOD AVENUE
CHICAGO, ILLINOIS 60614
TELEPHONE (773) 281 – 5900
FACSIMILE (773) 281 – 5975

November 14, 2007

Mr. Josh Warriner
Wight Construction
2500 N. Frontage Road
Darien, Illinois 60561

VIA FAX: 630-737-0518

RE: Winter Protection
One Place Condo

Dear Mr. Warriner,

Per your request, we provide the following pricing for enclosure of the hydro scaffolding for the purpose of providing winter protection of the scaffolding on the north and west only from floors three to ten for the price of $67,799.00 . Our proposal does not include heat, covering of openings, or repair or maintenance of the enclosure due to damage, i.e. wind.

We are pricing four months of bracket rental. Based on the latest schedule, the exterior masonry duration is 11/27/07-4/22/07 or a duration of 5 months plus 3 weeks to assemble/dismantle the scaffolding. It appears based on current site conditions, we would start the tower in January and have a duration of 3-4 months. If the protection is needed longer or shorter, the monthly rental of $8,032.00 would be adjusted accordingly. Please note, once the brackets are installed, they remain on the scaffolding for the duration of the work.

Please feel free to contact us with any questions or concerns.

Sincerely,
Crouch-Seranko Masonry

Julie Seranko

EXHIBIT
J

3.a.6.iv

Per attached Bracing Systems proposal

|  | Cost |  |
|---|---|---|
| Bracket Rental | $ | 4,140 |
| Overhead protection |  | 2,100 |
| Damage waiver |  | 168 |
|  |  | 6,408 |
| 9% tax |  | 577 |
|  |  | 6,985 |
| 4 months |  | 5 mo |
|  | $ | 27,939 |
| Overhead and profit  15% | $ | 4,191 |
| Rental cost |  | 32,130 |

Materials:

| Lumber | 995 |
|---|---|
| Plastic | 1,090 |
| Strips | 59 |
|  | 2,144 |
| 9% tax | 193 |
|  | 2,337 |
| 15% overhead and profit | 351 |
| Material cost | $  2,687 |

Labor to install brackets and enclose scaffolding

|  | Hours | Hourly rate | Cost |
|---|---|---|---|
| Foreman | 14 | 94.00 | 1,316 |
| Laborer | 336 | 78.00 | 26,208 |
|  |  |  | 27,524 |
|  | Overhead and profit |  | 4,129 |
| Labor cost |  |  | $  31,653 |

| Total labor and material | 66,470 |
|---|---|
| Bond fee | 1,329 |
| Total cost | $  67,799 |

## One Place Condominiums and The South Loop Shops

### Winter Condition Costs Incurred to Reduce Loss

| Vendor | Amount |
|---|---|
| Crouch-Seranko Masonry | $ 87,799.00 |
| Crouch-Seranko Masonry | 4,518.00 |
| D Three Construction | 10,410.00 |
| RKD Construction Supplies | 1,033.87 |
| RKD Construction Supplies | 1,672.00 |
| RKD Construction Supplies | 2,436.00 |
| R& J Construction Supply Co. | 1,760.00 |
| Rankin | 1,696.00 |
| Ashland Propane | 85.00 |
| R& J Construction Supply Co. | 1,983.00 |
| Home Depot | 1,789.20 |
| Wight Construction Company | 15,447.00 |
| | $ 110,629.07 |

EXHIBIT
K

P-2011-00253752

One Place Condominiums and The South Loop Shops

Acceleration Costs Incurred to Reduce Loss

| Vendor | Amount |
|---|---|
| Universal Construction Testing, Ltd. | $ 5,211.50 |
| Universal Construction Testing, Ltd. | 21,064.75 |
| Universal Construction Testing, Ltd. | 3,460.00 |
| Universal Construction Testing, Ltd. | 5,749.00 |
| Budron Excavating Company | 4,260.81 |
| Budron Excavating Company | 1,140.86 |
| Concrete Structures of the Midwest | 11,804.00 |
| Concrete Structures of the Midwest | 18,154.52 |
| Concrete Structures of the Midwest | 56,645.55 |
| Bonus Electric Co., LLC | 1,216.40 |
| Bonus Electric Co., LLC | 2,669.81 |
| Bonus Electric Co., LLC | 4,079.00 |
| D Three Construction | 4,902.92 |
| D Three Construction | 9,788.00 |
| D Three Construction | 2,708.00 |
| Crouch-Seranko Masonry | 4,757.00 |
| Crouch-Seranko Masonry | 32,591.00 |
| Crouch-Seranko Masonry | 30,986.00 |
| PES | 46,775.00 |
| PES | 10,588.00 |
| | 278,532.12 |
| GC Overhead and Profit - 15% | 41,779.82 |
| | 320,311.94 |



EXHIBIT
L

# TAB 7

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ONE PLACE CONDOMINIUM LLC, | ) | |
| THE SOUTH LOOP SHOPS LLC, | ) | |
| SOUTHBLOCK DEVELOPMENT LLC, | ) | Case No. 1:11-cv-02520 |
| C & K PARTNERSHIP, and | ) | |
| SOUTHBLOCK MANAGEMENT, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| TRAVELERS PROPERTY CASUALTY | ) | |
| COMPANY OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## PLAINTIFFS' REVISED SUPPLEMENTAL ANWERS TO DEFENDANT'SFIRST SET OF INTERROGATORIES

Plaintiffs, One Place Condominium LLC, The South Loop Shops LLC, Southblock Development LLC, C & K Partnership, and Southblock Management, Inc., state as follows for their Revised Supplemental Answers to Travelers' First Set of Interrogatories per the Court's Order:

## INTERROGATORIES

**INTERROGATORY NO. 5:**  Identify, with specificity, the costs (and associated scope of work) Plaintiffs are seeking to recover under the Valuation provision of the Policy for the costs to repair, replace or restore the earth retention system.

