**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ONE PLACE CONDOMINIUM LLC, | ) | |
| THE SOUTH LOOP SHOPS LLC, | ) | |
| SOUTHBLOCK DEVELOPMENT LLC, | ) | |
| C & K PARTNERSHIP, and | ) | |
| SOUTHBLOCK MANAGEMENT, INC., | ) | Case No. 1:11-cv-02520 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| TRAVELERS PROPERTY CASUALTY | ) | Honorable Sheila M. Finnegan |
| COMPANY OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA'S
MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY
JUDGMENT ON ONE PLACE'S SECTION 155 CLAIM**

## TABLE OF CONTENTS

PAGE

I.   Introduction……………………………………………………………………….   1

II.  Section 155 …………………………………………………………………...   2

III. Travelers Is Entitled To Summary Judgment…….…………………………...   4

   A.   Overview…...……………………………………………………….……   3

   B.   Travelers Original Position Denying Coverage as to the
        Earth Retention System Because of a Defective Design
        Exclusion was Supported By Expert Analysis and a
        Correct Application of the Policy ……………………..………………..…….   5

   C.   Travelers' Analysis of the Types of Costs Covered
        under the Policy is Accurate ……………………………………………..   12

   D.   West Side (D Line) Frost Wall and Caisson Issues…………………………...   17

   E.   Other Items In Complaint and Interrogatory Answers..……….…………….   22

IV. Conclusion…………………………………………………………………….   25

## <u>TABLE OF AUTHORITIES</u>

***Cases***

Page

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505 (1986)…………………… 3

*Bakal v. Paul Revere Life Ins. Co.,* 576 F. Supp. 2d 889 (N.D. Ill. 2008)………….. 3, 4

*Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.,* 200 F.3d 1102 (7th Cir. 2000)……………………………………………………………………………… 2, 3

*Horning Wire Corp. v. Home Indem. Co.,* 8 F.3d 587 (7th Cir. 1993)……………… 2

*James F. Campenella Const. Co. v. Great American Ins. Co.,* 2010 WL 4812990 (E.D. Pa. 2010)………………………………………………………………………… 16-17

*Knasel v. Ins. Co. of Illinois*, 254 Ill.App.3d 638, 627 N.E.2d 137 (1st Dist. 1993)… 2

*Kramer v. Village of North Fond du Lac,* 384 F.3d 856 (7th Cir. 2004)…………………… 3

*LeDonne v. AXA Equitable Life Ins. Co.,* 2009 WL 3721038 (N.D. Ill. November 2, 2009) (Judge Aspen)………………………………………………………………... 3

*Med. Prot. Co. v. Kim*, 507 F.3d 1076 (7th Cir. 2007)………………………………… 2

*O.T. Food & Liquor v. Hartford Ins. Co.,* 1996 WL 131805 (N.D. Ill. March 21, 1996)………………………………………………………………………………... 4

*Scottsdale Ins. Co. v. City of Waukegan*, 2007 WL 2740521 (N.D. Ill. September 10, 2007)………………………………………………………………………………... 2

*Shrader v. Paul Revere Life Ins. Co.,* 833 F. Supp. 2d 877 (N.D. Ill. 2011)……….. 3

*Sports Arena Mgmt., Inc. v. Great American Ins. Group,* 2007 WL 684003 (N.D. Ill. March 1, 2007)…………………………………………………………………… 4

*Vision One, LLC v. Philadelphia Indemnity Ins. Co.,* 174 Wash. 2d 501, 276 P.3d 390 (Wash. 2012)……………………………………………………………………… 16

*Wilder v. Barajas*, 2012 WL 3005505 (N.D. Ill. July 23, 2012)…………………………….. 3

***Statutes & Court Rules***

Fed. R. Civ. P. 56 (c)………………………………………………………………….. 3

Defendant Travelers Property Casualty Company of America ("Travelers"), by its counsel and pursuant to Rule 56 and Local Rule 56.1, submits its Memorandum in support of its Motion for Partial Summary Judgment on One Place's Section 155 (statutory bad faith) claim, Count II of One Place's Complaint.

## I.     Introduction

Section 155 of the Illinois Insurance Code provides that a court "may allow" the recovery of attorney's fees and a statutory penalty if an insurer's actions or delay in paying a claim were "vexatious and unreasonable".   An insurer has not engaged in vexatious and unreasonable conduct if there is a *bona fide* dispute as to the scope and application of coverage, or if the claim presents a genuine legal or factual issue regarding coverage.   To prevail on a Section 155 claim, an insured must prove that the insurer's behavior was willful and without reasonable cause.

One Place has pled that Travelers violated Section 155, and listed certain items in its Complaint.   One Place has disclosed its public adjuster, Mr. Craig Becker, as an expert on this issue.   Mr. Becker has opined about three actions that he believes constitute a violation of Section 155.   Mr. Becker, however, has never testified as an expert on Section 155.   He has read parts of Section 155, but no case law.   He is not a lawyer.   He is also being paid on a contingency basis.

As discussed below, Travelers has not violated Section 155.   Whether an insurer's conduct was "vexatious and unreasonable" is within the sound discretion of the Court.   The issue is not submitted to the jury.   Judges in this District have granted summary judgment to insurers on Section 155 claims.   This Court should do the same.

## II.    <u>Section 155</u>

Section 155 of the Illinois Insurance Code provides that in an action against an insurer, if there is an issue of liability on a policy or the amount of loss payable under a policy, or for an unreasonable delay in settling the claim, the "court may allow" the recovery of reasonable attorney's fees and a statutory penalty, not to exceed $60,000. 215 ILCS § 5/155.  Significantly, however, the Court may allow such a recovery only if the Court finds that the insurer's actions or delay were "vexatious and unreasonable". (*Id.*)  Since the statute is penal in nature, its provisions must be strictly construed. *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000).

