UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


Judge Sheila M. Finnegan
Case No. 1:11-cv-02520


ONE PLACE CONDOMINIUM LLC
THE SOUTH LOOP SHOPS LLC, SOUTHBLOCK DEVELOPMENT
LLC, C & K PARTNERSHIP, and SOUTHBLOCK MANAGEMENT, INC.,

Plaintiffs,


v.


TRAVELERS PROPERTY
CASUALTY COMPANY OF AMERICA,

Defendant.

## PLAINTIFFS' RESPONSE IN OPPOSITION TO TRAVELERS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CERTAIN CLAIMED COSTS

ONE PLACE CONDOMINIUM LLC, THE SOUTH LOOP SHOPS LLC, SOUTHBLOCK DEVELOPMENT LLC, C & K PARTNERSHIP, AND SOUTHBLOCK MANAGEMENT, INC.

By:    /s/Katherine Smith Dedrick
Katherine Smith Dedrick, Esq.
Illinois Bar No. 6185314
kdedrick@childresslawyers.com
Edward Eshoo, Jr. Esq.
Illinois Bar No. 6190179
eeshoo@childresslawyers.com
CHILDRESS DUFFY, LTD.
500 North Dearborn Street, Suite 1200
Chicago, Illinois 60654
(312) 494-0200
(312) 494-0202 facsimile

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

I.   INTRODUCTION .................................................................................... 1

II.  STATEMENT OF UNDISPUTED MATERIAL FACT ....................................... 3

III. SUMMARY JUDGMENT STANDARD ........................................................ 3

IV.  ARGUMENT ........................................................................................ 4

   A.   Illinois Standards For The Interpretation Of Insurance Contracts. ....................... 4

   B.   Travelers' Builders Risk Policy Provides Broad Coverage For Loss And Damage.
   Travelers' Attempt To Use The Valuation Provision To Turn Its Builders' Risk Policy
   Into A "Damage To Property" Policy Is Futile.  Nonetheless, Questions Of Fact Exist
   Warranting Denial Of Summary Judgment. ................................................................. 5

      1.   Travelers' All Risk, Builders' Risk, Policy Promises Payment for Loss or
      Damage. The Valuation Provision Does not Alter the Coverage. ........................... 5

      2.   The Valuation Language, As Used By Travelers, Is Ambiguous. ................... 11

      3.   Travelers' Citation To Only Three Cases Is Disingenuous And Does Not Help
      Its Argument. .......................................................................................... 12

      4.   In The Alternative, Even If This Court Agrees With Travelers And Finds That
      The Valuation Provision Limits Coverage, Repair/Replacement Costs Are Not
      Limited To Only Direct Costs To Damaged Property And A Question Of Fact Exists. ....... 13

   C.   Travelers' Reliance On An Exclusion For Loss Arising From Delay Ignores The
   Limiting Language Of Its Exclusion And Illinois Law. ........................................... 18

   D.   One Place's Claim Is Not Limited To $100,000, Contrary To Travelers
   Argument. .......................................................................................................... 23

   E.   Travelers' Other Arguments Regarding Costs Are Not Persuasive. ................... 24

   F.   One Place's Damages Supported By Expert Mark Robinson. ........................... 27

V.   CONCLUSION ...................................................................................... 28

i

**CASES**

*Am. States Ins. Co. v. Koloms*, 687 N.E.2d 72 (Ill. 1997)...................................................... 4

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) .................................................... 3

*Ball-Healy-Horn v. Hartford Fire Ins. Co.,* 1987 WL 6864 (N.D. Ill 1987)................................ 21

*BASF AG v. Great American Assur. Co.*, 522 F.3d 813 (7th Cir. 2008) ................................. 4, 23

*Bond v. Am. Family Mut. Ins. Co.,* 2008 WL 477873 (D. Ariz 2008)........................................ 15

*Burgess v. J.C. Penney Life Ins. Co.,* 167 F.3d 1137 (7th Cir. 1999)........................................ 11

*Campenella Constr. Co. Inc. v. Great Am. Ins. Co.,* 2010 WL 4812990
(E.D. Pa. 2010)................................................................................................................ 13

*Columbiaknit, Inc. v. Affiliated FM Ins. Co.,* 1999 WL 619100 (D. Or. 1999)............................ 9

*Davidson Hotel Co. v. St. Paul Fire and Marine Ins. Co.,* 136 F. Supp. 2d 901
(W.D. Tenn. 2001)........................................................................................................... 21

*Empire Indemnity Ins. Co. v. Winsett,* 325 F. App'x 849 (11th Cir. 2009) ................................. 21

*Employers Insurance Co. of Wausau v. Ehlco Liquidating Trust*, 708 N.E.2d 1122
(Ill. 1999) ...................................................................................................................... 22

*Farmers Ins. Co. of Oregon v. Trutanich,* 858 P.2d 1332 (Or. App. Ct. 1996) ............................ 9

*General Dynamics Corp. v. US*, 410 F.2d 404 (1969)................................................................ 17

*Ghoman v. New Hampshire Ins. Co.*, 159 F. Supp. 2d 928 (N.D. Tx. 2001) ............................... 16

*Gilderman v. State Farm Ins. Co.*, 649 A.2d 941 (Pa. 1994) ................................................ 14, 15

*Grinnell Mutual Reinsurance Co. v. LaForge,* 863 N.E.2d 1132 (Ill. App. Ct. 2006)............... 4, 7

*Gust K. Newberg Constr. Co. v. E.H. Crump & Co.,* 818 F.2d 1363 (7th Cir. 1987) ................... 5

*Hampton Foods, Inc. v. Aetna Cas. and Sur. Co.,* 787 F.2d 349 (8th Cir. 1986)......................... 8

*Hartford Fire Ins. Co. v. Whitehall Convalescent & Nursing Home, Inc.,*
748 N.E2d 674 (Ill. App. Ct. 2001) .............................................................................. 4

*Heller Intern. Corp. v. Sharp*, 839 F. Supp. 1297 (N.D. Ill. 1993)............................................. 28

*Home and Auto. Ins. Co. v. Scharli,* 293 N.E.2d 914 (Ill. App. Ct. 1975) ...................................... 7

*Hurst-Rosche Engineers, Inc. v. Commercial Union Ins. Co.,* 51 F.3d 1336 (7th Cir. 1995) ........ 5

*Kellogg Brown & Root Services, Inc.* v. *US,* 2013 WL 4749921 (2013) ...................................... 17

*Linc Equipment Service Inc. v. Signal Med. Servs., Inc.,* 319 F.3d 288 (7th Cir. 2003) .............. 28

*Lukes v. American Fam. Mut. Ins. Co.,* 455 F. Supp. 2d 1010 (D. Ariz. 2006) .......................... 15

*Manpower v. Ins. Co. of the State of Pa.,* 2009 WL 3738099 (E.D. Wisc. 2009) ......................... 8

*Mattis v. State Farm Fire & Casualty Co.,* 454 N.E.2d 1156 (5th Dist. 1983) ........................... 21

*Matzner v. Seaco Ins. Co.,* 1998 WL 566658 (Mass. Super. Ct. 1998) ......................................... 9

*Mazzocki v. State Farm Fire & Cas. Corp.,* 766 N.Y.S.2d 719 (N.Y. App. Ct. 2003) .......... 15, 17

*Mee v. Safeco Ins. Co.*, 908 A.2d 344 (Pa. Super. Ct. 2006) .................................................. 16, 17

*Midland Hotel v. Donnelley*, 515 N.E.2d 61 (Ill. 1987) .............................................................. 28

*Mills v. Foremost Ins. Co.*, 511 F.3d 1300 (11th Cir. 2008) ........................................................ 16

*Morrison Grain Co. Inc. v. Utica Mutual Ins. Co.,* 632 F.2d 424 (5th Cir. 1980) ........................ 5

