**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ONE PLACE CONDOMINIUM, LLC,<br>THE SOUTH LOOP SHOPS LLC,<br>SOUTHBLOCK DEVELOPMENT LLC,<br>C & K PARTNERSHIP, and SOUTHBLOCK<br>MANAGEMENT, INC., | )<br>)<br>)<br>)<br>) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 11 C 2520 |
| | ) | |
| TRAVELERS PROPERTY CASUALTY<br>COMPANY OF AMERICA, | )<br>) | Magistrate Judge Finnegan |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs One Place Condominium LLC, The South Loop Shops LLC, Southblock Development LLC, C & K Partnership, and Southblock Management, Inc. (collectively "Plaintiffs" or "One Place") have filed this diversity suit against Defendant Travelers Property Casualty Company of America seeking to recover amounts allegedly due under a commercial insurance policy. Plaintiffs charge Defendant with breach of contract and violation of Section 155 of the Illinois Insurance Code, 215 ILCS 5/155. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Defendant now seeks summary judgment on the Section 155 claim. For the reasons set forth here, the motion is granted.

## BACKGROUND

One Place Condominium LLC, The South Loop Shops LLC, Southblock Development LLC, and C & K Partnership are each comprised of partners who are

citizens of Illinois. (Doc. 116 ¶ 2). Southblock Management, Inc. is incorporated, and has its principal place of business, in Illinois. (*Id.*). Plaintiffs are all owners, developers and managers of property located at One East 8th Street in Chicago (the "Property"). (*Id.* ¶ 5). Defendant insurance company is a Connecticut corporation with its principal place of business in Hartford. (*Id.* ¶ 3).

## A.    The Construction Project

In late 2006, One Place began construction on the Property to erect a 10-story building with a one-story basement containing retail space, a parking garage and residential condominium units. (*Id.* ¶ 6). Levine Construction, Inc. ("Levine Construction") served as the original general contractor for the Project, but was replaced in April 2007 by Wight Construction ("Wight"). Key subcontractors included: (1) Concrete Structures of the Midwest, Inc. (concrete); (2) Budron Excavating (excavation); (3) Bonus Electric (electrical); (4) D-Three Construction (carpentry); (5) Crouch-Seranko (masonry); and (6) Hayward Baker (the earth retention system). (Doc. 123 ¶ 7).

## B.    The Insurance Policy

**1.    "Builders' Risk":** Defendant issued Plaintiffs a "Builders' Risk" insurance policy in connection with the construction project for the period from November 2, 2006 to November 2, 2007 (the "Policy"). (Doc. 116 ¶ 7). The Policy insures against "'loss' to Covered Property from any of the Covered Causes of Loss." (Policy, Doc. 1-1, at 14).[1] "Loss" is defined as "accidental loss or damage." (*Id.* at 28). "Covered Property" means

---

[1]    For ease of reference, page numbers for the Policy are drawn from the CM/ECF docket entries at the top of the filed document.

"Builders' Risk," which is defined as "[p]roperty described in the Declarations under 'Builders' Risk' . . . consisting of: a. Buildings or structures including temporary structures while being constructed, erected or fabricated at the 'job site'; [and] b. Property that will become a permanent part of the buildings or structures at the 'job site.'" (*Id.* at 26). Under "Builders' Risk" in the Declarations, the policy states that it covers "only the buildings and structures" described on that page, namely, "new construction of a three story fire resistive retail and condominium building located at 1 E. 8th Street, Chicago, IL 60605" (the "project"). (*Id.* at 7). "Covered Causes of Loss" means "RISKS OF DIRECT PHYSICAL 'LOSS' except those causes of 'loss' listed in the Exclusions." (*Id.* at 14).

       **2.** **"Soft Costs and Special Time Element":** After stating that Travelers will pay for "loss" to covered property for any of the covered causes of loss, the coverage section then addresses so-called "'Soft Costs' and Special Time Element." With respect to "soft costs," the Policy states that:

> We will pay your "soft costs" during the period of delay in completion. Such soft costs must result from "loss" to Covered Property from any of the Covered Causes of Loss which delays the completion of the project beyond the "planned completion date."

(*Id.* at 14). "Soft costs" are defined as "your actual and necessary business costs in excess of your budgeted amount for the 'project' consisting only of [the] type shown in the Declarations." (*Id.* at 29). The Declarations page lists the following items as "soft costs":

- Interest on money borrowed to finance construction

- Advertising expenses

3

- Realty taxes and other assessments

- Costs resulting from the renegotiation of your lease(s) or construction loans

(*Id.* at 7).

The "Special Time Element" portion of this section relates to coverage for "Rental Value":

> We will pay the amount by which your "rental value" is actually reduced during the "period of delay in completion." Such reduction in "rental value" must result from "loss" to Covered Property from any of the Covered Causes of Loss which delays the completion of the "project" beyond the "planned completion date."

(*Id.* at 14). "Rental Value" is defined as the sum of "a. The total rental income from the tenant occupancy of the completed 'project,' as furnished and equipped by you; b. The amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be your obligations; and c. The fair rental value of any portion of the completed 'project' which would have been occupied by you." (*Id.* at 29).

### C.    The Foundation and Earth Retention System

The foundation for the building being constructed on the Property included drilled shafts or piers, known as caissons, which would support the load of the building. (Doc. 116 ¶ 11; Doc. 123 ¶ 19). The caisson foundation consisted of more than 90 concrete columns constructed in cylindrical shafts excavated under the proposed locations for the structural columns. The concrete columns were created by drilling deep holes into the ground with an auger and then filling them with concrete. Portions of the length of the caisson holes were reinforced with steel liners. (Doc. 116 ¶ 12). In addition to the caissons, the building had concrete foundation walls extending to frost depth, which is

42 inches deep (a full basement wall is 20 plus feet deep). These "frost walls" sit on top of the caisson caps, which are also made of concrete. (*Id.* ¶ 13).

To assist with the excavation of these below-grade structures, Hayward Baker installed an earth retention system ("ERS") consisting of steel sheet piling that was driven partially into the ground to hold back the soil on the perimeter of the Project. (*Id.* ¶ 14). The sheet pile walls, which have soil on both sides, were installed on the south, east and west sides of the Project. The sheet piling on the south side was further braced by circular steel pipes, referred to as rakers, which were connected to the sheet piling on one end and a concrete grade beam on the other end. (*Id.*).

### D.    "Loss" Events on the Property

In late January 2007, workers discovered that sheet piling on the south side of the Project had moved along an east-west grid line. (*Id.* ¶ 15). Shortly thereafter, on February 26, 2007, someone from Levine Construction observed that sheet piling along the west side of the Project near grid line D (referred to here as the "D Line sheeting") had also moved significantly to the east. (*Id.* ¶ 16). Levine Construction notified One Place, Hayward Baker and others about the movement of the D Line sheeting, One Place informed Defendant, and on March 8, 2007, a Stop Work Order was issued on the Project.[2] (Doc. 123 ¶¶ 23, 24; Doc. 126 ¶ 9).

