**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ONE PLACE CONDOMINIUM, LLC, | ) | |
| THE SOUTH LOOP SHOPS LLC, | ) | |
| SOUTHBLOCK DEVELOPMENT LLC, | ) | |
| C & K PARTNERSHIP, and SOUTHBLOCK | ) | |
| MANAGEMENT, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 11 C 2520 |
| | ) | |
| TRAVELERS PROPERTY CASUALTY | ) | Magistrate Judge Finnegan |
| COMPANY OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs One Place Condominium LLC, The South Loop Shops LLC, Southblock

Development LLC, C & K Partnership, and Southblock Management, Inc. (collectively

"Plaintiffs" or "One Place") have filed this diversity suit against Defendant Travelers

Property Casualty Company of America seeking to recover amounts allegedly due

under a commercial insurance policy.  The parties consented to the jurisdiction of the

United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and both sides have

filed cross-motions for partial summary judgment relating to certain contract terms that

provide coverage for up to $2.5 million dollars in losses from "earth movement."  The

primary issue is whether the earth movement policy terms are ambiguous and must be

construed to apply only when earth movement losses stem from natural causes (as One

Place argues), or whether the terms are unambiguous and apply to earth movement

losses from both natural and man-made causes (as Travelers contends). For the reasons set forth here, One Place's motion is denied, and Travelers' motion is granted.

**BACKGROUND**

The One Place Plaintiffs are all owners, developers and managers of property located at One East 8th Street in Chicago (the "Property"). (Doc. 116 ¶ 5). In late 2006, One Place began construction on the Property to erect a 10-story building with a one-story basement containing retail space, a parking garage and residential condominium units. (*Id*. ¶ 6).

**A. The Insurance Policy**

**1. Limits of Insurance.** Travelers issued Plaintiffs a "Builders' Risk" insurance policy in connection with the construction project for the period from November 2, 2006 to November 2, 2007 (the "Policy"). (*Id*. ¶ 7). The Policy insures against "'loss' to Covered Property from any of the Covered Causes of Loss." (Policy, Doc. 1-1, at 14).[1] "Loss" is defined as "accidental loss or damage," (*Id*. at 28), and "Covered Causes of Loss" means "RISKS OF DIRECT PHYSICAL 'LOSS' except those causes of 'loss' listed in the Exclusions." (*Id*. at 14). The Declarations page states that the relevant Limits of Insurance for "Builders' Risk" include:

- "Basic Limit of Insurance"      $33,000,000

- "Earth Movement Limit of Insurance"      $2,500,000

- "Earth Movement Annual Aggregate Limit of Insurance"      $2,500,000

- "Flood Limit of Insurance"      $2,500,000

---

[1] For ease of reference, page numbers for the Policy and exhibits to Local Rule 56.1 statements are drawn from the CM/ECF docket entries at the top of the filed document.

- "Flood Annual Aggregate Limit of Insurance"          $2,500,000

- "Specified Machinery Limit of Insurance"          $33,000,000

(*Id*. at 7). The "Earth Movement Annual Aggregate Limit" (as well as the "Flood Annual Aggregate Limit") are shown as "modifiers" on the Im Pak® Coverage Summary page. (*Id*. at 9).

**2. Earth Movement Definitions.** "Earth Movement Limit of Insurance" is defined under the Policy as:

> the most we will pay for "loss" in any one occurrence caused directly or indirectly by "earth movement," regardless of any other cause or event that contributes concurrently or in any sequence to the "loss."
>
> But if 'loss' by fire, explosion or 'volcanic action' results from 'earth movement,' the "Earth Movement Limit of Insurance" will not apply to the resulting 'loss.' Instead, we will pay up to the applicable Limit of Insurance shown in the Declarations that would otherwise apply to 'loss' by fire, explosion or 'volcanic action.' We will also pay up to such applicable Limit of Insurance for 'loss' by building glass breakage resulting from volcanic eruption, explosion or effusion.
>
> All 'earth movement' that occurs within any 168-hour period will constitute a single occurrence. The expiration of this policy will not reduce the 168-hour period.
>
> Any payment under the 'Earth Movement of Limit of Insurance' will not increase the application Limit of Insurance shown elsewhere in this policy.

(*Id*. at 27). "Earth movement" is defined as "any movement of the earth (other than 'sinkhole collapse'),[2] including but not limited to: a. earthquake; b. landslide; c. earth

---

[2] "Sinkhole collapse" means "the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. 'Sinkhole collapse' does not mean the cost of filling sinkholes or the sinking or collapse of land into man-made underground cavities." (Doc. 1-1, at 29).

sinking, rising or shifting; d. volcanic eruption, explosion or effusion." (*Id*.). Losses from "mudslide" and "mudflow" are covered under the separate Flood Limit of Insurance.

3.    **Exclusions.**   The Policy identifies numerous Exclusions for events that are not covered.    For certain of these exclusions, such as those pertaining to governmental action, nuclear hazard, wars, and ordinance or law, the Policy states that it will not pay for loss "caused directly or indirectly" by the event, and such loss "is excluded regardless of any other cause or event that contributes concurrently or in any sequence to" the loss.  (*Id.* at 20).

For certain other exclusions, the language is different:  "We will not pay for 'loss' caused by or resulting from any of the following.  But if 'loss' by a Covered Cause of Loss results, we will pay for that resulting 'loss.'" (*Id.* at 21).  Losses excluded under this provision include (in part) those resulting from:

● "Omission in, or faulty, inadequate or defective:  (1) Planning, zoning, development, surveying, siting, design or specifications; or (2) Materials, workmanship or maintenance."

● "Settling, cracking, shrinking or expanding."

● "Hidden or latent defect, mechanical breakdown or failure (including rupture or bursting caused by centrifugal force)," corrosion, rust or dampness, wear and tear and gradual deterioration.

- "Weather conditions," but this varies depending upon whether "an amount is shown under" the "Earth Movement Limit of Insurance" and the "Flood Limit of Insurance."[3]

## C. "Loss" Events on the Property

The foundation for the building being constructed on the Property included drilled shafts or piers, known as caissons, which would support the load of the building.  (Doc. 116 ¶ 11; Doc. 123 ¶ 19).  The caisson foundation consisted of more than 90 concrete columns constructed in cylindrical shafts excavated under the proposed locations for the structural columns.  The concrete columns were created by drilling deep holes into the ground with an auger and then filling them with concrete.  Portions of the length of the caisson holes were reinforced with steel liners.  (Doc. 116 ¶ 12).  In addition to the caissons, the building had concrete foundation walls extending to frost depth, which is 42 inches deep (a full basement wall is 20 plus feet deep).  These "frost walls" sit on top of the caisson caps, which are also made of concrete.  (*Id*. ¶ 13).

To assist with the excavation of these below-grade structures, subcontractor Hayward Baker installed an earth retention system ("ERS") consisting of steel sheet piling that was driven partially into the ground to hold back the soil on the perimeter of the Project.  (*Id*. ¶ 14).  The sheet pile walls, which have soil on both sides, were installed on the south, east and west sides of the Project.  The sheet piling on the south side was further braced by circular steel pipes, referred to as rakers, which were

---

[3]     For example, the Policy does not pay for losses caused by or resulting from weather conditions.  "But this exclusion only applies if weather conditions contribute concurrently or in sequence with: . . . (2) 'Earth movement' *unless an amount is shown under Earth Movement Limit of Insurance'*…."  (Doc. 1-1, at 21) (emphasis added).

connected to the sheet piling on one end and a concrete grade beam on the other end. (*Id*.).

### 1. 2006 Movement of Earth

On October 23, 2006, One Place's project manager, Charles M. Shenk, reported a shaft cave-in at caisson 46 along grid line C on the west side of the Project, with an "[a]pproximately 30 [foot] radius slump." (Doc. 116-13, at 5). A Field Report prepared that day by an employee from the general contractor, Levine Construction, stated that during the excavation of caisson 46, the "shaft started to squeeze [at] approx[imately] 40 [feet]" and a "crack appeared [at] top elevation, encircling caisson approx[imately] 25 – 30 [feet] from caisson." (*Id*. at 7). Apparently, similar soil squeeze was observed at caisson 52. (Doc. 116 ¶ 49). One Place remediated the damage by removing the soil from the holes and installing steel liners, and submitted an insurance claim to Travelers. (*Id*.). The parties refer to this as the November 2006 event.[4]

### 2. 2007 Movement of Earth

In late January 2007, workers discovered that sheet piling on the south side of the Project had moved along an east-west grid line. (*Id*. ¶ 15). Shortly thereafter, on February 26, 2007, someone from Levine Construction observed that sheet piling along the west side of the Project near grid line D (referred to here as the "D Line sheeting") had also moved significantly to the east. (*Id*. ¶ 16). Levine Construction notified One Place, subcontractor Hayward Baker and others about the movement of the D Line

---

[4]    The reference to November 2006 may reflect the fact that the Policy did not go into effect until November 2, 2006.

sheeting, One Place informed Travelers, and on March 8, 2007, a Stop Work Order was issued on the Project.  (*Id*. ¶¶ 17; Doc. 123 ¶ 24; Doc. 126 ¶ 9).

Following an investigation, Hayward Baker redesigned the ERS to brace and reinforce the sheet piling as follows:  (a) steel H-piles were driven on the inside (east) of the sheeting; (b) to the extent there were gaps between the edges of the H-piles and sheeting, shims (steel plates) were welded to bridge the gap; (c) a horizontal steel beam called a whaler was installed on top of the H-piles and sheeting to tie the two together; (d) concrete grade beams were installed at columns 12 through 15; (e) five new rakers were installed, which went from the whaler on one end to the concrete grade beams on the other; and (f) certain soil excavation was performed to create room for equipment, along with certain backfilling (placing soil into a hole that is dug).  (Doc. 116 ¶ 17, 18; Doc. 123 ¶¶ 25, 26).  Construction relating to the reinforcement was completed by April 13, 2007, at which time the Stop Work Order was lifted and construction on the Project resumed.  (Doc. 116 ¶ 18; Doc. 123 ¶¶ 29, 30).