**ANSWER:**  Plaintiffs object to interrogatory no. 5 as being neither relevant nor reasonably calculated to lead to the discovery of admissible evidence as the Valuation provision of the Policy does not contain the language set forth by Defendant regarding "the costs to repair, replace or restore" the earth retention system.  Without waiving said objection, Plaintiffs

1

respond as follows:    The policy provides $33 million in coverage limits under the IM PAK COVERAGE FORM CM T1 43 08 96 for " 'loss' to Covered Property from any of the Covered Causes of Loss."  Covered Causes of Loss means "RISKS OF DIRECT PHYSICAL 'LOSS' except those causes of 'loss' listed in the Exclusions."  Policy form CM T1 43 08 96 p. 1.  Loss is defined under section F on page 15, paragraph 16 as "accidental loss or damage."  Covered property is identified in the same section as "Builders' Risk" which is defined on page 13 par. 4 and includes buildings and structures including temporary structures while being constructed and property that will become a permanent part of the building or structure.  Thus, the Policy pays for, in part: accidental loss or damage to Covered Property from any of the risks of direct physical accidental loss or damage.  Based on the policy language and further adjustment of the loss, some of the costs that were previously included in the claim as they had been due and owing, have since been negotiated and/or no longer need to be paid by Plaintiffs and so these amounts have been removed from   the claim.   Utilizing the adjusted claim numbers and responding to this interrogatory:   $5,879,062.80 (see attachment A).  Some of these amounts can be currently allocated as follows: $983,308.54 for the earth retention system (see attachment B); $631,483.84 for D-Line caissons (see attachment C); and the remaining amount of $4,264,270.42 cannot be further allocated but are loss or damage to Covered Property from any of the risks of direct physical accidental loss or damage.  Attachments A, B, and C provide further breakdown and specific references to previously produced documents in support.

Additionally, of the $5,879,062.80 some of these amounts are also covered under the policy provisions entitled "Expenses to Reduce 'Amount of Loss'" (Form CM T1 43 08 96, at p. 6 of 18) and/or "Expediting Costs" (Form CM T1 43 08 96, at p. 5 of 18).  Specifically,

$1,474,349.50 is also covered under the "Expenses to Reduce 'Amount of Loss'" provision (see attachment D), and $95,738.47 is also covered under the "Expediting Costs" (see attachment E).

Plaintiffs reserve the right to supplement this answer upon further investigation and through the disclosure of expert opinions in accordance with the Federal Rules of Civil Procedure and the Court's scheduling Order.

**INTERROGATORY NO. 9:** Identify, with specificity, the costs (and associated scope of work) Plaintiffs are seeking to recover under the Valuation provision of the Policy for the costs to repair, replace or restore the D-Line caissons and frost line.

**ANSWER:** *See* Plaintiffs response to interrogatory no. 5 which is incorporated herein by reference.

**INTERROGATORY NO. 11:** Identify, with specificity, the costs incurred (and associated scope of work) to expedite the repair of the earth retention system.

**ANSWER:** Plaintiffs object to interrogatory no. 11 as being neither relevant nor reasonably calculated to lead to the discovery of admissible evidence as the Policy does not contain language which provides that it will pay for only "the costs incurred (and associated scope of work) to expedite the repair" of damaged property, such as the earth retention system. Without waiving said objection, Plaintiffs respond as follows:

The policy provides coverage under the "Additional Coverage" section (see form CM T1 43 08 96, p. 2, par. 5) for "Expediting Costs and Additional Cost of Construction Materials and Labor" as follows: "We will pay for the following costs made necessary by a Covered Cause of Loss to Covered Property at the 'job site': (a) Your costs to expedite repair of Covered Property; (b) Your increased cost of construction material and labor" up to a policy limit of $100,000." See form CM T1 43 08 96, p. 5, par. h. Plaintiffs assume and understand that this is the Policy provision referred to in this interrogatory and answer based on that assumption and provide that

Plaintiffs incurred $95,738.47 in costs. *See* Attachment E for the breakdown. *See also* Plaintiffs' response to interrogatory no. 5 which is incorporated herein by reference.

Plaintiffs reserve the right to supplement this answer upon further investigation and through the disclosure of expert opinions in accordance with the Federal Rules of Civil Procedure and the Court's scheduling Order.

**INTERROGATORY NO. 12:** Identify, with specificity, the costs incurred (and associated scope of work) to expedite the repair of the D-Line caissons and frost line.

**ANSWER:** Plaintiffs object to interrogatory no. 12 as being neither relevant nor reasonably calculated to lead to the discovery of admissible evidence as the Policy does not contain language which provides that it will pay for "the costs incurred (and associated scope of work) to expedite the repair" of damaged property, such as the earth retention system. Without waiving said objection, Plaintiffs respond as follows:

The policy provides coverage under the "Additional Coverage" section (see form CM T1 43 08 96, p. 2, par. 5) for "Expediting Costs and Additional Cost of Construction Materials and Labor" providing, in part: "We will pay for the following costs made necessary by a Covered Cause of Loss to Covered Property at the "job site: (a) Your costs to expedite repair of Covered Property; (b) Your increased cost of construction material and labor" up to a policy limit of $100,000. " Form CM T1 43 08 96, p. 5, par. h. Plaintiffs assume and understand that this is the Policy provision referred to in this interrogatory and answer based on that assumption that Plaintiffs incurred $95,738.47 in costs. *See* Attachment E for the breakdown. *See also* Plaintiffs' response to interrogatory no. 5 which is incorporated herein by reference.

Plaintiffs reserve the right to supplement this answer upon further investigation and through the disclosure of expert opinions in accordance with the Federal Rules of Civil Procedure and the Court's scheduling Order.

**INTERROGATORY NO. 13:** Identify, with specificity, the increased cost of construction materials and labor (and associated scope of work) made necessary by the damage to the earth retention system and/or damage to the D-Line caissons and frost line.