Whether the insurer's actions or delay were "vexatious and unreasonable" is a matter committed to a trial court judge's discretion; it is not an issue to be decided by a jury.  *Knasel v. Ins. Co. of Illinois*, 254 Ill.App.3d 638, 643,  627 N.E.2d 137 (1st Dist. 1993); *Horning Wire Corp. v. Home Indem. Co.,* 8 F.3d 587, 590 (7th Cir. 1993); *Scottsdale Ins. Co. v. City of Waukegan*, 2007 WL 2740521 *2 (N.D. Ill. September 10, 2007).

An insurer has not engaged in vexatious and unreasonable conduct if there is a *bona fide* dispute as to the scope and application of coverage, or if the claim presents a genuine legal or factual issue regarding coverage.  *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000).  *See also Med. Prot. Co. v. Kim*, 507 F.3d 1076, 1087 (7th Cir. 2007) (If there is a bona fide dispute regarding coverage, meaning a dispute that is real, genuine and not feigned, statutory sanctions are inappropriate).  Further, Section 155 awards are not appropriate where an insurer

simply takes an unsuccessful position in litigation. *Citizens First Nat'l Bank,* 200 F.3d at 1110. Rather, to prevail on a Section 155 claim, it must be shown that the insurer's behavior was willful and without reasonable cause. *Id.* An insurer's conduct is not vexatious and unreasonable if: (1) there is a *bona fide* dispute concerning coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents a genuine legal or factual issue regarding coverage; or (4) the insurer takes a reasonable legal position on an unsettled issue of law. *Id.*

Summary judgment is appropriate as to a Section 155 claim.[1] As the Court explained in *Shrader v. Paul Revere Life Ins. Co.,* 833 F. Supp. 2d 877, 881 (N.D. Ill. 2011), the summary judgment standard as to a Section 155 claim "applies in a unique way" because in order to prevail on a motion for summary judgment, the insurer "must essentially show that it is undisputed that the facts of the case are disputed." Courts have not hesitated to grant summary judgment to insurers on a Section 155 claim. *See, e.g., Shrader v. Paul Revere Life Ins. Co.,* 833 F. Supp. 2d at 881-882 (Judge Hibbler); *LeDonne v. AXA Equitable Life Ins. Co.,* 2009 WL 3721038 *7-8 (N.D. Ill. November 2, 2009) (Judge Aspen) (granting summary judgment for insurer on Section 155 claim and noting that it is an appropriate question for summary judgment even if fact questions prevent summary judgment on the issue of coverage); *Bakal v. Paul Revere Life Ins.*

---

[1]      Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505 (1986). The moving party has the initial burden of demonstrating that they are entitled to summary judgment. *Wilder v. Barajas,* 2012 WL 3005505 *2 (N.D. Ill. July 23, 2012), citing *Kramer v. Village of North Fond du Lac,* 384 F.3d 856, 861 (7th Cir. 2004). The nonmoving party cannot overcome a summary judgment motion by relying on unsubstantiated facts; instead, "the party that bears the burden of proof on an issue must demonstrate by means of admissible evidence that no genuine issue of material fact exists that requires at trial." *Id.*

*Co.,* 576 F. Supp. 2d 889, 902 (N.D. Ill. 2008) (Judge Holderman) (summary judgment granted; insured's claim fails as a matter of law because there was a *bona fide* dispute as to coverage); *Sports Arena Mgmt., Inc. v. Great American Ins. Group,* 2007 WL 684003 * 4 (N.D. Ill. March 1, 2007) (Judge Conlon); *O.T. Food & Liquor v. Hartford Ins. Co.,* 1996 WL 131805 * 5 (N.D. Ill. March 21, 1996) (Judge Aspen) (granting summary judgment on the Section 155 claim even though court denied summary judgment as to the coverage claim).

### III. <u>Travelers Is Entitled To Summary Judgment</u>

#### A. Overview

One Place, in Count II of its Complaint, contended that Travelers violated Section 155 by engaging in vexatious and unreasonable conduct. One Place listed ten (10) items which it alleged were vexatious and unreasonable. (Stmt of Facts, ¶ 82.) Travelers asked One Place in an interrogatory to identify, in detail, all facts which supported One Place's allegations that Travelers engaged in vexatious and unreasonable conduct. One Place provided answers. (Stmt of Facts, ¶ 82.)

One Place disclosed Craig Becker as an expert on Travelers' handling and adjustment of the claim. Mr. Becker issued an expert report dated April 29, 2013, which included his opinion that Travelers' handling and adjustment of the claim did not meet the applicable standards for claims handling practices. (Stmt of Facts, ¶ 83.) Mr. Becker bases his opinion on the following acts:

1. Travelers' original position of denial of coverage for the ERS and associated soft cost losses.

2. Travelers' misapplication of coverage for loss and damage.

3. Travelers' sole reliance on newly retained expert to dispute findings and conclusions of their original expert and disallow agreements reached.

(Stmt of Facts, ¶ 83.)

Mr. Becker is not a lawyer. (Stmt of Facts, ¶ 87.) Mr. Becker has read "parts" of Section 155, but no case law involving the statute. (Stmt of Facts, ¶ 87.) Mr. Becker has never provided expert testimony on Section 155. (Stmt of Facts, ¶ 87.) Although numerous depositions have been taken in the litigation, Mr. Becker has not read any of the depositions, except for that of Harlan Karp, which he has "seen" but has "not thoroughly read it". (Stmt of Facts, ¶ 87.)

Travelers will first address the three acts referred to by Mr. Becker. These acts also encompass several of the items set forth in One Place's Complaint and interrogatory answers. Travelers will then address any remaining items One Place argues constitute vexatious and unreasonable acts.