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. Glenview Part Dist.*, 632 N.E.2d 1039
(Ill. 1994) ....................................................................................................................... 4, 23

*Northrop v. Allstate Ins. Co.,* 720 A.2d 879 (1998) .................................................................... 18

*O'Rourke v. Prudential Ins. Co. of America,* 13 N.E.2d 287 (Ill. App. Ct. 1938) ...................... 22

*Oceanside Pier View, L.P. v. Travelers Property Casualty Co. of America,* 2008 WL 7822214
(S.D. Ca. 2008) ............................................................................................................. 13, 24

*Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 607 N.E.2d 1204 (Ill. 1992) ...................... 4, 12

*Pace Properties, Inc. v. American Mfrs. Mut. Ins. Co.,* 918 S.W.2d 883 (Mo. App. Ct. 1996) ... 21

*Parkway Associates, LLC v. Harleysville Mut. Ins. Co.*, 129 Fed. Appx. 955
(6th Cir. 2005) ................................................................................................................... 16

*Pierce v. Farm Burea Mutual Ins. Co.,* 548 N.W.2d 551 (Iowa 1996) ....................................... 18

*Rush Presbyterian v. Safeco Ins. Co.*, 722 F. Supp. 485 (N.D. Ill. 1989) ................................... 28

iii

*Saleco Ins. Co. v. Guyton,* 692 F.2d 551 (9th Cir. 1982) ................................................................ 21

*Salesin v. State Farm Fire & Casualty Co.*, 581 N.W.2d 781 (Mich. App. Ct. 1998) ................ 16

*Santiago v. Lane*, 894 F.2d 218 (7th Cir. 1990) ........................................................................... 3

*Simonetti v. Selective Ins. Co.,* 859 A.2d 694 (N.J. 2004) ......................................................... 21

*State Farm Fire & Cas. Co. v. Metropolitan Dade County,* 639 So. 2d 63
(Fla. App. Ct. 1994) ...................................................................................................................... 21

*Travelers Property Cas. Co. of Am. v. Marion T, LLC.,* 2010 WL 1936165
(S.D. Ind. 2010) ............................................................................................................................ 12

*Tritschler v. Allstate Ins. Co.,* 144 P.3d 519 (Ariz. App. Ct. 2006) ...................................... 15, 17

*Twenhafel v. State Auto Prop. & Cas. Ins. Co.*, 581 F.3d 625 (7th Cir. 2009) ............................ 4

*Vision One, LLC v. Philadelphia Indem. Ins. Co.,* 174 Wash.2d 501 (Wa. 2012) ...................... 12

*W. Fire Ins. Co. v. First Presbyterian Church,* 437 P.2d 52 (Colo. 1968) .................................. 9

*Zurich Am. Ins. Co. v. Keating Bldg. Corp.,* 513 F. Supp. 2d 55
(D. N.J. 2007) ......................................................................................... 9, 10, 18, 19, 22

**RULES**
Fed. R. Civ. P. 56(c) ..................................................................................................................... 3

Local Rule 56.1 (a)(3) .................................................................................................................... 3

Local Rule 56.1(b)(3)(C) ............................................................................................................... 3

# I.    INTRODUCTION

Travelers' theme is the same throughout its motion: do anything to avoid the actual language of the insurance contract.[1] The reason, of course, is simple. The language of the policy does not convey the meaning that Travelers now, after the fact of the loss, wishes it would have conveyed. While hindsight may be twenty-twenty, it cannot change the contract between two parties. That Travelers wishes it would have sold a different contract is demonstrated by Travelers' attempts to ignore the breadth, and the disjointed nature of its builders' risk policy. In an effort to convince this Court that it sold One Place nothing more than a policy providing property damage coverage, Travelers argues:

> *The builder's risk policy is a simple property policy. If property on the project is physically damaged due to a covered loss, the insurer is obligated to pay to repair the damage. Nothing more, nothing less.* (D.E. 134 at p. 15). (Emphasis added).

Despite Travelers' attempts to revise its policy, there is no question that builders' risk and property policies are two different types of policies covering different risks. In fact, Travelers' website touts the difference between these risks by including builders' risk under its "Specialized Risks" section (Construction Pack[SM] -- Builders' Risk), and property damage coverage under its "For Business" section (Travelers Deluxe[SM]). (ASMF ¶ 3). If what Travelers declares in its motion is true, why then is Travelers selling two different types of coverage?

The central arguments of Travelers' motion are threefold. First, that the valuation provision limits coverage and payment. Second, that the exclusion for loss from "delay" precludes some of One Place's claimed costs. Finally, that all costs for construction material and

---

[1] One Place moves to strike Travelers' inappropriate and factually unsupported comments that Mr. Becker submitted an exaggerated claim. (D.E. 134 at p. 7).

labor are limited to $100,000. However, these arguments require that the rules of interpretation, case law, and questions of fact be ignored.

Travelers' first argues that the "valuation provision" limits coverage so that the policy pays *only* to, "restore, replace or repair *damaged property*." (D.E. 134 at pp. 8, 23-24). (Emphasis added). However, the policy is not so limited as Travelers promised to pay for "loss," defined as "accidental loss or damage." (ASMF ¶ 4). Promising to pay for "loss or damage" does not equate to paying for only damaged property. Next, the valuation provision is ambiguous in its application to payment owed by Travelers. Unlike other Travelers' policies, there is nothing in the policy at issue that ties the method of valuation to payment. In addition, the policy contains a second valuation provision with different language and no direction as to how these two provisions interact. (ASMF ¶¶ 31-40). Finally, assuming for purposes of argument only that the valuation provision limits payment, the law is clear that replacement or repair determinations include costs that are *reasonably likely* to be included within the scope of repair/replacement, such as overhead and profit, taxes, permitting and other similar costs. Thus, there is a question of fact as to the amount of costs reasonably likely to be included within the scope of repair/replacement.

Travelers' second argument depends on changing the language of its exclusion which provides that Travelers, "will not pay for 'loss' caused by or resulting from … delay." (ASMF ¶ 10). Travelers replaces the word "loss" with "costs" and ignores that it is loss *caused by or resulting from* delay that is excluded.[2] One Place is not seeking coverage for such a loss. In the alternative, the exclusion is ambiguous as it does not contain language which rules out coverage

_____

[2] In the previously ruled on motion for partial summary judgment regarding "soft costs," Travelers also ignored the import of the word "from" when it argued that soft costs were included in what it claims is a $2.5 million limit on earth movement. (D.E. 41).

for loss that is caused by a covered and non-covered cause.   In any event, there is a question of fact as to whether the loss is from "delay," as argued by Travelers.

Travelers' third argument requires the court to read a limitation broadly, replace words in the policy and ignore fact questions.

## II.      STATEMENT OF UNDISPUTED MATERIAL FACT

Travelers threw everything, including the kitchen sink, in to its motion.  There are over ninety statements of fact filed by Travelers.   Questions of fact exist to preclude granting Travelers' Motion for Partial Summary Judgment Regarding Certain Costs.   One Place has separately filed its response to Travelers' Local Rule 56.1(a)(3) statement of material facts submitted in support of its motion for summary judgment ("RSMF").   Additional facts that require the denial of Travelers' motion are set forth in One Place's separately filed Local General Rule 56.1(b)(3)(C) statement of material facts ("ASMF").

## III.      SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).   In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party.  *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir. 1990).   On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a fact finder.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).   Summary judgment is not appropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.

# IV.   <u>ARGUMENT</u>

Travelers' arguments require this Court to ignore the language of the policy and Illinois rules of contract interpretation. In addition, questions of fact exist which preclude partial summary judgment in favor of Travelers.