Following an investigation, Hayward Baker redesigned the ERS to brace and reinforce the sheet piling as follows: (a) steel H-piles were driven on the inside (east) of the sheeting; (b) to the extent there were gaps between the edges of the H-piles and

---

[2]    Defendant claims the Stop Work Order stemmed from concerns about a large construction crane in the vicinity of the ERS. (Doc. 123 ¶ 24). Plaintiffs insist it was "issued due to overall concerns for the project and the foundation." (Doc. 152 ¶ 24).

sheeting, shims (steel plates) were welded to bridge the gap; (c) a horizontal steel beam called a whaler was installed on top of the H-piles and sheeting to tie the two together; (d) concrete grade beams were installed at columns 12 through 15; (e) five new rakers were installed, which went from the whaler on one end to the concrete grade beams on the other; and (f) certain soil excavation was performed to create room for equipment, along with certain backfilling (placing soil into a hole that is dug). (Doc. 116 ¶ 17, 18; Doc. 123 ¶¶ 25, 26). Construction relating to the reinforcement was completed by April 13, 2007, at which time the Stop Work Order was lifted and construction on the Project resumed. (Doc. 116 ¶ 18; Doc. 123 ¶¶ 29, 30). Defendant paid for at least some of the repair costs, including $189,359 to Hayward Baker; $46,620.73 to Sherry K Corporation for concrete work; and $27,279.31 to Budron, for a total of $263,259.04. (Doc. 123 ¶ 28).

In the meantime, in late February and early March 2007, Concrete Structures raised concerns about the fact that soils under the frost walls and the caisson caps along the D Line had moved away from the concrete, creating voids. One Place's project manager, Charles M. Shenk, raised similar concerns. (Doc. 116 ¶ 19). It is not clear what, if anything, was done about these issues at that time, but in late July 2007, the contractors discovered that the frost wall on the west side of the building along the D Line (between columns 11 and 14) had moved or shifted, and it was possible that the caisson caps had moved as well. (*Id.* ¶ 20).

Though no stop work order was issued, the following repairs had to be made to the D Line frost wall and caisson caps: (a) backfilling of soil between the C and D lines; (b) the frost wall and caisson caps were demolished; (c) new concrete grade beams

were formed; (d) a new frost wall was poured; and (e) certain areas were backfilled with soil. (Doc. 123 ¶¶ 34, 35). Construction to fix these issues was completed by August 18, 2007. (Doc. 116 ¶ 22). Defendant paid for at least some of the repair costs, including $4,332 to Cobra Concrete; $11,919.77 to Budron; $133,635.70 to Concrete Structures; $32,521.09 to D-Three for carpentry work; $22,673 to Toltec Services for steel rebar; and $2,957.08 to Allied Waste for dumpsters, for a total of $208,038.65. (Doc. 123 ¶¶ 36, 37). The Project itself was substantially completed as of December 10, 2008. (*Id.* ¶ 6).

### E.    Investigation of the Loss Events and Related Insurance Claim

#### 1.    2007

On March 9, 2007, shortly after learning of the problems that arose with the sheet piling the previous month, Richard M. Sarff, Defendant's adjuster, retained construction consultants Madsen, Kneppers & Associates ("MKA") to assist in investigating and evaluating the loss. Mr. Sarff also spoke with Jerry Karp of One Place and scheduled a meeting for March 14, 2007. (Doc. 126 ¶ 10). At some point prior to that meeting, Plaintiffs hired Robert Levin, a public adjuster with Globe Midwest/Adjusters International ("Globe Midwest"), to review the Policy. On Mr. Levin's advice, Plaintiffs also retained the law firm of Childress Duffy in the spring of 2007. (*Id.* ¶ 11).

As scheduled, Mr. Sarff attended the March 14 meeting along with MKA's lead consultant Randy Goetz, Mr. Levin, and Jerry Karp and Harlan Karp of One Place. (*Id.* ¶ 12). After inspecting the loss and discussing the surrounding facts, Mr. Sarff determined that Defendant needed to retain a structural engineer. He subsequently hired engineers Chad Fisher (structural) and Peter A. Lenzini (geotechnical) of

Engineering Systems, Inc. ("ESI"). (*Id.* ¶ 13). Shortly thereafter, on March 19, 2007, Mr. Sarff sent a letter to One Place stating that Defendant had not yet made a determination as to coverage and was still investigating the matter. Mr. Sarff noted that his consultants had some concerns about the design of the ERS, and that the Policy contained an exclusion for defective design. (*Id.* ¶ 14).

In the meantime, One Place pursued its own investigation into the sheet piling failure and determined that it was caused by earth movement. Mr. Levin sent Mr. Sarff a letter to that effect on April 5, 2007, stating in part:

> In this instance, the Travelers' policy includes earth movement as a covered cause of loss . . . Inasmuch as the insured sustained a loss to covered property resulting from a covered cause of the loss, Travelers is responsible to indemnify the insured for their loss(es).

(Doc. 126-7, at 3).[3] Defendant agreed to loan One Place $250,000, without interest, with the understanding that it would be repayable if it was determined there was no coverage. (Doc. 126 ¶ 17).

When Defendant subsequently learned of the issues concerning the D Line frost wall and caissons in July 2007, Mr. Sarff did another site inspection with Barclay M. ("Skip") Roberts III, an Executive General Adjuster with Travelers and Mr. Sarff's direct supervisor, as well as other consultants. (*Id.* ¶ 20). Defendant's experts ultimately concluded that the defectively designed ERS caused the sheet piling failure, which in turn led to the problems with the D Line frost wall and caissons. ESI issued a report to that effect dated July 21, 2007, and prepared an Executive Summary of that report in August 2007. (*Id.* ¶ 21). Plaintiffs, however, retained their own experts to review the

---

[3]     For ease of reference, page numbers for exhibits to Local Rule 56.1 statements are drawn from the CM/ECF docket entries at the top of the filed document.

matter, including Jim Hauck of Wiss, Janney, Elstner Associates, Inc. and Robert Lukas of Geotechnical Engineering, Inc.  Based on Mr. Hauck's August 27, 2007 report, Mr. Lukas's August 28, 2007 report, and their own analysis, Plaintiffs were certain that the loss to the sheet piling and D Line frost wall and caissons was earth movement covered by the Policy.  (*Id.* ¶¶ 22, 23; Doc. 116 ¶¶ 24, 25).  As Mr. Lukas stated in his report, "It is our opinion that ground movements occurred because of the reduction in shear strength of the soil as a result of soil squeeze [during the drilling of the caisson holes] thereby resulting in failure of the steel sheeting retention system." (Doc. 126 ¶ 24).

Defendant had its experts from ESI review and respond to the Lukas report. ESI's resulting November 9, 2007 letter report reiterated that the loss was caused by the defective design of the ERS.  (*Id.* ¶ 25).  As a result, Mr. Sarff sent Plaintiffs a letter denying the claim for damages relating to the ERS, but agreeing to pay the costs for repairing the D Line frost wall and caissons (including soft costs and rental value incurred during the resulting delay in completing the Project) since they were not subject to the faulty design exclusion.  (*Id.* ¶¶ 26-28).

### 2. 2008

Plaintiffs still challenged the denial of coverage for the ERS and the parties continued to exchange information and attend meetings to discuss the issue.  (*Id.* ¶¶ 29, 30).  In January 2008, Katherine Dedrick, counsel for One Place, contacted Mr. Sarff for the first time and requested a meeting, which took place on February 28, 2008.  The attendees (Mr. Sarff, Travelers' in-house counsel, One Place representatives, Mr. Levin and Ms. Dedrick) agreed to schedule a second meeting for May 9, 2008, this time including experts Mr. Lukas, Mr. Fisher and Mr. Lenzini.  (*Id.* ¶¶ 31, 32).  One Place

9

emphasized at that meeting that there were caissons close to the ERS, two of which had experienced soil squeeze. Mr. Sarff asked Mr. Levin to provide copies of certain photographs and documents for Defendant's experts to consider. (Doc. 126 ¶ 32).