In the meantime, in late February and early March 2007, subcontractor Concrete Structures raised concerns about the fact that soils under the frost walls and the caisson caps along the D Line had moved away from the concrete, creating voids.  One Place's project manager, Mr. Shenk, raised similar concerns.  (Doc. 116 ¶ 19).  It is not clear what, if anything, was done about these issues at that time, but in late July 2007, the contractors discovered that the frost wall on the west side of the building along the D Line (between columns 11 and 14) had moved or shifted, and it was possible that the caisson caps had moved as well.  (*Id*. ¶ 20).

Though no stop work order was issued, the following repairs had to be made to the D Line frost wall and caisson caps: (a) backfilling of soil between the C and D lines; (b) the frost wall and caisson caps were demolished; (c) new concrete grade beams were formed; (d) a new frost wall was poured; and (e) certain areas were backfilled with soil. (Doc. 123 ¶¶ 34, 35). Construction to fix these issues was completed by August 18, 2007. (Doc. 116 ¶ 22). The Project itself was substantially completed as of December 10, 2008. (*Id*. ¶ 6).

**D.    Investigation of the Loss Events and Related Insurance Claims**

As a result of these events, One Place made claims for loss or damage to covered property under the Policy. Both sides retained experts to assist with the investigation and evaluation of the claims. Travelers initially retained construction consultants Madsen, Kneppers & Associates ("MKA") and engineers from Engineering Systems, Inc. ("ESI"), and subsequently hired Dr. Richard Finno, a professor and geotechnical expert at Northwestern University, as well as MKA competitor Lisa Enloe of Held Enloe & Associates, LLC. (Doc. 126 ¶¶ 9, 10, 13, 65, 66; Doc. 147 ¶ 5). One Place, in turn, hired the engineering firm Wiss, Janney, Elstner Associates, Inc., Robert Lukas of Geotechnical Engineering, Inc., and public adjuster Robert Levin of Globe Midwest/Adjusters International ("Globe Midwest"). On Mr. Levin's advice, One Place also retained the law firm of Childress Duffy in the spring of 2007. G. Craig Becker, another public adjuster from Globe Midwest became involved later in the case. (Doc. 116 ¶¶ 24, 25; Doc. 126 ¶¶ 11, 22).

### 1.    Claim from November 2006 Event

One Place submitted a claim to Travelers for remediating the damage to caisson shafts 46 and 52 caused by soil squeeze.  (Doc. 116 ¶ 49; Doc. 150 ¶ 49).  It appears that Travelers initially declined to pay the amounts requested, but on July 14, 2009, public adjuster Craig Becker wrote a letter to Richard M. Sarff, Travelers' adjuster, in which he expressed appreciation for Travelers' willingness to reconsider the 2006 claim. He further stated: "I also want to point out that the policy provides coverage for earth movement."  (Doc. 116-12, at 42).  At his deposition, after being shown this sentence in the letter, Mr. Becker affirmed that he was referring to the earth movement definition in the Policy.  (Doc. 116-14, at 15).  He was then shown the Policy itself and asked to read the definition of earth movement.  When asked whether, in his opinion, the language was ambiguous, he responded:   "I wouldn't categorize it as ambiguous.   I would categorize it as very broad."  (*Id.*).

There is no dispute that (a) One Place and Travelers ultimately reached a settlement agreement regarding caissons 46 and 52, which had suffered soil squeeze, with Travelers paying over $95,000; and (b) in the settlement agreement, both Travelers and One Place acknowledged that the loss was due to earth movement, and the $95,000 was allocated to the Earth Movement Aggregate Limit under the Policy.  (Doc. 116 ¶ 49; Doc. 150 ¶ 49).  Nowhere in the settlement agreement (or elsewhere for that matter, at least as far as the Court can tell) was there ever any discussion of whether the earth movement in 2006 that led to the losses occurred "naturally" or was "man-made."   The parties did not (and still do not) agree on the interaction, if any, between the 2006 and 2007 earth movement events.

9

## 2. Claim from 2007 Events

On March 19, 2007, shortly after the 2007 loss events, Travelers' adjuster Mr. Sarff sent a letter to One Place stating that his consultants had some concerns about the design of the earth retention system. The letter also reminded One Place that the Policy contained an exclusion for losses caused by defective design. (Doc. 126 ¶ 14). One Place did not believe the loss involved defective design, concluding instead that the sheet piling failure had been caused by earth movement which was covered under the Policy. Early on, One Place's public adjuster Levin knew that the Policy covered earth movement and had read the definition of earth movement in the Policy. (Doc. 116 ¶ 25; Doc. 150 ¶ 25). In a letter to Travelers' adjuster Sarff dated April 5, 2007, Mr. Levin stated:

> In this instance, the Travelers' policy includes earth movement as a covered cause of loss . . . Inasmuch as the insured sustained a loss to covered property resulting from a covered cause of the loss, Travelers is responsible to indemnify the insured for their loss(es).

(Doc. 126-7, at 3). During a subsequent July 1, 2013 deposition, Mr. Levin agreed that he intended the letter to convey to Travelers that "a loss by a covered cause of loss did result, and that covered cause of loss was earth movement." (Doc. 116-15, at 80, Levin Dep., at 49). Mr. Levin likewise referenced "the earth shifting incident(s)" in correspondence to Mr. Sarff dated April 10, 2007. (Doc. 116-12, at 56). In a May 2, 2007 email to Mr. Sarff, Mr. Levin further stated, "After numerous discussions regarding the cause of the earth movement loss, it is my belief causation was initiated during the caisson installation, thereby resulting in the ultimate loss and surrounding collapse." (Doc. 116-12, at 59). And in still another email to Mr. Sarff on July 23, 2007, Mr. Levin

said:  "As continuously stated to you verbally and formally, we see no exclusion contained in the policy whereby coverage could be prevented.  In fact, the policy explicitly provides coverage."  (Doc. 116-12, at 63).

As the investigation continued, Travelers' experts ultimately concluded that the defectively designed earth retention system caused the sheet piling failure, which in turn led to the problems with the D Line frost wall and caissons.  The engineers from ESI (retained by Travelers) issued a report to that effect dated July 21, 2007.  (Doc. 126 ¶ 21; Doc. 116 ¶ 21).  In an effort to establish coverage under the Policy, One Place responded with reports from their own experts confirming that the loss was earth movement.  (Doc. 126 ¶¶ 22, 23; Doc. 116 ¶¶ 24, 25).  As Mr. Lukas, the engineering expert, stated in his August 28, 2007 report, "It is our opinion that ground movements occurred because of the reduction in shear strength of the soil as a result of soil squeeze [during the drilling of the caisson holes] thereby resulting in failure of the steel sheeting retention system."  (Doc. 126 ¶ 24).  This statement is consistent with emails Mr. Levin sent to Mr. Sarff on July 26 and August 1, 2007, with the subject line "Sheet Piling Movement," and discussing what he called "the frost wall damage that occurred as a result of the earth movement," and the cost of structural repairs to the caissons "which have moved as a result of the Earth Movement Claim."  (Doc. 116-12, at 65).  It is also consistent with Mr. Levin's email to Mr. Sarff dated August 28, 2007, attaching reports and surveys identifying "what we now know to have occurred as a result of there (sic) earth movement."  (Doc. 116-12, at 71).  During his deposition, Mr. Levin agreed that as of August 1, 2007, it was his opinion that the loss was covered, and one of the

reasons was that there is coverage under the policy for earth movement.  (Doc. 116-15, at 78, Levin Dep., at 41).

Travelers had its experts from ESI review and respond to the Lukas report, but the engineers did not change their position that the loss was caused by the defective design of the earth retention system.  (Doc. 126 ¶ 25).  One Place still challenged the denial of coverage, however, and the parties continued to exchange information and attend meetings to discuss the issue.  (*Id*. ¶¶ 29, 30).  During a meeting on May 9, 2008 between Travelers (adjuster Sarff, ESI engineers Chad Fisher and Peter A. Lenzini, and in-house counsel) and One Place representatives (public adjuster Levin, engineering expert Lukas, and counsel Katherine Dedrick), One Place emphasized that there were caissons close to the earth retention system, two of which had experienced "soil squeeze."  (Doc. 126 ¶ 32).  During a July 30, 2008 telephone conference, Mr. Levin reportedly told Mr. Sarff that (1) he was sending additional letters to support One Place's position that the movement of the earth retention system was a covered loss, and (2) he had spent many hours with One Place's counsel going over the policy and they feel it is very broad and it is clear that the cause of the loss was earth movement. (Doc. 116 ¶ 26g).[5]

Negotiations continued, and Travelers eventually decided to have the expert engineering reports from ESI and Mr. Lukas peer reviewed by Northwestern professor Dr. Richard Finno.  (*Id*. ¶ 35).  In response to Dr. Finno's advice that with respect to the

---

[5]    The cited document is Mr. Sarff's memorialization of what Mr. Levin told him.  One Place does not object to the evidence as hearsay, and Mr. Sarff presumably could testify directly as to statements of Mr. Levin who was an agent of One Place.  Instead One Place vaguely denies that any of the multiple statements in paragraph 26 accurately reflect "the *positions* of both One Place and Mr. Levin."  (Doc. 150 ¶ 26) (emphasis added).

earth retention system both sides were correct to some degree and this was a gray area, Mr. Sarff sent One Place a letter dated December 22, 2008 withdrawing Travelers' denial of coverage as to the claim for damage to the ERS. (*Id*. ¶¶ 35, 36; Doc. 116 ¶ 30; Letter from R. Sarff to J. Karp of 12/22/08, Doc. 126-7, at 5).

At some point thereafter (it is unclear when), One Place began to take the position that the 2007 losses had *not* been caused by "Earth Movement" as defined in the Policy. One Place asserts in this litigation that "Earth Movement" as defined in the Policy is limited to movement of earth from natural as opposed to man-made causes. One Place states that they "do not dispute that earth moved at some point" but do "dispute the cause of this movement. It is [One Place's] position the cause of any earth movement was the drilling of the caisson holes." (Doc. 149, at 3). As One Place sees it, this means the 2007 losses all stem from earth movement caused by man, rather than naturally-occurring "Earth Movement" as defined in and explicitly covered by the Policy. Therefore, One Place contends that the $2.5 million Earth Movement Limit of Insurance does not apply and they should be allowed to recover up to the $33 million basic limit of insurance for the earth movement losses.

For purposes of summary judgment, Travelers assumes that the losses occurred in the manner described by One Place and argues that the $2.5 million dollar limit applies in any event since "Earth Movement" under the Policy encompasses *any* movement regardless of cause. (Doc. 155, at 5).