**ANSWER:** Plaintiffs object to interrogatory no. 13 as being neither relevant nor reasonably calculated to lead to the discovery of admissible evidence as the Policy does not contain language which provides that it will pay for "the increased cost of construction materials and labor (and associated scope of work) made necessary by" the damage to the earth retention system and/or damage to the D—Line caissons and frost line. Without waiving said objection, Plaintiffs respond as follows:

The policy provides coverage under the "Additional Coverage" section (see form CM T1 43 08 96, p. 2 par. 5) for "Expediting Costs and Additional Cost of Construction Materials and Labor" providing, in part: "We will pay for the following costs made necessary by a Covered Cause of Loss to Covered Property at the 'job site': (a) Your costs to expedite repair of Covered Property; (b) Your increased cost of construction material and labor up to a policy limit of $100,000. " (see form CM T1 43 08 96, p. 5, par. h). Plaintiffs assume and understand that this is the Policy provision referred to in this interrogatory and answer based on that assumption that Plaintiffs incurred $95,738.47 in costs. *See* Attachment E for the breakdown. *See also* Plaintiffs' response to interrogatory no. 5, which is incorporated herein by reference.

Plaintiffs reserve the right to supplement this answer upon further investigation and through the disclosure of expert opinions in accordance with the Federal Rules of Civil Procedure and the Court's scheduling Order.

**INTERROGATORY NO. 16:** Identify, with specificity, the expenses to reduce the amount of loss (and associated scope of work) Plaintiffs are seeking to recover under Section A.5.k. of the Policy.

**ANSWER:** The Policy provides "Additional Coverages" for "Expense to Reduce 'Amount of Loss.' Form CM T1 43 08 96, p. 2. The coverage provides: "We will pay the necessary expense you incur during the 'post-loss period of construction' if you would not have incurred such expense had there not been 'loss' to Covered Property from any of the Covered Causes of Loss which delayed the completion of the 'project' beyond the "planned completion date."  But we will not pay more for your expense than the amount by which such expense reduces the "amount of loss" we would have otherwise paid.  No deductible applies to this Additional Coverage." Form CM T1 43 08 96, p. 6, par. k.

The expense to reduce the amount of loss totals $1,474,349.50 (see attachment D).  This is comprised of three subcategories.  First, $110,629.07 is for what we refer to as winter conditions. Certain concrete, masonry and subsequent mechanical, electrical, plumbing and elevator work which was weather sensitive per the original schedule was scheduled to be completed either prior to the onset of the 2007/08 winter or to be performed in a fully enclosed, weather protected structure.  The loss resulted in lost construction days, delays in construction, work-arounds on site to accommodate loss related repairs and other schedule impacting construction inefficiencies directly attributable to the loss, all of which caused some of these construction activities to be performed in the following winter.  If the loss had not occurred, these activities would have been performed before the onset of the winter.  As a result, additional

6

unanticipated costs were incurred to provide protection from the elements so that work could continue. The $110,629.07 of costs were incurred to allow for work to be performed during winter conditions. If such winter condition related costs were not paid for by Plaintiffs, the alternative would have been to shut down the jobsite from late November through April, 2008 as evidenced by the letter from the Masonry Contractor (Attachment F). Such a shutdown would have added additional soft costs of at least 5-months and at the agreed daily amount of $10,254.10 (Attachment G), excluding back end penalties and interest charges, $1,538,115 of additional soft costs were averted.

Second, Plaintiffs incurred $260,377.60 of expenses after to the loss which were necessary to attempt to get the project back on line with the critical path schedule. Each lost day on the critical path would have at least a daily impact on soft costs, although some accelerated work improved the schedule on a better than 1:1 ratio. There were 82 days of accelerated work performed which is equal to $840,836.20 of averted costs.

Third, similar to the winter conditions above, the lost construction days, delays in construction, work-arounds on site to accommodate the loss related repairs and other schedule impacting construction inefficiencies directly attributable to the loss caused inefficiencies which resulted in the insured incurring significant additional costs in contract labor. $857,617.91 in incurred costs (Attachment D) primarily from the concrete and plumbing sub-contractors for increased period of construction costs as a result of the covered loss.

Plaintiffs reserve the right to supplement this answer upon further investigation and through the disclosure of expert opinions in accordance with the Federal Rules of Civil Procedure and the Court's scheduling Order.

7

**INTERROGATORY NO. 24:**  Identify, in detail, all losses, damages, fees, costs, or expenses Plaintiffs seek to recover from Travelers and, for each category of loss, damage, fee, cost or expense, identify the amount the Plaintiffs seeks to recover, the associated scope of work, the specific provision in the Policy pursuant to which the Plaintiffs believes they are entitled to recover said losses, damages, fees, costs or expenses, and all Persons with knowledge of said losses, damages, fees, costs or expenses, and/or who will testify with will testify with regard to your claim for losses, damages, fees, costs or expenses.

**ANSWER:**    Plaintiffs refer to interrogatories nos. 5, 9, 11, 12, 13, and 16, *supra*.  Further answering,  based on further adjustment of the loss, some of the costs that were previously included in the claim as they had been due and owing, have since been negotiated and/or no longer need to be paid by Plaintiffs and so these amounts have been removed from  the claim. Utilizing the adjusted claim numbers

The total claim is: $8,182,300.65 which is the total of loss or damage to covered property of $5,879,062.80 and soft costs (based on eight months) of $2,303,237.85 (see attachment H). Subtracting the amount paid by Travelers of $1,340,549.69 and the applicable policy deductible of $50,000, leaves a remaining amount owed to Plaintiffs of:  $6,791,750.96.  As set forth in the policy and in interrogatory 5 herein, various costs are covered under more than one policy provision.

In addition, Plaintiffs seek prejudgment interest, consequential loss including penalties and additional interest on loans, renegotiation costs, escalation fees for the loan, loss rental income and other market costs are still being investigated as the loans are still being serviced and continue to accrue.  See documents previously produced.