**B. Travelers Original Position Denying Coverage as to the Earth Retention System Because of a Defective Design Exclusion was Supported By Expert Analysis and a Correct Application of the Policy**

Mr. Becker's first criticism has to do with Travelers' original position as to coverage. Mr. Becker testified as to this point in his deposition. (Stmt of Facts, ¶ 83.) Mr. Becker believes Travelers made a mistake in the application and interpretation of coverage. (Stmt of Facts, ¶ 84.) When asked how Travelers failed to correctly apply coverage, Mr. Becker said they did not pay the claim, they denied coverage. (Stmt of Facts, ¶ 84.)

When pressed further, it appears that Mr. Becker's criticism is based on two beliefs. First, Mr. Becker thinks Travelers originally denied coverage for the entire loss, which included the damage to the earth retention system as well as the D Line frost wall and caissons. (Stmt of Facts, ¶ 84.) Second, Mr. Becker believes that Travelers focused solely on the defective design exclusion in the policy, but failed to recognize that there was an exception to the exclusion providing coverage for resulting losses. (Stmt of Facts, ¶ 84.)

Both of Mr. Becker's beliefs are factually inaccurate. Travelers never denied the entire loss. Travelers did, in fact, deny coverage for the earth retention system because it was defectively designed, and that decision was based on the reports of its experts. However, Travelers agreed to provide coverage for the D Line frost wall and caissons in light of the coverage for resulting losses.

An outline of the relevant facts is necessary to understand what happened, Travelers' investigation, and the decisions it originally made as to the claim.

In late February 2007, Levine Construction, the general contractor at the time, observed that steel sheeting along the west side of the Project had moved significantly to the east. (Stmt. of Facts, ¶ 8.)

One Place provided notice to Travelers. On March 7, 2007, Travelers assigned the loss to Richard M. Sarff, an experienced General Adjuster with Travelers. (Stmt of Facts, ¶ 9.) Mr. Sarff left a message with Jerry Karp of One Place to set up a meeting. (Stmt. of Facts, ¶ 9.)

On March 9, 2007, Mr. Sarff retained construction consultants Madsen, Kneppers & Associates ("MKA") in Chicago. (Stmt. of Facts, ¶ 10.) Mr. Randy Goetz was the lead

6

MKA consultant. (*Id.*) That same day, Jerry Karp returned Mr. Sarff's call, and they set up an appointment for a meeting in Chicago on March 14, 2007, with Mr. Sarff advising that he would bring along a construction consultant and structural engineer. (*Id.*)

Mr. Sarff and Mr. Goetz met with One Place (Jerry Karp and Harlan Karp) and Mr. Robert Levin on March 14, 2007 in Chicago. (Stmt. of Facts, ¶ 12.) Mr. Levin is with Globe Midwest/Adjusters International, who had been hired as public adjusters to represented One Place. (Stmt. of Facts, ¶ 11.) Mr. Becker is also with Globe Midwest. (Stmt. of Facts, ¶ 11.) The visit included an inspection of the loss, as well as a meeting to discuss the facts of the loss, what happened, what steps were being done to address the failure and the Policy. (Stmt. of Facts, ¶ 12.)

Mr. Sarff determined that Travelers needed to retain a structural engineer. (Stmt. of Facts, ¶ 13.) Very soon after the meeting, Mr. Sarff retained Engineering Systems, Inc. ("ESI") in Aurora, Illinois. The engineers retained were Chad Fisher (structural) and Peter A. Lenzeni (geotechnical). (Stmt. of Facts, ¶ 13.) At his deposition, Mr. Becker said he had never heard of ESI. (Stmt. of Facts, ¶ 84.)

Mr. Sarff wrote a detailed letter to One Place dated March 19, 2007. (Stmt. of Facts, ¶ 14.) Mr. Sarff advised that Travelers had not yet made a determination as to coverage and was proceeding with its investigation under a full reservation of rights. (*Id.*) Travelers listed some of the policy provisions that may apply. (*Id.*) Mr. Sarff and his consultants had some initial concerns about the design of the earth retention system. (Stmt. of Facts, ¶ 14.) The Policy contained an exclusion for loss caused by or resulting from "omission in, or faulty, inadequate or defective" design, which Mr. Sarff detailed in his letter. (*Id.*) However, as Mr. Sarff also noted, the provision also stated

7

that "if 'loss' by a Covered Cause of Loss results, we will pay for that resulting loss." (*Id.*)

Mr. Sarff followed up his letter by sending requests to One Place for project and other documents Travelers' experts needed to analysis the loss and determine what happened and why. (Stmt. of Facts, ¶ 15.)

One Place also starting investigating the sheeting failure, including trying to determine the cause. (Stmt. of Facts, ¶ 16.) One Place's analysis at the outset was that the cause was earth movement, and Mr. Levin repeatedly advised Mr. Sarff of this fact, highlighting that earth movement was covered under the policy. (Stmt. of Facts, ¶ 16.)

In late July 2007, it was discovered that the frost wall on the west side along the D Line had moved or shifted, along with the possibility that the tops of the caissons (the caisson caps) had moved as well. (Stmt. of Facts, ¶ 18.)

Travelers received notice of the issues concerning the D Line frost wall and caissons, and continued its investigation, which included another site visit and request for further documentation. (Stmt. of Facts, ¶ 20.)