## A.     **Illinois Standards For The Interpretation Of Insurance Contracts.**

In construing the language of an insurance policy, the Court's primary objective is "to ascertain and give effect to the intentions of the parties as expressed by the language of the policy." *Twenhafel v. State Auto Prop. & Cas. Ins. Co.*, 581 F.3d 625, 628 (7th Cir. 2009) (*quoting BASF AG v. Great American Assur. Co.*, 522 F.3d 813, 818-19 (7th Cir. 2008)); *Am. States Ins. Co. v. Koloms*, 687 N.E.2d 72, 75 (Ill. 1997). The language of an insurance contract is to be read so that every word has meaning and so that no word is superfluous. *Grinnell Mutual Reinsurance Co. v. LaForge,* 863 N.E.2d 1132, 1139 (Ill. App. Ct. 2006). The policy is to be read as a whole, taking into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract." *BASF*, 522 F.3d at 819.

If the terms of an insurance policy are clear and unambiguous, they must be applied as written and given their plain and ordinary meaning. *Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 607 N.E.2d 1204, 1212 (Ill. 1992). If there are two reasonable interpretations of an insurance contract, they are ambiguous. *Id.* If the terms are ambiguous, they will be strictly construed against the drafter. *Id.* If the insurer relies on an exclusionary or limiting provision, it must be clear and free from doubt that it excludes or limits coverage and such provision is to be liberally construed in favor of the insured and most strongly against the insurer. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. Glenview Part Dist.*, 632 N.E.2d 1039, 1042 (Ill. 1994); *Hartford Fire Ins. Co. v. Whitehall Convalescent & Nursing Home, Inc.,* 748 N.E2d 674,

682 (Ill. App. Ct. 2001). The insurer bears the burden of proving that a claim is excluded from coverage. *Hurst-Rosche Engineers, Inc. v. Commercial Union Ins. Co.,* 51 F.3d 1336, 1342 (7th Cir. 1995).

      **B.**      **Travelers' Builders Risk Policy Provides Broad Coverage For Loss And Damage. Travelers' Attempt To Use The Valuation Provision To Turn Its Builders' Risk Policy Into A "Damage To Property" Policy Is Futile. Nonetheless, Questions Of Fact Exist Warranting Denial Of Summary Judgment.**

Travelers argues that the valuation provision set forth in its motion, (it relies on a different valuation provision in its affirmative defenses), is a limitation on coverage and payment. (ASMF ¶ 35). As such, Travelers argues that One Place is only entitled to recover the costs to replace or restore the *damaged* property. (D.E. 134 at p. 9). However, Travelers' argument runs smack in to the language of its coverage grant promising payment for "loss or damage" and necessarily requires that the word "loss" be read out of the policy or ignored. Such a result is contrary to settled rules of policy interpretation.

      **1.**      <u>**Travelers' All Risk, Builders' Risk, Policy Promises Payment for Loss or Damage. The Valuation Provision Does not Alter the Coverage.**</u>

Travelers issued broad coverage by providing an all risk policy paying for loss or damage from any risk of direct physical loss or damage. (ASMF ¶¶ 1-2, 4); *Gust K. Newberg Constr. Co. v. E.H. Crump & Co.,* 818 F.2d 1363, 1364 (7th Cir. 1987) ("[U]nder an 'all risk' policy, the insurer bears the risk that a catastrophe not mentioned in the policy will occur; in a 'specified peril' policy, the insured bears that risk"); *Morrison Grain Co. Inc. v. Utica Mutual Ins. Co.,* 632 F.2d 424, 430 (5th Cir. 1980).

To ascertain Travelers' promise, it is important to focus on the policy language which begins with a one sentence coverage grant providing, "we will pay for 'loss' to Covered Property from any of the Covered Causes of Loss." This sentence contains defined terms within defined

terms. The first quote below reflects the policy as written. The second quote inserts the definitions.

The policy provides:

### A.    COVERAGE

We will pay for 'loss' to Covered Property from any of the Covered Causes of Loss.

**1.    Covered Property**
Covered Property, as used in this Coverage Part, means "Builders' Risk."

**2.    Covered Causes of Loss**
Covered Causes of Loss means Risks of Direct Physical 'Loss' except those causes of 'loss' listed in the Exclusions. (ASMF ¶ 4).

\*\*\*

### F.    DEFINITIONS

\*\*\*

4.    Builders' Risk means:
Property described in the Declarations under 'Builders Risk' owned by you or for which you are legally liable consisting of:

a.    Buildings or structures including temporary structures while being constructed, erected or fabricated at the 'job site;'

b.    Property that will become a permanent part of the buildings or structures at the 'job site;'
(1)    While in transit to the 'job site' or temporary storage location;
(2)    While at the 'job site' or at a temporary storage location. (ASMF ¶ 4).

\*\*\*

16.    'Loss' means accidental loss or damage. (ASMF ¶ 4).

\*\*\*

### DECLARATIONS

### I.  Covered Property and Limits of Insurance

**"Builders' Risk"**
We cover only the buildings and structures shown below:

LOCATION, DESCRIPTION AND COINSURANCE PERCENTAGE

| "Job Site" | Building Number | Description |
|---|---|---|
| 1 | 1 | New construction of a three story fire resistive retail and condominium building located at 1 E. 8th Street, Chicago, IL 60605 |

(ASMF ¶ 4).

With the definitions inserted in to the coverage grant, the policy provides:

> We will pay for [accidental loss or damage] to [property … consisting of buildings or structures including temporary structures while being constructed, erected or fabricated at the "job site;" property that will become a permanent part of the buildings or structures at the "job site" … while at the "job site" or at a temporary location] from any of the [risks of direct physical [accidental loss or damage]].

Since the language is to be read so that all words have meaning, the words "loss" and "damage," must have distinct and different meanings. To interpret otherwise would offend the well-settled principle of insurance contract interpretation that meaning and effect must be given to every part of the contract so no part is rendered meaningless or surplusage. *Grinnell Mutual Reinsurance Co.,* 863 N.E.2d at 1139. "It is presumed that all the provisions of a contract are inserted deliberately and for a purpose, and that the parties to a transaction did not intend to employ language idly." *Home and Auto. Ins. Co. v. Scharli,* 293 N.E.2d 914, 916 (Ill. App. Ct. 1975). Travelers promised to pay for loss to covered property or for damage to covered property arising from any risk of direct physical loss or damage. This includes more than simply costs for repairing or replacing damage to property. If Travelers wanted to limit its responsibility to only replace or restore *damaged* property, then it could have done so. It did not.

Moreover, the word "loss," while defined in the policy to mean "accidental loss or damage," circles back on itself without further definition. In other words, Travelers' violated the cardinal rule of definition: it used the word "loss" to define the word loss. According to Blacks, loss is defined as "an undesirable outcome of a risk, the disappearance or diminution of value in an unexpected or relatively unpredictable way. Black's Law Dictionary (9th ed. 2009). To make it even more difficult, "loss" is used in two places in the coverage grant: at the beginning to denote what Travelers will pay for and at the end, to describe the covered causes of loss. Not surprisingly, cases examining policy language requiring loss or damage have found that loss is different from damage.

In *Manpower v. Ins. Co. of the State of Pa.,* 2009 WL 3738099 (E.D. Wisc. 2009) the court examined language similar to that at issue and noted, "the policy issued to [the insured] contained an 'all risk' clause that covered 'all risk of direct physical loss of or damage to property described herein except as hereinafter excluded.'" *Id*. at *2. There, part of a building collapsed and the insured could not use its office, although the office had not been damaged. The insurer denied the insured's business interruption claim arguing that its policy was limited to physical damage to property. The court rejected the insurer's argument finding, "the policy covered physical losses in addition to physical damage, and if a physical loss could not occur without physical damage, then the policy would contain surplus language….Thus, 'direct physical loss' must mean something other than 'direct physical damage." *Id*. at *5.