On June 16, 2008, Mr. Levin sent Mr. Sarff a preliminary partial claim for more than $6.2 million, along with a spreadsheet. Shortly thereafter, on June 27, 2008, Mr. Levin, acting for One Place, also sent Mr. Sarff some of the supporting documentation he had requested back in early May, though it was not segregated into categories that corresponded to the costs that could be recovered under the Policy. (*Id.* ¶¶ 33, 40, 41). Mr. Sarff forwarded the information to Jason Walker and Ron Metcalfe, construction consultants with MKA, for review and analysis. They responded with a request for information letter dated July 24, 2008, asking for certain project documents such as change orders, weekly meeting minutes, subcontractor contracts, daily logs, pay applications, status reports, segregated costs, and an electronic version of certain project schedules. (*Id.* ¶ 42).

In September and October 2008, Plaintiffs sent Mr. Sarff additional documents, including a November 15, 2006 letter from specialists at Case Foundation Company he had requested at the May 2008 meeting. The Case Foundation letter identified seven caissons where lining was used to remediate and prevent soil squeeze. (*Id.* ¶¶ 33, 44). Mr. Sarff sent all of this information to Defendant's engineering experts at ESI, and they prepared another report dated October 22, 2008 once again concluding that the loss was caused by design error associated with the ERS. (*Id.* ¶¶ 33, 34, 44). In response to an October 31, 2008 letter from Ms. Dedrick demanding payment, Mr. Sarff wrote to her on November 10, 2008 stating that the preliminary claim was difficult to evaluate

because Plaintiffs did not segregate and categorize the expenses, and noting that Defendant had only just received a lot of pertinent documentation in late October 2008. (*Id.* ¶¶ 45, 46).

While this was going on, Defendant decided to have the expert reports from ESI and Mr. Lukas peer reviewed by Dr. Richard Finno, a professor and geotechnical expert at Northwestern University.[4]  (*Id.* ¶ 35).  At some point in late 2008, Dr. Finno advised Defendant that with respect to the ERS both sides were correct to some degree and this was a gray area.  As a result, Mr. Sarff sent One Place a letter dated December 22, 2008 withdrawing Defendant's denial of coverage as to the claim for damage to the ERS.  (*Id.* ¶¶ 35, 36; Doc. 116 ¶ 30; Letter from R. Sarff to J. Karp of 12/22/08, Doc. 126-7, at 5).  Around the same time, Defendant issued a payment of $250,000 to One Place.  (Doc. 126 ¶ 37).  On December 23, 2008, Mr. Sarff sent Mr. Levin a letter from MKA listing additional documents and information it needed, including an electronic version of certain contract schedules, certain project documents and information, and documentation relating to certain items in the preliminary partial claim.  (*Id.* ¶ 47).

### 3.    2009

The dispute over payment continued into January 2009, with correspondence going back and forth between Ms. Dedrick and Mr. Sarff regarding, among other things, the reasonableness of Defendant's request for electronic versions of contract schedules.  (*Id.* ¶¶ 48-50).  On February 18, 2009, Mr. Sarff sent Mr. Levin yet another letter from MKA requesting information and documentation.  (*Id.* ¶ 51).  The following

---

[4]        Defendant first contacted Dr. Finno about working as a consultant in April 2008. (Doc. 126 ¶ 35; Doc. 157 ¶ 20).

month, in late March 2009, Ms. Dedrick finally agreed to send Mr. Sarff the electronic schedules. (*Id.* ¶ 52). By that time, G. Craig Becker, another public adjuster from Globe Midwest had become involved in the case. (*Id.* ¶ 11). In response to his request, Defendant sent One Place another $250,000 check in April 2009. (*Id.* ¶ 53). On May 5, 2009, Mr. Levin sent Mr. Sarff more documents responsive to MKA's requests, along with a Preliminary Claim Summary. (*Id.* ¶ 54). On June 4, 2009, the parties met to discuss coverage issues, then exchanged more correspondence throughout June and July. (*Id.* ¶¶ 56-59). In a letter dated July 17, 2009, Ms. Dedrick sent Mr. Sarff a spreadsheet titled "Final Claim REVISED 7/14/2009" now seeking more than $6.9 million. The claim divides out types of costs into main and subcategories, but does not tie them to the types of costs potentially recoverable under the Policy. (*Id.* ¶ 60).

On August 18, 2009, the parties attended a meeting to discuss settlement and other matters. Mr. Sarff gave One Place a draft report from MKA dated August 17, 2009, which included conclusions from MKA consultant Gaurav "Gary" Lamba regarding the period of delay associated with the loss. (*Id.* ¶ 61, 62). Defendant says the draft report was "a work in process, put together in a short period of time by MKA for purposes of the settlement meeting." (*Id.* ¶ 62). Plaintiffs dispute this, citing a letter from Mr. Sarff dated June 9, 2009 stating that its "scheduling experts at MKA are currently working on the analysis needed to determine that time period in order to calculate the limit available under this coverage." (Doc. 144 ¶ 62). In any event, Mr. Lamba himself testified at a deposition that his report was preliminary because MKA did not have all the documents they needed or requested, meaning "there were many assumptions in the draft report." (Doc. 126 ¶ 63).

Defendant claims (and Plaintiffs deny) that even though Mr. Lamba's draft report set forth a period of delay of 105 calendar days, neither MKA nor Mr. Sarff agreed to that final figure during the meeting. (*Id.* ¶ 64; Doc. 144 ¶ 64; Doc. 147 ¶ 3; Doc. 157 ¶ 3). Defendant also claims that Mr. Sarff lost confidence in Mr. Lamba because of his inability to answer questions or explain his methodology and conclusions, and thus promptly retained Held Enloe, a direct competitor of MKA, to conduct an independent peer review and analysis of the period of delay. (Doc. 126 ¶¶ 65, 66; Doc. 147 ¶ 5). Lisa Enloe issued a report on December 14, 2009 stating that the period of delay was only 31 calendar days, significantly less than the 105 days set forth by MKA. (Doc. 126 ¶ 68; Doc. 147 ¶ 6). Defendant made it clear to Plaintiffs that it would rely on the December 2009 Held Enloe report. (Doc. 126 ¶ 70).

Plaintiffs deny that Ms. Enloe "peer reviewed" MKA's delay analysis and say she instead performed her own separate analysis based on the exact same documentation. In that regard, Plaintiffs stress that Ms. Enloe never visited the loss site or the Project, and never interviewed or spoke with any of the contractors. (Doc. 147 ¶ 11). Plaintiffs also cite to testimony from MKA representatives who said that: (1) they were "surprised" and "taken aback" when they learned Defendant wanted to peer review their delay analysis; (2) Defendant had never peer reviewed or criticized MKA's work in the past, or removed the company from a project; (3) they did not know why Defendant needed a "second opinion" on the matter; and (4) Defendant never showed MKA the Held Enloe reports. (*Id.* ¶ 14). Mr. Lamba, moreover, testified that he first interpreted Defendant's decision to peer review his period of delay analysis as an indication that the insurer did not like his number and wanted to get someone to come up with a different one, though

"when they told me no, it was just to get a second opinion, that put me to ease."  (Doc. 144 ¶ 65; Lamba Dep., Doc. 127-5, at 21).