**DISCUSSION**

**A.    Standard of Review**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  In viewing the facts presented on a motion for summary judgment, the court must construe the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986);  *National Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).  "A court's role is not to evaluate the weight of the evidence, to judge credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact."  *National Athletic Sportswear*, 528 F.3d at 512.

**B.    Construction of Insurance Contracts**

It is undisputed that Illinois law governs this diversity case.  "Under Illinois law, the interpretation of an insurance policy is a question of law that is properly decided by way of summary judgment."  *Twenhafel v. State Auto Prop. and Cas. Ins. Co.*, 581 F.3d 625, 628 (7th Cir. 2009) (quoting *BASF AG v. Great American Assurance Co.*, 522 F.3d 813, 818-19 (7th Cir. 2008)).  In construing the language of an insurance policy, the Court's primary objective is "to ascertain and give effect to the intentions of the parties as expressed by the language of the policy."  *Id*.  *See also American States Ins. Co. v. Koloms*, 177 Ill.2d 473, 479, 687 N.E.2d 72, 75 (1997).

If the terms of an insurance policy are clear and unambiguous, they must be applied as written and given their plain and ordinary meaning. *Id*.; *American States Ins. Co*, 177 Ill. 2d at 479, 687 N.E.2d at 75. If, however, the terms are ambiguous, they "will be strictly construed against the drafter." *Id*. (quoting *BASF*, 522 F.3d at 819). "[P]rovisions that limit or exclude coverage are to be construed liberally in favor of the insured and 'most strongly against the insurer.'" *National Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. Glenview Park Dist.*, 158 Ill.2d 116, 122, 632 N.E.2d 1039, 1042 (1994). The insurer bears the burden of proving that a claim is excluded from coverage. *Deal v. Prudential Ins. Co. of America*, 263 F. Supp. 2d 1138, 1143 n.2 (N.D. Ill. 2003)).

## C. Analysis of Scope of "Earth Movement" Coverage

One Place claims that the earth movement provisions in the Policy are ambiguous and must be construed to apply only when the earth movement occurs due to natural, as opposed to man-made causes. Travelers insists that the provisions are unambiguous and cover any earth movement whether natural or man-made. For the reasons explained below, the Court finds that the 2007 events resulted from "Earth Movement" within the meaning of the Policy and are subject to the $2.5 million limit.

### 1. Policy Language

Focusing solely on the plain language in the contract, the earth movement terms are not ambiguous and susceptible to two interpretations as One Place argues. Instead the language is clear in stating that the limitation applies to losses from *any* earth movement *regardless* of the cause. According to the Definitions section, **"[e]arth movement"** is "*any* movement of the earth (other than 'sinkhole collapse'), *including but*

*not limited to*: a. earthquake; b. landslide; c. earth sinking, rising or shifting; d. volcanic eruption, explosion or effusion." (Doc. 1-1, at 27) (emphasis added). Giving each term its plain and ordinary meaning, the word "any" means exactly that: any movement of the earth without distinction as to the type (i.e., natural or man-made). The phrase "including but not limited to" similarly conveys that the cited examples are not all-inclusive or restrictive in nature, and thus do not serve to narrow the types of earth movement covered under the Policy. Moreover, these cited examples are not of one type or the other since landslides certainly can occur naturally or be caused by man, as can the "sinking, rising or shifting" of earth.

Further supporting this reading of the Policy is the anti-concurrent cause language found in the definition of "**Earth Movement Limit of Insurance**":

> the most we will pay for "loss" in any one occurrence *caused directly or indirectly* by "earth movement," *regardless of any other cause or event that contributes concurrently or in any sequence to the "loss."*

(*Id*.) (emphasis added).[6] On its face, this provision limits the amount Travelers will pay for a loss that in any way involves earth movement, whether directly or indirectly, and regardless of any other cause that may contribute to that loss. The Court sees nothing in this language to support One Place's argument that the parties intended to delve into the cause of the earth movement and allow coverage of $2.5 million dollars if the earth movement stemmed from natural causes, but allow coverage of $33 million dollars for earth movement stemming from man-made causes. *See Milwaukee Mut. Ins. Co. v. J.P. Larsen, Inc.*, 2011 IL App (1st) 101316, ¶ 8, 956 N.E.2d 524, 527 (2011) ("In

---

[6]     An anti-concurrent clause is meant to "exclude[] coverage for damage caused by an excluded peril even when covered perils also contribute to the damage." *Alamia v. Nationwide Mut. Fire Ins. Co.*, 495 F. Supp. 2d 362, 368 (S.D.N.Y. 2007).

construing the terms of an insurance policy, it is the court's goal to give effect to the intent of the contracting parties by relying on the language used in the signed contract.").

## 2. Earth Movement Cases

In support of their respective interpretations of the "Earth Movement" language in the Policy, each side points to legal decisions in which courts construed similar language in a manner consistent with the party's position here. One Place argues that courts in Illinois and foreign jurisdictions have held that "similar earth movement provisions are ambiguous and must be interpreted in favor of coverage." (Doc. 120, at 7). It is worth noting that all of these cases involved policy *exclusions* for losses related to earth movement, and with very few exceptions, these exclusions were in homeowners policies. According to one commentator, these types of coverage issues arose after many insurance companies began modifying homeowners' "all-risk" policies to restrict the scope of coverage, resulting in the denial of claims for losses that traditionally had been covered. Brian Mattis, Earthquake and Earth Movement Claims Under All-Risk Insurance Policies in the New Madrid Fault Zone, 21 Mem. St. U. L. Rev. 59, 61-62 (Fall 1990).[7]

None of the cases identified by One Place involved an insurance policy obtained for the *construction* of a building where the policy expressly *included* coverage for earth movement losses. For this reason, construing the earth movement provisions as written

_____

[7] In the author's view, these policy modifications were usually done without sufficient notice to the insured and without a reduction in premium. Prior to 1983, most all-risk homeowners' policies did not exclude loss caused by defective design or improper construction, so a loss caused by earth movement together with defective design or improper construction, was covered. Mattis, supra, at 70.

instead of limiting them to naturally-occurring earth movement does not result in a *denial* of coverage. Instead it means that One Place will recover the amount of damages resulting from "earth movement" that the parties agreed to in the Policy.

In any event, close examination of the analysis and holdings in these policy exclusion cases reveals that courts have not been uniform in their approach. It is helpful to examine the progression of the primary cases over time to understand how the courts arrived at their holdings given the policy language at issue, and whether the analysis is persuasive.

a.      *Anderson v. Indiana Lumbermens Mut. Ins. Co. of Indianapolis, Ind.*, 127 So.2d 304 (La. Ct. App. 1961)

The *Anderson* case appears to have been the first of many cases in which a court arrived at a narrow construction of earth movement exclusionary language by applying the doctrine of *ejusdem generis*.[8] The policy in *Anderson* explicitly covered damage due to "Collapse of building(s) or any part thereof" but excluded damage **"caused directly or indirectly by earthquakes or other earth movements, except landslides."** *Id*. at 305. The homeowner made a claim for damages after the expansion and contraction of the soil resulted in a number of cracks in his home that caused it to start falling apart. *Id*.

After finding that the house had collapsed within the meaning of the policy (*id*. at 308), the court turned to the insurer's alternative argument: that it was still not liable

---

[8] The doctrine of *ejusdem generis* provides that "where general words follow particular and specific words in a [contract] the general words must be construed to include only things of the same kind as those indicated by the particular and specific words." *Brink's, Inc. v. Illinois Commerce Comm'n*, 108 Ill. App. 3d 186, 190, 439 N.E.2d 1, 3 (4th Dist. 1982) (internal quotations omitted).

because this loss was caused "directly or indirectly" by "'other earth movements,'" namely the contraction and expansion of the earth. *Id*. There was no discussion in the opinion about the cause of the expanding and contracting soil, or whether this was naturally-occurring earth movement. In the following succinct and rather abrupt analysis, the court rejected the insurance company's argument that the loss was excluded:

> In this instance 'earth movements' is entirely too general to have application to any degree of certainty. Under the 'ejusdem generis' doctrine, the words 'earth movement' as used in the policy must be construed as embracing the same general kind, class or nature of peril as its companion words 'earthquake' and 'landslide.'

*Id*. at 308-09.

Despite the more expansive earth movement exclusionary language at issue in later cases, many courts have relied on the analysis in *Anderson* as support for narrowly construing the exclusion. *See e.g., Wisconsin Builders, Inc. v. General Ins. Co. of Am.*, 65 Wis.2d 91, 102, 221 N.W.2d 832, 837-38 (Wis. 1974) (describing *Anderson* as a "leading case" and noting that "[i]n other cases following the Anderson rule . . . [i]n no instance has the ruling court felt constrained by the normal technicality of the ejusdem generis rule that the general words follow the specific.").

### b. *Wyatt v. Northwestern Mut. Ins. Co. of Seattle*, 304 F. Supp. 781 (D. Minn. 1969)

Seven years later, the *Wyatt* court quoted the analysis from *Anderson* with approval when faced with a dispute over the scope of an earth movement exclusion. *Wyatt* has been described as a "seminal" case (*Murray v. State Farm Fire and Cas. Co.*, 203 W. Va. 477, 485, 509 S.E.2d 1, 9 (W. Va. 1998)) and "particularly persuasive"

(*Wisconsin Builders,* 65 Wis.2d at 102, 221 N.W.2d at 387-38).   Perhaps more importantly, the Illinois Appellate Court relied on the *Wyatt* case fourteen years later when deciding *Mattis v. State Farm Fire and Cas. Co.*, 118 Ill. App. 3d 612, 617, 454 N.E.2d 1156, 1160 (5th Dist. 1983), a case that is given great weight by One Place.

In *Wyatt*, the insurance company denied coverage under a homeowners' policy for damage to a house caused by excavation work on an adjacent property.[9]  There was "no dispute" that the policy "cover[ed] acts of others than the owner."  304 F. Supp. at 783.  The insurance company, however, denied coverage under the earth movement exclusion for losses:

> **caused by, resulting from, contributed to or aggravated by *any* earth movement, *including but not limited to* earthquake, landslide, mud flow, *earth sinking, rising or shifting*; unless loss by fire or explosion ensues, and this Company shall then be liable only for such ensuing loss.**

*Id*. at 782 (emphasis added).  Plaintiffs/homeowners argued that this provision was intended to exclude damage from "natural causes and natural phenomena" and that "where the proximate and efficient cause of damage definitely is the action of a third-party, this exclusion does not apply even though the actions of such third-party may incidentally have caused some 'earth movement.'"  *Id*. at 782-83.  They reasoned that the purpose of the exclusion was to relieve insurers from unpredictable "major disasters" that cause widespread damage.  *Id*. at 783.