Plaintiffs reserve the right to supplement this answer upon further investigation and through the disclosure of expert opinions in accordance with the Federal Rules of Civil Procedure and the Court's scheduling Order.

Fact witnesses: Robert Levin, Craig Becker, Harlan Karp, Jerry Karp, Charles Shenk, Rick Sarff, Murray Sacks, Barclay Roberts, James Nagle, Lawrence Goldman, Neo Lorenzo, Robert Charal, Jason Walker, Ronald Metclafe, and Gaurav Lamba. Plaintiffs reserve the right to disclose additional witnesses.

Dated: March 1, 2013

Respectfully submitted,

One Place Condominium LLC, The South Loop Shops LLC, Southblock Development LLC, C & K Partnership, and Southblock Management, Inc.

By: _____
Katherine Smith Dedrick, Esq,
Illinois Bar No. 6185314
kdedrick@childresslawyers.com
Coleman J. Braun, Esq.
Illinois Bar No. 6295961
cbraun@childresslawyers.com
Childress Duffy, Ltd.
500 North Dearborn Street
Suite 1200
Chicago, Illinois 60654
Tel: (312) 494-0200
Fax: (312) 494-0202
*Attorneys for Plaintiffs*

Case No. 1:11-cv-02520

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, a non-attorney, on oath state I served the above referenced documents by mailing a copy of the same in an envelope properly addressed, sealed and stamped and depositing in the U.S. Mail at 500 North Dearborn Street, Suite 1200, Chicago, Illinois 60654 on the 1st day of March, 2013.

K. Clark Schirle, Esq.
cschirle@butlerpappas.com
Jonathan Barger, Esq.
jbarger@butlerpappas.com
Butler Pappas Weihmuller Katz Craig, LLP.
115 South LaSalle Street, Suite 3200
Chicago, Illinois 60603
Tel: (312) 456-0900
Fax: (312) 456-0909

By:  _____
Katherine Smith Dedrick, Esq,
Illinois Bar No. 6185314
kdedrick@childresslawyers.com
Coleman J. Braun, Esq.
Illinois Bar No. 6295961
cbraun@childresslawyers.com
Childress Duffy, Ltd.
500 North Dearborn Street
Suite 1200
Chicago, Illinois 60654
Tel: (312) 494-0200
Fax: (312) 494-0202
*Attorneys for Plaintiffs*

10

## VERIFICATION

BEFORE ME, the undersigned authority, a Notary Public on this day personally appeared Harlan Karp who being by me duly sworn on oath deposed and said that he has read the foregoing Plaintiffs' Revised Supplemental Answers to Defendant's First Set of Interrogatories and that every statement contained therein is based on information and belief, true and correct

HARLAN KARP

Subscribed and Sworn to before me, on this 28th day of February, 2013.

_____

Notary Public in and for the state of Illinois

My commission Expires on:

9/27/ 15

_____
Signature

OFFICIAL SEAL
IZABELA BURBAKOWSKA
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:09/27/15

**Engineering**

- *NAC Corp – 3/2007: bates# 15-17[1] =*                    *$7,082.50*
- *Wiss Janney – bates# 19-21 =*                            *$7,500.00*
- *Wiss Janney – bates# 22; 1724 - 1725 =*                  *$2,280.20*
- *Wiss Janney – bates# 23-24 =*                            *$350.00*
- *Wiss Janney – bates# 1729-1734 =*                        *$700.00*
- *Ground Engineering – bates# 26-28 =*                     *$5,265.00*
- *Ground Engineering – bates# 29 =*                        *$1,875.00*
- *Ground Engineering – bates# 1743  =*                     *$2,147.00*
- *Ground Engineering – bates# 1742  =*                     *$1,125.00*
- *Ground Engineering – bates# 1739-1741 =*                 *$750.00*
- *Ground Engineering – bates# 1738 =*                      *$1,177.00*
- *Rada Arch – 3/2007: bates# 30-32 =*                      *$1,974.50*


                                 **INVOICE TOTAL        $32,226.20**

**Testing**

- *Vibra-Tech –bates# 41-50=*                              *$5,800.00*
- *Professional Associated – 3/2007: bates# 52; 1173-1785 =$15,049*
- *Professional Associated – 4/2007: bates# 53-65 =*       *$17,616*
- *Professionals Associated – 4/2007: bates# 71-76=*       *$4,224*
- *Professionals Associated – bates# 70 =*                 *$7,040.00*
- *Professionals Associated – bates# 66-69 =*              *$6,336.00*
- *Professionals Associated – bates# 71 =*                 *$4,224.00*
- *Professionals Associated – bates# 82 =*                 *$10,560.00*
- *Professional Associated – 6/2007: bates#  77-78=*       *$1,336.00*
- *Professionals Associated – 6/2007: bates# 79-80 =*      *$1,002.00*
- *Professionals Associated – bates# 81 =*                 *$3,736.00*
- *Professionals Associated – bates# 83 =*                 *$668.00*
- *Professionals Associated – bates# 84 =*                 *$334.00*
- *Professionals Associated – bates# 1786-1787 =*          *$704.00*
- *UCT – 5/2007: bates# 90-91; 1789-1803 =*                *$4,810.00*
- *UCT – 6/2007: bates# 92-93=*                            *$10,209.00*
- *UCT – 7/2007: bates# 94- =*                             *$14,378.00*
- *UCT – bates# 95 =*                                      *$5,736.50*
- *UCT - bates# 96 =*                                      *$16,000.00*
- *UCT - bates# 97 =*                                      *$2,188.00*

---

[1] All bates# are to OP-GM/AI00----; unless otherwise noted

- *UCT - bates# 98 =*                                    *$17,750.00*
- *UCT – bates# 99 =*                                     *$21,064.75*
- *UCT – bates# 100 =*                                    *$3,460.00*
- *UCT – bates# 101 =*                                    *$5,749.00*
- *CTI – Dec. to May: bates# 103 =*                       *$6,100.00*
- *CTI – May to July: bates# 104 =*                       *$3,050.00*
- *ASC – July to October: bates#106-108; 1879-1882 =*     *$6,016.78*