An investigation was conducted, and it was determined that the frost wall and caisson caps moved or shifted at approximately the same time as the earth retention system sheet piling on the west side had moved. (Stmt. of Facts, ¶ 19.) In other words, it was clear that the D Line frost wall and caisson issues occurred because of the movement of the sheeting on the west side. (*Id.*)

Travelers' experts eventually determined that the defective design of the earth retention system was the cause of the sheeting failure, which, in turn, led to the issues

with the D Line frost wall and caissons.  (Stmt. of Facts, ¶ 21.)  ESI issued a report dated July 21, 2007.  ESI also issued an August 3, 2007 Executive Summary of its July 2007 Report.  (*Id.*)  Mr. Sarff sent copies of these to One Place and Mr. Levin.  (*Id.*)

At the same time, One Place and certain contractors continued to investigate the sheeting movement and D Line frost wall and caisson issues, which included an analysis of the cause.  (Stmt. of Facts, ¶ 22.)  One Place and the general contractor retained experts to assist.  One of the experts was a geotechnical engineering, Robert Lukas of Geotechnical Engineering, Inc., who issued a report in August 28, 2007 (the "Lukas August 2007 Report").  (Stmt. of Facts, ¶ 22.)  Mr. Levin sent the report to Travelers.  (*Id.*)

Based on their own analysis, as well as the reports of its experts, One Place was adamant that the cause of the loss to the sheeting and D Line frost wall and caisson caps was earth movement and that earth movement was expressly covered under the Policy.  (Stmt. of Facts, ¶ 23.)  One Place, primarily through Mr. Levin, repeatedly advised Travelers of this fact throughout 2007 and beyond.  (Stmt. of Facts, ¶ 23.)

Travelers' experts reviewed and analyzed One Place's expert reports, in particular, the Lukas August 2007 Report.  (Stmt. of Facts, ¶ 25.)  Travelers' experts still concluded that the cause was the defective design of the earth retention system.  (*Id.*)  ESI issued a letter report dated November 9, 2007, (the "ESI November 2007 Report") which addressed the August 2007 Lukas Report. (*Id.*) Mr. Sarff sent the ESI November 2007 Report to Mr. Levin and One Place.  (*Id.*)

Based on the reports of its experts, Travelers concluded that the earth retention system was defectively designed.  (Stmt. of Facts, ¶ 26.)  In November 2007, Travelers

9

denied the claim, in part, based on the design exclusion in the Policy. (Stmt. of Facts, ¶ 26.)

As the letter states:

(1) the damages being claimed for the earth retention system, and any associated soft costs, are not covered by your policy; and

(2) the cost of repairs to the frost wall and the reinforcing of the caissons, and any associated soft costs, are covered by your policy.

(*Id.*)

As Mr. Sarff explained in the letter, based on the expert reports, the cause of the loss to the earth retention system was the faulty design of the system, which is excluded under the policy. (Stmt. of Facts, ¶ 27.) However, the cost for the repairs to the frost wall and the reinforcing of the caissons was not subject to the faulty design exclusion. (*Id.*) The policy contained a resulting loss provision which provided that although Travelers would not pay for loss caused by or resulting from faulty design. If "loss" by a Covered Cause of Loss results, Travelers would pay for that resulting "loss".

One Place, Travelers and their respective experts were at an impasse. During 2008, they continued to have communications about the conflicting conclusions of their respective experts, exchanged further documentation and information about their findings, and had meetings both with and without their experts present. (Stmt. of Facts, ¶¶ 31-34.) However, ESI still concluded that the cause was design error, and reported that again to Mr. Sarff. (Stmt. of Facts, ¶ 34.)

Travelers then had all the expert reports peer reviewed and relevant documents studied by Dr. Richard Finno, a professor and geotechnical expert at Northwestern

University. (Stmt. of Facts, ¶ 35.) Dr. Finno advised Travelers that both sides were to some degree correct; it was a gray area. (*Id.*) Based on Dr. Finno's review, and giving the benefit to One Place, in December 2008 Travelers withdrew it denial of coverage as to the claim for damage to the earth retention system. (Stmt. of Facts, ¶ 37.)

The facts are clear. Contrary to Mr. Becker's belief, Travelers never denied coverage for the entire loss. Further, Travelers did not fail to ignore the resulting loss provision in the policy. Acknowledging this coverage, Travelers agreed there was coverage for the damage to the D Line frost wall and caissons, even though it concluded the earth retention system was defectively designed. There was no mistake in the application and interpretation of coverage as contended by Mr. Becker.

Further, as highlighted above, Travelers hired structural and geotechnical engineers to conduct a complete and thorough analysis of what happened and why. ESI concluded there was an error in the design of the earth retention system, issued reports detailing that conclusion and Travelers properly relied on those conclusions. Since One Place disputed that conclusion, Travelers went one step further, exchanging and analyzing further information and meeting with One Place and its consultants in 2008 to discuss the findings. This did not resolve the dispute, as ESI continued to reaffirm its findings. Travelers then had the reports of the experts peer reviewed by Dr. Finno and, based on his conclusions, gave One Place the benefit of the doubt and withdrew its denial of coverage as to the earth retention system. Travelers' conduct was not vexatious and unreasonable in any way.

11

### C. Travelers' Analysis of the Types of Costs Covered under the Policy is Accurate

Mr. Becker's second criticism is Travelers "misapplication for coverage for loss or damage." (See also Complaint, Count II, ¶ 22 (h), failing to pay based on "an unreasonable and erroneous interpretation of its own policy provisions".) Mr. Becker testified as to this point in his deposition. (Stmt of Facts, ¶ 85.) Mr. Becker references two instances.

First, Mr. Becker states that Travelers "carved out" losses which it categorized as "indirect". He states he cannot find an exclusion in the policy that applies to indirect losses. (Stmt of Facts, ¶ 85.)

Once again, some background facts are in order to understand the context.