In *Hampton Foods, Inc. v. Aetna Cas. and Sur. Co.,* 787 F.2d 349, 351 (8th Cir. 1986), the court examined language in a personal property policy insuring a commercial operation against, "loss of or damage to the property insured … resulting from all risks of direct physical loss." There, the building evidenced signs that it was in danger of collapse and tenants had

limited time to remove property. The insured grocery store removed property and inventory, and sold it as salvage at a loss. The insured claimed the difference between the salvage and market value as economic loss. In finding coverage for the insured, the district court found the aforementioned language ambiguous and held the "commonsense meaning of [the policy provision] is that any loss or damage due to the danger of direct physical loss is covered." *Id.* at 352. The Eighth Circuit agreed, finding the language ambiguous and held that the insured's realized economic loss constituted a loss. *Id*

Other cases find that loss to property includes items such as loss of use and the inability to use the property in the manner intended. *See, e.g., W. Fire Ins. Co. v. First Presbyterian Church,* 437 P.2d 52 (Colo. 1968) (gasoline vapors); *Farmers Ins. Co. of Oregon v. Trutanich,* 858 P.2d 1332 (Or. App. Ct. 1996) (odors from illegal methamphetamine cooking); *Matzner v. Seaco Ins. Co.,* 1998 WL 566658 (Mass. Super. Ct. 1998) (carbon monoxide fumes); *Columbiaknit, Inc. v. Affiliated FM Ins. Co.,* 1999 WL 619100 (D. Or. 1999) (mildew).

Finally, in *Zurich Am. Ins. Co. v. Keating Bldg. Corp.,* 513 F. Supp. 2d 55 (D. N.J. 2007), the court rejected arguments almost identical to those being made by Travelers focusing on similar policy language. There, Zurich issued an all risk, builder's risk policy covering construction of an Atlantic City resort expansion. The policy insured "against all risk of direct physical loss or damage to Insured Project." *Id*. at 59. During construction, a portion of the building collapsed. The incident brought construction of the project to a halt for three months and the insured eventually submitted a claim for $300 million. Part of the claim consisted of general conditions ("administrative costs, trailers, supplies and other costs that are not captured as direct charges"), contractor's delay charges ("costs and expenses such as idle labor and equipment incurred before reconstruction began"), and storage price increases ("increases in

labor wages and building material costs, as well as storage costs that would not have been needed but for the collapse"). *Id.* at 67-68.

In denying coverage, Zurich relied on, in part, its valuation provision arguing that it limits payment to only costs to repair damaged property. The valuation provision provided that Zurich would pay for the cost to "repair or replace the property lost or damaged at the time and place of loss…." *Id.* at 68. Zurich also argued that the costs claimed relate solely to the delay in completing undamaged portions of the project. Thus, "Zurich assert[ed], the scope of the indemnity *only covers repair costs to the damaged portion of the Project*, not increased costs to complete construction of undamaged property." *Id.* at 68. (Emphasis added).

The court found all the aforementioned costs were covered and rejected Zurich's reliance on its valuation provision to limit coverage noting that had Zurich intended to limit its obligation to only an obligation to repair costs for the damaged portion of the project, Zurich could have done so. The court also noted that in another form used by Zurich, it specifically narrowed its obligation to pay for losses required to, "rebuild, repair, or replace such part of the property herein described *as has been damaged or destroyed*….Because Zurich knew how to (but did not) issue a policy with this limiting language, the court cannot now limit the language in the Policy in such a way." *Id.* at 69. (Emphasis added). The court also found persuasive the all-risk nature of the contract finding, the policy "is to be considered as creating a special type of insurance extending to risks not usually contemplated, and recovery will usually be allowed at least for all losses of a fortuitous nature," unless excluded. *Id.* at 69.

Similarly, Travelers' valuation clause does not limit its obligation to only property which has been damaged or destroyed. In fact, Mr. Sarff[3] testified that the valuation provision does not

---

[3] Mr. Sarff is Travelers' general adjuster for this matter and corporate representative.

focus on "damaged" property. (ASMF ¶ 36). Moreover, it is interesting to note that the other valuation language, relied on by Travelers in its affirmative defense, specifically values "Covered Property" which is defined as "Builders Risk," which is then further defined as "property described in the declaration….owned by you or for which you are legally liable…." (ASMF ¶ 34). The property described in the declarations is "new construction of a three story …." (ASMF ¶ 8). Under the other valuation provision, it is clear that covered property is valued, not only damaged property. Under Travelers' all risk policy, and the broad coverage grant promising to pay for loss or damage, this makes sense.

       **2.**      **The Valuation Language, As Used By Travelers, Is Ambiguous.**

The valuation provision relied on by Travelers only sets forth how to value certain items, but it is missing a provision connecting it to Travelers' obligation to pay. In short, the language sits awkwardly in the contract. Had Travelers wanted the valuation provision to reflect the measure of payment, it should have drafted it that way. To now try to read this disjointed language in a way that limits coverage or payment, requires Travelers to add language to its contract. That it cannot do. *Burgess v. J.C. Penney Life Ins. Co.,* 167 F.3d 1137, 1140 (7th Cir. 1999). Moreover, when Travelers wants to limit payment based on the manner in which it values the loss or damage, it writes that language in to the policy. For instance:

> 4.    Loss Payment – Building and Personal Property a. In the event of loss or damage covered by this Coverage Form, *at our option, we will either: (1) Pay the value of lost or damaged property; (2) Pay the cost of repairing or replacing the lost or damaged property….*
>
> *We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of Paragragh e. below* or any applicable provision which amends or supersedes these valuation conditions. (ASMF

¶ 41).

\*\*\*

> e.    *We will determine the value of Covered Property in the event of loss or damage as follows:* a. At replacement cost (without deduction for depreciation), except as provided in Paragraphs (2) through (18) below. (ASMF ¶ 41) (Emphasis added).

*See Travelers Property Cas. Co. of Am. v. Marion T, LLC.,* 2010 WL 1936165 at \*5 (S.D. Ind. 2010) (quoting same "loss payment" language in a Traveler's Policy).

For whatever reason, Travelers chose not to include such language in the policy at issue. Instead, Travelers' valuation provision is simply thrown, twice, in to its policy with no connection to payment or notice as to how it is to be used. In fact, Mr. Sarff could not figure out how the two valuation provisions should be read together stating that he is "not a lawyer…" and explaining that "we can apply all of them [the valuation provisions] together." (ASMF ¶ 32). In order for Travelers' argument to reach the end zone and somehow limit its payment, at least three rules of insurance contract construction must be violated. The word "loss" must be read to be superfluous, language must be added to the policy tying valuation to payment, and finally, the ambiguity created by the two valuation provisions must be construed against the insured. Clearly, such violations cannot be allowed. Thus, the valuation provision is ambiguous as to whether it limits or controls the payment owed by Travelers and such ambiguity must be construed in favor of the insured and against the insurer. *Outboard Marine Corp.*, 607 N.E.2d at 1212.

**3.    Travelers' Citation To Only Three Cases Is Disingenuous And Does Not Help Its Argument.**

Travelers' citation to *Vision One, LLC v. Philadelphia Indem. Ins. Co.,* 174 Wash.2d 501 (Wa. 2012) misses the mark. There, the builders risk policy limited the insurer's payment to

"direct physical loss to covered property caused by or resulting from any of the covered causes of loss." *Id.* at 506. Travelers' policy is not limited to payment of only direct physical loss. In fact, the difference between the language in the policies supports One Place's position regarding the breadth of the Travelers' policy. Travelers agreed to pay for loss; direct or not; physical or not.