Also in December 2009, Defendant paid Plaintiffs another $500,000, bringing the payment total to $1,250,000.  (Doc. 126 ¶ 72).  In addition, Mr. Becker sent Mr. Sarff a letter and documentation setting forth new claims for: interest on additional construction loans; and increased costs under the original construction loan and legal fees incurred in renegotiating an extension of that loan.  (*Id.* ¶ 73).

### 4.    2010

Throughout 2010, the parties continued to communicate with each other about the claim in an effort to resolve their disputes and explain their respective positions.  (*Id.* ¶ 74).  Many communications related to the December 2009 Held Enloe report, and two additional reports issued in 2010.  (*Id.*).  The first, dated February 9, 2010, addressed Plaintiffs' claim for "winter conditions costs," and indicated that Plaintiffs would have incurred those costs even if there had been no damage to the sheet piling and D Line frost wall and caissons.  (*Id.* ¶ 71).  Another report dated May 14, 2010 responded to a March 30, 2010 letter from Mr. Becker.  (*Id.*).

The parties also discussed settlement in 2010.  In that regard, Plaintiffs' counsel sent Defendant a proposed settlement sheet on May 13, 2010 with a demand of over $9.3 million.  (*Id.* ¶ 75).  Mr. Sarff sent Mr. Becker and Ms. Dedrick a letter dated August 27, 2010 detailing Defendant's position regarding an appropriate recovery amount.  (*Id.* ¶ 76).  Mr. Becker responded with his own letter on October 29, 2010, at which point Mr. Sarff asked Held Enloe to review the claim documentation and determine if there were any additional costs to repair or replace the ERS and D Line frost wall and caissons.

(*Id.* ¶¶ 77, 78).  Held Enloe issued a final report dated December 10, 2010 with its review of certain claimed costs and recommendation for further payments.  (*Id.* ¶¶ 71, 78).

### 5. 2011

In early 2011, the parties tried once again to settle the claim but a March 2011 mediation was unsuccessful.  (*Id.* ¶ 79).  Based on Held Enloe's December 2010 report, however, Defendant did pay Plaintiffs an additional $95,549.60 on March 28, 2011.  (*Id.* ¶ 80).

### F. The Lawsuit

Plaintiffs filed suit against Defendant in April 2011 to resolve these issues.  (Doc. 116 ¶ 31; Doc. 1).  They seek (1) $5,461,077.23[5] for loss or damage to covered property under the Policy (Doc. 153 ¶ 15); (2) $2,450,495 for economic losses associated with condo sales; and (3) excess costs to finance the total amount allegedly remaining unpaid on the claim, depending on the period of delay, as follows:  (a) $1,173,667 if 118 days; (b) $1,295,853 if 178 days; and (c) $1,350,782 if 8 months. (Doc. 123 ¶¶ 80, 89; Doc. 153 ¶ 23).  To date, Defendant has paid Plaintiffs $1,340,549.69, including $235,844.30 for "soft costs," $100,000 for expediting repairs, and $5,000 for claim data, (Doc. 142 ¶ 14; Doc. 158 ¶ 42).

---

[5]     The amount was originally $5,879,062.80 but has since been reduced.  (Doc. 123 ¶ 40; Doc. 152 ¶ 40).

## DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  In viewing the facts presented on a motion for summary judgment, the court must construe the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *National Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).  "A court's role is not to evaluate the weight of the evidence, to judge credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *National Athletic Sportswear*, 528 F.3d at 512.

### B.    Section 155

Section 155 of the Illinois Insurance Code "allows for an award of attorney fees and costs for an insurer's 'unreasonable and vexatious' refusal to comply with its policy obligations." *John T. Doyle Trust v. Country Mut. Ins. Co.*, 2013 IL App (2d) 121238-U, at ¶ 29, 2013 WL 5434584, at *8 (Sept. 25, 2013).  The statute is designed "to provide a remedy to an insured who encounters unnecessary difficulties when an insurer withholds policy benefits." *McGee v. State Farm Fire and Cas. Co.*, 315 Ill. App. 3d 673, 680-81, 734 N.E.2d 144, 151 (2d Dist. 2000) (internal quotations omitted).  "The attorney fees, costs and limited penalty provisions of section 155 are an extracontractual remedy intended to make suits by policyholders economically feasible

16

and punish insurance companies for misconduct." *Id.* (citing *Cramer v. Insurance Exchange Agency*, 174 Ill. 2d 513, 521, 675 N.E.2d 897, 901-02 (1996)). In that regard, attorneys' fees should not be awarded "simply because an insurer takes an unsuccessful position in litigation, but only where the evidence shows that the insurer's behavior was willful and without reasonable cause." *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000). This means that an insurer's conduct will not be found vexatious and unreasonable if: "(1) there is a bona fide dispute concerning the scope and application of insurance coverage . . .; (2) the insurer asserts a legitimate policy defense . . .; (3) the claim presents a genuine legal or factual issue regarding coverage . . .; or (4) the insurer takes a reasonable legal position on an unsettled issue of law." *Id.* (internal citations omitted).

In making a determination as to whether conduct is vexatious and unreasonable, "[a] trial court must consider the totality of the circumstances including the insurer's attitude, whether the insured was forced to sue to recover, and whether the insured was deprived of the use of her or his property." *McGee*, 315 Ill. App. 3d at 681, 734 N.E.2d at 151. Since an award of relief under Section 155 is permissive rather than mandatory, it is "committed to the discretion of the trial court." *Buckner v. Causey*, 311 Ill. App. 3d 139, 150, 724 N.E.2d 95, 105 (1st Dist. 1999). *See also Herrera v. Benefit Trust Life Ins. Co.*, 126 Ill. App. 3d 355, 361, 466 N.E.2d 1172, 1177 (1st Dist. 1984) ("The question of vexatious and unreasonable delay is one of fact, the determination of which is discretionary with the trial court after it has examined and assessed the totality of the circumstances.").

Courts in this district have noted that "the summary judgment standard applies in a relatively unique way" in Section 155 cases, because in order for an insurer to succeed on such a motion, it "must essentially show that it is undisputed that the facts of the case are disputed." *Shrader v. Paul Revere Life Ins. Co.*, 833 F. Supp. 2d 877, 881 (N.D. Ill. 2011). In other words, summary judgment is proper if "there is a *bona fide* dispute as to coverage or the claim presents a genuine legal or factual issue regarding coverage." *Id.* Whether an insurer acted vexatiously and unreasonably "is an appropriate question for summary judgment even if fact questions prevent summary judgment on the issue of coverage." *LeDonne v. AXA Equitable Life Ins. Co.*, No. 05 C 1151, 2009 WL 3721038, at *7 (N.D. Ill. Nov. 2, 2009).