In resolving this issue, the court looked to other provisions in the policy that it said gave force to the view that the exclusion was not intended to cover "'earth

---

[9]    The insurance company filed a third party complaint, alleging that negligent excavation on the adjoining property caused the removal of lateral support and earth movement that damaged the house.  304 F. Supp. at 782

movement' occur[ing] under a single dwelling, allegedly due to human action of third persons in the immediate vicinity of the damage." *Id*. These "other" provisions excluded losses from "floods, tidal waves, a back up of water below the surface, changes in temperature and changes in the law," and the court noted that "[a]ll of these are phenomena likely to affect great numbers of people when they occur." *Id*.

At no time did the court discuss the specific language in the policy and whether the words were ambiguous. Instead, the court announced its "interpretation" (wholly apart from the express policy terms) which it then said *created* ambiguity in the exclusionary language. Moreover, the court was unwilling to go so far as to conclude from the types of earth movement set forth in the exclusion that it was limited to "natural phenomena." Rather, the court reached a much more narrow holding: that the exclusion did not cover what occurred in this case where the policy covered acts of others. The entirety of the court's analysis in this regard is contained in the following paragraph:

> Certainly not all earth movements, or at least those where some human action causes such are included in the exclusion. If this interpretation creates an ambiguity in the language then it is necessary to decide what earth movements were intended to be covered. The class cited in the exclusionary clause is therefore held, if not limited to natural phenomena, at least not to exclude coverage in the case at bar. There is no dispute that the policy here involved covers acts of others than the owner.

*Id*.

This Court does not find the analysis in *Wyatt* helpful given its failure to examine the Policy language and its very limited holding. Moreover, the policy in *Wyatt* did not contain the anti-concurrent cause language that appears in the One Place policy, defining the Earth Movement Limit of Insurance as "the most we will pay for 'loss' in any

one occurrence caused directly or indirectly by 'earth movement,' regardless of any other cause or event that contributes concurrently or in any sequence to the 'loss.'" (Doc. 1-1, at 27).

      **c.**      ***Stewart v. Preferred Fire Ins. Co.*, 206 Kan. 247, 477 P.2d 966 (Kan. 1970)**

Faced with virtually identical exclusionary language as in *Wyatt*, the Supreme Court of Kansas reached a different result.  In *Stewart*, the plaintiff's house sunk into a pre-existing cavern or shaft area of a mining operation after soil under and around the foundation gave way.  *Id*. at 248, 477 P.2d at 967.  In challenging the denial of the claim based on the earth movement exclusion, the plaintiff argued that the language was ambiguous and urged the court to apply the *ejusdem generis* doctrine to find that "the enumerated events, earthquake, landslide and earth sinking are all events which have their origin in nature, are 'acts of God.'"  *Id*. at 249, 477 P.2d at 968-69.

The court declined to apply the doctrine since the policy language was not ambiguous:

> Before the rule of ejusdem generis can be applied the clause must be ambiguous. … The term "earth movement" taken in its plain, ordinary and popular sense means any movement of earth whether it be up, down or sideways.  The words "earthquake, landslide, mud flow" and the term "earth sinking, rising or shifting" all refer to vertical or horizontal movements of earth or soil, wet and dry.  We fail to see how the exclusionary clause can be considered ambiguous.  The words used may not reasonably be understood to have two or more possible meanings.

*Id*. at 249-50, 477 P.2d at 969 (citations omitted).  Further, the court observed that, even if it were to apply the *ejusdem generis* doctrine, this still would not lead to the narrow construction suggested by the plaintiff.  "[W]e cannot agree that landslides, mud flows, earth sinking, rising or shifting are natural phenomena or 'acts of God' . . . For the most

part the events enumerated in the exclusionary clause originate from the negligence or carelessness of man in failing to follow proper conservation practices." *Id*. at 250, 477 P.2d at 969. Instead, the court reasoned: "[w]hen earthquakes, which fall within the legal definition of an 'act of God,' are included along with landslides, mud flows and earth sinking there is no apparent basis for the restriction urged by appellants under the rule of ejusdem generis." *Id*. In so holding, the court distinguished the 1969 ruling in *Anderson* where the exclusionary clause was "quite limited in scope" in contrast to the "really quite specific" language here. *Id*. at 250-51, 477 P.2d at 969.

This Court finds the analysis in *Stewart* persuasive in that it focused first on the specific language in the policy to determine whether it was ambiguous, and when it later applied the *ejusdem generis* doctrine, it acknowledged that the examples of earth movement were *not* all of the same type.[10]

### d. *Government Employees Ins. Co. v. DeJames*, 256 Md. 717, 261 A.2d 747 (Md. 1970)

In *DeJames* the court examined an earth movement exclusion identical to the one in *Stewart* but, after citing *Anderson* and applying the *ejusdem generis* doctrine, the court construed the policy narrowly. The homeowners in *DeJames* made a claim under the policy after noticing hairline cracks in the basement wall of a newly constructed

---

[10]    The policy excluded "loss caused by, resulting from, contributed to or aggravated by any earth movement, including but not limited to earthquake, landslide, mud flow, earth sinking, rising or shifting." Id. at 248, 477 P.2d at 968. Oddly, the court in *Wisconsin Builders* (discussed *infra*) said the holding in this case was "dicta" because the earth movement exclusion applied "through the specific term 'earth sinking.'" 65 Wis.2d at 101, 221 N.W.2d at 837. But as the dissent in *Stewart* argued, had the court construed the exclusion narrowly to mean only earth movement (such as sinking) from "natural phenomenon," the exclusion would not have applied since the earth movement resulted from "a direct unbroken sequence from the negligence or wrongdoing of a third party." 206 Kan. at 252, 477 P.2d at 970.

home that they had purchased. *Id*. at 719, 261 A.2d at 748. Despite the builder making some repairs, almost two years later the homeowners heard what sounded like a distant "explosion" and discovered an indentation near the floor of the basement wall and "hundreds of thousands of cracks." *Id*. In denying the claim, the insurer said the event did not qualify as a "collapse" (this term excluded "settling, cracking, shrinkage, bulging or expansion" of buildings) and asserted that two exclusions applied: earth movement and an exclusion for losses related to water below the ground. *Id*. at 718, 261 A.2d at 748.

The case proceeded to trial where a jury found for the homeowner. On appeal the court considered whether it was error to "submit the case to the jury when the evidence showed that the wall had cracked and bulged as a result of the outside earth load against it and that earth movement and water in the earth . . . were contributing factors causing the damage." In finding no error, the court explained:

> While the doctrine of ejusdem generis is usually relied on when a general term follows an enumeration of specifics, Levy v. American Mut. Liability Ins. Co., 195 Md. 537, 73 A.2d 892 (1950); Anderson v. Indiana Lumbermens Mut. Ins. Co., supra, 127 So.2d 304, we are unwilling to say that it is wholly inapplicable here. We therefore construe 'any earth movement' to mean unusual movement of the same nature and character as those specified. Consequently, the exclusion could not encompass damage occasioned by normal pressure or settling unless they were spelled out in the exclusionary clause. To hold otherwise would make virtually meaningless the coverage which was purportedly accorded by the policy, for it would be difficult to envision many other reasons why a house would collapse.

*Id*. at 726, 261 A.2d at 752.

As in *Wyatt,* the analysis in *DeJames* is somewhat lacking. First, the court failed even to discuss the specific language in the exclusion before seemingly applying the

*ejusdem generis* doctrine (after noting it was "unwilling to say [the doctrine] is wholly inapplicable here."). It is also unclear how the court applied the doctrine in reaching its holding, and how it construed the language (what qualifies as an "*unusual"* movement of earth that is "of the same nature and character as those specified"?) In any event, there was no discussion in the case of natural versus man-made causes of earth movement.

e. ***Wisconsin Builders, Inc. v. General Ins. Co. of Am.*, 65 Wis.2d 91, 221 N.W.2d 832 (Wis. 1974)**

The exclusionary language in the *Wisconsin Builders* case was similar to the language in the two preceding cases.[11] *Id*. at 94, 221 N.W.2d at 834. This case is unusual, however, in that it involved a builders risk policy obtained for the construction of a building, rather than a policy for an existing structure. The L-shaped apartment building under construction sat at the foot of a bluff that was partially excavated, and at various times concerns had been raised about the "continuing instability of the bluff." *Id*. at 94-95, 221 N.W.2d at 833-34. As builders were installing interior drywall about a year into construction (in 1969), a portion of the building located along the south side of the bluff collapsed. *Id*. at 95, 221 N.W.2d at 834. Witnesses at the scene were "nearly unanimous" that "[t]here was a good deal of earth behind and on top of the collapsed north wall." *Id*. at 98, 221 N.W.2d at 835.