                          **INVOICE TOTAL        $195,141.03**


**Excavating**

- *Budron – 3/2007: bates# 185-195 =*                     *$27,279.31*
- *Budron – bates# 196 =*                                 *$4,140.00*
- *Budron – bates# 198 -203 =*                            *$4,828.00*
- *Budron – bates# 204-206 =*                             *$4,376.00*
- *Budron – bates# 207 - 208=*                            *$4,140.00*
- *Budron  - bates# 209 – 214 =*                          *$11,919.77*
- *Budron – bates# 215  =*                                *$1,140.86*

                          **INVOICE TOTAL        $57,823.94**

**ERS Repairs**

- *Levine – 8/2007: bates# 218 =*                         *$189,359.00*

**Concrete Sherry K**

- *Sherry K Corp – 4/2007: bates# 220; 2258-2260*         *$46,620.73*

**Concrete CSM**

- *CSM – bates#221-230 =*                                 *$11,804.00*
- *CSM - bates# 231-238 =*                                *$2,167.00*
- *CSM – bates# 239-253 =*                                *$19,223.01*
- *CSM – 8/2007: bates# 254-298 =*                        *$144,238.06*
- *CSM – bates# 299-342=*                                 *$56,645.55*
- *CSM - bates# 343=*                                     *$4,065.00*
- *CSM – bates# 344-347 =*                                *$412,876.00*
- *CSM - bates# 348- =*                                   *$253,722.00*
- *CSM – bates# 349 =*                                    *$29,490.00*

**Attachment A**

- *CSM – bates# 1884 - 1893=*          *$769,132.00*
- *CSM – bates# 1895 - 1905 =*         *$5,994.91*
- *CSM – bates# 1907 – 1931 =*         *$22,958.00*

**INVOICE TOTAL**     **$1,732,315.53**

## Concrete Cutting

- *Cobra Concrete – bates# 350; 1934-1937 =*     *$4,332.00*

## Water Proofing

- *Sager Sealants – bates# 352 - 354*     *$1,060.80*

## Electric

- *Bonus Electric – bates# 356-358 =*     *$1,216.40*
- *Bonus Electric – bates# 359-365 =*     *$2,669.81*
- *Bonus Electric – bates#1939-1942 =*     *$4,079.00*

**INVOICE TOTAL**     **$7,965.21**

## Arrigo

- *Arrigo Enterprises Inc. - bates# 1943-1945=*     *$53,920.06*

## Masonry

- *Crouch-Seranko – bates# 372-375 =*     *$67,799.00*
- *Crouch-Seranko – bates# 1951-1955 =*     *$4,757.00*
- *Crouch-Seranko – bates# 1956-1962=*     *$32,591.00*
- *Crouch-Seranko  - bates# 1984-1994 =*     *$4,518.00*
- *Western Arch – 4/2008: bates# 1996-2002=*     *$22,520.00*
- *Crouch-Seranko -6/2008: bates# 1950=*     *$7,790.00*
- *Crouch-Seranko – bates# 2009-2011 =*     *$30,986.00*

**INVOICE TOTAL**     **$170,961.00**

## Carpentry

- *D Three– 6/2007: bates# 377-382=*     *$6,350.00*
- *D Three – 7/2007: bates#383-390 =*     *$6,522.00*
- *D Three – 7/16/07: bates # 390-395 =*     *$1,005.20*
- *D Three – 7/23/07: bates# 396-401=*     *$2,050.62*
- *D Three - bates#402-416 =*     *$20,420.15*
- *D Three – bates# 417-424=*     *$4,902.92*

**Attachment A**

- *D Three  – bates# 425-430=*                                          *$9,788.00*
- *D Three – 11/2007: bates# 427-431=*                          *$2,708.00*
- *D Three – bates# 432-436 =*                                        *$10,410.00*
- *D Three – bates # 437 - 467 =*                                     *$45,442.00*
- *D Three – bates # 2012 - 2034 =*                                 *$47,370.00*
- *D Three – bates # 2036 - 2050 =*                                 *$38,679.00*
- *D Three – bates # 2052 - 2062 =*                                 *$15,010.00*

                                    **INVOICE TOTAL          $ 210,657.89**

## Materials & Supplies

- *RKD – 8/2007: bates# 469-470=*                               *$266.40*
- *RKD – 8/2007: bates# 471-472=*                               *$1,066.76*
- *RKD – 10/2007: bates# 473-477=*                             *$2,946.30*
- *RKD – 11/2007: bates# 478-=*                                    *$3,866.93*
- *RKD – 11/2007: bates#479 =*                                     *$271.40*
- *RKD  – bates# 480 =*                                                  *$1,033.87*
- *RKD  – bates# 2064 – 2065 =*                                   *$1,672.00*
- *RKD  – bates# 2067 – 2071 =*                                   *$2,436.00*
- *R & J Construction Supply Co. – bates# 2073 – 2077 =*    *$1,760.00*
- *Rankin Invoice – bates# 2079  =*                               *$1,696.00*
- *Ashland Propane Invoice – bates# 2081-=*                 *$85.00*
- *R & J Construction Supply Co. – bates# 2083 – 2091 =*   *$1,983.00*

                                    **INVOICE TOTAL          $19,083.66**

## Wight

- *Toltec Services – 9/2007: bates# 482=*                      *$22,673.00*
- *Home Depot – bates# 483 – 488 =*                            *$1,789.20*
- *Wight Const. – bates# 489 – 517 =*                           *$15,447.00*

                                    **INVOICE TOTAL          $39,909.20**

## Dumpsters

- *Allied – March to Aug/07: bates# 519-521 =*               *$2,957.08*

## Elevators

4

**Attachment A**

- *PES – 3/2008: bates#2112-2114 =*               *$18,072.00*
- *PES – bates# 2119 -2181 =*                      *$46,775.00*
- *PES – bates# 2183-2185 =*                        *$10,568.00*