If there is coverage, the Policy provides that Travelers will pay for the costs to restore, repair or replace the damaged property. In other words, it is a simple property policy. Nothing more, nothing less. The Policy also provides certain extensions of coverage and additional coverages. One of the additional coverages is the costs to expedite the repair of the damaged property and increased costs of construction materials and labor, capped at $100,000. Another additional coverage is for expense to reduce the "Amount Of Loss". The Policy excludes loss caused by or resulting from delay. However, under the coverage for "soft costs" and "rental expenses", the Policy provides coverage for 4 specific types of soft costs, along with rental expenses, due to the delay in completion of the project caused by the damage to the earth retention system and D Line frost wall and caissons.

Mr. Sarff knew that Mr. Levin was in the process of preparing One Place's claim for costs, along with backup documentation. Mr. Sarff advised Mr. Levin, as well as

One Place's counsel, Ms. Dedrick, to categorize the claim items pursuant to the Policy provisions, that is, costs to repair the earth retention system, costs to repair the D Line frost wall, soft costs, etc.  (Stmt. of Facts, ¶ 39.)

In June 2008, Mr. Levin submitted a claim for over $6.2 million, which included a spreadsheet and certain back up documentation.  (Stmt. of Facts, ¶ 40.)  The June 2008 claim submission and documentation was not segregated into categories in accordance with the policy coverages.  (Stmt. of Facts, ¶ 41.)[2]  Accordingly, Mr. Sarff and MKA (Jason Walker and Ron Metcalfe) were left with the task of not only reviewing the documentation, but putting it into categories relating to costs to repair the earth retention system, the frost wall and caissons, and other categories.  (Stmt. of Facts, ¶ 41.)  Mr. Sarff spoke with Mr. Levin, and Mr. Levin advised that he tried to categorize the loss as Mr. Sarff had asked, but it was too difficult to do.  (Stmt. of Facts, ¶ 41.)  In July 2009, Mr. Levin sent a Final Claim Revised of over $6.9 million, which included an updated spreadsheet and additional documents.  Once again, the revised claim was not categorized into costs which were potentially recoverable under the Policy.  (Stmt. of Facts, ¶ 60.)

Mr. Sarff wrote two very detailed letters to One Place regarding Travelers' coverage position, the types of costs potentially recoverable under the Policy, how they are to be valued, and Travelers' determination of the recoverable costs.  The first letter

---

[2]    In general, the spreadsheet was organized by the type of work done and vendor.  For example, there was a category called "Monitor, Testing and Inspection", one called "Excavators", one called "Concrete", one called "Carpentry and Labor", etc.  For each item of cost, Mr. Levin listed the vendor name, invoice date, and cost amount.  With one exception, there was no description on the spreadsheet stating specifically what the costs were for.  The one exception was a line item for "partial repair of retention structure" by Levine for $189,359.  However, both then and now, One Place is seeking significantly more than $189,359 for the costs to restore the earth retention system.

was dated June 9, 2009 and the second August 27, 2010. (Stmt. of Facts, ¶¶ 56-58, 76.)

Both letters explain that One Place is entitled to recover the costs to repair the damage to the earth retention system and D Line frost wall and caissons, and Travelers had determined that amount. Mr. Sarff referred to these as "direct costs" in his June 9, 2009 letter. (Stmt. of Facts, ¶ 56.) Mr. Sarff explained that One Place is entitled to no further direct costs under the Policy after the date the repairs were completed on the earth retention system (April 17, 2007) and on the D Line (August 16, 2007). Mr. Sarff also explained that One Place was entitled to $100,000 for the costs to expedite the repair of the damaged property as well as the increased costs of construction materials and labor. Mr. Sarff also explained that One Place was not entitled to recover under the Expense to Reduce "Amount of Loss" provision because it had not shown that any of its acceleration costs reduced the "amount of loss" Travelers would have otherwise paid under the Policy. Mr. Sarff also explained the "soft costs" and "rental value" coverage, and the amount due under those provisions.

In his June 9, 2009, Mr. Sarff attached a 12-page document he prepared titled "Claim Analysis of Invoices." (Stmt. of Facts, ¶ 56.) Mr. Sarff's claim analysis listed all of the line items listed by Mr. Levin in his June 2008 claim submission spreadsheet. Mr. Sarff placed each line item in one of six categories: (a) not covered property; (b) testing costs to determine cause of loss; (c) testing costs to determine damage; (d) indirect costs; (e) direct costs; and (f) undetermined. (Mr. Sarff also included notes as to 110 of the line items.) (*Id.*)

As Mr. Sarff explained, costs to repair or replace the damaged property he classified as "direct costs." Costs that he put under the category of "indirect costs" are those costs which are not related to the cost to repair or replace the damaged property. (Stmt. of Facts,¶ 56.)

As Mr. Sarff highlighted in his letter, a significant number of the costs he placed in the "indirect costs" category were costs purportedly due to delay on the project. (Stmt. of Facts, ¶ 57.)[3] Mr. Sarff elaborated that based on an exclusion in the Policy, Travelers does not pay for loss caused by or resulting from delay. (Further, none of listed costs were for the four types of "soft costs" which were covered under the Policy.)

Mr. Sarff also explained that many of the items in the "indirect costs" category were for costs to attempt to accelerate the project. (Stmt. of Facts, ¶ 58.) He stated that these might be recoverable under the Expense to Reduce "Amount of Loss" provision, or, if they were to expedite the repair of the damaged property, then subject to the $100,000 limit. (*Id.*)

Mr. Becker takes issue with Mr. Sarff's choice of the words "indirect costs" for a column heading and category for certain costs. Yet, Mr. Sarff explained in his letter as well as in the notes in his Claim Analysis that these were, at best, costs resulting from delay which were not covered and/or attempts to accelerate the project. Mr. Sarff also explained that some of theses costs were subject to the $100,000 limit. If Mr. Sarff had

---

[3]     Although Travelers has not conducted a line by line comparison, a significant number of the delay costs which Mr. Sarff put in his "indirect costs" column are included as part of Travelers Motion for Partial Summary Judgment as to Certain Claimed Costs. Examples include the claim for general conditions, project management, permits, CTA flaggers, certain Concrete Structure's change orders, certain Crouch-Seranko invoices, certain D-Three Construction invoices, and so called winter conditions. As Travelers explains in its Memorandum, these costs are not covered because they are not to repair or replace the damaged property, are excluded under the Policy and, at best, at increased costs of construction materials and labor subject to the $100,000 limit.

labeled the column "Delay Exclusion And/Or Subject To The $100,000 Limit", perhaps Mr. Becker would have been satisfied.