Next, in *Campenella Constr. Co. Inc. v. Great Am. Ins. Co.,* 2010 WL 4812990 (E.D. Pa. 2010) it is important to note that the court issued its opinion after hearing all the evidence at a bench trial, rather than on summary judgment. Moreover, and contrary to rules of policy interpretation in Illinois, the court adds language to the policy in order to reach its conclusion. The court holds that the policy covers "**direct** loss from any of the covered causes of loss." *Id.* at *5. Travelers' policy does not require "direct loss." Next, the court notes the policy excludes "**costs** incurred due to delay." *Id.* Again, that is not the language of Traveler's exclusion. Instead, Travelers' exclusion is for "loss caused by or resulting from delay." (ASMF ¶ 10).

Finally, in *Oceanside Pier View, L.P. v. Travelers Property Casualty Co. of America,* 2008 WL 7822214 (S.D. Ca. 2008), the court addresses neither the meaning of loss in light of coverage for both loss or damage, nor the valuation provision as a limitation on payment. In addition, the issue there was whether plaintiffs could recover more than the $100,000 limit for increased costs of construction materials and labor for previously unconstructed portions of the project. One Place is not seeking such costs.

   4.   **In The Alternative, Even If This Court Agrees With Travelers And Finds That The Valuation Provision Limits Coverage, Repair/Replacement Costs Are Not Limited To Only Direct Costs To Damaged Property And A Question Of Fact Exists.**

Distilled to its essence, Travelers' argument is that per the valuation provision, it is required to pay only costs that are directly linked to the restoration of damage to the ERS and the

D-Line. (D.E. 134 at pp. 8, 23-24); *see* Traveler's SMF for its section 155 claims documenting Travelers "direct" versus "indirect" position (D.E. 126 at ¶¶ 56, 57 and 76). Travelers' argument is wrong not only on the law, but it is clear that it also raises a question of fact as to the proper scope and costs of the claim.

When repair or replacement costs are at issue, the rule is that "repair or replacement cost*s logically and necessarily include any costs that an insured reasonably would be expected to incur in repairing or replacing the covered loss*." [4] *Gilderman v. State Farm Ins. Co.,* 649 A.2d 941, 945 (Pa. 1994). Costs to repair and replace damaged property have been found to include items such as overhead and profit, construction and project management fees, sales tax, permitting, and other items. Questions of what an insured reasonably would be expected to incur to repair/replace involve scope and reasonableness issues and thus, fact questions. Nonetheless, Travelers tries to short circuit this issue of fact by arguing that such costs should not be included even though per the testimony such costs were for loss or damage to the ERS and D-Line or both. (ASMF ¶ 15).

In *Gilderman,* the insured challenged the insurer's routine practice of deducting from replacement cost 20% percent for contractor's overhead and profit in determining actual cash value. The court held that "repair or replacement costs logically and necessarily include any costs that an insured reasonably would be expected to incur in repairing or replacing the covered loss." As such, the court found that general contractor's overhead and profit must be included in replacement cost if a contractor would reasonably be expected to be involved in the repair or replacement of the loss.

---

[4] These cases discuss determining the amount owed for actual cash value defined as repair or replacement costs less depreciation, which necessarily requires an initial determination of the proper scope of repair or replacement before depreciation is deducted to reach actual cash value.

Moreover, these fees need not actually be incurred or paid in order to be included in the amount that is owed by the insurer. In *Mazzocki v. State Farm Fire & Cas. Corp.,* 766 N.Y.S.2d 719 (N.Y. App. Ct. 2003), the court also concluded that contractor overhead and profit should be included in replacement cost in order to arrive at an actual cash value settlement using a "replacement cost less depreciation" formula. There, the question was whether replacement cost includes general contractor overhead and profit, even if not actually incurred. The term "replacement cost" was not defined in the policy.[5] The court found that the term "replacement cost" could reasonably be interpreted to include profit and overhead whenever it is reasonably likely that a general contractor will be needed to repair or replace the damage.

In *Lukes v. American Fam. Mut. Ins. Co.,* 455 F. Supp. 2d 1010 (D. Ariz. 2006), the insureds argued that the policy required inclusion of sales tax into the actual cash value calculation for its personal property loss. The insurer argued that it was only required to pay sales tax in the event that the insured actually replaced the damaged property. The policy defined actual cash value as "the amount which it would cost to repair or replace covered property with material of like kind and quality, less allowance for physical deterioration and depreciation, including obsolescence." Relying upon the language of the policy "the amount which it *would* cost", the court rejected the insurer's argument and concluded that a reasonable interpretation of the policy is that it covers any cost that an insured is reasonably likely to incur when repairing or replacing covered property, including sales tax. *See also Bond v. Am. Family Mut. Ins. Co.,* 2008 WL 477873 at *1 (D. Ariz 2008); *Tritschler v. Allstate Ins. Co.,* 144 P.3d 519, 527 (Ariz. App. Ct. 2006).

The *Gilderman, Mazzocki,* and *Lukes* decisions stand for the proposition that replacement

---

[5] Replacement cost is not defined in Travelers' policy.

cost includes "any costs" that the insured would be reasonably likely to incur as a result of repairing or replacing the damaged or destroyed property, including "indirect costs." In fact, the overwhelming majority of case law supports general contractor overhead and profit being included in an actual cash value loss calculation utilizing a "replacement cost less depreciation" methodology. *See generally Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1035-36 (11th Cir. 2008) ("actual cash value" includes contractor's overhead and profit charges if it is reasonably likely that insureds would incur such charges); *Parkway Associates, LLC v. Harleysville Mut. Ins. Co.*, 129 Fed. Appx. 955, 963 (6th Cir. 2005) (costs of contractor's overhead and profit should be included in actual cash value of loss when insured would reasonably be expected to hire a contractor to repair its property); *Salesin v. State Farm Fire & Casualty Co.*, 581 N.W.2d 781, 790 (Mich. App. Ct. 1998) (repair or replacement costs include any costs that an insured reasonably would be expected to incur in repairing or replacing the covered loss); *Mee v. Safeco. Ins. Co.*, 908 A.2d 344, 350 (Pa. Super. Ct. 2006) (insured is entitled to overhead and profit when use of a general contractor would be reasonably likely, even if no contractor is used or no repairs are made); and *Ghoman v. New Hampshire Ins. Co.*, 159 F. Supp. 2d 928, 934 (N.D. Tx. 2001) (concluding that repair or replacement cost includes any cost that an insured is reasonably likely to incur in repairing or replacing a covered loss).

In addition, the National Underwriter Company in its FC&S Bulletins, a recognized resource in the insurance industry for insurance policy interpretation, was posed with the question of whether replacement cost includes architect and engineer fees. The National Underwriter Company stated that "replacement cost" includes everything that goes into replacing a home – the building materials, the necessary permits, the labor, etc. The replacement cost of a home also should include architect's fees. (ASMF ¶ 43).

There is no question that the issue of what an insured would "reasonably … be expected to incur in repairing or replacing the covered loss" is one that leads to a question of fact.[6] *See Mee v. Safeco Ins. Co.*, 908 A.2d 344, 348 (Pa. Super. Ct. 2006) (fact questions preclude summary judgment on what costs are reasonably likely for repair/replacement); *Tritschler v. Allstate Ins. Co.*, 144 P.3d 519, 533 (Ariz. App. Ct. 2006) (question of fact as to whether overhead and profit is reasonably likely to be incurred); *Mazzocki v. State Farm Fire & Cas. Corp.*, 766 N.Y.S.2d 719, 722 (N.Y. App. Ct. 2003) (trier of fact needs to determine what costs reasonably likely to be incurred).