## C. Analysis

Relying in large measure on an April 29, 2013 expert report from Mr. Becker, who is not an attorney, (Doc. 126 ¶¶ 83, 87), Plaintiffs argue that Defendant acted in an unreasonable and vexatious manner by: (1) initially denying coverage for the ERS; (2) retaining Held Enloe as a new "period of delay" expert; (3) arguing that the $2.5 million Earth Movement Limit of Insurance included soft costs; (4) interpreting the delay exclusion in an unreasonable manner; (5) relying on a "planned substantial completion date" in calculating the period of delay when the Policy contemplates a "planned completion date"; and (6) "slow paying" Plaintiffs' claims. The Court considers each in turn.

### 1. Initial Denial of Coverage for ERS

Plaintiffs first claim that Defendant violated Section 155 by denying coverage for damage to the ERS in November 2007. In its motion for summary judgment, Defendant

explains in detail how in March 2007, soon after learning of the problems with the sheet piling movement, it retained engineers from ESI to determine the cause of the damage. Early on, ESI expressed concern about the design of the ERS, and the experts ultimately issued a report in July 2007 stating that the defectively designed ERS caused the sheet piling failure, which in turn led to the subsequent problems with the D Line frost wall and caissons. When Plaintiffs' expert, Mr. Lukas, issued a contrary report in August 2007, Defendant had ESI review it and submit a response.

In that November 2007 report, ESI affirmed its earlier finding that the loss had been caused by a defective design of the ERS. Defendant thus denied Plaintiffs' claim for damage relating to the ERS, though it simultaneously agreed to pay the costs for repairing the D Line frost wall and caissons, which were not subject to the faulty design exclusion. Mr. Becker's contrary belief that Defendant denied the entire claim, or refused to pay for loss resulting from the defective design, is thus incorrect. Plaintiffs continued to challenge the defective design finding into 2008. Rather than just resting on the opinion from ESI, Defendant took the extra step of asking another expert, Dr. Finno, to peer review the reports. Based on Dr. Finno's assessment that both parties were correct to some degree and this was a gray area, moreover, Defendant withdrew its denial of coverage for the damage to the ERS in December 2008.

Plaintiffs do not explain, and this Court does not see how this sequence of events is remotely vexatious or unreasonable. The only argument Plaintiffs offer in that regard is their belief that since Defendant now takes the position in this litigation that the sheet piling damage was caused by "earth movement," it "knew or should have known back in February 2007 that the ERS damage was covered even if defective design contributed

to the damage." (Doc. 145, at 14). The problem with this argument is that in 2007, Defendant's experts told the company that the damage to the ERS was caused by defective design, not earth movement. It was Plaintiffs' expert, Mr. Lukas, who believed the damage stemmed from earth movement. Given that Dr. Finno said this was a gray area (and Defendant thus agreed to cover the ERS damage), the Court is satisfied that the parties had a *bona fide* dispute as to coverage regarding this issue. *Citizens First Nat'l Bank of Princeton*, 200 F.3d at 1110. Thus, Defendant's initial denial of coverage for damage to the ERS was not vexatious or unreasonable and cannot support a claim under Section 155.

### 2. Retaining New "Period of Delay" Expert

Plaintiffs next argue that Defendant's vexatious and unreasonable conduct stems from its decision to reject the 105-day period of delay set forth by Mr. Lamba of MKA and instead hire a new expert, Lisa Enloe, to come up with a conveniently shorter 31-day period of delay. The parties do have differing views as to how this decision came about. Defendant claims that Mr. Lamba prepared a very preliminary report dated August 17, 2009 that was "a work in process, put together in a short period of time . . . for purposes of [an August 18, 2009] settlement meeting." (Doc. 125, at 17). According to Mr. Sarff, he lost confidence in Mr. Lamba because of his inability at the settlement meeting to answer questions presented or explain his methodology and conclusions. (Doc. 126 ¶ 65). Mr. Sarff thus retained Held Enloe to conduct an independent analysis, explaining at his deposition:

> We didn't feel comfortable that we really knew what the correct number was, whether it was 105 days, 120 days, 50 days, 130 days. We didn't

feel like we got our arms around it and we wanted to have it peer reviewed.

(*Id.* ¶ 66).  Mr. Sarff further stated that "the original MKA was a work in process.  It was not a final designated number.  If Held Enloe would have come back and said it was 115 days, we would have offered that to the insured and then told them it was 115 days."  (*Id.* ¶ 67).

Plaintiffs deny that Mr. Sarff lost confidence in Mr. Lamba due to his inability to explain his conclusions at the August 2009 settlement meeting, claiming that Mr. Lamba testified at his deposition that he never even spoke at that meeting at all.  "If he never spoke at this meeting," Plaintiffs posit, "then Sarff's testimony he lost confidence in Lamba because he could not explain his opinions during this meeting is not credible." (Doc. 145, at 6).  The cited testimony does not support Plaintiffs' theory.  Plaintiffs' counsel asked Mr. Lamba whether he "and/or Ron [Metcalfe, his colleague from MKA] actually sp[oke] during the meeting?"  Mr. Lamba responded, "No, we did not.  We were in the room all the time and we didn't speak to each other."  (Lamba Dep., Doc. 127-5, at 20-21).  The Court agrees with Defendant that Mr. Lamba clearly understood the question to be whether he had spoken directly with Mr. Metcalfe during the meeting, and not whether he had spoken at all for the entire 2 1/2 hours.  This is supported by the fact that Plaintiffs failed to submit affidavits from any other attendees, including their attorney Ms. Dedrick, stating that Mr. Lamba never spoke at the meeting.  (Doc. 156, at 5).

Plaintiffs claim that a question of fact nonetheless exists as to whether the parties affirmatively agreed to the period of delay at the meeting, rendering Defendant's

retention of Held Enloe suspect. In that regard, Mr. Levin and Mr. Becker both testified that the parties agreed to a period of delay of 120 days. (Doc. 144 ¶ 64). If a jury were to credit this testimony, then Plaintiffs would have strong evidence that Defendant acted in bad faith by ignoring that agreement and retaining Held Enloe. Other evidence of record, however, conclusively establishes that the parties genuinely disputed whether they reached such an agreement. In contrast to the testimony from Plaintiffs' experts, Defendant's representatives, Mr. Sarff, Mr. Lamba and Mr. Metcalfe, all deny that any agreement was reached at the August 2009 meeting. (Doc. 144 ¶ 64). Moreover, though this is obviously a very important issue to Plaintiffs, there is no written memorialization of the alleged agreement, or even a statement from attorney Dedrick that one was reached, even though as noted, she was present at the meeting as well. The Court finds no basis for concluding that Defendant acted in a vexatious or unreasonable manner by disputing that the parties agreed to a period of delay at the August 2009 meeting, or by deciding to hire Held Enloe thereafter.

Also unavailing is Plaintiffs' assertion that Held Enloe did not actually conduct a "peer review" of MKA's work. This argument is based on the fact that unlike MKA, Lisa Enloe never visited the loss site or the Project, and never interviewed or spoke with any of the contractors involved. (Doc. 147 ¶ 11). Defendant responds that Ms. Enloe and her team did review and analyze the deposition transcripts and exhibits, as well as the project documents and other materials produced during discovery, but much of this was after Ms. Enloe prepared her initial report on December 14, 2009. (Doc. 157 ¶ 11; Held Enloe Report of 6/20/13, Doc. 123-8, at 122-23; Held Enloe Report of 12/14/09, Doc. 126-4, at 19-20). Regardless, the Court fails to see how Ms. Enloe's research

methodology demonstrates that she "performed her own analysis" of the data rather than conducting a "peer review."