The case proceeded to a jury trial with special verdicts and the insurer prevailed after the jury answered "yes" to a question whether the loss resulted from earth

---

11 The policy language in this case is arguably narrower than the preceding cases in that it omits the word "any" before earth movement. It states that the policy does not insure against loss "caused by, resulting from, contributed to or aggravated by … earth movement, including but not limited to earthquake, volcanic eruption, landslide, mudflow, earth sinking, rising or shifting." 65 Wis.2d at 94, 221 N.W.2d at 834.

movement.[12]  The appellate court ordered a new trial in part based on the "improper instruction as to the definition of 'earth movement' in light of the limitation placed on that term by the application of ejusdem generis rule."  *Id*. at 107, 221 N.W.2d at 840.  The court did not offer further explanation for its holding other than to say that *Anderson* was a "leading case" and "[i]n other cases following the Anderson rule, the exclusionary clause has been more nearly the exact wording in issue.  In no instance has the ruling court felt constrained by the normal technicality of the ejusdem generis rule that the general words follow the specific."  *Id*. at 102, 221 N.W.2d at 837-38.  In addition, the court noted that the "majority of courts which have considered this particular exclusion have found it to be ambiguous and have applied the doctrine of ejusdem generis to limit the definition of 'earth movement.'"  *Id*. at 101-02, 221 N.W.2d at 837.  The opinion contains no discussion of the specific language in the policy.  Nor does it address naturally occurring earth movement versus man-caused movement or endeavor to explain what type of earth movement falls within the exclusion.

      f.       ***Mattis v. State Farm Fire and Cas. Co.*, 118 Ill. App. 3d 612, 454 N.E.2d 1156 (5th Dist. 1983)**

Nine years after the decision in *Wisconsin Builders*, the Illinois Appellate Court decided the *Mattis* case in which it had occasion to interpret an earth movement

---

[12]      The special verdict read: "At or immediately prior to the collapse of the building in question, was the loss created by, resulting from, contributed to or aggravated by any of the following: 'earth movement, including but not limited to earthquake, volcanic eruption, landslide, mudflow, earth sinking, earth rising or shifting?'  65 Wis.2d at 99, 221 N.W.2d at 836.  The jury was instructed that: "'earth movement' means any movement of earth 'whether it be up, down or sideways"; "'landslide' means a sliding mass or earth or rock in its natural state"; "'backfill' was not to be included in the definition of either earth movement or landslide"; and they were to "disregard the remaining phrases . . . earthquake, volcanic eruption, mudflow, earth sinking, earth rising or shifting, because they were not involved in the case."  *Id.*

exclusion in an all-risk homeowners policy.   Structural damage to the house was discovered during a termite inspection in 1979 and an architect then discovered a cracked and displaced basement wall on the north side that needed to be replaced or reinforced to avoid further damage or collapse.   *Id*. at 615, 454 N.E.2d at 1158-59.   After coverage was denied, the owners reinforced the north wall and in the process, soil adjacent to that wall was excavated and a similar wall was constructed and bolted to the existing one.   The soil was then backfilled and landscaped to allow proper drainage and runoff.   *Id*. at 615, 454 N.E.2d at 1159.   But the damage became worse over time with doors and windows askew and out of plumb, and brick veneer separating from the wall. When the insurer continued to deny coverage, plaintiffs filed a lawsuit.   *Id*.

The trial court found from the proof that "*one* cause of the loss was inadequate or improper design or construction of the dwelling…."   *Id*. at 619, 454 N.E.2d at 1161 (emphasis added).   It then applied the "principle that if more than one cause creates a loss with one cause covered, but other causes not covered, the loss will be within the coverage of an all risk policy."   *Id*. at 616, 454 N.E.2d at 1159.   On appeal the insurer pointed to certain exclusions, including for earth movement.   That exclusion said the policy did not insure against loss:

> **caused by, resulting from, contributed to or aggravated by any earth movement, including but not limited to earthquake, volcanic eruption, landslide, mudflow, earth sinking, rising or shifting.**

*Id*. at 617, 454 N.E.2d at 1160.   While the court acknowledged that both testifying experts "agreed that settlement and consolidation of the backfill material placed against the north basement wall contributed to the loss," it said this was not the "sole" cause. *Id*.

The court then turned to the exclusion, stating it was "not persuaded . . . that this settlement and consolidation constitutes "earth movement" under the terms of the policy." *Id*. First, the court quoted the statement from *Wisconsin Builders* that the "majority of courts" have found earth movement terms to be ambiguous and have "applied the doctrine of *ejusdem generis* to limit the definition . . . to causes of the same class as earthquake and landslide." *Id*. From there, the court concluded:

> It is our view that the exclusions contained in this clause were not intended to cover damage resulting from something other than those causes of the type expressly stated in the exclusions. Moreover, other causes, defective design and construction, contributed to the damage resulting from the consolidation of soil placed against the north basement wall. [Citations omitted]. We conclude that the earth movement clause does not provide a basis for denial of coverage.

*Id*.

While One Place relies heavily on the *Mattis* case, it is interesting to note that one of the plaintiffs in the case (a law school professor and former insurance agent) later identified the case in a law review article as an example of "earlier policies" in which "the earth movement exclusion was read very narrowly." Mattis, supra, at 70 n.51.[13] The analysis is lacking in that the court did not discuss the specific language in the exclusion and why it was ambiguous. Nor did it explain how it applied the *ejusdem generis* doctrine and what it considered to be "causes of the type expressly stated" where the exclusion included earth "sinking, rising, shifting." There was no discussion, for example, of whether earth movement must be naturally-occurring to come within the

---

[13] According to the law review article, the author was a law professor at Southern Illinois University and had owned a general insurance agency for five years. Mattis, *supra*, at 70 n.a. He and his wife also are described as having successfully litigated cases involving concurrent causation. *Id.*

exclusion.  In lieu of analysis, the court seemed merely to adopt the holding in the prior cases that it identified.[14]  *Mattis* is distinguishable in any event because the policy did not contain the anti-concurrent cause language found in the One Place Policy.

### g.    *Murray v. State Farm Fire and Cas. Co.*, 203 W. Va. 477, 509 S.E.2d 1 (W. Va. 1998)

Fifteen years after the decision in *Mattis*, the Supreme Court of West Virginia examined earth movement exclusions in homeowners policies that *did* contain anti-concurrent cause language, as well as a more explicit definition of earth movement. Nonetheless, the court found the exclusions were ambiguous and then narrowly construed them so they did not apply to the claimed losses.  The three plaintiffs in *Murray* owned adjacent properties constructed in the 1970s and insured by homeowners policies with Allstate and State Farm.  "Immediately adjacent to the rear of the three houses [was] a man-made highwall standing nearly 50 feet high" that resulted from quarrying operations in the 1950s.  *Id*. at 480, 509 S.E.2d at 4.  In 1994, large boulders and rocks fell off the highwall, causing extensive damage to two of the houses. After an engineer concluded that rockfalls would "'continue to occur, some with potentially disastrous results,'" the plaintiffs decided never to return to live in the houses. *Id*. at 481, 509 S.E.2d at 5.  Engineers and geologists who examined the site gave a

---

[14]    In addition to relying on *Wyatt, DeJames,* and *Wisconsin Builders*, the court cited (but did not discuss) *Gullett v. St. Paul Fire & Marine Ins. Co*., 446 F.2d 1100 (7th Cir. 1971), in which rocks behind a retaining wall crashed onto a building below.  The Seventh Circuit affirmed the denial of a motion for judgment notwithstanding the jury's verdict that the damage was caused by covered perils of "falling objects" or "collapse of building" rather than "landslide" or "other earth movement" which were excluded.  *Id.* at 1102.  In holding that the evidence allowed the jury to find for either party, the court applied the *ejusdem generis* doctrine and concluded that the event here had not been a "landslide" or "other earth movement" under the policy.  *Id.* at 1104.  The analysis in *Gullett* is skeletal and somewhat confusing.  In any event, the case is distinguishable given the difference in the definition of "earth movement" and the absence of anti-concurrent cause language in the policy.

variety of opinions as to what had occurred and why. While they said this was primarily a "rockfall" and not a "landslide," some "conceded" that rockfalls are a type or subcategory of a landslide. In addition, they agreed that erosion contributed to the falling rocks but there was also evidence that negligent construction of the highwall was a contributing factor. *Id*.

The insurers denied coverage based in part on the earth movement exclusions. The Allstate Policy that applied to one of the houses excluded coverage for any loss resulting from:

> **Earth movement, including, but not limited to, earthquake, volcanic eruption, landslide, subsidence, mud flow, sinkhole, erosion, or the sinking rising, shifting, expanding, bulging, cracking, settling or contracting of the earth. This exclusion applies whether or not the earth movement is combined with water.**

*Id*. at 484, 509 S.E.2d at 8. The State Farm policy for the other two houses had similar but not identical exclusionary language for losses resulting from:

> **Earth Movement, meaning the sinking, rising, shifting, expanding or contracting of earth, all whether combined with water or not. Earth movement includes but is not limited to earthquake, landslide, mudflow.**

*Id*. In addition, the State Farm policy had the following "lead-in" language before the listing of earth movement and other exclusions:

> **We do not insure under any coverage for any loss which would not have occurred in the absence of one or more of the following excluded events. We do not insure for such loss regardless of: (a) the cause of the excluded event; or (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss; or (d) whether the event occurs suddenly or gradually, involves isolated or widespread damage, *arises from natural or external forces*, or occurs as a result of any combination of these.**

*Id*. at 489, 509 S.E.2d at 13 (emphasis added).

On appeal (after winning in the lower court), the homeowners argued that the earth movement exclusion did not apply because the damage to their homes was caused by the negligent creation and maintenance of the highwall. The insurers, on the other hand, argued that the exclusions applied because the rocks and earthen debris that fell on the homes amounted to a "landslide" caused by "erosion." *Id*. at 484-85, 509 S.E.2d at 8-9.

At the outset, the *Murray* court acknowledged (unlike courts in many of the preceding cases) that the specific types of earth movement listed in the exclusion were *not* all of one type, namely, naturally occurring. Rather than concluding from this that the exclusion was meant to apply to losses from any type of earth movement regardless of cause (as the policy stated), the court reasoned that the policy was ambiguous and so should be narrowly construed:

> On the one hand, the exclusions cited in the defendants' policies could bar coverage for solely *natural* events such as earthquakes, volcanic eruptions, and sinkholes. On the other hand, the same exclusions refer to events which could be *man-made*, such as subsidence or earth movement caused by equipment or a broken water line. Or, as alleged in this case earth movement could be caused by *both man and nature* over a period of time, such as landslides, mudflows, or the earth sinking, shifting, or settling. Because the policy language is reasonably susceptible to different meanings, we believe that the earth movement exclusions in the insurance policies at issue are ambiguous, and must have a more limited meaning than that assigned to it by the defendants.

203 W. Va. at 485, 509 S.E.2d at 9 (emphasis in original).

Oddly, the court then went on to say that it was applying "the construction principles of *ejusdem generis* and *noscitur a sociis*." *Id*. at 485, 509 S.E.2d at 9. But rather than explain how it did so, the court merely quoted a long passage from *Wyatt*

which said earth movement exclusions "were not intended to cover the situation . . . where 'earth movement' occurred under a single dwelling."  *Id*. at 486, 509 S.E.2d at 10. After observing that "similar reasoning underlies the exclusions in this case," the *Murray* court "appl[ied] the rule that ambiguities must be resolved in favor of the insured" and then held:

> Therefore, when an earth movement exclusion in an insurance policy contains terms not otherwise defined in the policy, and the terms of the exclusion relate to natural events (such as earthquakes or volcanic eruptions), which events, in some instances, may also be attributed to a combination of natural and man-made causes (such as landslides, subsidence or erosion), the terms of the exclusion must be read together and limited to exclude naturally-occurring events rather than man-made events.