**INVOICE TOTAL      $75,415.00**

## Plumbing

- *Nadolna Brothers bates# 2187 - 2190 =*           *$59,533.00*

## Permit Extensions

- *City of Chicago, etc. bates# 528 - 536; 2101 - 2110 =*   *$12,496.00*
- *City of Chicago, etc. bates# 528 - 536; 2101 - 2110 =*   *$50,126.00*
- *City of Chicago, etc. bates# 528 - 536; 2101 - 2110 =*   *$24,566.00*
- *City of Chicago, etc. bates# 2106-2108 =*                *$3,288.00*

**INVOICE TOTAL      $90,476.00**

## Additional Flaggers

- *CTA Flaggers – bates# 2253 - 2256 =*             *$218,254.00*

## General Conditions                                *$1,564,031.00*

- Wight Contract – bates# OP00471 – OP00474  =
- Draw #11 – bates# 1702
- Draw #28 – bates# REV00037673
- Draw #30 – bates # REV0037719
- Draw #31 – bates# REV00041963 =

***INVOICES SUB-TOTAL           $4,772,042.33***

**Const. Management 5% =**

- *SBD Contract dated 4/2/07 – bates # 551 - 552 =  $238,602.12*

**O&P 15%**

- *Wight Contract – bates# OP00471 – OP00474  = $715,806.35*

**Project Management**

- *SBD Contract – bates# REV00039494 =*            *$120,000.00*

5

**Attachment A**

**Extra Insurance**

- Insurance = *bates# TRVRSUNDERWRITING 25 - 28  $32,612.00*

***FEES SUB-TOTAL*  $1,107,020.47**

**TOTAL LOSS OR DAMAGE TO COVERED PROPERTY        $5,879,062.80**

**TOTAL BENEFITS DUE UNDER THE POLICY**

| | |
|---|---|
| **LOSS OR DAMAGE TO COVERED PROPERTY** | $5,879,062.80 |
| Paid by Travelers | ($1,104,705.39) |
| **SOFT COST – *ESTIMATED* (8 months)** | $2,303,237.85 |
| Paid by Travelers | ($235,844.30) |
| **Policy Deductible** | (*$50,000.00*) |

**TOTAL DEMAND_____  $6,791,750.96**

**Attachment A**

## EARTH RETENTION SYSTEM ALLOCATION

- *NAC Corp – 3/2007: bates# 15-17[1] =*        $7,082.50
- *Rada Arch – 3/2007: bates# 30-32 =*        $1,974.50
- *Professional Associated – 3/2007: bates# 52; 1173-1785 =* $15,049
- *Professional Associated – 4/2007: bates# 53-65 =*      $17,616
- *Professional Associated – 6/2007: bates#  77-78=*     $1,336.00
- *Professionals Associated – 6/2007: bates# 79-80 =*    $1,002.00
- *UCT – 5/2007: bates# 90-91; 1789-1803 =*      $4,810.00
- *UCT – 6/2007: bates# 92-93=*        $10,209.00
- *UCT – 7/2007: bates# 94- =*        $14,378.00
- *CTI – Dec. to May: bates# 103 =*        $3,965.00
- *CTI – May to July: bates# 104 =*        $3,050.00
- *ASC – July to October: bates#106-108; 1879-1882 =*   $6,016.78
- *Budron – 3/2007: bates# 185-195 =*      $27,279.31
- *Budron – bates# 196 =*        $4,140.00
- *Budron – bates# 198 -203 =*       $4,828.00
- *Budron – bates# 204-206 =*       $4,376.00
- *Budron – bates# 207 - 208=*       $4,140.00
- *Budron  - bates# 209 – 214 =*       $7,658.96
- *Levine – 8/2007: bates# 218 =*      $189,359.00
- *Sherry K Corp – 4/2007: bates# 220; 2258-2260*   $46,620.73
- *CSM - bates# 231-238 =*       $2,167.00
- *CSM – bates# 344-347 =*     $412,876.00
- *CSM – bates# 349 =*      $29,490.00

|  | ***Invoice Sub-Total*** | ***$819,423.78*** |
|---|---|---|
| **O&P @ 15%** | | $122,913.57 |
| **Construction Management @ 5%** | | $40,971.19 |
| **TOTAL ERS** | | **$983,308.54** |

---

[1] All bates# are to OP-GM/AI00----; unless otherwise noted

**Attachment B**

## D-LINE ALLOCATION

- *Wiss Janney – bates# 19-21[1] =*                   *$7,500.00*
- *Professionals Associated – 4/2007: bates# 71-76=*   *$4,224.00*
- *UCT – bates# 95 =*                                   *$525.00*
- *UCT - bates# 96 =*                                   *$16,000.00*
- *UCT - bates# 97 =*                                   *$2,188.00*
- *CSM – bates# 239-253 =*                              *$19,223.01*
- *CSM – 8/2007: bates# 254-298 =*                      *$126,092.54*
- *CSM - bates# 343=*                                   *$4,065.00*
- *CSM - bates# 348- =*                                 *$253,722.00*
- *Cobra Concrete – bates# 350; 1934-1937 =*            *$4,332.00*
- *Western Arch – 4/2008: bates# 1996-2002=*            *$22,520.00*
- *D Three– 6/2007: bates# 377-382=*                    *$6,350.00*
- *D Three – 7/2007: bates#383-390 =*                   *$6,522.00*
- *D Three – 7/16/07: bates # 390-395=*                 *$1,005.20*
- *D Three – 7/23/07: bates# 396-401=*                  *$2,050.62*
- *D Three - bates#402-416 =*                           *$20,420.15*
- *RKD – 11/2007: bates# 478-=*                         *$3,866.93*
- *Toltec Services – 9/2007: bates# 482=*               *$22,673.00*
- *Allied – March to Aug/07: bates# 519-521 =*          *$2,957.08*

|                                       |                |
|---------------------------------------|----------------|
| ***Invoice Sub-Total***               | ***$526,236.53*** |
| **O&P @ 15%**                         | $78,935.48     |
| **Construction Management @ 5%**      | $26,311.83     |
| **TOTAL D-LINE**                      | **$631,483.84** |