Mr. Becker also complains that there is no exclusion for "indirect costs". Mr. Becker admitted it is One Place's burden to establish and prove its damages under the Policy. (Stmt of Facts, ¶ 85.) Yet, in the next breath, Mr. Becker states that the way the policy works, if One Place submits an invoice that somehow relates to the earth retention system and D Line frost wall and caissons, Travelers has to pay it unless Travelers can point to an exclusion in the policy. (Stmt of Facts, ¶ 85.) That is not how the policy works. *See, e.g., Vision One, LLC v. Philadelphia Indemnity Ins. Co.,* 174 Wash. 2d 501, 276 P.3d 390 (Wash. 2012) (rejecting an insured's argument that because soft costs were not excluded under the policy, they were covered, stating that the insured's argument fails because "it wrongly assumes the policy covered financial losses in the first place." It is of no consequence that soft costs were not specifically listed in the delay exclusion: "[b]ecause the policy did not cover soft costs, there was no need to exclude them.")

Second, Mr. Becker states that Travelers improperly relies on the exclusion for loss caused by or resulting from delay. Mr. Becker agrees that if there is a delay in completion on the project, the only four types of soft costs that the policy covers are the four listed. (Stmt of Facts, ¶ 85.) Yet, at the same time, Mr. Becker's view is that "all delay costs" incurred as a result of the earth retention system and D line failures are covered under the policy. (Stmt of Facts, ¶ 85.) Even though he has read no cases involving the delay exclusion, he opines it is not applicable. (Stmt of Facts, ¶ 85.) Mr. Becker is wrong. *See, e.g., James F. Campenella Const. Co. v. Great American Ins.*

*Co.,* 2010 WL 4812990 (E.D. Pa. 2010) (enforcing exclusion for loss caused by and resulting from delay).

### D. Travelers Reliance on Held Enloe's Independent Review of the Period of Delay Was Proper

Mr. Becker's final criticism is Travelers "reliance on newly retained expert to dispute findings and conclusions of their original expert and disallow agreements reached." Mr. Becker testified about this at his deposition. (Stmt of Facts, ¶ 86.) This is also mentioned by One Place in its Complaint, as well as in its answers to Traveler's interrogatories. This relates to Travelers' decision to have an independent scheduling analysis done by Held Enloe after it lost confidence in the MKA scheduler (Mr. Lamba) when he was unable to explain his opinions during a settlement meeting with One Place. There was nothing improper. There was no agreement reached at the settlement meeting.

The facts are clear.

On August 18, 2009, there was a settlement meeting between Travelers, One Place, and their representatives, including Ms. Dedrick. (Stmt. of Facts, ¶ 61.) Travelers' consultants from MKA were also present. (Stmt. of Facts, ¶ 62.) At the meeting, Travelers handed One Place a draft report from MKA which was dated August 17, 2009. (Stmt. of Facts, ¶ 62.) Included in the draft report were preliminary conclusions by MKA's scheduling consultant, Mr. Gary Lamba, regarding the period of delay, which he believed to be 105 calendar days per the draft report. (Stmt. of Facts, ¶ 62.) The MKA draft report was a work in process, put together in a short period of time by MKA for purposes of the settlement meeting. (*Id.*)

17

Mr. Lamba's role was to look at the schedules and come up with a delay finding. The MKA report was a draft report, with preliminary findings.  (Stmt. of Facts, ¶ 63.) MKA did not have all of the documents they needed or requested and there were many assumptions in the draft report.  (*Id*.)  The MKA report was not an expert report and Mr. Lamba is not in a position to offer expert opinions as to the period of delay.  (*Id*.)  The MKA draft report was intended to be a preliminary review to be used for settlement purposes.  (*Id*.)

There was no agreement by MKA or Mr. Sarff at the meeting that the delay relating to the earth retention system and D Line frost wall and caissons was at least four (4) months.  (Stmt. of Facts, ¶ 64.)  Ms. Dedrick, counsel for One Place, as well as their public adjusters, were present at the meeting.  If there was an agreement reached between the parties about a period of delay, Ms. Dedrick and/or the public adjusters would have confirmed it in a letter the next day.  There was no such letter.

Mr. Sarff lost confidence in MKA's scheduling consultant because of his inability at the settlement meeting to answer questions presented or explain his methodology and conclusions.  (Stmt. of Facts, ¶ 65.)

Travelers then promptly retained Held Enloe to conduct an independent peer review and analysis of the period of delay.  (Stmt. of Facts, ¶ 66.)  As Mr. Sarff testified:

> We didn't feel comfortable that we really knew what the correct number was, whether it was 105 days, 120 days, 50 days, 130 days.  We didn't feel like we got our arms around it and we wanted to have it peer reviewed.

(Stmt. of Facts, ¶ 66.)

Mr. Sarff then elaborated:

> First of all, the original MKA was a work in process. It was not a final designated number. If Held Enloe would have come back and said it was 115 days, we would have offered that to the insured and told them it was 115 days.

(Stmt. of Facts, ¶ 67.)