Questions of fact exist. Mr. Shenk the project manager, testified that he pulled the invoices concerning the ERS/D-Line and provided them to the owner and Mr. Becker's company. (ASMF ¶ 14). Craig Becker[7] testified that the costs presented, (and specifically set forth in his report by trade and bates number to invoices and other supporting documents), are part of the loss or damage and repair/restoration to the property. (ASMF ¶ 30). Harlan Karp[8] testified that the claimed costs are from the loss or damage from the ERS/D-Line. He explained that in responding to Travelers' interrogatories requesting allocation of costs to repair, replace or restore either the ERS or D-Line, he allocated $983,308.54 for the earth retention system and $631,482.84 for the D-Line, and the remaining amounts of the $5,879,062.80 claim were for one or the other or both. (ASMF ¶ 15). Questions of fact exist as to whether the claimed costs are

---

[6] *See Kellogg Brown & Root Services, Inc*. v. *US,* 2013 WL 4749921 (2013) (cost reasonableness is a question of fact in a public contract case); *General Dynamics Corp. v. US,* 410 F.2d 404 (1969) (whether housing expenditures are reasonable is a question of fact regarding housing project contract).

[7] Mr. Becker is One Place's expert regarding, in part, the claim owed by Travelers. (ASMF ¶ 16). During Mr. Becker's deposition, clarification was sought which results in a reduction of the One Place Claim. (AMSF ¶ 44).

[8] Harlan Karp is the President of SouthBlock Management, Inc. (ASMF ¶ 15).

for repair, replacement or restoration of the ERS/D-Line.

In summary, contrary to Travelers' argument, the valuation language does not limit payment to only "direct" costs to repair damaged property. Not only do the rules of contract construction require that the words loss and damage have different meanings, but Travelers' other valuation language referring to Covered Property clearly responds to more than just damaged property. As stated in *Zurich*, had Travelers wanted to limit its coverage, it should have drafted its policy to reflect its intent. In the alternative, the language in the policy is ambiguous particularly given the manner in which the coverage grant is drafted with loss defining loss, and the fact that there are two valuation provisions; one that focuses on property and the other on covered property. Ambiguities must be construed against Travelers and in favor of the insured. However, should the Court agree with Travelers and find the valuation provision limits payment to only costs for the restoration or replacement of the damage to the ERS/D-Line, then a question of fact exists as to the reasonableness of the scope of the work and the costs relating to that work,[9] which precludes judgment in Travelers' favor.

### C. Travelers' Reliance On An Exclusion For Loss Arising From Delay Ignores The Limiting Language Of Its Exclusion And Illinois Law.

Travelers' argues that the following exclusion precludes some of One Place's claim:

> We will not pay for "loss" caused by or resulting from any of the following:
> a. Delay . . . . (ASMF ¶ 10).

Once the insured establishes a loss within the terms of the policy, the burden then shifts

---

[9] Travelers argues that some costs were not paid and thus are not owed (i.e., the 5% construction management fee). However, as set forth above, it is not necessary for costs to have been paid under the law or the language of the policy. Rather, the issue is what is reasonable for the repair/replacement. Moreover, One Place owes the 5% construction management under a contract. (ASMF ¶ 24). Costs owed under a contract are certainly costs incurred. *Northrop v. Allstate Ins. Co.,* 720 A.2d 879, 882 (1998); *Pierce v. Farm Bureau Mutual Ins. Co.,* 548 N.W.2d 551, 556 (Iowa 1996).

to the insurer to prove that the loss arose from a cause which is excluded, and which costs are from the excluded loss. *One Place Condo., LLC v. Travelers Prop. Cas. Co. of Am.,* 2011 WL 6182363 at * 4 (N.D. Ill. 2011). There is no dispute that One Place established a loss within the policy as Travelers has paid some of its costs. (ASMF ¶ 42). The burden rests with Travelers to prove that a loss arose from an excluded cause and if so, what costs are from that excluded cause.

Travelers fails on the first point, as this exclusion does not apply to this loss. In fact, the application of this exclusion to this case makes no sense based on Travelers own argument that the loss in this case is the damage to the ERS/D-Line. (D.E. 134 at p. 9). Using Travelers owns argument and asserting its language in to the exclusion in place of the word "loss" the result is nonsensical: "we will not pay for damage to the ERS/D-Line caused by or resulting from delay." The damage to the ERS/D-Line was not from delay. Travelers provides no evidence that delay caused the damage to the property.

In addition, Travelers consistently argues throughout its motion that the policy does not cover delay "costs" or that certain "costs" are from delay. (D.E. 134 at pp. 12, 28, 29-32). However, the exclusion does not exclude costs, rather it excludes a loss.[10] Had Travelers wanted to exclude costs from delay, it could have done so. *Zurich Am. Ins. Co. v. Keating Bldg. Corp,* 513 F. Supp. 2d 55, 70 (D. N.J. 2007). Moreover, Travelers policy does pay for costs from delay. In fact Travelers concedes, "the policy does, however, provide for a limited category of delay costs that are defined in the policy as soft costs and rental value."[11] (D.E. 134 at p. 13).

---

[10] In fact, Covered Causes of Loss means, "risks of direct physical 'loss' except those causes of 'loss' listed in the exclusion." (ASMF ¶ 10). This supports the meaning that the exclusions go to the loss, not a particular cost incurred from a covered loss.

[11] Travelers' statement that its policy allows for only a limited category of delay costs reflected by the soft costs and rental definitions, is not accurate. While it is true that soft costs and rental value are defined to include only certain types of "business costs" for which an insured can recover during only a limited time

(Contrary to Travelers' statement, soft costs are defined in the policy as "business costs," not delay costs.) (ASMF ¶ 7). So, to read the exclusion as Travelers does to mean "costs" from delay, rather than loss from delay, makes no sense when juxtaposed with Travelers' admission that the policy covers costs from delay. The exclusion does not say, for instance, "but for the soft costs" all other costs from delay are excluded. In fact, there is nothing excluding costs from delay.

Next, Travelers gets twisted in its own argument while referring to one of the change orders and states, "[h]owever, like the change order above, Concrete Structures submitted this one because it believed it incurred costs *due to* the impact and delay on the project *due to* the D Line frost wall and caisson issues." (D.E. 134 at p. 33). Apparently, Travelers real argument is that if there is an intervening cause and the word delay is involved, then the intervening cause controls. However, Travelers policy provides otherwise as it contains different categories of exclusions controlled by different lead in language.

The "B.1" exclusions have the following lead in language:

> We will not pay for 'loss' caused directly or indirectly by any of the following. Such 'loss' is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the 'loss.' (ASMF ¶ 12).

However, the "B.2" exclusions, which house the exclusion relied on by Travelers, are controlled by the following lead in language:

> We will not pay for 'loss' caused by or resulting from any of the following: (ASMF ¶ 13).

---

period called the "period of delay in completion," there is nothing in the policy excluding other costs of delay. Instead, soft costs and rental value limit the time only the costs listed in their definitions can be recovered. Importantly, Travelers admits that other builders' risk policies include general conditions, project administration and other costs in the definition of soft costs, but Travelers' policy does not. (D.E. 134 at p. 14, n. 5). Accordingly, had Travelers wanted to limit other costs to the "period of delay in completion," it could have done so by including them in soft costs. It chose not to.