Plaintiffs seem to be suggesting that Ms. Enloe's review was a sham and that Defendant instructed her to come up with a shorter period of delay. The only possible evidence of this, however, is Plaintiffs' claim that MKA consultant Lamba himself testified that "the way he took Travelers' decision to 'peer review' his period of delay analysis was Travelers did not like his number and wanted to get someone else to come up with a different number." (Doc. 145, at 8). In truth, it was Plaintiffs' counsel who suggested that Defendant wanted a different number:

> Q: You know, from where I sit, it seems like they didn't like your number and they wanted to get somebody to come up with a different number.
>
> A: Yes, that's – you know, that was the way I took it when I first heard it, but –
>
> Q: Sure.
>
> A: – when they told me no, it was just to get a second opinion, that put me to ease.

(Lamba Dep., Doc. 127-5, at 21). This exchange in no way supports a claim that Defendant told Ms. Enloe to come up with a lower number than the one provided by MKA.

Plaintiffs make much of the fact that MKA representatives were "surprised" and "taken aback" when they learned Defendant wanted a "second opinion" regarding their delay analysis, noting that MKA had never heard of an insurance company peer reviewing its consultant's work. In addition, Defendant had never criticized or peer reviewed MKA's work in the past or removed the company from a project, and MKA was

not given a chance to review the Held Enloe report. (Doc. 145, at 7; Doc. 147 ¶ 14). The mere fact that Defendant had not reviewed MKA's work in the past is not sufficient evidence that its decision to do so here was vexatious and unreasonable, especially since this was not the first time Defendant had sought a peer review in the case. As discussed earlier, Defendant retained Dr. Finno to address the cause of the sheet piling movement despite ESI's repeated affirmations that it was the defective design of the ERS. Dr. Finno's review worked in Plaintiffs' favor, as Defendant withdrew its objection to coverage based on his opinion that both parties were correct to some degree. Held Enloe's review was not similarly beneficial to Plaintiffs, but there is no evidence suggesting that Defendant instructed the firm to come up with a shorter period of delay, or that the insurer would have disregarded the Held Enloe report had it assessed a longer period of delay.[6]

Given that Plaintiffs' own project manager, Charlie Shenk, thought the period of delay was only 70 days (and not 105 as stated by MKA), the parties clearly have a genuine dispute as to this particular issue. (Doc. 126-7, at 14; Doc. 147 ¶ 37). Viewing the totality of the circumstances, including the fact that the MKA report is marked as a "draft," (Doc. 127-1, at 2-35; Doc. 127-2, at 2-25), the Court finds no basis for

---

[6]    For all the same reasons stated in this section, there is no evidence from which a reasonable trier of fact could conclude that Defendant violated Section 154.6 of the Insurance Code, assuming it is applicable here, by knowingly misrepresenting relevant facts; not acting in good faith to effectuate a prompt, fair and equitable settlement; or compelling Plaintiffs to file suit by offering substantially less than they may ultimately recover. (Doc. 145, at 8). *But see O'Connor v. Country Mut. Ins. Co.*, 2013 IL App (3d) 110870, ¶ 16, 999 N.E.2d 705, 710 (2013) (holding that the trial court "was not required as a matter of law to find [the insurer's] settlement practices were unreasonable and violative of section[] 154.6" in evaluating Section 155 claim). Nor is there evidence supporting a claim that Defendant violated recognized insurance industry standards by "not looking for facts favoring One Place as hard as it looked for facts favoring itself." (Doc. 145, at 8). Defendant's decision to hire Dr. Finno despite ESI's repeated assurances that the ERS was defectively designed refutes any such argument.

concluding that Defendant's decision to retain Held Enloe was vexatious or unreasonable.

### 3. Interpretation of Earth Movement Limit of Insurance

Plaintiffs' next example of vexatious and unreasonable conduct relates to a dispute this Court resolved in December 2011. Plaintiffs sought a declaration that if the $2.5 million Earth Movement Limit of Insurance applies to their loss, they are still eligible to recover up to $3.3 million in additional monies for soft costs. *One Place Condominium, LLC v. Travelers Property Cas. Co. of America*, No. 11 C 2520, 2011 WL 6182363, at *4 (N.D. Ill. Dec. 13, 2011). In granting Plaintiffs' motion for partial summary judgment, the Court rejected Defendant's contrary theory that the Earth Movement Limit of Insurance covers all losses caused directly or indirectly by earth movement, including any soft costs. The Court noted that "[a]t best, there is ambiguity as to the intention of the parties regarding the scope of this type of coverage," and held that since ambiguities must be construed against the insurer, Plaintiffs' interpretation had to prevail. *Id.* at *5.

Plaintiffs claim that based on this ruling, "[a] reasonable trier of fact could conclude Travelers' interpretation . . . was unreasonable." (Doc. 145, at 10). As Defendant notes, however, "a Section 155 award is not warranted simply because an insurer takes a position that is unsuccessful in litigation." (Doc. 156, at 7). *See Citizens First Nat'l Bank of Princeton*, 200 F.3d at 1110. Neither party cited any case law conclusively establishing the proper interpretation of the disputed language, and though the Court accepted Plaintiffs' position and determined that the terms were ambiguous,

this does not demonstrate that Defendant manufactured a dispute to avoid its coverage obligations.

Citing *Industrial Enclosure Corp. v. Northern Ins. Corp. of New York*, No. 97 C 6850, 1998 WL 852845 (N.D. Ill. Nov. 30, 1998), Plaintiffs suggest that the finding of ambiguity alone supports fees under Section 155. In *Industrial Enclosure*, the court denied a motion to dismiss a Section 155 claim, explaining that the insurer "might be liable . . . if the damages to [the plaintiff's] property are easily determined to have resulted from the sewer back-up. Likewise, [the insurer] may be liable under Section 155 if the court subsequently determines that an ambiguity exists in the policy exclusion." *Id.* at *7. In support of this finding, the court cited *Prisco Serena Sturm Architects, Ltd. v. Liberty Mut. Ins. Co.*, 126 F.3d 886 (7th Cir. 1997), where the Seventh Circuit cautioned that "[g]iven the strong Illinois rule in favor of construing all ambiguities for the insured, an insurer could well find itself not only paying the costs of a defense, but also the additional § 155 penalties if it dragged its feet." *Id.* at 894.

Neither of these cases involved an actual award of penalties under Section 155 based solely on the existence of an ambiguity in a policy. *Industrial Enclosure* was decided on a motion to dismiss, and *Prisco Serena Sturm Architects* merely indicated that while such penalties were theoretically possible, there was no basis for awarding them in that case. 126 F.3d at 894. Plaintiffs do not cite any other cases demonstrating that ambiguity alone supports Section 155 penalties, and the Court does not find this an appropriate basis for awarding them here. *See Baxter Int'l, Inc. v. American Guarantee and Liability Ins. Co.*, 369 Ill. App. 3d 700, 710, 861 N.E.2d 263, 272 (1st Dist. 2006) (trial court did not abuse its discretion in denying sanctions under Section 155 where the

parties had "*bona fide* dispute over coverage" as reflected in the fact that "the language of the insurance policy [wa]s ambiguous, leaving no *clear* answer to the issue disputed by the parties.") (emphasis in original).