*Id*., 509 S.E.2d at 10.

As for State Farm's argument that the "lead-in" language foreclosed any ambiguity, the *Murray* court disagreed.  While recognizing that this clause expressly stated that losses were excluded "regardless" of cause and whether the losses arose "from natural or external forces," the court said the word "external" was not defined and could not include "man-made forces."  *Id*. at 489, 509 S.E.2d at 13.  Instead the court interpreted the provision to mean "excluding from coverage natural risks arising from beyond or outside the property."  *Id*.  Finally, the court rejected State Farm's argument that the lead-in clause "defeat[ed] the efficient proximate cause doctrine" since this conflicted with the "reasonable expectation of the parties."  *Id*. at 490, 509 S.E.2d at 14. This was so because "[o]nly through a painstaking review of the lengthy 'Losses Not Included' section would a policyholder discover the language" in question.  *Id*.  In the court's view, if it gave "full effect to the State Farm policy language excluding coverage

whenever an excluded peril is a contributing or aggravating factor in the loss, we would be giving insurance companies carte blanche to deny coverage in nearly all cases." *Id.* (quoting *Howell v. State Farm Fire & Cas. Co.*, 218 Cal. App.3d 1446, 1456 n.6, 267 Cal. Rptr. 708, 715 n.6 (Cal. Ct. App. 1990)). *See also Sentinel Associates v. American Mfrs. Mut. Ins. Co.,* 804 F. Supp. 815, 818-19 (E.D. Va. 1992) (court recognizes that policy with anti-concurrent cause language "must be analyzed based on its own unique language, which has not been confronted previously in any reported decision[,]" but construes earth movement exclusion to apply "only to phenomena resulting from natural, rather than man-made, forces.").

> **h.** ***Gillin v. Universal Underwriters Ins. Co.***, **Civ. A. No. 09-5855, 2011 WL 780744 (E.D. Pa. Mar. 4, 2011) and other cases**

Not all courts have declined to enforce anti-concurrent cause language like the *Murray* court. In *Gillin*, the policy's lead-in clause to the exclusions was virtually identical to the language in the "Earth Movement Limit of Insurance" in the One Place Policy. It stated that the insurer would not pay for loss "caused directly or indirectly by any of the following; such loss is excluded regardless of any other cause or event that takes place at the same time or in any sequence to such LOSS." *Id.* at *6. The earth movement definition that followed was also quite similar to the definition in the One Place Policy. *Id.*[15] The court determined that the policy language was "clear and

---

[15]    In *Gillin*, the definition was: "earth movement, including but not limited to earthquake, volcanic eruption, explosion or effusion, landslide, mudflow or mudslide, earth shrinking, rising or shifting." 2011 WL 780744, at *2. In the One Place Policy, the definition is: "any movement of the earth (other than 'sinkhole collapse') including but not limited to: a. earthquake; b. landslide; c. earth sinking, rising or shifting; d. volcanic eruption, explosion or effusion." (Doc. 1-1, at 27).

unambiguous" and that the "lead-in clause" to the exclusions "is only capable of one construction, that is, when more than one cause is involved in a loss which includes one of the excluded events named under the lead-in clause, in this case, earth movement, there is no coverage regardless of whether the causes acted at the same time or in any sequence with the excluded event." *Id*. at *7. As a result, the court held that the policy did not cover loss stemming from negligent construction where it was a secondary cause of the loss along with soil movement and hydrostatic pressure. *Id*. at *2, 7.

Several other courts have also upheld earth movement exclusions in policies that included anti-concurrent cause language. For example, in *Village Inn Apartments v. State Farm Fire and Cas. Co.*, 790 P.2d 581 (Utah Ct. App. 1990), the court agreed that the phrase earth movement "could be limited to natural or geological processes," but only if "it is viewed in the isolation of that subparagraph" without considering the preceding anti-concurrent cause language. *Id*. As the court explained:

> This "lead-in" clause, apparently a relatively recent addition by State Farm in its policies, clearly excludes from coverage any loss from earth movement, combined with water, *regardless of cause*. . . . Since the exclusion is for earth movement loss from *any* cause, we can only conclude earth movement encompasses both natural and human processes. In view of the lead-in language, we hold that the district court was correct in its interpretation that the policy was unambiguous and excluded coverage as a coverage was excluded under the policy as a matter of law.

*Id*. at 583 (emphasis in original).[16] *See also Millar v. State Farm Fire and Cas. Co.*, 167 Ariz. 93, 95, 804 P.2d 822, 825 (Ariz. Ct. App. 1990) (following the rationale set forth in

---

[16] The policy in *Village Inn Apartments* stated:

The Company does not insure for loss which would not have occurred in the absence of one or more of the following excluded events. The Company does not

*Village Inn Apartments* in upholding similar earth movement exclusion); *Schroeder v. State Farm Fire and Cas. Co.*, 770 F. Supp. 558, 561 (D. Nev. 1991) (following the rationale set forth in *Millar* in upholding similar earth movement exclusion); *Kula v. State Farm Fire and Cas. Co.*, 212 A.D.2d 16, 628 N.Y.S.2d 988 (N.Y. App. Div. 1995) (finding similar earth movement exclusion covered losses from natural and man-made causes); *State Farm Fire and Cas. Co. v. Martin*, 872 F.2d 319 (9th Cir. 1989).

### i. *Nautilus Ins. Co. v. Vuk Builders, Inc.*, 406 F. Supp. 2d 899 (N.D. Ill. 2005)

Seven years after the decision in *Murray* and twenty-two years after the Illinois Appellate Court's decision in *Mattis*, the *Nautilus* court followed the reasoning in both of those cases (and some others) when deciding how to construe earth movement exclusionary language in a third-party comprehensive liability policy. One Place believes the *Nautilus* case provides strong support for its interpretation of the earth movement exclusionary language at issue here. This Court disagrees since the earth movement definition in the *Nautilus* policy was different from the one at issue here and

---

insure for such loss regardless of: a) the cause of the excluded event; or b) other causes of the loss; or c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss:

* * * * *

b. caused by, resulting from, contributed to, or aggravated by any of the following:

(1) *earth movement, whether combined with water or not*, including but not limited to earthquake, volcanic eruption, landslide, subsidence, mudflow, sinkhole, erosion, or the sinking, rising, *583 shifting, expanding, or contracting of earth; . . .

*Id*. at 582-83 (emphasis in original).

the policy did not contain anti-concurrent causation language. The *Nautilus* policy stated:

> "**This insurance does not apply to 'bodily injury,' 'property damage,' 'personal and advertising injury' or medical payments caused by, resulting from, contributed to or aggravated by the 'subsidence' of land. . . . 'Subsidence' shall mean earth movement, including but not limited to landslide, mud flow, earth sinking, rising or shifting.**"

*Id*. at 904.

The policy in *Nautilus* was purchased by a contractor before undertaking excavation work for a property owner who was named as an additional insured. Damage to neighboring properties resulted in lawsuits against the contractor and owner for negligently performing the excavation work. *Id*. at 901. The insurance company eventually filed a declaratory judgment action in federal court, seeking a ruling that it did not have a duty to defend (or indemnify – though this issue was deferred by the court) based on the subsidence exclusion. *Id*. at 902.

In deciding whether "the alleged damage due to negligent excavation" fell within the "subsidence exclusion" in the policy, the court first observed that "Illinois courts have not had very many opportunities to construe 'subsidence' or 'earth movement' exclusions" like the one at issue. *Id*. at 903. The court then discussed the holdings in prior earth movement cases, and quoted language from *Murray* and *Mattis* that the "majority of courts" have found earth movement exclusions to be ambiguous. *Id*. at 903-04. Next the court examined the specific policy language and concluded that it was ambiguous for reasons similar to those provided in *Murray*:

> The examples could be construed to exclude coverage for natural causes. For example, earth sinking, rising or shifting could be attributed to earthquakes. On the other hand, the same examples could be construed

to exclude coverage for man-made events. For example, negligent excavation could also result in earth sinking, rising or shifting. Without further definition of the excluded causes of subsidence or earth movement, we conclude that the exclusion does not clearly stand for one or the other.

*Id*. at 904.

Finally, the court observed that "because [Nautilus] is in the business of insurance and easily could have specifically defined excluded causes of subsidence or excluded earth movement, 'regardless of cause,' we consider its omission to be significant." *Id*. at 905. As an example of such apparently unambiguous language, the court cited *State Farm Fire and Cas. Co. v. Castillo*, 829 So.2d 242, 246 (Fla. Dist. Ct. App. 2002), which it noted had disagreed with *Murray* and found an exclusion did apply to man-made causes where the exclusion included a lead-in clause saying coverage was excluded regardless of the cause of the excluded event. *Id*.

Construing the ambiguous "subsidence of land" exclusion narrowly and "according to precedent," the court then held that the insurer had a duty to defend since the exclusion covered only earth movement "due to natural causes" and not the earth movement from negligent excavation work.[17] *Id*.

### j.    Summary

Review of the many cases construing earth movement exclusionary clauses does not change this Court's view that the language in the One Place Policy is unambiguous and, as it states, applies to "any" earth movement, "including but not

---

[17]    The court also cited but did not discuss *Henning Nelson Constr. Co. v. Fireman's Fund American Life Ins. Co.*, 383 N.W.2d 645, 653 (Minn. 1986), which involved a builders' risk policy that lacked the anti-concurrent cause language and excluded losses caused by "[e]arthquake, volcanic eruption, landslide, or any other earth movement." *Id.* at 752.

limited to" the types of movement listed in the clause which includes "earth sinking, rising or shifting." The well-reasoned opinions involving language similar to what appears in the One Place Policy declined the invitation to find ambiguity and to construe the language as meaning only naturally-occurring earth movement. Here the parties clearly intended the limited coverage for earth movement losses to apply regardless of the cause of the earth movement. Hence the Policy broadly defines "earth movement" and states that the $2.5 million dollar limit is the most that will be paid for loss in any one occurrence "caused directly or indirectly by 'earth movement,' regardless of any other cause or event that contributes concurrently or in any sequence to the 'loss.'" This language forecloses the Court from holding, as the *Wyatt* court did, that "earth movement" does not include movement "occur[ing] under a single dwelling, allegedly due to human action of third persons in the immediate vicinity of the damage." 304 F. Supp. at 783.