[1] All bates# are to OP-GM/AI00----; unless otherwise noted

**Attachment C**

## EXPENSES TO REDUCE AMOUNT OF LOSS INVOICES

### Winter Conditions

- *Crouch-Seranko – bates# 372-375[1] =*                     *$67,799.00*
- *Crouch-Seranko  - bates# 1984-1994 =*                  *$4,518.00*
- *D Three – bates# 432-436 =*                            *$10,410.00*
- *RKD  – bates# 480 =*                                   *$1,033.87*
- *RKD  – bates# 2064 – 2065 =*                           *$1,672.00*
- *RKD  – bates# 2067 – 2071 =*                           *$2,436.00*
- *R & J Construction Supply Co. – bates# 2073 – 2077 =*  *$1,760.00*
- *R & J Construction Supply Co. – bates# 2083 – 2091 =*  *$1,983.00*
- *Rankin Invoice – bates# 2079  =*                       *$1,696.00*
- *Ashland Propane Invoice – bates# 2081-=*               *$85.00*
- *Home Depot – bates# 483 – 488 =*                       *$1,789.20*
- *Wight Const. – bates# 489 – 517 =*                     *$15,447.00*

### *Winter Conditions Sub-Total          $110,629.07*

### Acceleration

- *UCT - bates# 98 =*                    *$5,211.50*
- *UCT – bates# 99 =*                    *$21,064.75*
- *UCT – bates# 100 =*                   *$3,460.00*
- *UCT – bates# 101 =*                   *$5,749.00*
- *Budron  - bates# 209 – 214 =*         *$4,260.81*
- *Budron – bates# 215  =*               *$1,140.86*
- *CSM – bates#221-230 =*                *$11,804.00*
- *CSM – bates# 299-342=*                *$56,645.55*
- *Bonus Electric – bates# 356-358 =*    *$1,216.40*
- *Bonus Electric – bates# 359-365 =*    *$2,669.81*
- *Bonus Electric – bates#1939-1942 =*   *$4,079.00*
- *D Three – bates# 417-424=*            *$4,902.92*
- *D Three  – bates# 425-430=*           *$9,788.00*

---

[1] All bates# are to OP-GM/AI00----; unless otherwise noted

**Attachment D**

- *D Three – 11/2007: bates# 427-431=*                    *$2,708.00*
- *Crouch-Seranko – bates# 1951-1955 =*                 *$4,757.00*
- *Crouch-Seranko – bates# 1956-1962=*                  *$32,591.00*
- *Crouch-Seranko – bates# 2009-2011 =*                 *$30,986.00*
- *PES – bates# 2119 -2181 =*                            *$46,775.00*
- *PES – bates# 2183-2185 =*                             *$10,568.00*


### *Acceleration Sub-Total*          *$260,377.60*


## Period of Delay Costs Incurred to Reduce Loss

- *CSM – bates# 1884 - 1893=*                            *$225,000.00*
- *CSM – bates# 1895 - 1905 =*                           *$5,994.91*
- *CSM – bates# 1907 – 1931 =*                           *$22,958.00*
- *Nadolna Brothers bates# 2187 - 2190 =*               *$59,533.00*


### *Period of Delay Costs Sub-Total*          *$857,617.91*


### *Invoice Sub-Total*          *$1,228,624.58*

**O&P @ 15%**                    $184,293.69
**Construction Management @ 5%**  $61,431.23


## EXPENSES TO REDUCE AMOUNT OF LOSS TOTAL          $1,474,349.50

**Attachment D**

## Expediting Costs and Additional Cost of
## Construction Materials and Labor

- *Arrigo Enterprises Inc. - bates# 1943-1945[1]=*    *$53,920.06*
- *Crouch-Seranko -6/2008: bates# 1950=*    *$7,790.00*
- *PES – 3/2008: bates#2112-2114 =*    *$18,072.00*

***Invoice Sub-Total***    ***$79,782.06***

**O&P @ 15%**    $11,967.31
**Construction Management @ 5%**    $3,989.10

**TOTAL ESCALATION**    **$95,738.47**

---

[1] All bates# are to OP-GM/AI00----; unless otherwise noted

**Attachment E**

P-2012-000453648

3.a.6.IV

# CROUCH - SERANKO MASONRY

C O N T R A C T O R S   I N   M A S O N R Y

November 14, 2007

1307 W. WRIGHTWOOD AVENUE
CHICAGO, ILLINOIS 60614
TELEPHONE (773) 281 – 5900
FACSIMILE (773) 281 – 5975

Mr. Josh Warriner
Wight Construction
2500 N. Frontage Road
Darien, Illinois 60561

VIA FAX: 630-737-0518

RE: Winter Protection
    One Place Condo

Dear Mr. Warriner,

Per your request, we provide the following pricing for enclosure of the hydro scaffolding
for the purpose of providing winter protection of the scaffolding on the north and west
only from floors three to ten for the price of $67,799.00 . Our proposal does not include
heat, covering of openings, or repair or maintenance of the enclosure due to damage, i.e.
wind.

We are pricing four months of bracket rental. Based on the latest schedule, the exterior
masonry duration is 11/27/07-4/22/07 or a duration of 5 months plus 3 weeks to
assemble/dismantle the scaffolding. It appears based on current site conditions, we would
start the tower in January and have a duration of 3-4 months. If the protection is needed
longer or shorter, the monthly rental of $8,032.00 would be adjusted accordingly. Please
note, once the brackets are installed, they remain on the scaffolding for the duration of
the work.

Please feel free to contact us with any questions or concerns.