After Held Enloe's review and analysis, they issued a report dated December 14, 2009 as to the period of delay. (Stmt. of Facts, ¶ 68.) Mr. Sarff sent the December 2009 Held Enloe Report to One Place's public adjuster and its counsel, Ms. Dedrick. (*Id*.) Held Enloe's December 2009 Report concluded that the period of delay was shorter than the period MKA had in its draft report. (*Id*.)

During subsequent telephone calls and meetings with One Place and its representatives, Travelers made it clear that it was relying on the Held Enloe December 2009 Report. (Stmt. of Facts, ¶ 70.)

Held Enloe also issued subsequent reports: (a) one dated February 9, 2010, regarding One Place's claim for winter conditions costs and setting forth Held Enloe's conclusion that One Place would have incurred those costs even if there had been no damage; (b) one dated May 14, 2010 responding to Craig Becker's letter of March 30, 2010; and (c) one dated December 10, 2010 regarding Held Enloe's review of certain claimed costs. (Stmt. of Facts, ¶ 71.) Mr. Sarff promptly provided all of these reports to Mr. Levin and One Place. (*Id*.) [4]

In 2008, Travelers had Dr. Finno peer review the expert reports regarding causation and take an independent look at what happened. Based on Dr. Finno's

---

[4] In One Place's interrogatory answers, they state that Held Enloe's opinion was the delay from the loss was only 37 days and that "Travelers refused to provide back-up for Held Enloe's opinion and, instead, the insured received only a terse phone call with Held Enloe answering a few questions." In reality, all four of Held Enloe's reports were provided to One Place. The reports go into great detail, explain Held Enloe's opinions, cite to specific schedules and project records, and contain attachments.

review, Travelers withdrew its denial of coverage based on the defective design exclusion. One Place did not complain that Travelers decided to provide coverage, even though its original expert, ESI, was adamant that the cause was the defective design of the earth retention system. In 2009, Travelers followed a similar path, this time because it lost confidence in Mr. Lamba. (One Place did not have a scheduling expert). Travelers had Held Enloe conduct an independent review and analysis of the period of delay and, as it turns out, Held Enloe concluded the period was shorter than the period in MKA's draft report it had prepared for the settlement conference.

There was nothing improper about having Mr. Lamba's preliminary view looked at by Held Enloe and having them conduct a separate, detailed analysis. There was nothing vexatious or unreasonable about these actions.

One Place laments because Held Enloe's opinion as to the period of delay was shorter than Mr. Lamba's preliminary view in his draft report. One Place will no doubt argue that Held Enloe's calculation of the period is too low, and that the delay was much, much longer. Ironically, Travelers learned during discovery in this case that One Place had Charlie Shenk, its project manager, review the Held Enloe December 2009 report. Mr. Shenk conducted his own analysis, and, in a letter report to Mr. Becker dated January 26, 2010, Mr. Shenk concluded that the period of delay caused by the earth retention system and D Line frost wall and caissons was only 7 calendar days longer than Held Enloe determined. (Stmt of Facts, ¶ 69.) It is difficult to understand how One Place continues to be critical of Travelers' reliance on Held Enloe's conclusions, when its own project manager has determined the period of delay was only a few days longer than determined by Held Enloe.

### E. Other Items In Complaint and Interrogatory Answers

Although not disclosed or mentioned by Mr. Becker, One Place has asserted that certain other acts constituted vexatious and unreasonable conduct in violation of Section 155. These are, quite frankly, boiler plate allegations with no details. In its Statement of Undisputed Material Facts, which is supported by the Affidavit of Mr. Sarff, deposition testimony, and other evidence, Travelers has provided a chronological summary of the claim process. Even a brief overview of the facts demonstrates that One Place's allegations have no merit. In fact, any delay in the claim process was caused by One Place, not Travelers.

First, One Place alleges in its Complaint that Travelers failed to advise One Place in writing with 75 days from the date the loss of the reason for delay in not resolving the claim; failed to provide reasonable explanation for the delay in resolving the claim and failed to acknowledge with reasonable promptness pertinent communications. One Place claims these are violations of certain regulations. (Stmt of Facts, ¶ 82.)

These allegations are not true. As set forth in the Statement of Facts and the Affidavit of Mr. Sarff (and as reflected in his adjuster log), Travelers had numerous communications with One Place and its representatives, by telephone, email, letter and in person and acknowledged and responded to all their communication. (Stmt. of Facts, ¶¶ 9, 10, 12, 14, 15, 20, 21, 26, 28, 30, 32, 39, 42, 46, 47, 50, 51, 55, 56, 61, 68, 74 and 76.) Mr. Sarff first advised One Place in writing on March 19, 2007 that Travelers had not yet made a decision as to coverage, was in the process of conducting its investigation and would be seeking documents. (Stmt. of Facts, ¶ 14.) This was well

within the 75 day period referenced in the Complaint. These were followed up with other detailed letters during the course of the investigation.

Second, One Place contends that Travelers did not attempt in good faith to effectuate a prompt, fair, and equitable settlement of One Place's claim, a claim in which liability was reasonably clear. One Place contends this violates a regulation. (Stmt of Facts, ¶ 82.)

This is not true. Travelers had numerous discussions with One Place and its representatives about trying to settle the claim, which included several settlement meetings. (Stmt. of Facts, ¶¶ 31, 32, 55, 61, 75 and 79.) Further, even though One Place's settlement demand in May 2010 of over $9.3 million – an outrageous amount – Travelers agreed to a mediation in an attempt to settle the claim prior to the time One Place filed suit. (Stmt. of Facts, ¶¶ 75, 79.) However, a settlement was not reached. (Stmt. of Facts, ¶ 79.)[5]

Third, One Place argues its it interrogatory answers that "Travelers also failed to adjust the loss and review its own policy language, leaving the insured to fend for itself in adjusting the loss, contrary to the policy language and standard insurance industry practice." (Stmt. of Facts, ¶ 82.)