Travelers' policy provides that the B.1. exclusions apply *"regardless of any other cause or event that contributes concurrently or in any sequence to this loss."* (Emphasis added.) Significantly, this anti-concurrent cause language might exclude coverage when a prescribed risk, in combination with a covered risk, either simultaneously or sequentially, cause loss or damage. However, the B.2 exclusions do not contain such language. The difference in policy language indicates a difference in coverage intent with respect to these two groups of exclusions. *See, e.g., Empire Indemnity Ins. Co. v. Winsett,* 325 F. App'x 849, 852 (11th Cir. 2009); *Davidson Hotel Co. v. St. Paul Fire and Marine Ins. Co.,* 136 F. Supp. 2d 901, 905 (W.D. Tenn. 2001); *Simonetti v. Selective Ins. Co.,* 859 A.2d 694, 700 (N.J. 2004); *State Farm Fire & Cas. Co. v. Metropolitan Dade County,* 639 So. 2d 63, 65 (Fla. App. Ct. 1994). More specifically, the absence of anti-concurrent cause lead-in language for the B.2 exclusions plainly and unambiguously indicates an intent to exclude loss from the B.2 exclusions *only* when a B.2 exclusion is the *sole* cause of the loss or damage. *See Pace Properties, Inc. v. American Mfrs. Mut. Ins. Co.,* 918 S.W.2d 883, 886 (Mo. App. Ct. 1996). It thus necessarily follows that if a covered risk is *a* cause of loss, then the B.2 exclusions cannot apply to defeat coverage. The exclusion Travelers relies on is found in the B.2 category of exclusions. *Ball-Healy-Horn v. Hartford Fire Ins. Co.,* 1987 WL 6864 at *3 (N.D. Ill 1987) ("Both Illinois and California apply to the rule that under an all-risk insurance policy, where one cause of the loss is a covered risk, coverage is not defeated because an excluded risk contributed to the loss"); *Saleco Ins. Co. v. Guyton,* 692 F.2d 551, 555 (9th Cir. 1982) (California law); *Mattis v. State Farm Fire & Casualty Co.,* 454 N.E.2d 1156, 1161 (5th Dist. 1983)(declined to be followed by *Spearman Industries, Inc. v. St. Paul Fire and Marine Ins. Co.*, 139 F. Supp. 2d 943 (N.D. Ill. 2001)).

At best, the exclusion is ambiguous as to whether coverage is barred if loss is partially caused by a covered risk and partially caused by a B.2 risk. *See O'Rourke v. Prudential Ins. Co. of America,* 13 N.E.2d 287, 288 (Ill. App. Ct. 1938) ("We think it clear that the language in the policy in the instant case is ambiguous, as demonstrated by the contrariety of the opinions of the courts where language in the policies involved is almost identical with the language in the policy before us."). Consequently, in accordance with the above rule of insurance contract construction, a rule designed to protect the insured's reasonable expectation of coverage in a situation in which the insurer-draftsman controls the language of the policy, this court is required to construe the policy strictly against Travelers and in favor of coverage for One Place. *See Employers Insurance Co. of Wausau v. Ehlco Liquidating Trust*, 708 N.E.2d 1122, 1130 (Ill. 1999) ("Where competing reasonable interpretations of a policy exist, a court is not permitted to choose which interpretation it will follow. Rather, in such circumstances, the court must construe the policy in favor of the insured and against the insurer that drafted the policy.").

In *Zurich American Ins. Co. v. Keating Building Corp.,* 513 F. Supp. 2d 55, 69 (D. N.J. 2007), the insurer argued that its delay in completion exclusion precluded payment of general conditions, contractor's delay, storage and other similar costs. Zurich argued that "the extra costs-which were incurred largely as a result of construction delays due to the collapse- are the epitome of consequential losses as they are losses that 'do not flow directly and immediately from the act of the party, but only from some of the consequences or results of the act[s]." *Id.* at 69. The court found the exclusion inapplicable for a number of reasons including that the original cause of the loss was the collapse, that the construction costs are not consequential losses and that the exclusion has a narrower reach than that presented by Zurich. *Id.* at 70-71.

Finally, a question of fact exists as to whether costs are from a loss for delay. Mr. Becker

testified that the costs presented and specifically denoted in the claim are part of the loss or damage and repair/restoration to the property and are owed by Travelers. (ASMF ¶ 30). Harlan Karp testified that the claimed amount of $5,879,062.80 is from the loss or damage from the ERS/D-Line. Mr. Karp allocated the claimed amount to costs to repair, replace or restore either the ERS or D-Line, not to loss from delay. (ASMF ¶ 15). Finally, Mr. Lorenzo of Concrete Structures testified to impact costs from the ERS/D-Line. Mr. Lorenzo did not testify that loss was from delay. (RSMF ¶¶ 59, 63).

### D. One Place's Claim Is Not Limited To $100,000, Contrary To Travelers Argument.

Travelers argues that some of the claimed costs are limited to $100,000 relying on the "expediting and additional costs of construction materials and labor provision." (D.E. 134 at p. 11). This provision limits coverage and so must be narrowly construed against the insurer. *Nati'l Union Fire Ins. Co.,* 632 N.E.2d at 1042. Moreover, Travelers' broad construction of this provision creates an ambiguity, which must also be construed against the insurer. *BASF*, 522 F.3d at 819. The language in this limitation provides:

### B. Expediting Costs and Additional Costs of Construction Material and Labor.

> We will pay for the following costs made necessary by a Covered Cause of Loss to Covered Property at the 'job site': (a) Your costs to expedite repair of Covered Property; (b) Your increased cost of construction materials and labor…." (ASMF ¶ 5).

Travelers' construes this language to apply to both repair costs (direct) and all other costs of construction material and labor (indirect), whether directly for the repair or otherwise. (D.E. 134 at p. 11). However, as section "a" refers to repair costs, section 'b' logically also concerns the increased costs of construction materials and labor concerning the repair. To hold otherwise would make no sense as anytime anything happens on a job site triggering coverage under this

policy it will involve additional costs of construction materials and labor. If Travelers' reading were correct, what coverage would be left for the insured?

Travelers also reads the word "increased costs" to mean the same thing as "additional costs." But the two words do not have the same meaning. This is made even more confusing by the fact that the title of this provision uses the word "additional" and the body uses the word "increased." (ASMF ¶ 5). Nonetheless, the body controls and only increased costs are addressed in "b." This provision is also contradicted by the "expenses to reduce the amount of the loss" (k in the Policy) which specifically allows for any expenses incurred by the insured in order to reduce the completion date of a project after a loss. There is no dollar limitation in provision k, so how these two provisions interact is ambiguous at best as (k) allows for all expenses.

Travelers' reliance on *Oceanside* is misplaced. There, the insured sought the "increased costs of construction materials and labor which Plaintiff alleges it incurred to complete portions of the Project which were not yet under construction." *Id*. at *7. One Place is not seeking such costs. Moreover, Travelers' policy does cover "property that will become a permanent part of the buildings or structures…." (ASMF ¶ 4). This includes property that is not yet under construction.

Finally, the testimony is that certain costs were for additional, rather than increased costs and a question of fact exists. RSMF ¶ 62.

### E. Travelers' Other Arguments Regarding Costs Are Not Persuasive.

One Place claims $1,474,349.59 in expenses to reduce the amount of the loss (provision k of the policy).[12] (ASMF ¶ 6). One Place supports these costs with invoices and breaks them in

---

[12] This provision provides "additional insurance," per the policy. (ASMF ¶¶ 6, 9).

to three categories for easy reference, all of which is fully set forth in Becker's report, affidavit, and One Place's supplemental answers to interrogatories. (ASMF ¶¶ 17, 44, 45).

Travelers argues that One Place does not have evidence to support that these costs improved the schedule per the language of (k) in the policy. (D.E. 134 at p. 35-36). However, this statement is not correct. In fact, Harlan Karp testified that the overall completion of the project was reduced by at least eighty-two days due to the acceleration and other mitigation efforts including winter conditions and other costs to reduce loss. (ASMF ¶ 18). Mr. Karp explained that since One Place had to write the checks for the overtime, as it was a cost plus project they would not just give money away so if it was not working, they would not be spending money on it. (ASMF ¶ 18). Moreover, Mr. Karp explained that the winter conditions were included in this amount to reduce loss as the project was not originally expected to go through the winter of 2007. He explained that had those costs not been incurred to enclose the project, Crouch Serenko, the masons, would not have performed their work during this winter. (ASMF ¶ 19). He also explains that the Concrete Structures amount of $769,132 is part of the "period of delay costs incurred to reduce loss." (ASMF ¶ 45). Furthermore, there is evidence that the job would have been closed from November through April if the costs for winter conditions had not been incurred. (ASMF ¶ 19). Mr. Becker also opined that these are expenses to reduce the amount of the loss. (SMF ¶ 71). Moreover, Mr. John Spittler, One Place's engineering and scheduling expert opined that had One Place not done the winter conditions, accelerated the work and other mitigating actions the project slippage or completion would have been much worse than it was. (ASMF ¶ 20). There is clearly a question of fact on the issue of whether these costs reduced the amount of the loss.[13]

_____

[13] Moreover, it is One Place's position that these costs also fit within the general coverage grant.