Plaintiffs argue that there nonetheless remains a genuine issue of material fact as to whether Defendant merely feigned a dispute regarding the availability of $3.3 million in soft costs in addition to the $2.5 million for earth movement. (Doc. 145, at 10). Plaintiffs note that on June 9, 2009, Mr. Sarff sent Ms. Dedrick a letter stating in relevant part:

> [S]ubject to the 14 day deductible for "Soft Costs" and Special Time Element, the policy provides coverage for delay costs that fall within "soft costs" or "rental value" for the period of time from the planned completion date to the date when the project should have been reasonably completed after repairs for the covered loss, up to the $3.3 million sublimit.

(Doc. 126-7, at 41). On August 27, 2010, Mr. Sarff sent another letter to Ms. Dedrick and Mr. Becker stating that since the loss to the ERS and D Line frost wall and caissons "was caused directly or indirectly by 'earth movement,' . . . Travelers' limit of liability for this claim is $2,500,000." (Doc. 126-3, at 86). Plaintiffs maintain that despite these letters, Defendant "reversed course" after this lawsuit was filed and suddenly claimed that soft costs were included in the $2.5 million Earth Movement Limit of Insurance. (Doc. 145, at 10).

The Court does not see how the cited evidence shows that Defendant changed its position when it argued in this litigation that the Earth Movement Limit of Insurance includes soft costs. Neither the June 2009 nor the August 2010 letter said anything about the interaction between the two Policy provisions, and Plaintiffs themselves concede that the August 2010 letter "was unclear" in that regard. (*Id.* at 9). The parties

had a genuine dispute over the meaning of these Policy terms and there is no evidence that Defendant's position was "faked" or "feigned," or that it knowingly made misrepresentations about relevant Policy provisions in violation of Section 154.6(a) of the Illinois Insurance Code. *Cf. McGee*, 315 Ill. App. 3d at 685, 734 N.E.2d at 154 (dispute not *bona fide* but feigned where the plaintiff alleged that "the individuals defendant assigned to evaluate the loss were untrained and unqualified to make that determination."). In light of this genuine dispute, Defendant did not act in a vexatious or unreasonable manner by arguing that the Earth Movement Limit of Insurance included soft costs.

### 4. Interpretation of Delay Exclusion Provision

Turning once again to Mr. Sarff's June 2009 and August 2010 letters, Plaintiffs next argue that Defendant acted in a vexatious and unreasonable manner by asserting that certain "indirect costs" fall within the Policy's delay exclusion. (Doc. 145, at 11). In those letters, Mr. Sarff characterized costs to repair the damage to the ERS and D Line frost wall and caissons as "direct costs," with all other costs being "indirect costs."[7] Many of the "indirect costs" purportedly arose from delay in completing the Project, which Mr. Sarff said was excluded by the following provision: "We will not pay for 'loss' caused by or resulting from . . . a. Delay, loss of use or loss of market." (Doc. 1-1, at 20).

Plaintiffs disagree with this interpretation of the Policy. In support, they note that in Defendant's memorandum in support of partial summary judgment as to certain

---

[7] Plaintiffs object that the Policy "does not differentiate between 'direct' and 'indirect' costs," (Doc. 145, at 11), but Mr. Sarff reasonably explained what he meant by these terms. (Doc. 125, at 15).

claimed costs, it states that "the earth retention system and D Line frost wall and caissons suffered physical damage which was accidental." (Def's Memo, Doc. 134, at 5). Since this is the "loss" as articulated by Defendant, Plaintiffs insert it into the delay exclusion provision quoted above to demonstrate that Defendant's position is unreasonable. When this definition of "loss" is inserted into the provision, it reads: "We will not pay for [damage to the ERS and D Line frost wall and caissons] caused by or resulting from delay." (Doc. 145, at 11). Given that the damage to the ERS and D Line frost wall and caissons was not caused by delay, Plaintiffs argue, Defendant's attempt to deny coverage based on the delay exclusion is unreasonable. (*Id.*). In Plaintiffs' view, Defendant is attempting to replace the term "loss" with the terms "costs" or "expenses," such that the exclusion reads: "We will not pay for [costs or expenses] caused by or resulting from delay."

Even assuming that Plaintiffs' interpretation ultimately proves correct, there is no evidence that Defendant has somehow feigned its position on this issue. *See LeDonne*, , at *7 (quoting *Citizens First*, 200 F.3d at 1110) ("[A]ttorney's fees are not appropriate 'simply because an insurer takes an unsuccessful position in litigation' – evidence must show that 'the insurer's behavior was willful and without reasonable cause.'"). The Court finds that the parties have a *bona fide* dispute regarding the Policy's delay exclusion, which precludes a finding of vexatious and unreasonable conduct.[8]

---

[8]     Plaintiffs claim that Defendant's "interpretation of the 'delay' exclusion is no less unreasonable than the insurer's interpretation of 'insurable interest' in *Aguilera v. Pacific Ins. Co.*, [No. 95 C 1163], 1996 WL 14043 (N.D. Ill. [Jan. 11, 1996]), in which Judge Zagel awarded attorney's fees and costs." (Doc. 145, at 12). Since the *Aguilera* court did not award fees and costs pursuant to Section 155 or make any finding that the insurer's conduct was vexatious and unreasonable, however, the case does not advance Plaintiffs' position.

Plaintiffs argue that summary judgment is nonetheless inappropriate because "a dispute as to liability does not preclude an award under section 155 of the Code." (Doc. 145, at 12). The case they cite, however, merely found that Section 155 relief was available in a garnishment proceeding that was "the functional equivalent of an action for breach of contract." *Buckner v. Causey*, 311 Ill. App. 3d 139, 150, 724 N.E.2d 95, 104 (1st Dist. 1999). Plaintiffs must still demonstrate that Defendant acted in a vexatious and unreasonable manner, and their failure to do so here defeats this portion of their Section 155 claim.

### 5. "Planned Completion Date"

Plaintiffs next argue that Defendant has adopted a vexatious and unreasonable interpretation for the "period of delay in completion" of the Project caused by the damage to the ERS and D Line frost wall and caissons. As noted earlier, the Policy provides that Defendant will pay for soft costs "during the 'period of delay in completion,'" which means "the period of time that: a. Begins with the 'planned completion date'; and b. Ends on the date when the 'project' should be completed using reasonable speed and similar materials and workmanship." (Doc. 1-1, at 14, 29). The "planned completion date" is defined as "the date the 'project' would be put into operation or use in the normal course of construction if 'loss' to Covered Property from any of the Covered Causes of Loss had not occurred." (*Id.* at 29).

Plaintiffs note that in Ms. Enloe's December 14, 2009 report, she indicated that the "substantial completion date" relating to the damage to the ERS was May 22, 2008. (Doc. 145, at 13; Held Enloe Report of 12/14/09, Doc. 126-4, at 12). Since the Policy contemplates a "planned completion date" and not a "planned *substantial* completion

date," Plaintiffs say Defendant has not provided any valid basis for measuring the period of delay, and its arguments in that regard are unreasonable. Defendant concedes that Ms. Enloe used the term "substantial completion date," but claims this reflects the parties' *bona fide* dispute as to what it means for the "project" to be complete. (Doc. 156, at 9). The Policy states that "project" means "the total construction of all Covered Property at the 'job site.'" (Doc. 1-1, at 29). Defendant interprets this to mean "construction of all the buildings and structures on the job site." (Doc. 156, at 9). Plaintiffs, on the other hand, appear to believe that "project" includes "post-construction project close out and punch list work." (*Id.*).