One Place argues that "[i]t is the 'earth movement' definition that must have [the anti-concurrent cause] language, as the 'Earth Movement Limit of Insurance' provision does not apply unless the event at issue comes within the definition of 'earth movement' in the first place." (Doc. 120, at 11). In other words, if there was no "earth movement" as that term is defined (limited to earth movement from natural causes), then there is no need to even look to the limit of insurance for losses caused by such movement. If, on the other hand, there *was* "earth movement," then the limit of insurance provision comes into play and provides that the limit applies if the loss was "caused directly or indirectly by 'earth movement,' regardless of any other cause or event that contributes concurrently or in any sequence to the 'loss.'"

The Court is not persuaded by One Place's interpretation. By including the "regardless of any other cause or event" language in the Earth Movement Limit of Insurance, the Policy is clearly designed to limit the amount Travelers will pay for loss caused in any way by earth movement, with no differentiation between natural and man-made events. *See, e.g., Gillin*, 2011 WL 780744, at *2. Here One Place obtained the Policy for a construction project and with a modifier so that the Policy expressly covered losses from earth movement with a limit of $2.5 million dollars (plus soft costs under a separate limit). Under One Place's strained reading of the terms, the Policy provided coverage for two types of earth movement but only one type (naturally occurring) was expressly defined and subject to the limit of $2.5 million dollars. The other type of earth movement (caused by man) was not mentioned in the Policy and was instead treated like any other non-excluded loss with a limit of $33 million dollars. This Court sees no basis for such a reading of the Policy given the unambiguous language. Viewing the Policy as a whole, the earth movement provisions unambiguously cover *any* movement of the earth, regardless of any other cause or event, which clearly encompasses both natural and man-made events.

Finally One Place faults Travelers for not explicitly stating that earth movement encompassed both natural and man-made movement as it did in the policy in *Bentoria Holdings, Inc. v. Travelers Indem. Co.*, 20 N.Y.3d 65, 980 N.E.2d 504 (N.Y. 2012). (Doc. 120, at 12). In that case, the words "all whether naturally occurring or due to man made or other artificial causes" were added at the bottom of the earth movement definition. 20 N.Y.3d at 67, 980 N.E.2d 504. While such language certainly would have

been preferable and foreclosed One Place's argument, the Court does not agree that without these words, the policy was ambiguous.

### 3. The Parties' Course of Dealing Supports Reading Earth Movement to Include Both Natural and Man-Made Causes

Even if the Court agreed that the Policy was ambiguous as to whether earth movement includes movement from both natural and man-made causes, the parties' course of dealing removes any doubt that it does. When the terms of an insurance contract are ambiguous, "the court should consider extrinsic matters such as . . . the conduct of the parties when acting thereunder." *Seeburg Corp. of Delaware v. United Founders Life Ins. Co. of Illinois*, 82 Ill. App. 3d 1034, 1039, 403 N.E.2d 503, 506 (1st Dist. 1980). As Travelers notes, One Place itself has since 2007 "taken the position that earth movement was the cause" of the loss to the sheet piling and D Line frost wall and caisson caps. (Doc. 113, at 20). Indeed, One Place and their experts routinely made statements to that effect in letters, emails, telephone conversations and depositions. (Doc. 116 ¶ 26a-j).

On April 5, 2007, for example, shortly after both of the 2007 claim events occurred, public adjuster Levin sent Travelers' adjuster Sarff a letter stating:

> In this instance, the Travelers' policy includes earth movement as a covered cause of loss . . . Inasmuch as the insured sustained a loss to covered property resulting from a covered cause of the loss, Travelers is responsible to indemnify the insured for their loss(es).

(Doc. 126-7, at 3). During a subsequent July 1, 2013 deposition, Mr. Levin agreed that he was telling Travelers that "a loss by a covered cause of loss did result, and that covered cause of loss was earth movement." (Doc. 116-15, at 80, p. 49). Mr. Levin likewise referenced "the earth shifting incident(s)" in correspondence to Mr. Sarff dated

April 10, 2007. (Doc. 116-12, at 56). In a May 2, 2007 email to Mr. Sarff, Mr. Levin further stated, "After numerous discussions regarding the cause of the earth movement loss, it is my belief causation was initiated during the caisson installation, thereby resulting in the ultimate loss and surrounding collapse." (Doc. 116-12, at 59). And in yet another email to Mr. Sarff on July 23, 2007, Mr. Levin said, "we see no exclusion contained in the policy whereby coverage could be prevented. In fact, the policy explicitly provides coverage." (Doc. 116-12, at 63). One Place certainly was not suggesting at this juncture that the "earth movement" for which the policy explicitly provided coverage was limited to "naturally occurring" earth movement and was not intended to cover man-made earth movement or, as the *Wyatt* court put it, "'earth movement' occur[ing] under a single dwelling, allegedly due to human action of third persons in the immediate vicinity of the damage." *Wyatt*, 304 F. Supp. at 783.

Thereafter, One Place's engineering expert, Robert Lukas, prepared a report dated August 28, 2007 in support of a claim for coverage under the Policy. As Mr. Lukas explained, "It is our opinion that ground movements occurred because of the reduction in shear strength of the soil as a result of soil squeeze [during the drilling of the caisson holes] thereby resulting in failure of the steel sheeting retention system." (Doc. 126 ¶ 24; Doc. 126-8, Lukas Report, at 26). This statement is consistent with emails Mr. Levin sent to Mr. Sarff on July 26 and August 1, 2007, with the subject line "Sheet Piling Movement," and discussing what he called "the frost wall damage that occurred as a result of the earth movement," and the cost of structural repairs to the caissons "which have moved as a result of the Earth Movement Claim." (Doc. 116-12, at 65). It is also consistent with Mr. Levin's email to Mr. Sarff dated August 28, 2007,

attaching reports and surveys identifying "what we now know to have occurred as a result of there (sic) earth movement." (Doc. 116-12, at 71). During his deposition, Mr. Levin agreed that as of August 2007, it was his opinion that the loss was covered, and that one of the bases for coverage was earth movement under the Policy. (Doc. 116-15, at 78, Levin Dep., at 41).

During a May 9, 2008 meeting attended by Mr. Sarff, Travelers' in-house counsel, One Place representatives, Mr. Levin, Mr. Lukas, engineers from Travelers' expert ESI, and One Place's counsel Ms. Dedrick, One Place emphasized that there were caissons close to the ERS, two of which had experienced soil squeeze. (Doc. 126 ¶ 32). And during a July 30, 2008 telephone conference with Mr. Sarff, Mr. Levin said One Place "feel[s] it is clear that the cause of the loss was earth movement." (Doc. 116 ¶ 26g). More than two and a half years later, on March 14, 2011, One Place's public adjuster Craig Becker, who testified that he is a policy interpretation expert, summarized the respective positions of Travelers and One Place on this issue in an email to Harlan Karp of One Place:

> Traveler's initial position on coverage was that the ERS failed because the design was inadequate. At that point, they would owe nothing for the fix to the ERS itself because it was a bad design and inasmuch as there was no other resulting damage they figured they owed nothing. (If resulting damage occurred to covered property that was in itself a result of the bad design there would be coverage for that).

> What we argued was that the ERS failure was not the result of a bad design but rather the result of earth movement (Combined with flooding). Now the repairs to the ERS are covered as well as any resulting damage like soft costs.

(Doc. 116 ¶ 26h).[18]

It appears that the first time One Place suggested that there are two different kinds of earth movement, natural and man-made – with only natural subject to a limit of $2.5 million dollars – was when the litigation began in 2011.  At that point, they started claiming that when they used the term earth movement, they did not mean "Earth Movement" as contemplated by the Policy because the losses resulted from man-made and not natural causes.  This position is belied by the parties' dealings up to that point.

One Place objects that Travelers has used "fragmented excerpts" from various letters, emails, telephone conversations and deposition transcripts to "mischaracterize" their positions about the cause of the loss.  (Doc. 150 ¶¶ 26, 27).  Despite at all times having the same counsel and experts, however, One Place does not cite any evidence suggesting that prior to this lawsuit they believed there was a distinction in the earth movement terms of the Policy between natural and man-made causes of earth movement, or that they conveyed that belief to Travelers.  Early on, One Place invoked the concept of "earth movement" in fighting for coverage under the Policy to counter Travelers' insistence (supported by its experts) that the 2007 losses stemmed from defective design.  Since "earth movement" is only mentioned in the Policy as part of the coverage modifiers, there is no logic to One Place's assertion that it was arguing for

---

[18]    Mr. Becker testified at his deposition that he "wouldn't categorize [the earth movement provision] as ambiguous [but] would categorize it as very broad."  (Doc. 150 ¶ 10; Doc. 116-14, at 15, Becker Dep., at 51).  (Doc. 150 ¶ 10; Doc. 116-14, at 15, p. 51).  Notably, Mr. Becker arguably has a "personal incentive to make the claim as high as possible – he receives a commission of 3.5% of the 10% paid to Globe Midwest."  (Doc. 134, at 2; Doc. 123 ¶ 39).  His colleague, Mr. Levin, is one of Globe Midwest's owners so does not receive a separate commission but also has a financial stake in the outcome of the coverage dispute.  (Doc. 116-14, at 4, Becker Dep., at 8).

coverage under some other provision. Indeed, this makes no sense given the huge disparity between available funds for earth movement losses ($2.5 million) and the basic losses they now seek ($33 million). If One Place understood the Policy to afford coverage of $33 million for losses stemming from man-made earth movements, surely they would have made clear their position that the earth movement provision under discussion at the time only covered naturally-occurring earth movement.

It is also telling that according to One Place's expert, Robert Lukas, the damage at issue here was caused by the same thing as the damage that occurred in November 2006 to caissons 46 and 52, namely, earth movement in the form of "soil squeeze." (Doc. 116 ¶ 40; Doc. 113, at 20). Yet One Place settled the November 2006 matter by agreeing that the loss was due to earth movement under the Policy, with Travelers paying $95,950 specifically allocated to the Earth Movement Limit of Insurance. (Doc. 113, at 20; Doc. 116 ¶ 49; Doc. 141, at 4). One Place does not explain how the 2006 earth movement differed from the 2007 earth movement vis-à-vis the issue of natural versus man-made causes.