Sincerely,
Crouch-Seranko Masonry

Julie Seranko

3.q.6.1v

Per attached Bracing Systems proposal

| | | Cost | |
|---|---|---|---|
| Bracket Rental | $ | 4,140 | |
| Overhead protection | | 2,100 | |
| Damage waiver | | 168 | |
| | | 6,408 | |
| 9% tax | | 577 | |
| | | 6,985 | 3/w1 |
| ?? months | $ | 27,939 | |
| Overhead and profit 15% | $ | 4,191 | |
| **Rental cost** | | | 32,130 |

Materials:

| | | | |
|---|---|---|---|
| Lumber | | 995 | |
| Plastic | | 1,090 | |
| Strips | | 59 | |
| | | 2,144 | |
| 9% tax | | 193 | |
| | | 2,337 | |
| 15% overhead and profit | | 351 | |
| **Material cost** | | | $ 2,687 |

Labor to install brackets and enclose scaffolding

| | Hours | Hourly rate | Cost |
|---|---|---|---|
| Foreman | 14 | 94.00 | 1,316 |
| Laborer | 336 | 78.00 | 26,208 |
| | | | 27,524 |
| Overhead and profit | | | 4,129 |
| **Labor cost** | | | $ 31,653 |

| | | |
|---|---|---|
| Total labor and material | | 66,470 |
| Bond fee | | 1,329 |
| **Total cost** | | $ 67,799 |

003/004

CROUCH SERRANO MASONRY

**Attachment F**

P-2012-000253656

DAILY SOFT COSTS ANALYSIS ONE PLACE CONDOMINIUM, LLC REVISED JANUARY 6, 2010

*APRIL 09*     **87,847.08**

| Soft Cost Item | Yearly Cost | Monthly Cost | Daily Cost |
|---|---|---|---|
| | *MARCH 09* | 96,413.05 | |
| **Interest** | *FEB .09* | 88,710.87 | |
| **Original construction loan** | *JAN -09* | 93,412.85 | |
| *NEED ALL PAYMENTS* | Dec-08 | 114,287.80 | |
| *FROM APRIL 08 thru 4/09* | Nov-08 | 108,543.31 | |
| | Oct-08 | 190,388.78 | |
| Total for three months at end of project | *APRIL 7843.67* | 413,219.89 | |
| Average daily interest original loan | *MARCH 7291.66* | | **4,491.52** |
| | *FEB 8266.67* | | |
| | *JAN 09 · 8266.67* | | |
| **Construction loan 11541524 Chicago Community Bank** | | | |
| *LOAN 4/07 1,008,185 PD 9/8* | Dec-08 | 8,059.84 ✓ | |
| " 5/08 1.6 | Nov-08 | 8,098.01 ✓ | |
| | Oct-08 | 7,836.79 ✓ | |
| Total for three months at end of project | *APRIL 7398.72* | 23,994.64 | |
| Average daily interest original loan | *MARCH 7440.41* | | **260.81** |
| | *F+B 7599.38* | | |
| **Construction loan 11541527 Chicago Community Bank** *JAN.09 7997.72* | | | |
| *57* | Dec-08 | 7,449.93 ✓ | |
| | Nov-08 *JOURNAL ENTRY* | 7,605.77 ✓ | |
| | Oct-08 *+ 1,241.68* | 4,970.52 ✓ | |
| Total for three months at end of project | *A BRIL 11, 985.18* | 20,026.22 | |
| Average daily interest original loan | *MARCH 11, 912.91* | | **217.68** |
| | *F+B 20, 649.40* | | |
| **Construction loan C&K Partnership** | *JAN 20, 552.46* | | |
| *3.8 MIL* | Dec-08 | 20,455.98 ✓ | |
| | Nov-08 | 20,359.95 ✓ | |
| | Oct-08 | 20,264.37 ✓ | |
| Total for three months at end of project | | 61,080.30 | |
| Average daily interest original loan | | | **663.92** |
| **Daily Interest on Construction Loans, Total** | | | **5,633.92** |
| **Rent** | | | |
| Starbucks | 86,950.00 | | 238.22 |
| X-Port | 892,000.00 | | 2,443.84 |
| U&C Foods | 87,296.00 | | 239.17 |
| Parking | 587,736.00 | | 1,610.24 |
| **Average Daily Rent** | | | **4,531.46** |
| **Real Estate Taxes** | 10,795.00 | | 29.58 |
| **Daily Soft Costs** | | | **10,194.96** |

*REVISED TO*
*$10,254.10*

*360 X 5.633*    *1.8*
*( INTEREST pd on cента loss)*

**Attachment G**

**One Place Soft Cost Claim**
**Date of Loss: February 22, 2007**
**Projected Completion: April 4, 2008**
**Actual Project Pompletion: April, 2009**
**Period of Delay: 12-months**

| Restated Claim Calculation | | | Source | |
|---|---|---|---|---|
| Daily Soft Cost | $ | 10,254.10 | 8/27/10 Rick Sarff letter | |
| 365 X $10,254.10 | | | | $ 3,742,746.50 |
| Less 5 months adjusted for actual revenue | $ | (4,531.00) | Travelers calculation | |
| $4,531.00 X 150 days | | | | $ (679,650.00) |
| Less parking revenue | | | | |
| October | | | 12 month P&L recap | $ (892.00) |
| November | | | 12 month P&L recap | $ (2,117.00) |
| | | | | |
| Loan Renegotiation Exit Fee | | | | $ 300,000.00 |
| Loan Renegotiation Legal Fees | | | | $ 46,278.00 |
| | | | | |
| Paid on Water Damage Claim | | | Travelers actual | $ (959,570.25) |
| Less 14 day deductible | | | | |
| 14 X $10,254.10/day | | | Travelers calculation | $ (143,557.40) |
| (Taken on front end with zero revenue offset) | | | | |
| | | | | |
| **Soft Costs Claim** | | | | **$ 2,303,237.85** |

**Attachment H**