As the chronology shows, this is simply not true. Travelers did, in fact, review its policy language. Mr. Sarff had numerous communications with One Place and its representatives about policy language, what was covered and what was not covered. Mr. Sarff sent two detailed letters to One Place explaining the policy language, one in June 2009 and one in August 2010. (Stmt. of Facts, ¶¶ 56-58, 76.) Travelers did not

---

[5]     One Place and Travelers did settle One Place's claim relating to a water loss that occurred in August 2008. One Place and Travelers also settled One Place's claim relating to caisson shafts that suffered soil squeeze during drilling in November 2006. (Stmt. of Facts, ¶ 43.)

leave the insured to "fend for itself in adjusting the loss." To the contrary, One Place's claim, as submitted by Mr. Levin, simply listed line items, by vendor, according to the type of work, but did not categorize the costs by the coverages available under the policy. (Stmt. of Facts, ¶¶ 40, 41, 60.) Mr. Sarff and MKA, then, were left with the task of reviewing the documents and categorizing them accordingly.

Fourth, One Place argues that despite admitting coverage and the passage of time, Travelers "has failed to pay the insurance benefits due Plaintiffs under the policy despite having access to all necessary information." (Stmt of Facts, ¶ 82.) Although Travelers has admitted there is coverage for the damage to the earth retention system and D Line frost wall and caissons, Travelers has not paid One Place for the additional amounts it is seeking because those costs are not covered under the Policy.

Fifth, One Place contends in its Complaint that Travelers delayed and/or refused to pay for all of One Place's claim without conducting a full, fair and prompt investigation. (Stmt. of Facts, ¶ 82.) Travelers' chronology, however, shows that Travelers did, in fact, conduct a full, fair and prompt investigation.

Finally, One Place argues in its Complaint that Travelers' conduct forced it to retain legal counsel. (Stmt. of Facts, ¶ 82.) One Place, however, hired Childress Duffy in the spring of 2007 based on the recommendation of Mr. Levin. (Stmt. of Facts, ¶ 11.) This was long before Travelers made any decisions on coverage.

In reality, any delay during the claim process was caused by One Place, not by Travelers. Travelers requested project documents, schedules, claim information and other documents during the course of its investigation. While many documents were, in

fact, produced promptly, Travelers had to wait months and months for certain information and documents.

Travelers, for example, requested that One Place promptly provide the costs it was seeking to recover, the back up documentation, and asked that it be categorized according to the types of costs which may be recoverable under the Policy. (Stmt. of Facts, ¶¶ 38-39.) One Place did not provide its preliminary claim until June 2008, and it was not categorized as requested. (Stmt. of Facts, ¶¶ 40-41.) One Place did not provide a "Final" revised claim until July 2009, which was also not categorized as requested. (Stmt. of Facts, ¶ 60.) One Place did not provide its soft costs and rental claim until June and July, 2009. (Stmt. of Facts, ¶¶ 59-60.)

By way of further example, Travelers and its consultants requested that One Place produce the electronic versions of certain project schedules. (Stmt. of Facts, ¶ 40.) The schedules contain hidden cells which critical information, so a hard copy alone is not sufficient for expert analysis. Travelers repeated this request numerous times in 2008. (Stmt. of Facts, ¶¶ 46, 47 and 50.) Counsel for One Place objected, stating they did not have to produce the electronic versions. (Stmt. of Facts, ¶ 49.) She eventually relented and finally produced them in late March 2009. (Stmt. of Facts, ¶ 52.)

In another example, One Place, Travelers and their experts on causation had a meeting on May 9, 2008. (Stmt. of Facts, ¶ 32.) At the meeting, Travelers' experts asked for certain photos and documents, so that they could study and consider them in their analysis. (*Id.*) Although certain documents were provided on June 27, 2008, a key letter Travelers was seeking was not provided until September 2008. (Stmt. of Facts, ¶ 33.)

Counsel for One Place also requested a tolling agreement, which was signed in October 2008.  (Stmt. of Facts, ¶ 81.)  Counsel then asked for and Travelers agreed to eight extensions to the tolling agreement.  (*Id.*)  Counsel for One Place has also asked for and received numerous extension of time since it filed suit.  Any delay is due to One Place, not Travelers.

## IV.    Conclusion

WHEREFORE, Defendant, TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, respectfully requests that this Court enter an order granting Travelers' Motion for Partial Summary Judgment and for such other relief as the Court deems just and proper.

Dated:  August 30, 2013

Respectfully submitted,

Butler Pappas Weihmuller Katz Craig, LLP

 /s/ K. Clark Schirle
K. Clark Schirle
ARDC No. 6199270
cschirle@butlerpappas.com
Jonathan K. Barger
ARDC No. 6277079
jbarger@butlerpappas.com
115 S. LaSalle Street, Suite 3200
Chicago, Illinois 60603
(312) 456-0900
(312) 456-0909 fax
Attorneys for Travelers Property Casualty Company of America

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 30, 2013, a copy of the foregoing is being served on all counsel of record identified on the below Service List via Electronic Mail.

Michael Duffy
mduffy@childresslawyers.com
Katherine Smith Dedrick
kdedrick@childresslawyers.com
Childress Duffy, Ltd.
500 North Dearborn Street, Suite 1200
Chicago, Illinois 60654
Attorneys for Plaintiffs

   /s/ K. Clark Schirle
K. Clark Schirle
Jonathan K. Barger
Butler Pappas Weihmuller Katz Craig, LLP
115 South LaSalle Street
Suite 3200
Chicago, IL 60603