Moreover, Travelers admits that Concrete Structures submitted change orders for $412,876 and $253,722 because it incurred these costs due to the earth retention system issues. (D.E. 134 at p. 32); (SMF ¶¶ 58- 59). In fact, these amounts are further itemized to show exactly how the ERS/D-Line effected Concrete Structures. (SMF ¶ 58). Mr. Karp also testified that weather delays in the Concrete Structures amount claims was due to the fact that they got pushed in to the winter that was not on the schedule because of the ERS/D-Line. (ASMF ¶ 21). Had that not occurred, the days from weather would not have occurred. Mr. Karp further testified that they paid Concrete Structures for additional work to get the project back on track because of the ERS/D-Line and that it was not until September of 2007 that a decision was made to stop some of the overtime for Concrete Structures. (ASMF ¶ 21).

Next, Travelers argues that costs incurred after the ERS/D-Line fix are not covered under the policy. (D.E. 134 at pp. 32-35). However, there is nothing in the policy, which supports Travelers' position that there is a cut off date or time limit. In fact, the valuation provision cuts against Travelers' time limit argument as it provides," [w]e cover loss or damage commencing during the policy period…." (ASMF ¶ 35). Travelers' position again depends on its argument that it only pays for costs to fix the damage to the ERS/D-Line and since these costs were after the fix, then they are not covered. One Place refers the Court to its previous discussion of this issue.

As to the few remaining costs for monitoring the site after repairs, and other items (D.E. 134 at p. 39), these are all submitted as part of the claim. Both Mr. Karp and Mr. Becker testified to these numbers and that they are part of the claim for the loss or damage. (ASMF ¶¶ 14-22).

## F.      One Place's Damages Supported By Expert Mark Robinson[14]

Plaintiffs' expert Mr. Mark Robinson testified to two categories of damage.  The first, economic losses associated with condo sales, fits within the coverage of the policy.  The second, excess financing necessary due to the unpaid claim amount, is direct or consequential damages due to Travelers' breach of contract.  Travelers argument that neither is covered under the policy misses the mark.

Mr. Robinson testified that $2,450,495 is the economic loss suffered by One Place measured by the loss associated with condo sales due to the ERS/D-Line. (ASMF ¶ 23).   As discussed in the case law in the preceding sections, loss is different from damage and includes economic damage suffered by the insured, an undesirable outcome of a risk and the disappearance or diminution of value in an unexpected or relatively unpredictable way.  Black's Law Dictionary (9th ed. 2009).  The economic loss associated with the condo sales of the project fit within the broad coverage grant for loss or damage to property from any risk of direct physical loss or damage.  Moreover, One Place can also seek these damages as direct or consequential from Travelers' breach of contract.  Travelers' only argument against this is to repeat its theme that this loss is not "costs to restore, repair or replace the damaged property" or "soft costs" or "increased costs of construction."  Missing, however, is Travelers' discussion or even recognition of its broad coverage grant for loss or damage.

---

[14] Travelers makes a point of commenting on the amount of damages One Place will be seeking at trial, but seems to have no point in doing so, other than to inappropriately try to sway this Court to believe that One Place is being greedy and therefore summary judgment should be entered in its favor.  First, Travelers statements in this regard are irrelevant and inappropriate.  Second, nothing could be further from the facts or the truth.  Instead, Travelers' declination of coverage, failure to pay timely, and its payment only in bits and drabs over a four year period of time, caused extensive and long-lasting damage to One Place; damage for which One Place is entitled to be compensated.  (SMF ¶ 80); (ASMF ¶ 22).

Next, Mr. Robinson testified that the excess financing on the remaining unpaid claim amount suffered by One Place ranges from $1,173,667 to $1,350,782, depending on the period of delay. (SMF ¶ 91.). Travelers' misses the mark when it repeats its mantra that these costs are not to repair or replace damaged property or for increased costs or soft costs. One Place is not claiming that these damages fit within the coverage of the policy. Rather, One Place is seeking such damages as consequential or direct damages resulting from Travelers' breach. *See Rush Presbyterian v. Safeco Ins. Co*., 722 F. Supp. 485, 490 (N.D. Ill. 1989) (applying general consequential damage rules to insurance contracts); *Linc Equipment Service Inc. v. Signal Med. Servs., Inc*., 319 F.3d 288, 289 (7th Cir. 2003) (noting that the parties need not have expressly contemplated consequential damages). Depending on the factual setting, damages may "naturally and generally" result from breach in one case, yet constitute consequential damages in another. *See Heller Intern. Corp. v. Sharp*, 839 F. Supp. 1297, 1302 (N.D. Ill. 1993); *see also Midland Hotel v. Donnelley*, 515 N.E.2d 61, 67 (Ill. 1987). Mr. Karp testified to the increased damage caused by Travelers' failure to pay the claim. (ASMF ¶ 22). Moreover, prejudgment interest does not fully compensate for the financing damage as testified to by Mr. Robinson.

Travelers' has failed to prove that it is entitled to judgment as a matter of law on these issues. Plaintiffs are entitled to their day in court on the issue of damages.

## V. <u>CONCLUSION</u>

For all of these reasons, Plaintiffs, One Place Condominium LLC, The South Loop Shops LLC, Southblock Development LLC, C & K Partnership, and Southblock Management, Inc., respectfully pray that this Court deny Defendant's, Travelers Property Casualty Company of America, motion for partial summary judgment as to certain claimed costs.

Dated: October 21, 2013.

ONE PLACE CONDOMINIUM LLC, THE SOUTH
LOOP SHOPS LLC, SOUTHBLOCK
DEVELOPMENT LLC, C & K PARTNERSHIP,
AND SOUTHBLOCK MANAGEMENT, INC.

By:     /s/Katherine Smith Dedrick
        Katherine Smith Dedrick, Esq.
        Illinois Bar No. 6185314
        kdedrick@childresslawyers.com
        Edward Eshoo, Jr. Esq.
        Illinois Bar No. 6190179
        eeshoo@childresslawyers.com
        CHILDRESS DUFFY, LTD.
        500 North Dearborn Street, Suite 1200
        Chicago, Illinois 60654
        (312) 494-0200
        (312) 494-0202 facsimile

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed via CM/ECF and a copy was furnished via CM/ECF on this 21st day of October, 2013, to:

K. Clark Schirle, Esq.
cschirle@butlerpappas.com
BUTLER PAPPAS WEIHMULLER KATZ CRAIG, LLP
115 South LaSalle Street, Suite 3200
Chicago, Illinois 60603
(312) 456-0900
(312) 456-0909 facsimile

By:     /s/Katherine Smith Dedrick
        Katherine Smith Dedrick, Esq.
        Illinois Bar No. 6185314
        kdedrick@childresslawyers.com
        Edward Eshoo, Jr. Esq.
        Illinois Bar No. 6190179
        eeshoo@childresslawyers.com
        CHILDRESS DUFFY, LTD.
        500 North Dearborn Street, Suite 1200
        Chicago, Illinois 60654
        (312) 494-0200
        (312) 494-0202 facsimile