Once again, even assuming that Plaintiffs' interpretation is correct, there is no evidence suggesting that Defendant's contrary position amounts to a fake dispute. In that regard, Plaintiffs' own expert, Mr. Becker, provided alternative "completion dates" for the Project, explaining that he calculated soft costs "based on the alternative dates the project 'should be completed,'" which he identified as either August 13, 2008, October 12, 2008 or April 28, 2009. The period of delay in completion of the Project thus ranged from 118 days, to 178 days to 12 months, with Mr. Becker opining that the appropriate period of delay was 178 days. (Becker Report of 4/29/13, Doc. 126-7, at 44-45). Ms. Enloe believes the period of delay in completion is much shorter at 31 days, but there is no evidence that her reliance on a May 22, 2008 "substantial" completion date was an attempt to redraft the Policy language or utilize impermissible calculations. On the evidence presented, Defendant's decision to rely on Ms. Enloe's stated period of delay was not vexatious or unreasonable and does not support sanctions under Section 155.

### 6. Delays in Payment

Plaintiffs finally argue that Defendant acted vexatiously and unreasonably by deciding to pay them in small increments over a four year period, including (1) a $250,000 loan in April 2007; (2) $250,000 in December 2008; (3) $250,000 in April 2009; (4) $500,000 in December 2009; and (5) $95,599.60 in March 2011. (Doc. 145, at 15). Plaintiffs insist that Defendant knew and understood as early as April 2007 that Plaintiffs were in critical need of financial payments to avoid suffering additional loss. (Doc. 147 ¶ 24). For example, on June 15, 2008, Plaintiffs' public adjuster Robert Levin sent Defendant an email stating that Plaintiffs expected the insurer "to issue a significant partial payment to assist with the financial burden placed upon them as a direct result of this loss." (Doc. 157 ¶ 25). On December 17, 2008, Ms. Dedrick sent Mr. Sarff and Murray Sacks, Defendant's Senior Counsel, a letter stating that Plaintiffs were "currently experiencing severe financial difficulty due to the failure of Travelers to make payment of any substance on the insured claim," and were "in jeopardy of losing the project and their reputation as they have had to continually front the funds to repair the project; funds which should have been paid or reimbursed by Travelers." (Letter from Dedrick to Sarff of 12/17/08, Doc. 116-13, at 9). Finally, on January 15, 2009, Mr. Levin sent another email to Defendant stating that Plaintiffs were in a "critical financial position." (Doc. 157 ¶ 27).

Plaintiffs claim that despite knowing about these financial hardships, between November 2007 and December 2008, Defendant told MKA not to focus on information Plaintiffs had provided relating to the ERS loss. (Doc. 147 ¶ 23). As Plaintiffs see it, Defendant unreasonably "slow paid" them when they were "most in need of . . . peace

of mind and security" that insurance is supposed to provide.  (Doc. 145, at 16-17) (citing *T.H.E. Ins. Co. v. Chicago Fireworks Mfg. Co.*, 311 Ill. App. 3d 73, 80, 724 N.E.2d 188, 194 (1st Dist. 1999) (quoting *Hoglund v. State Farm Mut. Auto. Ins. Co.*, 148 Ill. 2d 272, 278, 592 N.E.2d 1031, 1034 (1992)) ("Insurers are . . . expected to honor claims under their policies for which premiums have been paid in good faith.").

Defendant admits that it received letters and emails from Plaintiffs expressing financial difficulties, but claims there was never any "backup, substantiation documentation, or other evidence to support these allegations," (Doc. 157 ¶¶ 24-27), and they thus viewed the communications as "an attempt to pressure Travelers."  (Doc. 156, at 11).  Defendant also stresses that Plaintiffs did not provide even a preliminary partial claim until June 2008, more than a year after the loss occurred.  Since that partial claim failed to include all of the relevant documentation, MKA requested further information in July 2008, which they did not receive until September and October 2008.  (*Id.*; Doc. 126 ¶¶ 33, 34).  Mr. Sarff explained to Ms. Dedrick in a November 2008 letter that the partial claim was difficult to evaluate not only because Defendant had only just received many of the pertinent documents, but also because Plaintiffs did not segregate and categorize the expenses to correspond with costs allowed under the Policy, or to distinguish between losses associated with the ERS and losses associated with the D Line frost wall and caissons.  (Doc. 126 ¶ 46).  Plaintiffs note that the Policy did not require such allocation, (Doc. 144 ¶ 46), but do not dispute that this made it difficult to evaluate their claimed expenses.  Nor do they deny that their final claim was submitted in July 2009, more than a year after the preliminary claim.  (Doc. 126 ¶ 60).

As for instructing MKA not to focus on the ERS loss prior to December 2008,

Defendant reiterates that it initially denied coverage for that loss, so it "made sense" to

prioritize "the costs for the repairs that Travelers had already agreed were covered."

(Doc. 156, at 11-12).   Defendant also cites testimony from Mr. Sarff stating that he

believed MKA was reviewing the ERS costs in any event, and from Jason Walker, a

senior consultant with MKA, indicating that in addition to the D Line frost wall and

caisson repairs, he was also looking at the ERS repairs in 2008.   (*Id.*; Doc. 157 ¶ 23;

Walker Dep., Doc. 147-2, at 54-55).

Viewing the totality of the circumstances, the Court finds insufficient evidence

that Defendant's manner of paying Plaintiffs for this claim was vexatious or

unreasonable.   The parties and their experts had a *bona fide* dispute as to coverage,

and Plaintiffs were somewhat slow in submitting even a preliminary partial claim, not to

mention supporting documentation.   From 2009 through early 2011, the parties tried

repeatedly to settle their claims, and there is no evidence that this was done in bad

faith.   Moreover, Defendant made payments over time as it determined they were due,

totaling more than $1.3 million.[9]   This easily distinguishes the case cited by Plaintiffs,

*Millers Mut. Ins. Ass'n of Illinois v. House*, 286 Ill. App. 3d 378, 675 N.E.2d 1037 (5th

Dist. 1997), where the insurer failed to pay any of the $40,000 it admitted was due to

the insured while awaiting a determination as to its liability to pay "the amount she

_____

[9]       For all these same reasons, there is no evidence from which a reasonable trier of
fact could conclude that Defendant violated Section 154.6(d) of the Insurance Code by not
acting in good faith to effectuate a prompt, fair and equitable settlement, or that it violated
Section 919.50 of the Illinois Department of Insurance Regulations, 50 Ill. Adm. Code 919.50, by
failing to pay the undisputed portion of Plaintiffs' claim within 30 days after affirming liability,
assuming these provisions are relevant here.   (Doc. 145, at 16).

claimed in excess of $40,000." *Id.* at 387, 675 N.E.2d at 1043-44. On these facts, Defendant is entitled to summary judgment on this portion of Plaintiffs' Section 155 claim.

## **CONCLUSION**

For the reasons stated above, Defendant's Motion for Summary Judgment on the Section 155 Claim [Doc. 124] is granted.


ENTER:

_Sheila Finnegan_
_____

Dated: March 17, 2014          SHEILA FINNEGAN
                               United States Magistrate Judge