On the record presented, the parties' course of dealing makes it clear that the 2007 losses are covered under the Policy as earth movement regardless of whether the underlying cause is natural, man-made, or some combination thereof.

**4. The 2007 Losses Were Caused by "Earth Movement" as Defined Under the Policy**

In light of the Court's conclusion that earth movement includes both natural and man-made causes, it necessarily follows that the 2007 losses are subject to the $2.5 million Earth Movement Limit of Insurance. One Place concedes that "earth moved at

some point," but "dispute[s] the cause of this movement," arguing that it was the act of drilling the caisson holes. (Doc. 149, at 3). Assuming One Place is correct, this man-made event is nonetheless covered as Earth Movement under the Policy. As a result, One Place's claims are subject to the $2.5 million limit on coverage. One Place's Motion for Partial Summary Judgment as to the term "Earth Movement" is denied, and Travelers' cross-Motion for Partial Summary Judgment as to the term "Earth Movement Limit of Insurance" is granted.

**D. Analysis of "Reinstatement of Limit After Loss" and "Earth Movement Annual Aggregate Limit of Insurance"**

One Place also seeks a declaration that the "Reinstatement of Limit After Loss" provision in the Policy means that Travelers is liable to pay the full $2.5 million limit for any "Earth Movement" event regardless of the amounts it has already paid. This argument turns in part on the meaning of "Earth Movement Annual Aggregate Limit of Insurance," which One Place says is also ambiguous. The "Reinstatement" provision is found in the "Additional Coverage Conditions" section of the Policy and states:

> **[t]he Limit of Insurance will not be reduced by the payment of any claim except for total 'loss' of a building or structure, in which event we will refund the unearned premium on that building or structure.**

(Doc. 1-1, at 26). The term "Earth Movement Annual Aggregate Limit of Insurance" is found in the Definitions section and means "the most we will pay for all covered 'earth movement' occurrences in any one policy year." (*Id.* at 27).

To date, Travelers has paid Plaintiffs $1,004,705.39 for loss relating to the 2007 ERS and D Line frost wall and caissons claim at issue here, and an additional $95,950 for loss relating to the November 2006 loss, which the parties agreed should be

45

allocated to the Earth Movement Annual Aggregate Limit of Insurance.[19]  (Doc. 141, at 4; Doc. 142 ¶ 14; Doc. 159, at 1 ¶ 14).  One Place argues that if it turns out that the Earth Movement Limit of Insurance applies in this case, the $2.5 million amount should not be reduced by any of these payments.  (Doc. 120, at 4-5).  Looking at the language of the reinstatement provision, One Place notes that it broadly applies to "payment of '*any claim*,'" without further modifiers.  (*Id*. at 4).  In One Place's view, "[i]f Travelers wanted to limit its obligation, then it could have used different language such as per loss or per occurrence or per year."  (*Id*. at 5).

Travelers insists that One Place's argument "makes no sense."  (Doc. 141, at 3).  Since both the 2006 and 2007 claims arose during the same policy year (November 2, 2006 to November 2, 2007), Travelers believes that One Place has only $1,399,344.61 still remaining for any earth movement claim ($2,500,000 (the Earth Movement Annual Aggregate Limit of Insurance) - $1,004,705.39 (paid for 2007 claim to date) + $95,950 (paid for 2006 claim) = $1,399,344.61).  (Doc. 141, at 3-4).  In making this argument, Travelers says the reinstatement provision "only applies to reinstate a limit for a separate claim or loss (subject to any aggregate limits).  It does [not], as One Place appears to argue, reinstate a limit within the context of a single claim or loss."  (*Id*. at 4).

As the Court understands the arguments, it appears that One Place wants to invoke a separate $2.5 million earth movement limit every time Travelers makes an earth movement-related payment, even if the money is for loss relating to the exact

---

[19]    Travelers has also paid an additional $235,844.30 for soft costs, the full $100,000 limit for expediting repairs, and the full $5,000 limit for claim data.  (Doc. 142 ¶ 14; Doc. 159, at 1 ¶ 14).  The parties agree that none of these payments is applicable to the $2.5 million Earth Movement Limit of Insurance or the $2.5 million Earth Movement Annual Aggregate Limit of Insurance.  (Doc. 120, at 4-5; Doc. 141, at 3).

same claim. In other words, the limit essentially "resets" after every payment is issued. Under this theory, Travelers' decision to voluntarily pay One Place more than $1 million on the 2007 claim was a very bad idea indeed because the insurer will still have to pay the full $2.5 million earth movement limit for that claim if One Place wins this lawsuit. Travelers believes that the $2.5 million limit applies to each claim as a whole, regardless of how payments are made, but that payment is limited for all such claims to an annual limit of $2.5 million. For example, though One Place could have recovered up to $2.5 million on the 2006 claim, and can in theory recover up to $2.5 million on the 2007 claim, all told, they can never recover more than the $2.5 million annual aggregate limit.

The Policy itself does not distinguish between general and aggregate limits applicable to the reinstatement provision, mentioning only "[t]he Limit of Insurance." (Doc. 1-1, at 26). As a result, it is not clear whether the provision is intended to apply to the "Earth Movement Limit of Insurance" for each claim, as well as to the "Earth Movement Annual Aggregate Limit of Insurance" for all claims in a single policy year. (*Id*.). If it does apply to the annual aggregate limit of insurance, however, then there is essentially no purpose for that aggregate limit because each time Travelers pays some amount towards the $2.5 million limit, the amount available for further payments would reset back to $2.5 million, nullifying the purported aggregate limit. This is a problem because the Earth Movement Annual Aggregate Limit of Insurance is an important part of the Policy, as it appears on the Declarations page along with all the other forms of insurance limits applicable to Builders' Risk. (*Id*. at 7).

One Place argues that the Earth Movement Annual Aggregate Limit of Insurance provision is ambiguous and must be construed to afford coverage. One Place notes that the provision addresses "the most we will pay for all covered 'earth movement' occurrences in any one policy year," (Doc. 1-1, at 27), and "does not state it is the most that will be paid for other covered loss or damage." (Doc. 120, at 14). In One Place's view, "[t]his definition leaves open the possibility that if other covered occurrences happen outside of earth movement, then that payment will also be owed by Travelers." (*Id*.). The logic behind this argument is not entirely clear, but as One Place explains it, "even if the loss was caused in part by earth movement, this provision only limits the aggregate payment to $2.5 million for 'earth movement,' while *leaving the door open* for payment of other events or causes." (*Id*.) (emphasis in original). One Place contrasts this provision with the Earth Movement Limit of Insurance, which they say "seeks to *close* the door for other events by using the 'regardless of any other cause or event' language." (*Id*.) (emphasis in original). Travelers claims that the Policy unambiguously provides that any loss caused at least in part by earth movement is subject to the $2.5 million limit. Thus, "if there are three 'earth movement' occurrences in a policy year, the most Travelers will pay in the aggregate for all three occurrences is $2.5 million." (Doc. 141, at 15-16).

The Court understands One Place to be arguing that if a loss was caused by both earth movement and other causes, then the $2.5 million Earth Movement Limit of Insurance would apply; however, the loss would not be subject to the Earth Movement Annual Aggregate Limit of Insurance. Once again, One Place's interpretation would essentially nullify the Earth Movement Annual Aggregate Limit of Insurance provision,

which is clearly intended to limit the amount Travelers will pay for any loss that is subject to the Earth Movement Limit of Insurance.

The Court must "construe an insurance policy as a whole, using the plain and ordinary meaning of the terms to give effect to every provision." *Milwaukee Mut. Ins. Co. v. J.P. Larsen, Inc.*, 2011 IL App (1st) 101316, at ¶ 8, 956 N.E.2d 524, 527 (1st Dist. 2011). Though ambiguous terms must be construed against the insurer, *Twenhafel*, 581 F.3d at 628, "a reviewing court will not interpret an insurance policy in such a way that any of its terms are rendered meaningless or superfluous." *National Cas. Co. v. Jewel's Bus Co.*, 880 F. Supp. 2d 914, 916 (N.D. Ill. 2012) (citing *Pekin Ins. Co. v. Wilson*, 237 Ill. 2d 446, 466, 930 N.E.2d 1011, 1023 (2010)). To ensure that the Earth Movement Annual Aggregate Limit of Insurance provision does not become a nullity, the Court finds that if the Earth Movement Limit of Insurance applies, then there is an aggregate annual cap of $2.5 million on all such claims pursuant to the Earth Movement Annual Aggregate Limit of Insurance. The $95,950 Travelers paid for the 2006 claim must be deducted from the $2.5 million annual limit as agreed by the parties, and since the 2007 loss stemmed from earth movement as well, the additional $1 million in payments must also be deducted. One Place's motion for a declaration that "the amount Travelers has paid thus far [for earth movement] does not reduce the limit of $2.5 million available to pay Plaintiffs" is therefore denied.[20] (Doc. 120, at 5).

---

[20] This Court previously held that Travelers must pay up to $2.5 million when an Earth Movement loss occurs, plus up to $3.3 million more for soft costs resulting from that Earth Movement loss. *One Place Condominium, LLC v. Travelers Property Cas. Co. of America*, No. 11 C 2520, 2011 WL 6182363 (N.D. Ill. Dec. 13, 2011). Contrary to One Place's assertion, that decision has no bearing on the instant motions, which seek to clarify whether the Earth Movement provisions apply in the first place.

## CONCLUSION

In summary, the Court denies One Place's Motion for Partial Summary Judgment [Doc. 120] that the term "Earth Movement" under the Policy is ambiguous and thus encompasses only natural and not man-made causes. The Court grants Travelers' Motion for Partial Summary Judgment [Doc. 112] regarding application of the "Earth Movement Limit of Insurance" provision. One Place's related Motion for Partial Summary Judgment regarding application of the "Earth Movement Annual Aggregate Limit of Insurance" provision is denied. One Place's Motion for Partial Summary Judgment as to the "Reinstatement of Limit After Loss" provision is also denied.

ENTER:

Dated: October 6, 2014

_Sheila Finnegan_
SHEILA FINNEGAN
United States Magistrate Judge