**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ONE PLACE CONDOMINIUM, LLC, | ) | |
| THE SOUTH LOOP SHOPS LLC, | ) | |
| SOUTHBLOCK DEVELOPMENT LLC, | ) | |
| C & K PARTNERSHIP, and SOUTHBLOCK | ) | |
| MANAGEMENT, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 11 C 2520 |
| | ) | |
| TRAVELERS PROPERTY CASUALTY | ) | Magistrate Judge Finnegan |
| COMPANY OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs One Place Condominium LLC, The South Loop Shops LLC, Southblock Development LLC, C & K Partnership, and Southblock Management, Inc. (collectively "Plaintiffs" or "One Place") are owners, developers and managers of a condominium building.  They have filed this diversity suit against Defendant Travelers Property Casualty Company of America seeking to recover amounts allegedly due under a commercial "Builders Risk" insurance policy.  The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Travelers now seeks summary judgment as to One Place's request for certain costs.  For the reasons set forth here, the motion is granted in part and denied in part.

<u>**BACKGROUND**</u>

In late 2006, One Place began constructing a ten-story building with one-story basement, containing retail space, a parking garage and residential condominium units (the "Property").  (Doc. 123 ¶ 6).  The construction project was substantially completed

by December 10, 2008. (*Id.*).  To protect against certain loss or damage to the Property during construction, One Place purchased a "Builders' Risk" insurance policy from Travelers (the "Policy").  The Policy provided two basic types of coverage: (1) Builder's Risk coverage with a limit of $33,000,000 (but only $2,500,000 for damages stemming from "earth movement"); and (2) Soft Costs and Special Time element with a limit of $3,300,000.[1]

## A.    Damage and Repairs to the Earth Retention System and D Line Frost Wall

Not long into the construction project, the builders experienced problems with the foundation that resulted in damages and the need for repairs.  The foundation included drilled shafts or piers, known as caissons, which would support the load of the building.  (Doc. 123 ¶ 19).  To assist with the excavation of certain below-grade structures, an earth retention system ("ERS") was installed, consisting of steel sheet piling that was driven partially into the ground to hold back the soil on the perimeter of the Project.  (*Id.* ¶ 21).  On March 8, 2007, a Stop Work Order was issued after movement of the "D Line" sheeting was detected.  (*Id.* ¶¶ 23, 24; Doc. 126 ¶ 9).  The sheet piling itself was never removed or replaced; instead, a new design was prepared and materials were installed to brace and reinforce the existing sheet piling.  (Doc. 123 ¶¶ 25, 26, 27).  Construction activities to reinforce the sheet piling were completed by April 13, 2007, at which time the Stop Work Order was lifted and construction on the Project resumed.  (*Id.* ¶¶ 29, 30).  Travelers paid some of the repair costs.

---

[1]    This Court previously issued opinions construing the earth movement language (*One Place Condominium, LLC v. Travelers Property Cas. Co. of Am.*, No. 11 C 2520, 2014 WL 4977331 (N.D. Ill. Oct. 6, 2014)), and the Soft Costs coverage (*One Place Condominium, LLC v. Travelers Property Cas. Co. of Am.*, No. 11 C 2520, 2011 WL 6182363 (N.D. Ill. Dec. 13, 2011)).  This opinion assumes the reader's familiarity with the facts of the case as set forth in detail in the previous opinions.

In late February and early March 2007, concerns were raised about the fact that soils under the "frost walls" and the caisson caps along the D Line had moved away from the concrete, creating voids. The frost walls (made of concrete) sit on top of the caisson caps. (*Id.* ¶ 20). It is not clear what, if anything, was done about these issues at that time, but in late July 2007, the contractors discovered that the frost wall on the west side of the building along the D Line had moved or shifted, and it was possible that the caisson caps had moved as well. This movement occurred because of the earlier movement of the ERS sheet piling. (*Id.* ¶ 32). Though no stop work order was issued, repairs had to be made to the D Line frost wall and caisson caps. (*Id.* ¶¶ 34, 35). Construction to fix these issues was completed by August 18, 2007. Travelers again paid some of the repair costs. (*Id.* ¶ 38).

**B.    One Place's Insurance Claim**

As a result of the above events, One Place made a claim for loss or damage to covered property under the Policy. Both sides retained experts to assist with the investigation and evaluation of the claim. Despite working on the claim for nearly four years, the parties were never able to reach a final agreement as to the type of loss One Place suffered, the extent to which the Policy covers that loss, and the total insurance payments due. As a result, One Place filed this lawsuit. (Doc. 116 ¶ 31; Doc. 1).

According to Travelers, even when the facts are viewed in the light most favorable to One Place, no reasonable jury could find One Place is entitled to recover certain of the claimed costs under the Policy. One Place, on the other hand, argues that the motion for partial summary judgment on these claimed costs must be denied

because the Policy is ambiguous and, even if it is not, the coverage issues involve disputed questions of fact.

**DISCUSSION**

## I.     Standard of Review

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  In viewing the facts presented on a motion for summary judgment, the court must construe the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *National Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).  "A court's role is not to evaluate the weight of the evidence, to judge credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact."  *National Athletic Sportswear*, 528 F.3d at 512.

For purposes of considering the motion for partial summary judgment on the claimed costs at issue, Travelers has requested the Court to assume (with a few exceptions discussed later) that (1) One Place actually incurred the costs or losses and has documentation to show this, (2) the costs/losses are related to the damage to and repair of the ERS and D Line, and (3) the period of delay in completion of the Project due to the damage to the ERS and D Line is as long as contended by One Place (178 days).

## II.    Construction of Insurance Contracts

It is undisputed that Illinois law governs this diversity case. "Under Illinois law, the interpretation of an insurance policy is a question of law that is properly decided by way of summary judgment." *Twenhafel v. State Auto Prop. and Cas. Ins. Co.*, 581 F.3d 625, 628 (7th Cir. 2009) (quoting *BASF AG v. Great American Assurance Co.*, 522 F.3d 813, 818-19 (7th Cir. 2008)). In construing the language of an insurance policy, the Court's primary objective is "to ascertain and give effect to the intentions of the parties as expressed by the language of the policy." *Id. See also American States Ins. Co. v. Koloms*, 177 Ill.2d 473, 479, 687 N.E.2d 72, 75 (1997). This requires the Court to "construe the policy as a whole, taking into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract." *Id.* (quoting *BASF*, 522 F.3d at 819).

If the terms of an insurance policy are clear and unambiguous, they must be applied as written and given their plain and ordinary meaning. *Id.*; *American States Ins. Co*, 177 Ill. 2d at 479, 687 N.E.2d at 75. If, however, the terms are ambiguous, they "will be strictly construed against the drafter." *Id.* (quoting *BASF*, 522 F.3d at 819). "[P]rovisions that limit or exclude coverage are to be construed liberally in favor of the insured and 'most strongly against the insurer.'" *National Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. Glenview Park Dist.*, 158 Ill.2d 116, 122, 632 N.E.2d 1039, 1042 (1994). "[T]he existence of coverage is an essential element of the insured's case," *St. Michael's Orthodox Catholic Church v. Preferred Risk Mut. Ins. Co.*, 146 Ill. App. 3d 107, 109, 496 N.E.2d 1176, 1178 (1st Dist. 1986), but the insurer bears the burden of proving that a claim is excluded from coverage. *Deal v. Prudential Ins. Co. of*

*America*, 263 F. Supp. 2d 1138, 1143 n.2 (N.D. Ill. 2003)). All of the provisions in a policy must be viewed together to give meaning and effect to each. *National Cas. Co. v. Jewel's Bus Co.*, 880 F. Supp. 2d 914, 916 (N.D. Ill. 2012) (citing *Pekin Ins. Co. v. Wilson*, 237 Ill. 2d 446, 466, 930 N.E.2d 1011, 1023 (2010)) ("[A] reviewing court will not interpret an insurance policy in such a way that any of its terms are rendered meaningless or superfluous.").

### III.    Overview of Travelers' Builder's Risk Policy

Before turning to the specific coverage disputes, this Court examines the overall structure and terms of the Policy, and discusses builder's risk policies generally. "'Builder[']s risk' insurance is a unique form of property insurance that typically covers only projects under construction, renovation, or repair and insures against accidental losses, damages or destruction of property for which the insured has an insurable interest. . . . The purpose of builder's risk insurance is to compensate for loss due to physical damage or destruction caused to the construction project itself." *Fireman's Fund v. Structural Sys. Tech., Inc.*, 426 F. Supp. 2d 1009, 1025 (D. Neb. 2006). *See also Ajax Bldg. Corp. v. Hartford Fire Ins. Co.*, 358 F.3d 795, 799 (11th Cir. 2004) ("The very purpose of a 'builder's risk policy' is to provide protection for the building under construction.").

As with any other property insurance, coverage is "triggered" by "some threshold concept of injury to the insured property," which in the case of all-risk policies is "frequently 'physical loss or damage.'" 10A COUCH ON INS. 3D § 148.46. "The requirement that the loss be 'physical' . . . is widely held to exclude alleged losses that

are intangible or incorporeal" such as "a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property." *Id.*

### A.   Insuring Clause: Payment for Loss/Damage to Covered Property

The thirty-one page Travelers Policy follows the typical format for a builder's risk policy. The insuring clause states that Travelers "will pay for 'loss' to Covered Property from any of the Covered Causes of Loss." (Doc. 1-1, at 14). "Loss" is defined as "accidental loss or damage," (*id.* at 28), and "Covered Causes of Loss" means "RISKS OF DIRECT PHYSICAL 'LOSS' except those causes of 'loss' listed in the Exclusions." (*Id.* at 14). The "Covered Property" here consists of the "[b]uildings or structures including temporary structures while being constructed, erected or fabricated at the 'job site'; [and] [p]roperty that will become a permanent part of the buildings or structures at the 'job site.'" (*Id.* at 26). In other words, the Policy pays for accidental direct physical loss of or damage to the Property. *See also* 4 BRUNER & O'CONNOR CONSTRUCTION LAW § 11:211 (July 2014) ("The insuring clause of the standard builder's risk coverage form is as follows: . . . We will pay for direct physical loss of or damage to covered property at the premises described . . . caused by or resulting from any covered cause of loss.").

### B.   Valuation Provision

Because the value of property undergoing construction increases over time as construction proceeds, builder's risk policies are generally "open or unvalued policies," meaning that "the amount of liability is left open to be determined according to the actual loss." John V. Garaffa and Heidi Hudson Raschke, *The Valuation of Losses Under Builder's Risk Policies*, 40-FALL Brief 50, at 52 (American Bar Association, Fall 2010). *See also* 14A AM. JUR. PL. & PR. FORMS *Insurance* § 1 (2014) (for unvalued

policies, "the amount of insurance set forth in the policy merely reflects the limits of coverage, and the insurer is obligated to pay the actual value of the lost property up to, but not in excess of, the stated limitation.").  In that regard, valuation clauses generally "provide for an objective measure of damaged property on the basis of the actual value of the lost or damaged property at the time of loss," or alternatively, "based upon 'replacement cost.'"  *Id.* at 53, 54.

The Travelers Policy includes the following "Valuation" provision with the formula for valuing the damaged property under construction:

The value of property will be the least of the following amounts:

1.  The actual cash value of that property;

2.  The cost of reasonably restoring that property to its condition immediately before loss or damage; or

3.  The cost of replacing that property with substantially identical property.

In the event of loss or damage, the value of property will be determined as of the time of loss or damage.

(Doc. 1-1, at 13).

## C.    Coverage Extensions

Beyond paying for loss or damage "to" the covered property as valued in the manner described above, the Policy also has certain "Coverage Extensions" wherein payment is made for delineated losses that flow "from" a covered cause of loss.  (*See* Doc. 1-1, at 14) (Travelers "will pay for 'loss' from a Covered Cause of Loss for each of the . . . Coverage Extensions.").  Under these coverage extensions, the Policy provides that Travelers will pay for losses to a fire protection system, valuable papers and records, and items like fencing, scaffolds, office trailers and their contents, trees, and

8

signs at the job site. Specific dollar limits apply to each coverage extension (e.g., $75,000 for the fire protection system). (*Id.* at 14-15).

**D.    Additional Coverages**

The Policy also has a section entitled "Additional Coverages," consisting of subsections (a) through (l). (*Id.* at 15-19). The first additional coverage provides, for example, that if expenses are incurred to re-excavate the site or re-perform similar work "*because of* 'loss' by a Covered Cause of Loss to Covered Property," then the insured "may extend the applicable limit of insurance for that 'job site' to pay for such expense" under certain circumstances. (*Id.* at 15) (emphasis added). Similarly, there is additional coverage to "pay for your expense to remove debris of Covered Property *caused by or resulting from* a Covered Cause of Loss," but with a specified dollar limit. (*Id.* at 17) (emphasis added). Other subsections within Additional Coverages provide for reimbursement of expenses such as construction contract penalties, fire department service charges, pollutant clean up and removal, and pollutant expenses, among others. As will be discussed later, such additional coverage would be unnecessary if this Court were to accept One Place's expansive reading of the Policy as essentially covering all losses that result from damage to the property under construction.

Two particular subsections of the "Additional Coverages" section are deserving of special mention since they are the subject of dispute in this case. Subsection (k) – entitled **"Expense to Reduce 'Amount of Loss'"** – is tied to the amount paid for soft costs and rental value so will be discussed after and in conjunction with the soft costs provisions. Subsection (h) of the Additional Coverages – entitled "**Expediting Costs and Additional Costs of Construction Materials and Labor"** – states that Travelers

"will pay for the following costs *made necessary by* a Covered Cause of Loss to Covered Property at the 'job site.'" (*Id.* at 18) (emphasis added). Two of the three listed costs are relevant here:

> (a)     Your costs to expedite repair of Covered Property;
>
> (b)     Your increased cost of construction materials and labor; . . .

The limit of this additional coverage is $100,000.

As this Court construes the Policy, section (a) provides for reimbursement of costs to expedite the repair of the damaged property, here the ERS and D Line. Section (b) provides for recovery of increased costs of material and labor to complete the undamaged and unfinished portion of the project. But this "Additional" coverage is limited to $100,000. In other words, while the insured may recover the entire cost of construction material and labor to repair the damage to the property itself (per the Valuation provision and subject to the Policy's overall limits), if that damage resulted in increased material and labor costs to construct the remainder of the project (the part that is undamaged or has not been built yet), there is only limited coverage up to $100,000. *Oceanside Pier View, L.P. v. Travelers Property Cas. Co. of Am.*, No. 07 C 1174-WQH-POR, 2008 WL 7822214 (S.D. Cal. May 6, 2008) (discussed in detail *infra* pp. 28-30)

One Place disagrees, arguing that this provision is ambiguous and should be construed differently. One Place asserts that sections (a) and (b) must be read together as both applying to repair costs. That is, One Place says Travelers has agreed to pay for (a) costs to expedite repair, and (b) increased costs of construction materials and labor *concerning the repair*. (Doc. 151, at 23). One Place notes that "anytime anything

happens on a job site triggering coverage under this policy it will involve additional costs of construction materials and labor." (*Id.* at 23-24). For this reason, One Place claims the provision cannot be construed to limit all increased labor and material costs for the entire Project. "If Travelers' reading were correct," they ask, "what coverage would be left for the insured?" (*Id.* at 24).

The flaw in One Place's reasoning is two-fold. First, subsection (b) does not on its face tie increased labor and materials to the repair, and unambiguous policy language must be given its plain and ordinary meaning. *Twenhafel*, 581 F.3d at 628. Second, One Place's interpretation makes no logical sense: why would Travelers agree to pay only $100,000 in increased labor and materials to repair actual damage from a covered loss, but then pay up to $33 million in labor and materials for costs to construct other undamaged portions of the Project as long as they can be traced in some fashion to the covered loss? It is no surprise that even One Place's own self-described policy interpretation expert, public adjuster G. Craig Becker of Globe Midwest/Adjusters International ("Globe Midwest"), testified that this contract language is unambiguous and refers to the increased costs of "[e]scalation of labor, overtime labor, more labor and escalation of material costs" to complete the Project. (Doc. 123-18, at 77, Becker Dep., at 73).

One Place also contends that the provision is ambiguous because the title mentions "Additional" costs of materials and labor, whereas the body of the provision uses the word "increased" costs of materials and labor. (Doc. 151, at 24). This Court agrees with Travelers that the two terms are essentially synonymous in this context. (Doc. 160, at 20). Indeed, One Place offers no explanation as to why they are different

aside from a blanket assertion that they are.  Moreover, One Place concedes that "the body controls" in such circumstances, meaning Travelers will pay up to $100,000 for the "increased" costs of materials and labor, and the use of the term "additional" is of no import.  (*Id.*).  *See, e.g., Pekin Ins. Co. v. Tovar Snow Professionals, Inc.*, 2012 IL App (1st) 111136, at ¶ 13 (2012) ("[A] contract term used only in a heading and not in the text and otherwise not defined cannot properly be imposed on an insured to exclude coverage.").

Finally, One Place suggests that the provision regarding increased costs of construction materials and labor is "contradicted by the 'expense to reduce the amount of the loss'" provision, which as summarized by One Place "allows for any expenses incurred by the insured in order to reduce the completion date of a project after a loss." (Doc. 151, at 24).  As discussed in more detail below, however, the Expense to Reduce "Amount of Loss" provision to which One Place refers is tied to reducing soft costs and rental value and, thus, has no bearing on the $100,000 limit.

### E.     Soft Costs and Rental Value

Like most builder's risk policies, the Travelers Policy has a section for "Exclusions," including one stating that Travelers "will not pay for 'loss' caused by or resulting from . . . Delay, loss of use or loss of market."  (Doc. 1-1, at 20).  *See* 4 BRUNER & O'CONNOR § 11:212 ("Builder's risk policies typically contain an exclusion for consequential or indirect loss[es]" that "result from delays in construction due to the structure being damaged by a covered 'cause of loss.'").  (*See also* Doc. 160-1, at 10, Adjusting Today) ("Not covered by the basic builder's risk policy is the delay in

completion and resulting loss of business income, loss of rents, extra expense, interest on loans and other consequential losses incurred after an insured property loss.").[2]

In recognition of the fact that "[c]ommercial owners can incur significant damages if their projects are delayed," insureds often obtain additional "time element" or "soft costs" coverage "by endorsement to the builder's risk policy." 4 BRUNER & O'CONNOR § 11:212. In this case, One Place obtained such coverage with a separate limit of $3,300,000. This coverage, entitled "Soft Costs and Special Time Element," provides for recovery of four types of soft costs that result from delay in completing the project because of damage to the covered property. The Policy provides:

> We will pay your "soft costs" during the period of delay in completion. Such soft costs must result from "loss" to Covered Property from any of the Covered Causes of Loss which delays the completion of the "project" beyond the "planned completion date."

(Doc. 1-1, at 14). The Declarations page lists the four specific soft costs that are potentially recoverable:

- Interest on money borrowed to finance construction;
- Advertising expenses;
- Realty taxes and other assessments; and
- Costs resulting from the renegotiation of your lease(s) or construction loans.

(*Id.* at 7).

These soft costs are recoverable only "during the **period of delay in completion**." This period begins with the planned completion date, defined as the date the project would have been put in use in the normal course of construction if the

---

[2]     One Place's public adjusters at Globe Midwest maintain a website with a link to the cited publication from Adjusting Today. (http://adjustersinternational.com/publications/adjusting-today/builders-risk-insurance-specialized-coverage-construction-projects/, last viewed on April 13, 2015).

damage had not occurred. (*Id.* at 16). The period of delay in completion ends with the date the project "should be completed using reasonable speed and similar materials and workmanship." (*Id.* at 29). For this same period of delay in completion, the Policy provides for payment of "the amount by which your 'rental value' is actually reduced" if this results from the loss to covered property. (*Id.* at 14). The sum of the soft costs and rental value is called the "amount of loss." (*Id.* at 26).

By stipulation, the parties have agreed that for each day of the "period of delay in completion" resulting from the damage to the ERS and D Line, One Place is entitled to recover soft costs and rental value ("amount of loss") in the amount of $10,254.10. But the parties disagree as to how many days this period of delay encompasses, so this disputed fact will be decided by a jury. While Travelers will argue to the jury that there was *no* period of delay (based on expert testimony regarding unrelated construction problems that delayed the completion date), for purposes of considering the motion for partial summary judgment, Travelers assumes the period of delay is 178 days as alleged by One Place.

### F. Subsection (k) of Additional Coverages: "Expense to Reduce 'Amount of Loss'"

Subsection (k) under the "Additional Coverages" section of the Policy provides for reimbursement of expenses during the "post-loss period of construction" if the expenses would not have been incurred absent a loss to covered property which delayed the completion of the project beyond the planned completion date. (*Id.* at 19). Significantly, while there is no dollar cap on how much will be reimbursed for such expenses, the Policy states that Travelers will not pay more than the amount by which

the expense reduces the "amount of loss" (the sum of soft costs and rental value) that otherwise would be paid. (*Id.*). Subsection (k) states in full:

> We will pay the necessary expense you incur during the "post-loss period of construction" if you would not have incurred such expense had there not been "loss" to Covered Property from any of the Covered Causes of Loss which delayed the completion of the "project" beyond the "planned completion date." But we will not pay more for your expense than the amount by which such expense reduces the "amount of loss" we would have otherwise paid.

(*Id.* at 19).

This provision makes it clear that Travelers must pay for the stated additional expenses only to the extent that they reduce the amount that it otherwise must pay for amount of loss. Given the parties' stipulation that the amount of loss is $10,254.10 for each day of the period of delay in completion, One Place seeks to recover certain expenses that it contends reduced that period of delay by accelerating the completion of the project. If so, Travelers arguably would have been saved $10,254.10 in amount of loss for each day of acceleration. According to One Place expert Craig Becker from Globe Midwest, One Place is entitled to $1,474,340.50 in "Expenses to Reduce Amount of Loss." (Doc. 123-7, at 41-42). Travelers argues, on the other hand, that there is insufficient evidence from which a jury could reasonably conclude that these expenses succeeded in accelerating the completion of the project such that they are recoverable under the Policy.

Having described the structure and key provisions of the Policy, the Court now turns to the parties' general coverage disputes.

IV.    **Coverage Disputes**

**A.    Travelers' Position:**    Travelers argues that the Builder's Risk coverage provided in the Policy is "simple property damage coverage" and "does not provide coverage for any other type of costs or losses."  (Doc. 134, at 6).  This argument is based on the "Valuation" provision summarized earlier, providing that in the event of loss or damage, the value of property will be determined as of the time of loss or damage with the value being the least of (1) the actual cash value, (2) the cost of reasonably restoring that property to its condition immediately before the loss or damage, or (3) the cost of replacing that property with substantially identical property. (Doc. 1-1, at 13).  Travelers notes that it has already paid to repair/replace the ERS and D Line damage, and stresses that those activities were completed as of April 13, 2007 and August 18, 2007, respectively.

In Travelers' view, the interpretation of the Policy offered by One Place as requiring payment for *all* costs and losses caused by the damage to the ERS and D Line, including those resulting from delay in the project, renders superfluous the Policy's Valuation provision, the provisions setting forth certain additional (but limited) coverages, and the specific exclusion for losses due to delay.  Travelers contends that not only has it paid in full for the cost to restore and replace the damaged ERS and D Line, but also reimbursed One Place for the Policy limit of $100,000 for the costs to expedite the repair of that damaged property and to cover the increased costs of construction materials and labor to finish the undamaged portion of the project.  The

total paid to date is $1,340,549.69. This amount includes payment for some "soft costs" and "rental value" due under the Policy.[3]

**B. One Place's Position:** One Place construes the Policy broadly to pay for essentially all costs, expenses and economic losses that flow from the damage to the ERS and D Line and resulting delay in completing the project. This view is reflected in the claim compiled and prepared on their behalf by One Place expert (and public adjuster) Craig Becker. For example, the work to repair/replace the damaged ERS and D Line caused delays in the Project schedule that then necessitated pushing certain work into the winter of 2007 and early 2008. This in turn required One Place to expend money to "winterize" the Project with such items as propane heaters and enclosures. The delay also led to increases in payments One Place had to make for, among other things, overhead and profit, insurance, construction and project management fees, and out-of-pocket expenses for the general contractor. Finally, the damage to the property allegedly led to certain economic losses when some advance purchasers of the condos backed out of their contracts due to the delay. In total, One Place seeks an additional $5,461,077 for costs and expenses plus $2,450,495 in economic losses.[4]

For the reasons discussed below, this Court does not find One Place's Policy interpretation arguments persuasive.

---

[3]     To date Travelers has paid $235,844.30 in soft costs, leaving $3,064,155.70 available under the Policy. (Doc. 142 ¶ 14; Doc. 158 ¶ 42). Travelers understands that, as a result of a prior ruling of this Court, it will be required to pay an additional amount toward soft costs once a jury resolves the question of how long the period of delay in completion was due to the damage to the ERS and D Line. Mr. Becker opines that Travelers owes One Place an additional $2,027,058 under the "Soft Costs and Rental Value" coverage.

[4]     One Place also seeks to recover as consequential damages (not under the Policy) financing costs of between $1.1 million and $1.3 million because Travelers did not pay the claim in full when it was submitted. This claim is discussed *infra* at 63-67.

**C.** **"Loss" versus "Damage":** One Place argues that the Policy is not limited to payment to repair or replace the damaged property but instead provides a "broad coverage grant for loss or damage to property from any risk of direct physical loss or damage." (Doc. 151, at 27). In this regard, One Place notes that the insuring clause states that Travelers "will pay for 'loss' to Covered Property from any of the Covered Causes of Loss" and "Loss" is defined elsewhere as "accidental **loss or damage.**" (Doc. 1-1, at 14, 28) (emphasis added). One Place then argues that since the Policy covers both "loss" and "damage," and those terms have "distinct and different meanings," they must both be given effect. (Doc. 151, at 7). From this, One Place concludes that "loss" is broad enough to include every expense that has any link whatsoever to the ERS/D Line damage and is not limited to paying only to repair or replace the damaged property.

In support of its broad reading of the Policy, One Place cites inapposite cases discussing when coverage is triggered, even though it is undisputed that the tangible physical damage to the ERS and D Line triggered coverage here. While there is nothing gained in discussing these cases in detail, at best they reflect that where a general all-risk commercial or homeowner's policy insures against both "loss" and "damage" to an existing structure, "physical" damage may take the form of loss of use of otherwise undamaged property, which in turn suffices as a covered loss.[5] The cases do

---

[5]     The cases cited by One Place are: *Manpower Inc. v. Insurance Co. of the State of Pennsylvania*, No. 08 C 0085, 2009 WL 3738099 (E.D. Wis. Nov. 3, 2009) (insured suffered a "direct physical loss" covered by all-risk insurance policy when it was forced to evacuate the insured premises for safety reasons, even though the premises themselves were not physically damaged); *Hampton Foods, Inc. v. Aetna Cas. & Surety Co.*, 787 F.2d 349, 352 (8th Cir. 1986) (plaintiff that removed property from a structurally unsound building before it collapsed suffered a "direct, concrete and immediate loss" sufficient for coverage under all-risk insurance policy;

not establish that once coverage has been triggered, a builder's risk policy affirmatively covers expenses beyond those necessary to repair or replace the damaged property irrespective of other policy provisions.  Nor are these cases instructive regarding the extent to which the Valuation provision limits Travelers' obligation to pay for the economic losses or other disputed costs.

D.    **Alleged Ambiguity in Valuation Provision:** One Place also takes issue with Traveler's position that the Valuation provision means Travelers must pay only for costs to restore, replace or repair damaged property (absent the application of other coverage provisions such as soft costs).  One Place argues that the Valuation provision is ambiguous because there is no language that ties the method of valuation to payment, so the provision sits "awkwardly" in the Policy.  (Doc. 151, at 11).  In One Place's view, Travelers needed to state in the insuring clause or elsewhere that the amount that Travelers "will pay for loss to covered property" *is set forth in the Valuation provision.*  One Place stresses that "when Travelers wants to limit payment based on the manner in which it values the loss or damage, it writes that language in to the Policy," suggesting that its failure to do so here is fatal.  (*Id.*).  But One Place offers no support for this argument since the document it relies on is not a policy as stated in its

---

"[t]he loss in value of [the plaintiff's] inventory necessitated by the sudden evacuation, and the destruction of its business equipment upon the building's collapse, constitute 'loss or damage to the property insured . . . resulting from all risks of direct physical loss.'"); *Western Fire Ins. Co. v. First Presbyterian Church*, 165 Colo. 34, 38-39, 437 P.2d 52 (Colo. 1968) (affirming jury verdict for insured because gasoline vapors that rendered church building uninhabitable constituted a "direct physical loss" within the meaning of the insurance policy); *Farmers Ins. Co. of Oregon v. Trutanich*, 123 Or. App. 6, 10-11, 858 P.2d 1332, 1335-36 (Or. Ct. App. 1993) (all-risk homeowner's policy insuring against "accidental direct physical loss to property" covered methamphetamine odor that physically damaged the house and the cost of removing the odor was a "direct rectification of the problem.").

response but merely a Travelers' Property Best Practices Manual that does not contain the language quoted by One Place.  (Doc. 153 ¶ 41; Doc. 158 ¶ 41; Doc. 154-1, Ex. C).

One Place also notes that Travelers used more precise language in the policy discussed in *Travelers Property Cas. Co. of Am. v. Marion T, LLC*, No. 1:07-cv-1384-WTL-DML, 2010 WL 1936165 (S.D. Ind. May 12, 2010).  There the policy said that "[i]n the event of a loss or damage covered by this coverage form . . . we will either: (1) *pay* the value of the lost or damaged property; [or] (2) *pay* the cost of repairing or replacing the lost or damaged property . . . ."  *Id.* at *5 (emphasis added).  Since Travelers "chose not to include such language in the policy at issue," One Place says, "the valuation provision is ambiguous as to whether it limits or controls the payment owed by Travelers and such ambiguity must be construed in favor of the insured and against the insured."  (Doc. 151, at 12).

This Court is not persuaded that the Valuation provision in the Policy at hand is ambiguous.  First, unlike this case, *Marion T* did not involve a claim under a builder's risk policy for damage on property under construction but, rather, a fire insurance claim on an existing manufacturing facility.  The two policies are thus distinguishable not only in their language but also their purpose and construction.  Second, the Valuation provision states that "[i]n the event of loss or damage, the value of the property will be determined as of the time of loss or damage." (Doc. 1-1, at 13).  Since a builder's risk policy is designed to insure against loss or damage to property undergoing construction, there is no point in explaining how to determine the monetary value of damaged property unless that value then translates into a payment obligation.  Even One Place's self-avowed policy interpretation expert, Mr. Becker, agrees that the Valuation provision

refers to the damaged (or lost) property – at the time the loss or damage occurs. (Doc. 123-18, at 75, Becker Dep., at 63).

Moreover, One Place's construction of the Policy would render other provisions in it superfluous in contravention of established law regarding contract interpretation that requires provisions of an insurance policy to be read together so as to give effect to every part. *National Cas. Co.*, 880 F. Supp. 2d at 916 (citing *Pekin Ins. Co.*, 237 Ill. 2d at 466, 930 N.E.2d at 1023). For example, if the Policy were construed as broadly as One Place suggests, there would be no need for "Coverage Extensions" to "pay for 'loss' from a Covered Cause of Loss" or "Additional Coverages" to pay for things like debris removal expenses "caused by or resulting from a Covered Cause of Loss…." (Doc. 1-1, at 14, 17).

One Place also finds ambiguity in the fact that the Policy contains two Valuation provisions. The one previously described is found under the "Conditions" section of the Policy under "General Conditions." (*Id.* at 13). Another Valuation provision is found under the "Coverage Form" portion of the Policy under a section for "Additional Coverage Conditions." (*Id.* at 23). The differences in these provisions are immaterial here and do not render the Valuation provision ambiguous.[6]

---

[6]     As Travelers notes, the valuation provision found under "Additional Coverage Conditions" includes a subsection (4) to allow the value of Covered Property to include "Your legal liability for property of others," something not found in the other provision. (*Id.* at 23). This subsection may apply where, for example, a subcontractor or vendor had a piece of equipment on the job site which was physically damaged and One Place had a legal responsibility to the subcontractor or vendor to repair or replace the equipment. (Doc. 160, at 13 n.10). The "property of others" subsection is not relevant here, but even if it were, the extra language does not create any ambiguity for purposes of this case. Since the second Valuation provision appears in the Additional Coverage Conditions section, the added language is clearly intended to supplement the general Valuation provision and is neither inconsistent nor ambiguous.

E.      *Zurich American Ins. Co. v. Keating Bldg. Corp.*

One Place relies on *Zurich American Ins. Co. v. Keating Bldg. Corp.*, 513 F. Supp. 2d 55 (D.N.J. 2007), to support their view that the Valuation provision has no limiting effect on the ability to recover costs beyond those associated with repair and replacement of the damaged ERS/D Line.  For reasons discussed below, the *Keating* case is both distinguishable and unpersuasive.[7]

*Keating* involved a 27-floor expansion of a hotel and resort that went awry when portions of six floors of the garage structure collapsed on top of the retail, dining and entertainment complex.  In addition to significant property damage and delay losses, four workers were killed and twenty-one were injured.  *Id.* at 58.  Construction on the entire project was halted for nearly three months.  *Id.* at 59.  All told, the collapse led to a nearly eight-month delay in the project and caused the costs to "balloon[] from $225 million to over $300 million."  *Id.*  After Zurich agreed to pay only $40 million of the $80 million sought for increased construction costs resulting from the accident, the owner and general contractor who were insured under the builder's risk policy filed suit.  *Id.* at 62.

On cross-motions for partial summary judgment, the court considered (in part) whether Zurich had to pay for the following "Additional Costs" of the general contractor: (1) Extended General Conditions (e.g., administrative costs, trailers, supplies and other costs that are not captured as direct charges); (2) Contractor's Delay charges (e.g., costs and expenses such as idle labor and equipment that was incurred before

---

[7]      One commentator noted that the *Keating* court reached an "unexpected result" and its decision "sent ripples throughout the insurance industry in 2007 with its expansive reading of builders risk soft cost coverages."  Roger D. Branigin, *Lessons Learned from the Downturn*, 40-SUM Brief 17, 20 (American Bar Association Summer 2011).

reconstruction could begin; and (3) Storage, Price Increases, Etc. (e.g., increases in labor wages and building material costs, as well as storage costs that would not have been needed but for the collapse). *Id.* at 67-68. These cost increases to finish the project stemmed largely from the change in the construction schedule and re-sequencing of work. The owner argued these Additional Costs fell within the Policy's grant of coverage because it covered "'all risks of direct physical loss or damage," which the owner said included "coverage of all fortuitous losses for which an insured peril is the proximate causes (unless expressly excluded from coverage)." *Id.* at 68.

According to the court, Zurich's counter-argument was "centered on the premise that the construction delays caused by the accident are losses suffered by [the general contractor rather than the owner] and that [the general contractor's] losses are not covered by the Policy." This was so because the general contractor was not covered by the Delay in Completion endorsement as the owner was, so the general contractor had to show coverage under the general indemnity provision. *Id.* In that regard, the Policy provided that the Valuation of the "direct physical loss or damages" to property under construction "shall be: Costs to repair or replace the property lost or damaged at the time and place of loss with material of like kind and quality less betterment including contractor's reasonable profit and overhead." *Id.* at 59 (citing the Policy, at AZINS 000548)). Based on this provision, Zurich said "the scope of the indemnity only covers repair costs to the damaged portion of the Project, not increased costs to complete construction of undamaged property." *Id.* at 68.

In rejecting this argument and finding each of the three types of additional costs covered under the Policy, the court first noted that, "[a]ccording to New Jersey law, an

'all risk' policy like the Policy at issue in this case covers all fortuitous losses that an insured peril proximately causes (unless an exclusion applies)." *Id.* In support of this statement, the court cited but did not discuss a 1986 decision of a New Jersey trial court that "cited approvingly to the American Law Reports section titled 'Coverage Under 'All Risks' Insurance.'"[8] *Id.* at 69.

The *Keating* court also found coverage by relying on the fact that the "Policy does not restrict coverage only to the area of the Project where the accident occurred[,] but instead insured "physical damage to the insured property at the 'Insured Project.'" In that regard, the court noted that the policy defined "Property Insured" to include all property used to construct the "Insured Project," and defined "Insured Project" as "the work which the Insured is contractually obligated to perform in accordance with the contract documents." *Id.* The court did not explain why having a policy that covers loss occurring anywhere at the job site translates into an insurer being responsible for paying the increased costs to complete construction of *undamaged* property following a loss.

As for the Valuation provision, the *Keating* court stated only that "from the perspective of an ordinary insured," the costs to "repair or replace the property lost or damaged" referred to "the entire structure, not simply to the location of the collapse." *Id.* But in support of this proposition, the court cited a single case, *Daus v. Marble*, 270 N.J. Super. 241, 636 A.2d 1091 (App. Div. 1994), that did not say this. *Daus* involved the question of whether a forklift was a "motorized land conveyance" within the meaning of

---

[8]     The 1986 decision was *Ariston Airline & Catering Supply Co. Inc. v. Forbes,* 211 N.J. Super. 472, 511 A.2d 1278 (Law Div. 1986). But actually that decision was quoting from another decision, one from a Connecticut court, that cited the ALR section. *Standard Structural Steel Co. v. Bethlehem Steel Corp.*, 597 F. Supp. 164 (D. Conn. 1984). Oddly, neither of the decisions provided or discussed the case(s) upon which the ALR relied for the stated proposition.

a homeowner's policy. In holding that it was, the court said "the average policy holder should expect" that it would be. *Id.* at 251, 636 A.2d at 1097. In this context, the court also observed that "'[i]nsurance contracts are to be construed in accordance with the reasonable expectations of the average policy holder[,]' and any ambiguity must be resolved against the insurance company." *Id.* at 250, 636 A.2d at 1096 (citations omitted). At the same time, the *Daus* court acknowledged that "'the rule of liberal construction 'cannot operate to authorize a perversion of the language and the intent of the contracting parties.'" *Id.* at 250-51, 636 A.2d at 1096 (citations omitted).

Bearing this in mind, the *Keating* court likely would have reached a different result had the policy contained a provision like the one in the Travelers Policy that specifically provided limited coverage for increased costs to complete the remainder of the project. As discussed previously, subsection (h) in the "Additional Coverages" section of the Policy states that Travelers "will pay for the following costs *made necessary by* a Covered Cause of Loss to Covered Property at the job site," and one of these costs is "Your increased cost of construction materials and labor" to complete the undamaged and unfinished portion of the project. (Doc. 1-1, at 18) (emphasis added). The limit that is paid for such costs is $100,000. Had the *Keating* policy contained this type of provision, it is unlikely that the court would still have construed the Valuation provision to cover such "additional costs." Indeed, elsewhere in the opinion, the *Keating* court declined to construe a particular term ("debris removal") in a way that would render another term ("demolition") superfluous, remarking that this would be "contrary to New Jersey law regarding interpretation of insurance policies." 513 F. Supp. 2d at 64 (citing *Gunther v. Metropolitan Casualty Ins. Co.*, 33 N.J. Super. 101, 113, 109 A.2d

485, 492 (Law Div. 1954) ("No part of any contract, particularly a policy prepared with the care with which this one was prepared, should be treated as useless unless it is indeed useless."). As the *Keating* court emphasized, "when interpreting an insurance policy, '[a] court must endeavor to give effect to all terms in a contract and the construction which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable.'" *Id.* (citations omitted).

After finding that the Additional Costs were covered under the general coverage grant, the *Keating* court next considered whether any exclusions to coverage applied. In that regard, the policy contained a "consequential loss" exclusion stating that Zurich would not pay for any "loss, damage or expense caused directly or indirectly and/or contributed to, in whole or in part, by":

> **Consequential loss, damage or expense of any kind or description including but not limited to** loss of market or delay, liquidated damages, performance penalties, penalties for non-completion, **delay in completion**, or non-compliance with contract conditions, whether caused by a peril insured or otherwise, however the foregoing shall not exclude Delay in Completion Coverage when it is endorsed to the Policy.

*Id.* at 70 (emphasis in original).

Zurich characterized the Additional Costs as "the epitome of consequential losses [since] they are losses that 'do[] not flow directly and immediately from the act of the party, but only from some of the consequences or results of such act[s].'" *Id.* In rejecting this position, the court first noted that under New Jersey law, a peril is only excluded if it was the "'efficient proximate cause' of the loss." *Id.* According to the court, the parties agreed that the efficient proximate cause of the loss was the garage

collapse, not delay, so the exclusion did not operate to bar coverage for the Additional Costs. *Id.* Unlike New Jersey courts, which have adopted the "efficient proximate cause" doctrine, courts in Illinois have "directly repudiat[ed] the use of tort analysis in construing insurance policies," foreclosing the proximate cause theory. *Sports Arena Mgmt., Inc. v. Great Am. Ins. Group*, No. 06 C 788, 2007 WL 684003, at *3 (N.D. Ill. Mar. 1, 2007) (citing *Transamerica Ins. Co. v. South*, 125 F.3d 392, 398 (7th Cir. 1997)).

The *Keating* court also found it significant that the "specific types of losses that are excluded as 'consequential' losses" – loss of market or delay; liquidated damages; performance penalties; and penalties for non-completion, delay in completion, or non-compliance with contract conditions – were all fairly described as "purely economic losses that are separate and apart from regular construction costs." *Id.* at 71. In the court's view,

> [e]xtending the exclusion of "consequential losses" beyond purely economic losses to include regular construction costs incurred to simply finish the Project is unwarranted and impermissible in light of New Jersey law directing courts to interpret exclusionary language narrowly.

*Id.*

Finally, the *Keating* court rejected Zurich's argument that since the consequential loss exclusion listed "delay in completion" as an example of such consequential losses, that provision necessarily excluded delays in completing the project. *Id.* The court stressed that as worded, "the exclusion excludes only losses caused by the 'perils' of 'consequential loss, damage or expense' and gives several examples of excluded losses, including 'penalties for non-completion, delay in completion, or non-compliance with contract conditions.'" *Id.* In other words, "the exclusion does not state that a delay

in completion would be a consequential loss but that the penalties associated with a delay in completion would be a consequential loss." *Id.* To the extent that the owner was not seeking coverage for a penalty, but instead for Additional Costs associated with a delay in completion, the court held that the exclusion did not apply and the insured was entitled to recover those costs. *Id.* The delay exclusion in the Travelers Policy at hand is entirely different than the consequential loss provision at issue in *Keating*. The delay exclusion is not tied to *penalties* and is not clearly limited to economic losses as opposed to regular construction costs.

      **F.** *Oceanside Pier View, L.P. v. Travelers Property Casualty Co.*: Travelers urges this Court to follow the reasoning in *Oceanside Pier View, L.P. v. Travelers Property Cas. Co.*, No. 07 C 1174-WQH-POR, 2008 WL 7822214 (S.D. Cal. May 6, 2008), which construed a builder's risk policy nearly identical to the one issued to One Place. In *Oceanside*, the plaintiff was constructing a building for retail, office, residential condominium, and parking garage uses. *Id.* at *1. When a shoring wall on the property failed and caused damage to the project, the plaintiff suffered a variety of losses including "costs to redesign and repair the failed shoring wall, increases to the [Guaranteed Maximum Price contract with a general contractor] pursuant to change order requests . . ., increased costs to protect the Property from further damage, increased costs of financing, increased fees and general conditions for the general contractor and project manager, and other soft costs and loss of business income." *Id.* at *3.

      The builders' risk policy insured against "RISKS OF DIRECT PHYSICAL 'LOSS'" to the covered property. *Id.* at *2-3. The policy also contained a valuation provision

stating that "covered property is valued as the least of (a) the cost to replace the covered property with other property, (b) the cost of reasonably restoring the property to its condition immediately before loss, or (c) the cost to replace the covered property with substantially identical property." *Id.* at *7. A separate provision entitled "Expediting Costs and Additional Cost of Construction Materials and Labor" stated that the most the insurer would pay for "increased costs of construction materials and labor" that were "made necessary by a Covered Cause of Loss" was $100,000. *Id.* at *2-3.

The only issue before the court was whether the plaintiff was entitled to recover more than $100,000 for losses resulting from "the increased costs of construction materials and labor associated with previously unconstructed portions of the Project." *Id.* at *5. The court held that the builder's risk provisions "plainly provide coverage for losses resulting from the direct physical loss of buildings or structures being erected on the Property, but do not include coverage for the increased costs of construction materials and labor to construct never-before constructed portions of the Project." *Id.* at *7. As a result,

> while the "Builders' Risk" provisions covered – and Defendant paid Plaintiff for – the cost to replace the failed shoring wall in this case, *including any increased costs to construction materials and labor which were necessary to reconstruct or replace the shoring wall to its original condition*, the "Builders' Risk" provisions did not and do not cover the increased costs of construction materials and labor which Plaintiff alleges it incurred to complete portions of the Project which were not yet under construction at the time that the shoring wall failure caused the delay.

*Id.* (emphasis added).

The court stated that this conclusion was "buttressed" by the fact that the valuation provisions focused on how to value covered property "at the time of loss,"

thereby confirming that "the 'Builders' Risk' provisions do not contemplate coverage for unforeseen costs which may be incurred to construct buildings or portions of buildings which have yet to be constructed in the first instance at the time of a delay." *Id.* The court also held that "[i]nterpreting the 'Builders' Risk' provisions as including coverage for the increased costs of construction materials and labor would render the . . . provision for 'Expediting Costs and Additional Cost of Construction Materials and Labor' superfluous, ambiguous, and with respect to the latter provision's $100,000.00 limitation, meaningless." *Id.* at *8. This Court finds the analysis in *Oceanside* persuasive.

G.      **Questions of Fact as to the Scope of Repair/Replacement Costs:**

One Place insists that even if the Valuation provision is not ambiguous, there are still questions of fact regarding which costs fall within the rubric of "repair or replacement." (Doc. 151, at 13-14). This Court will consider as to each claimed loss and claimed cost for which summary judgment is requested whether there are any disputed facts. For the most part there are not. One Place's general argument in this regard is based primarily on cases construing the proper scope of payment of "actual cash value" for damage under homeowner's policies before that damage has been repaired. One Place maintains that "[t]here is no question that the issue of what an insured would 'reasonably . . . be expected to incur in repairing or replacing the covered loss' is one that leads to a question of fact." (Doc. 151, at 17). This may have been true in the cited cases, where the insureds had not yet repaired or replaced the damaged property, and the scope of the repairs would not exceed that damage. *See, e.g., Mee v. Safeco Ins. Co. of Am.*, 908 A.2d 344, 348 (Pa. Super. Ct. 2006) ("Whether [homeowner's] use of a

30

general contractor [to repair water damage] was reasonably likely is a question of fact for the jury."). Here, however, "One Place never submitted a claim on an actual cash value basis" but instead sought amounts "based on the actual costs and expenses it purportedly incurred on the project." (Doc. 160, at 13 n.9). Thus, the question is not what costs One Place is reasonably *likely* to incur for the repair, but whether the costs they actually incurred were part of the ERS/D Line repair as opposed to something else.

     **H.**    **Delay Exclusion:** As noted, the Exclusions section of the Policy states that Travelers generally "will not pay for 'loss' caused by or resulting from . . . Delay, loss of use or loss of market." (Doc. 1-1, at 20). One Place argues that the general delay exclusion is only for "loss" caused by delay and not for "costs" caused by delay. (Doc. 151, at 19). This argument is illogical, as the only way to pay for a loss is to pay the costs associated with that loss. *See James F. Campenella Constr. Co. v. Great Am. Ins. Co. of New York*, Civil A. No. 10-681, 2010 WL 4812990, at *5 (E.D. Pa. Nov. 24, 2010) (discussed in greater detail *infra*) (where policy excluded "loss" caused by delay, the insurer did not have to pay "any additional general conditions *costs*" resulting from "delay in construction to perform repairs.") (emphasis added).

     One Place also contends that costs and losses from delay are covered under the broad coverage in the Policy since Travelers has not met its burden of establishing that the delay exclusion applies. (Doc. 151, at 18-23); *Deal*, 263 F. Supp. 2d at 1143 n.2. According to One Place, the delay exclusion has no application here since the loss to the ERS/D Line was not caused by delay. But One Place has it backwards. The first question is whether coverage is triggered under the Policy. The Policy states that Travelers "will pay for 'loss' to Covered Property from any of the Covered Causes of

Loss" and "Covered Causes of Loss means RISKS OF DIRECT PHYSICAL 'LOSS' *except those causes of 'loss' listed in the Exclusions."* (Doc. 1-1 at 14) (emphasis added). Here the parties are in agreement that the damage to the ERS/D Line *did* trigger coverage. In other words, Travelers is not denying coverage based on any Exclusion.

Since coverage is triggered, One Place certainly may recover for their loss but only to the extent provided for in the Policy. One must look to the language in the Valuation provision, Coverage Extensions, Additional Coverages, and Soft Costs/Rental Value section to determine the losses and costs that Travelers is obligated to pay under the Policy. As discussed previously, this Policy is quite specific and limited in the types of delay costs that are reimbursed, as is common with builder's risk policies. *See* 4 BRUNER & O'CONNOR § 11:212, *supra* p. 13 (noting that insureds may incur significant losses when projects are delayed due to damage to a structure and builder's risk policies typically exclude indirect losses from such delays, so insureds often obtain additional soft costs coverage). Here, One Place is seeking to recover many delay costs/losses beyond those provided for in the Policy's provisions regarding soft costs and rental value and expenses flowing from the delay that reduce amount of loss. One Place illogically disregards these provisions in arguing that they are entitled to recover all of the claimed delay costs and losses if the delay exclusion does not apply. Such costs and losses are not recoverable regardless of how one construes the delay exclusion.

That said, the language in the delay exclusion reinforces this Court's view that One Place's proposed construction of the Policy must be rejected since it fails to

consider the Policy as a whole and with the objective of ascertaining and giving effect to the intentions of the parties as expressed in the language of the Policy. *American States Ins. Co. v. Koloms*, 177 Ill.2d 473 at 479. Here the Policy not only has a broadly worded delay exclusion but is specific (and limited) in the types of delay costs that it describes as recoverable in the event that coverage is triggered. It is impossible to reconcile One Place's position on the broad coverage of delay costs with the Policy language as a whole, including the delay exclusion.

Finally, One Place points to some differing lead-in language within the Exclusions section of the Policy that they say shows the delay exclusion does not apply to losses caused both by damage to covered property and by delay. The first section under "Exclusions" deals with governmental action, nuclear hazard, war and military action, and ordinance or law. The lead-in clause for these "B.1" exclusions states:

> We will not pay for "loss" caused directly or indirectly by any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss."

(Doc. 1-1, at 20). This is commonly known as an anti-concurrent cause clause and is meant to "exclude[] coverage for damage caused by an excluded peril even when covered perils also contribute to the damage." *Alamia v. Nationwide Mut. Fire Ins. Co.*, 495 F. Supp. 2d 362, 368 (S.D.N.Y. 2007). The second section under "Exclusions" addresses, among other things, delay, loss of use or loss of market. The lead-in clause for these "B.2" exclusions does not have the same anti-concurrent cause language. It instead states: "We will not pay for 'loss' caused by or resulting from any of the following . . ." (Doc. 1-1, at 20).

One Place contends that "the absence of anti-concurrent cause lead-in language for the B.2 exclusions plainly and unambiguously indicates an intent to exclude loss from the B.2 exclusions *only* when a B.2 exclusion is the *sole* cause of the loss or damage." (Doc. 151, at 21) (emphasis in original). The theory seems to be that since the losses from delay can be traced back to the loss from the ERS/D Line damage, the delay losses have more than one "cause" and thus the delay exclusion cannot apply. (*Id.*). In support of this position, One Place directs the Court to *Pace Properties, Inc. v. American Mfrs. Mut. Ins. Co.*, 918 S.W.2d 883 (Mo. Ct. App. 1996), where a retaining wall collapsed and damaged a shopping center. *Id.* at 885. The insurer denied the claim based on an exclusion for loss from water pressure. *Id.* But the policy had two separate lead-in clauses for the exclusions sections, one with anti-concurrent cause language, and the other without. Since the exclusion that the insurer relied upon in denying the claim fell in the latter section, the court concluded that the loss was covered, stating: "The absence of [anti-concurrent cause] language indicates the exclusions . . . only apply when they are the sole cause of the loss." *Id. See also Ball-Healy-Horn v. Hartford Fire Ins. Co.*, No. 83 C 1484, 1987 WL 6864, at *3 (N.D. Ill. Feb. 17, 1987) ("[U]nder an all-risk insurance policy, where one cause of the loss is a covered risk, coverage is not defeated because an excluded risk contributed to the loss.").

*Pace* is distinguishable from this case in that it involved a question as to whether the retaining wall collapse triggered coverage under the policy at all. Here, the parties agree that the ERS/D Line damage is a covered loss, and Travelers is not attempting to deny coverage by pointing to delay as a proximate or other cause for this loss. Rather,

Travelers claims that One Place is overreaching in the types of costs and losses they seek to recover for that covered loss. At best, One Place perhaps could argue from the lead-in language in the Exclusions that, to the extent the Policy provides for recovery of certain losses and costs resulting from damage to covered property (e.g., in certain provisions of the Additional Coverages section and under Soft Costs/Rental Value), Travelers cannot escape payment by arguing that these losses were also caused by delay and therefore are excluded. For example, if One Place sought the limit of $100,000 for increased costs of construction for the undamaged portion of the property under subsection (h) of the Additional Coverages, Travelers could not avoid payment by showing that the increased costs also resulted from delay and so are excluded losses under the delay exclusion. In no way does the absence of the anti-concurrent cause language mean that One Place may recover for all costs and losses resulting from delay caused by the damage to covered property.

## V.      Disputes Over Claimed Economic Losses and Costs

Having now examined the Policy and the parties' general coverage disputes, the Court turns to One Place's specific claimed economic losses and claimed costs for which Travelers seeks summary judgment.

### A.      Economic Losses from Condo Sales

Travelers argues that summary judgment should be granted as to One Place's claim for reimbursement of $2,450,495 for economic losses associated with condo sales. This economic loss stems from sales contracts One Place obtained during 2005 and 2006 for 81 condominium units in the Property, including escrow deposits. Approximately 33 of the buyers backed out or defaulted on the contract. One Place

expert Mark A. Robinson, the Managing Partner of KOIOS Consulting Group, LLC, has opined that this number would have been much lower were it not for the delay associated with the ERS and D Line frost wall and caissons. (Doc. 152 ¶¶ 81, 82). He assumes that, absent the delay, One Place would have closed on all 81 sales contracts on June 20, 2008, at the price specified, with only 15% (approximately 12) of the pre-sold contracts failing to close. (*Id.* ¶ 82).

        **1.**      **Calculation of Economic Loss:** Looking first to the losses associated with condo sales, Mr. Robinson explains that One Place suffered an economic loss of $1,812,142 on the price of the condos. He reached this figure by taking the sales price in the pre-sold contracts for the condos and subtracting the actual sales prices at which the units were eventually sold. (*Id.* ¶ 83). In addition, Mr. Robinson opines that One Place experienced a related financing loss since it was required to carry financing for the Project for a longer period of time, and in a larger amount than would have been necessary had the pre-sold condos closed in a timely fashion. (*Id.* ¶ 84). In calculating this financing loss, Mr. Robinson assumes that One Place would have had a certain amount of money had the pre-sold contracts closed at the contract price on June 20, 2008. He then assumes that One Place would have used that money to pay down its bank loans (which had a 5% interest rate) the very same day, thus reducing its financing costs. (*Id.* ¶ 85). From there, Mr. Robinson calculates the reduction in financing costs One Place actually obtained based on sales prices and closing dates for the condos, as well as the mitigating effect of escrow deposits One Place retained and rental income on certain units. (*Id.* ¶ 86). The total economic loss on financing is then the difference between the reduction in financing costs One Place

would have obtained less the reduction in financing costs actually obtained, which comes out to $2,324,099. (*Id.* ¶ 87; Doc. 152 ¶ 87).

After making these calculations, Mr. Robinson takes the $1,812,142 for economic loss on the reduced prices of the condos, subtracts the escrow money retained ($606,817) and rental income ($646,849), and adds the excess financing loss of $2,324,099, for a subtotal of $2,882,935. To account for the assumed 15% default rate had One Place been able to close on June 20, 2008, Mr. Robinson then takes 85% of the subtotal, resulting in a total claimed economic loss of $2,450,495. (Doc. 123 ¶ 88).

**2. Analysis:** One Place argues that the economic losses are covered because they "fit within the broad coverage grant for loss or damage to property from any risk of direct physical loss or damage." (Doc. 151, at 27). Since the economic losses related to the condos do not qualify as costs to restore or replace the damaged property, Travelers argues that the losses may be reimbursed under the Policy only if they fall within one of the "Additional Coverage" provisions or under Soft Costs/Rental Value incurred during the period of delay in completion of the Project. At first blush, the losses might appear to be lost rental value or one of the four enumerated soft costs (interest on money borrowed to finance construction). But the parties already have an agreed amount of loss that One Place is entitled to recover toward lost rental value and all soft costs for each day of the period of delay in completion. (Doc. 134, at 38 n.9). As for the "Additional Coverage" provisions, One Place does not contend that these economic losses qualify for payment under subsection (k) as expenses to reduce the amount of loss. Nor do they identify any other additional coverage that arguably applies to these losses.

Since the economic losses from the condo sales, even assuming they resulted from delay to the Project because of the damaged ERS and D Line, are not recoverable under the Policy, the Court grants Traveler's motion for summary judgment as to these losses.[9]

**B.      General Contractor's "General Conditions"**

Travelers objects to paying $1,215,709.70 for "General Conditions," which are out-of-pocket expenses the general contractor incurs on the job.   On the One Place Project, these included such things as street cleaning, general cleaning, dumpsters, reproductions and copies, photos, postage and mail, small tools, portable toilets, field office and supplies.  (Doc. 123 ¶¶ 42, 43; Doc. 152 ¶¶ 42, 43; Doc. 123-7, at 37; Doc. 153-5, at 3 ¶ 8).  In an affidavit submitted in response to this motion for partial summary judgment, Mr. Becker states that he calculated this amount of $1,215,709.70 by taking the daily amount of General Conditions ($6,829.83 as determined by Travelers' construction consultants, Madsen, Kneppers & Associates ("MKA")), and multiplying this amount by 178-days – the period of delay in completion claimed by One Place.   (Doc. 153-5, at 3 ¶¶ 7, 8).  At his deposition, Mr. Becker further explained that the figure of $6,829.83 per day was based on "the general conditions that they [One Place] paid to Wight [Construction]," the company that had replaced Levine Construction, Inc. as the general contractor on the Project in April 2007.  (Doc. 123-18, at 81, Becker Dep., at 89; Doc. 123-7, at 17-20, Construction Agreement between Southblock and Wight).

Travelers contends that general conditions are not covered under the Policy because they are not costs to restore, replace or repair the damaged property.  Nor do

---

[9]      One Place also cannot recover these economic losses as direct or consequential damages from Travelers' alleged breach of contract for reasons discussed *infra* at 67-68.

they fall within one of the four types of soft costs available as a result of the delay in completing the Project. (Doc. 134, at 23). "At best, . . . these are additional costs of construction materials and labor subject to the $100,000 limit." (Doc. 160, at 26).

This Court agrees that One Place is not entitled to reimbursement of General Conditions for the period of delay in completing the Project. In this regard, the analysis in *James F. Campenella Constr. Co. v. Great Am. Ins. Co. of New York*, Civil A. No. 10-681, 2010 WL 4812990 (E.D. Pa. Nov. 24, 2010), is instructive. In *Campenella*, the plaintiffs made claims under a builder's risk policy after a water-supply line failed, causing damage to the building under construction. The plaintiffs sought to recover "hard-costs," representing "costs resulting from building damage," as well as "soft costs" incurred "during the 'period of delay in completion' of the project. *Id.* at *1 and n.1. The defendant denied coverage for all of the soft costs, and for the "general conditions" portion of the hard-cost request, which included "items necessary for the job to proceed other than labor and materials, such as dumpsters, fencing, and safety signs." *Id.* at *2 and n.5. The plaintiffs had calculated the general conditions by "taking their budgeted general conditions for the entire construction project…[and] dividing by a 540-day assumed construction schedule, and multiplying by the number of days for repair" of the water-supply line that had failed. *Id.* at *5.

Following a bench trial, the court held that the builder's risk policy did not cover the "general conditions" since these were "associated with the construction project as a whole and, therefore, would have been incurred even in the absence of the loss event." In the court's view, this meant that "any additional general conditions costs incurred necessarily resulted from delay in construction to perform repairs." *Id.* Since the policy

contained an express exclusion for costs resulting from delay, the plaintiffs were not entitled to recover the requested amounts. *Id.*

As in *Campenella*, One Place may not recover General Conditions stemming from the fact that the damage to the ERS/D Line resulted in delays that caused work on other portions of the Project to take longer. Nor may they recover for General Conditions during the period of the actual repair of the ERS and D Line if other construction work continued during this same period so the repair did not necessitate any extra costs attributable to General Conditions. On the other hand, if One Place was required to incur extra costs for General Conditions during the repair of the ERS and D Line and these costs would not otherwise have been incurred, then these costs are recoverable as costs to repair and replace the damaged property. For illustrative purposes, consider a situation where all regular construction stops for a few months because of damage to covered property, and a new general contractor is brought in to oversee only the repair. If that general contractor imposes costs on the insured for General Conditions necessary to complete the repair, these would be recoverable under the Valuation provision as part of the costs of repair. In situations where the existing general contractor oversees the repair of damaged property, and/or where the repair proceeds concurrently with regular construction, it is less likely that an insured would incur extra general conditions during the period of the repair.

One Place's expert has attributed the $1,215,709.70 sought for "General Conditions" to the 178 day delay in completion of the project. For this reason, the motion for summary judgment is granted. If One Place has evidence that it incurred special or extra General Conditions costs to repair the ERS and D Line during the

period when those repairs were made, it will be allowed to present this evidence to the jury.

## C. Construction Management

Before the damage to the property occurred, One Place Condominiums, LLC and The South Loop Shops, LLC (the "Owner") had entered into a contract with Southblock Development, LLC. (the "Manager") to provide project management for $15,000 per month.[10]  After the damage to the ERS and D Line, they entered into another agreement (dated April 2, 2007) in which the Owner promised to pay the Manager a fee of 5% of the additional construction costs for services relating to the damage to the property. (Doc. 123 ¶ 47; Doc. 123-11, at 12-13).  Harlan Karp explained the rationale for this new agreement as follows: "[i]t was a monthly fee plus a percentage to manage.  The cost got higher.  You know, the work that was required to manage – you know, this is the job I am doing, this is what he did.  But if it's going to be more, you are going to pay me based on a rate plus a percentage fee."  (Doc. 123-21, at 36, Karp Dep., at 135-36).

Based on this agreement, One Place seeks reimbursement of $238,602.12 for "Construction Management" costs that it alleges were incurred because of the damage to the ERS and D Line.  Mr. Becker calculated this figure by first totaling the additional construction costs that One Place contends resulted from the damage to the property: $4,772,042.33.  Mr. Becker then took 5% of this figure to calculate the Construction Management cost of $238,602.12.  (Doc. 123 ¶ 46; Doc. 123-7, at 37).

As a general matter, an insured may recover fees that it must pay a manager who is needed to oversee the repair of damaged property.  This is part of the repair

---

[10]    The parties have not provided the Court with a copy of the Southblock contract so the specific terms are unknown.

costs under the Valuation provision. For example, if regular construction ceased and a person with special expertise were hired to manage the repair of the damaged property, the fees paid for this service could be recoverable as repair costs. Alternatively, if the existing manager were qualified and able to oversee the repair but was required to work additional hours (for additional pay) during the repair period, the extra pay would be part of the repair cost. On the other hand, if repair work occurred during the same period as regular construction and using the same manager paid the same amount, then there would be no basis for the insured to recover construction management costs as part of the repair.

In this case, One Place certainly cannot recover a construction management fee that is derived by taking 5% of $4,772,042.33 since this latter figure includes many costs incurred after the repair of the ERS and D Line was completed. As a result, the $238,602.12 fee derived from this calculation necessarily would compensate the Manager for services well beyond the repair of the damaged property.

It also remains to be seen whether One Place is able to offer sufficient evidence to a jury to demonstrate that they incurred *any* extra construction management fees in order to repair the ERS and D Line. Travelers cites this particular cost as one of the "exceptions" where it is not assuming for purposes of the motion for summary judgment that One Place actually incurred the claimed cost. Indeed, it is undisputed that the Owners have never actually paid the Manager the 5% fee called for under the agreement. (Doc. 123 ¶ 48).[11]

---

[11]     This is perhaps because these Owner and Manager entities are all owned by Harlan Karp and his relatives or close friends. Harlan Karp has an ownership interest in One Place (the Owner), and owns 50% of Southblock (the Manager). The remaining ownership interest in One

One Place asserts in a footnote that it is irrelevant that they have not paid the 5% fee. "Rather, the issue is what is reasonable for the repair/replacement." (Doc. 151, at 18 n.9). One Place further notes that "[c]osts owed under a contract are certainly costs incurred." (*Id.*) (citing *Northrop v. Allstate Ins. Co.*, 247 Conn. 242, 720 A.2d 879 (1998) (rejecting insurer's argument that homeowners were required to have actually paid for a repair job in order to be reimbursed for it, holding that the term "spent" included "the incurring of a valid debt" for the repair or replacement of the damage); *Pierce v. Farm Bureau Mut. Ins. Co.*, 548 N.W.2d 551 (Iowa 1996) (plaintiffs fairly "replaced" damaged home by entering into a binding executory real estate contract to buy a new house from their parents; the fact that payments were not made until after the date provided for in the insurance policy was irrelevant given clear intent to be bound)).

The claim for a 5% construction management fee seems weak given the lack of payment, the ties between Owner and Manager, and the manner in which the amount was derived. Nevertheless, on summary judgment the Court must construe the facts in the light most favorable to One Place and cannot assume that the agreement was a sham document between related parties. It will be for a jury to decide whether the Manager in fact performed extra services during the repair of the damaged property for which the Owner is obligated to provide an extra construction management fee under the agreement. In any event, One Place's recovery of a construction management fee (if any) will be a fraction of the claimed $238,602.12 given the manner in which that fee was calculated. The jury will be instructed in a manner consistent with this analysis and

Place and The South Loop Shops is held by C & K Partnership, which is owned by Harlan's stepmother Linda Karp, and Roselyn Chertow, whose husband Wayne Chertow started the business with Harlan's father Jerry Karp. Wayne also owns the other 50% of Southblock along with Harlan.

can then evaluate the evidence to determine whether there is a basis for requiring Travelers to pay any of the construction management fee that is sought. Summary judgment as to this claimed cost is denied.

### D. Project Management

As discussed above, before the damage to the ERS and D Line, Manager Southblock was entitled under its contract with the Owner to receive a project management fee of $15,000 per month. As a result of the damage to the property, One Place seeks to recover under the Policy a "Project Management" fee of $120,000. Mr. Becker derived this figure by multiplying the $15,000 monthly fee by 8 months, the length of time One Place contends the Project was delayed by the damage to the ERS and D Line frost wall and caissons. (Doc. 123 ¶ 51; Doc. 123-18, at 84, Becker Dep., at 98-99). In other words, One Place contends that, due to the damage and resulting 8 months of delay in completing the project, One Place was required to incur an extra $120,000 in Project Management costs payable to Southblock.

When asked at his deposition whether One Place incurred these costs "because of the delay on the project," Mr. Becker stated "Yes." (Doc. 123-18, at 84, Becker Dep., at 101). One Place stresses, however, that Mr. Becker subsequently testified to his belief that the Policy's delay exclusion did not apply in this case: "The delay exclusion is an exclusion to exclude loss caused by delay as the proximate cause of loss. The delay [at issue here] was not the proximate cause of loss. The delay resulted from the loss." (*Id.* at 93, Becker Dep., at 134).

For the reasons stated earlier, the ability to recover the project management fee does not turn on whether the delay exclusion applies. Instead the Court looks to the

provisions setting forth what types of delay costs are paid under the Policy in the event that coverage is triggered, as it is here.  Given Mr. Becker's calculation and explanation, the extra project management fees plainly are not part of the cost to repair the ERS and D Line.  As for the other coverage provisions, One Place does not assert that the Project Management fee is part of the expense to reduce amount of loss, or one of the enumerated soft costs.  At best, the project management fee constitutes increased costs of construction materials and labor subject to the $100,000 limit.  Travelers' motion for summary judgment is therefore granted as to this cost.

### E.  General Contractor Overhead and Profit

One Place seeks recovery of $715,806.35 incurred for general contractor services (i.e., overhead and profit).  Mr. Becker calculated this amount by taking 15% of the subtotal of all invoices that he attributes as related to the damaged property ($4,772,042.33).  (*Id.* ¶ 49; Doc. 123-7, at 37).  Travelers contends that One Place never actually paid overhead and profit for costs associated with the ERS and D Line damage.  It points to the affidavit of Janice M. Inguagiato, a Director with Held Enloe, who stated that "Levine [the general contractor] did submit a change order for overhead and profit based on a percentage in connection with the restoration," but "based on the 'Final Settlement Version' of Application #11 submitted by Levine, the claimed amount was crossed out and not paid."  (Doc. 123-11, at 15, 16, Inguagiato Aff. ¶¶ 2, 4).  Exhibit 1 to the affidavit, a "Sworn Statement for Contractor and Subcontractor to Owner" dated May 11, 2007, does show the line item for "Levine Construction Change Order #15 Levine's Overhead & Profit" as being crossed out.  (Doc. 123-11, at 18).

Ms. Inguagiato also states in her affidavit that "One Place did not pay [the successor general contractor,] Wight, overhead and profit in connection with the repair of the D Line frost wall and caissons." In support she states that she "reviewed, in extensive detail, the project files, including the Wight documents, Wight pay applications, Owner Change Orders issued to Wight and other One Place documents." (*Id.* at 17, Inguagiato Aff. ¶ 5; Doc. 123 ¶ 50).

Rather than point to evidence of any specific payments made to Levine or Wight, One Place responds with a competing affidavit from Harlan Karp stating simply that "One Place paid general contractor fees and general conditions totaling $5,341,114 on the One Place project, $2,537,524 more than the original budgeted amount of $2,803,590." (Doc. 153-6, at 3, Karp Aff. ¶ 8). This sentence is in no way sufficient to create an issue of fact as to whether One Place paid overhead and profit to the general contractors on the work done to repair the ERS and D Line. There could be many reasons One Place went over budget on these items and on the facts presented, Travelers is entitled to summary judgment on the $715,806.35 amount.

### F.    Extra Insurance and Permit Extensions

One Place paid $32,612 for "Extra Insurance," (Doc. 123 ¶ 52; Doc. 123-18, at 84, Becker Dep., at 101), and $90,476 for "Permit Extensions" required by the City of Chicago. (Doc. 123 ¶ 53). They cannot recover these costs under the Policy because they are attributable to the subsequent delay occasioned by the ERS/D Line damage, not the repair/replacement of that damage. (Doc. 123-18, at 84, 89-90, Becker Dep., at 100-01, 121-22) (agreeing that One Place incurred the extra insurance and permit

extensions costs because of the delay on the Project).  In addition, neither cost is an enumerated soft cost or identified as an expense to reduce the amount of loss.

### G.    Additional Flaggers

One Place seeks to recover $218,031 for "Additional Flaggers" based on the fact that the City of Chicago required flaggers to be present during construction to signal CTA trains to slow down.  One Place concedes there were no flaggers needed during the restoration and reinforcement of the ERS because the Project was shut down throughout that period.  One Place also admits that the flaggers present during the course of repairing the D Line frost wall and caissons would have been there regardless of the damage because other work continued on the Project at the same time.  (Doc. 123 ¶¶ 54, 55; Doc. 152 ¶ 54, 55).  The only thing One Place says in response is that they "paid more to the CTA than what was budgeted," (Doc. 152 ¶ 55), but that is not the test for determining the existence of coverage.  To the extent there were any additional flaggers, they cannot be characterized as soft costs or expense to reduce amount of loss, but instead appear to be uncovered delay costs.  To the extent that these costs qualify as increased cost of construction labor, they are subject to the $100,000 limit that already has been met.  As such, they are not covered under the Policy.

### H.    Concrete Structures Change Orders

Concrete Structures of the Midwest, Inc. ("Concrete Structures") was the subcontractor responsible for performing concrete work on the Project.  The only exception was that Sherry K Corporation came in to handle concrete work associated with repairing the damaged ERS.  (Doc. 123 ¶ 27).  Throughout the course of the

Project, Concrete Structures submitted numerous change orders to One Place to account for alterations in their work and associated expenses they incurred affecting payments due under their contract. In this motion, Travelers challenges three of the change orders for which One Place seeks reimbursement under the Policy.

### 1. CSM-010

One Place seeks to recover $412,876 based on a June 2007 Concrete Structures change order (CSM-010) titled "Earth Retention Delay." (Doc. 123 ¶ 57). That change order sets forth 8 line items of costs as follows: (1) additional framework rental; (2) tower crane foundation monitoring; (3) additional concrete work at rakers; (4) direct impact of rakers on 1st floor shoring; (5) direct impact of rakers on foundation work; (6) labor escalation; (7) winter conditions allowance; and (8) general conditions during work stoppage and remobilization period. (Doc. 123 ¶ 58; Doc. 123-12, at 28-29, 35). The first item is Concrete Structures' cost to rent fabricated panels during the temporary shutdown, even though they were not being used. The second item is for labor costs to monitor the crane. The third item is for costs to reorder certain material, and also included labor costs. The fourth and fifth items are for labor and material, and the sixth item is for an increase in labor prices. The seventh item is again for labor and material, and the eighth item is for general conditions, which included labor and some equipment. (Doc. 123 ¶ 58).

Neo Lorenzo, a Concrete Structures Project Manager, testified at his deposition that these were costs the company incurred "while the job was shut down" for materials and equipment "that are sitting there doing nothing but we still have to pay the rent because of this delay or this shutdown and now our work got pushed by that duration

48

further." (Doc. 123-22, at 4, 21, Lorenzo Dep., at 11-12, 75). This figure also includes lost worker productivity. (*Id.* at 22, Lorenzo Dep., at 79-80). Mr. Becker similarly testified to his understanding that these represented "delay costs incurred by Concrete Structures," which he believes are covered under the Policy's Valuation provision. (Doc. 123-18, at 86, Becker Dep., at 109).

As Travelers notes, none of these costs is to repair, restore or replace the ERS/D Line damage. Rather, the costs are the consequence of the delay caused by the need to conduct that repair/replacement. One Place does not argue that the items listed above are soft costs or rental value or expense to reduce loss, and many appear to be increased costs of construction materials or labor covered by the $100,000 limit. The costs thus are not recoverable under the Policy.

### 2. No. 4.1

One Place next seeks to recover $253,722 for Proposed Change Order No. 4.1, which is dated October 2007 and titled "Impact Costs from Caisson D." This change order reflects Concrete Structures' impact costs due to the delay in the Project caused by the D Line frost wall issues. (Doc. 123 ¶ 59; Doc. 123-12, at 77). Mr. Lorenzo explained the six items associated with this change order as follows: (1) extended general conditions, including labor and material; (2) loss of labor productivity, representing labor costs incurred because Concrete Structures had to perform work out of sequence; (3) additional framework and equipment rental, plus some labor costs; (4) additional crane charges during authorized OT (overtime) and Extra Work (more rental costs); (5) Material Escalation costs; and (6) Winter Conditions (costs for labor and material). (Doc. 123 ¶ 60).

Once again, none of these costs is to repair, restore or replace the ERS/D Line damage, stemming instead from the delay caused by the need to conduct that repair/replacement. One Place claims there is a factual dispute on this issue, (Doc. 151, at 20), but has fully admitted Travelers' Statement of Facts relating to this change order, with paragraph 59 expressly stating that "[t]hese are Concrete Structures' impact costs *due to the delay in the Project* because of the D Line frost wall issues." (Doc. 152 ¶ 59) (emphasis added). These types of delay costs are not among those that are recoverable under the Policy so Travelers' motion for summary judgment on this issue is granted.

### 3. No. 3, Item 6

For Change Order No. 3, One Place claims Travelers must pay, among other amounts, $29,490 for "Delay Impact Costs due to Raker Interference based on Six (6) Working Days." This stems from raker installation work that Sherry K Corporation did in connection with the repair to the ERS. Apparently, "the location of one of the [new] rakers along the west wall was not properly coordinated and interfered with a wall." (Doc. 123-8, at 99, Held Enloe Report, at 11). To remedy the problem, Concrete Structures framed and poured a revised grade beam wall, furnished and installed reinforcing, drilled and grouted bars, and boxed out the raker. (Doc. 123-12, at 42). This work prompted Concrete Structures to submit the cited change order seeking $29,490 for extended general conditions stemming from the repair, including both labor and material costs. (Doc. 123 ¶ 61; Doc. 123-12, at 42).

Viewing the facts in a light most favorable to One Place, it is possible that they will be able to demonstrate that the raker work, and the associated general conditions,

constituted costs to repair or replace the damaged ERS. Sherry K's initial raker work was certainly part of the repair, and Concrete Structures' work in fixing one of Sherry K's mistakes is arguably a natural continuation of the repair. Travelers' motion for summary judgment on this claim is denied.

## I.     Expense to Reduce Amount of Loss

Mr. Becker has identified three categories of costs that he says fall under subsection (k) of "Additional Coverages," which provides for reimbursement of Expense to Reduce Amount of Loss:  (1) "Winter Conditions"; (2) "Acceleration"; and (3) "Period of Delay Costs Incurred to Reduce Loss."

### 1.     "Winter Conditions" and "Acceleration"

One Place claims that the delays caused by the damaged ERS and D Line frost wall and caissons resulted in the Project unexpectedly extending through the winter of 2007.  To keep production moving forward, One Place says it had to take measures to "winterize" the Project.  As One Place explains:

> Certain concrete, masonry and subsequent mechanical, electrical, plumbing and elevator work which was weather sensitive per the original schedule was scheduled to be completed prior to the onset of the 2007/2008 winter or be performed in a fully enclosed, weather protected structure.  The loss resulted in lost construction days, delays in construction, work-arounds on site to accommodate loss related repairs and other schedule impacting construction inefficiencies directly attributable to the loss, all of which caused some of these construction activities to be performed in the following winter.  If the loss had not occurred, these activities would have been performed before the onset of winter.  As a result, additional unanticipated costs were incurred to provide protection from the elements so that work could continue.

(Doc. 123 ¶ 72; Doc. 152 ¶ 72; Doc. 158 ¶ 19).  These Winter Conditions expenses total $110,629.07 and include costs to enclose the scaffolding for winter protection, and for certain carpentry work, heaters, propane and other materials.

In a similar vein, One Place is also seeking $260,377.60 for costs they incurred attempting to accelerate the construction schedule and "make up for any delay to the overall completion of the project due to the earth retention system and D Line frost wall damage and repairs."  (Doc. 123 ¶ 66).  Mr. Becker's report identifies 7 subcontractors, including Concrete Structures, Universal Construction Testing, Bonus Electric and D-Three, who charged One Place extra amounts for weekend, premium and overtime work they performed.  (*Id.* ¶ 67).

The parties appear to agree that One Place can recover these expenses provided the expenses would not have been incurred absent delay in completing the project because of the damage to the ERS and D Line,  There is also no dispute that subsection (k) provides that Travelers "will not pay more for your expense than the amount by which such expense reduces the 'amount of loss' [the sum of soft costs and rental value] we would have otherwise paid."  (Doc. 1-1 at 19).  Given the agreement on a daily fixed amount that Travelers must pay in soft costs and rental value during the period of delay in completion, the parties understandably focus on whether the claimed expenses to reduce loss actually resulted in the Project being completed faster such that the "amount of loss" would have been reduced.

They disagree, however, as to the proof required to establish this.  Travelers insists that determining whether amounts One Place expended to get the Project completed sooner actually did so "requires a detailed scheduling analysis by an expert

who must demonstrate the number of days by which the Project was accelerated." (Doc. 160, at 21). Consistent with this theory, Travelers' experts from Held Enloe have submitted a lengthy report opining that "[t]he Substantial Completion of the project was delayed for reasons other than the ERS and D Line movement and subsequent repair, including later than planned masonry and window installations. As a result, although ERS and D line caused a delay to the concrete work at the time of the loss, masonry, windows and other delays caused the delay to the Substantial Completion of the project." (Doc. 123-8, at 90, Held Enloe Report, at 2). For this reason, Held Enloe believes that "accelerating the concrete work did not mitigate the overall delay to the Substantial Completion date." (*Id.*).

One Place does not cite to any expert report or testimony stating that the above measures actually served to accelerate the Project's completion date. Instead, One Place points to testimony from Harlan Karp that the overall completion of the Project was reduced by at least 82 days due to the acceleration and other mitigation efforts they employed, including winter conditions. (Doc. 151, at 25). For purposes of the "acceleration" category, Mr. Karp based this assessment on his "[d]etailed analysis of the invoices and days that were worked," but this means only that he counted the number of times there was overtime or weekend work performed on the Project. (Doc. 123-21, at 38, H. Karp Dep., at 144-45). With respect to the "winter conditions" category, Mr. Karp testified that the masons from Crouch-Seranko "weren't going to work until the weather got nice." (*Id.* at 39, Karp Dep., at 148). Though he did not state it outright, Mr. Karp presumably believes that the efforts made to enclose and heat the

work space resulted in the masons agreeing to work through the winter, thereby allowing other portions of the Project to be completed sooner.

Travelers argues that the non-expert testimony from Mr. Karp is insufficient to rebut its expert showing from Held Enloe. Travelers notes, for example, that Mr. Karp acknowledged that sometime in late September 2007 the general contractor at the time, Wight Construction, recommended that One Place stop authorizing additional overtime for the Concrete Structures workers because "you don't pay the money if you are not getting the benefit of the work." (Doc. 123-21, at 18, 38, Karp Dep., at 62-63, 145). Though Mr. Karp did not do an analysis to determine whether the overtime performed by Concrete Structures actually accelerated the schedule, he nonetheless claims that overtime generally did reduce the amount of loss overall. (*Id.* at 18, Karp Dep., at 64-65).

Aside from Mr. Karp's testimony, One Place's only rebuttal to the Held Enloe report is deposition testimony from John Spittler, their engineering and scheduling expert, who opined that if One Place had not implemented the winter conditions and other mitigating measures, the project schedule "slippage" would have been much worse. (Doc. 153 ¶ 20; Doc. 158 ¶ 20). However, Mr. Spittler testified that he was not asked to do a delay analysis of the Project for the period September 1, 2007 through the first quarter of 2009, but only for the period February 1, 2007 through August 31, 2007. (Doc. 158 ¶ 20; Doc. 153-2, at 14, Spittler Dep., at 46-47). In other words, Mr. Spittler did not do a delay analysis as to what was happening on the Project after the repairs to the ERS/D Line were completed. Had he been asked to prepare such an analysis, Mr. Spittler "would have drilled down into the details of the activities rather

than looking at them in a summary level to understand what was occurring on multiple paths." (*Id.*, Spittler Dep., at 46).

Travelers has not cited any cases mandating expert testimony to demonstrate that expenses incurred to complete a project faster in fact accomplished that result. There does appear to be some question regarding the effectiveness of paying Concrete Structures premium and overtime pay given that at some point in September 2007 the general contractor recommended that One Place stop doing so. On the record presented, however, the Court cannot say that no reasonable jury could ever conclude that the measures One Place implemented to accelerate the schedule failed in that regard, or make that determination as a matter of law. One Place has presented sufficient evidence to raise a question of fact as to whether (1) the Winter Conditions and Acceleration costs actually got the Project completed faster, (2) if so, whether those expenses reduced the amount of soft costs and rental value Travelers otherwise would have paid, and (3) if so, in what amount. A jury must answer these questions so Travelers' motion for summary judgment on these claimed costs is denied.

## 2. "Period of Delay Costs Incurred to Reduce Loss"

The third category of claimed expenses to reduce amount of loss set forth in Mr. Becker's report are for Period of Delay Costs Incurred to Reduce Loss. One Place defines these as:

> the lost construction days, delays in construction, work-arounds on site to accommodate the loss related repairs and other schedule impacting construction inefficiencies directly attributable to the loss caused inefficiencies which resulted in the insured incurring significant additional costs in contact labor . . . [the costs are] primarily from the concrete and plumbing subcontractors for increased period of construction costs as a result of the covered loss.

(Doc. 123 ¶ 74). These costs, totaling $857,617.91, include payments to two subcontractors as follows:

    a. Concrete Structures

        1. $769,132 for impact costs due to 52 working days of weather delays on the Project (Doc. 123-14, at 3-12)

        2. $5,994.91 for snow removal in February 2008 and a concrete pour in April 2008 "to allow chiller units on roof to be placed ahead of schedule"

        3. $22,958 for work in March and April 2008 to hoist scaffolding and materials for Crouch-Seranko

    b. Nadolna Brothers Co.

        $59,533 for extra labor hours from June 4, 2008 to the end of November 2008

(Doc. 123 ¶ 73; Doc. 123-7, at 42).

### a. The Concrete Structures Lawsuit

The first entry for $769,132 relates to a lawsuit Concrete Structures filed against One Place seeking $1,428,373 for impact costs incurred due to a loss of 52 working days on the Project as a result of weather delays. (Doc. 123 ¶¶ 62, 63; Doc. 123-14, at 3-5). Neo Lorenzo, the Project Manager for Concrete Structures, prepared an "Escalation Claim" explaining that "[s]ubsequent to January 30, 2008 the concrete work was . . . delayed beyond our control" due to (a) "Weather Delays," and (b) "Other Delays" such as "ComEd shutdowns, Crane Boom Motor Damage due to weather, etc." (Doc. 123-13, at 5). As a result of those delays, Concrete Structures said it had to pay a variety of increased expenses, including: (1) $512,874 for general conditions escalation; (2) $375,237 for labor escalation "due to productivity loss subsequent to

12/31/07"; (3) $33,882 for material escalation due to an increase in the prices for ready-mixed concrete and reinforcing bars; (4) $309,669 for equipment rental cost escalation; (5) $3,324 for City and County Sales Tax Increases; (6) $46,416 for insurance escalation; and (7) $141,536 for winter conditions cost escalation "due to expenses for heater rental, enclosures, tarps, accelerators, etc., as it completed the work in some of the worst winter weather in recent memory." (Doc. 123 ¶ 62; Doc. 123-13, at 6; Doc. 123-14, at 3-5).

Concrete Structures sued One Place to recover the $1,428,373 (plus other amounts). One Place filed an answer denying that it owed Concrete Structures these funds, and also asserted counterclaims. In the end the parties reached a confidential settlement, with One Place making a settlement payment of $225,000 to Concrete Structures. (Doc. 123 ¶¶ 64, 65). One Place claims, through an affidavit from Harlan Karp, that $769,132 of the $1,428,373 sought by Concrete Structures in its Escalation Claim and ensuing lawsuit constitutes part of the recoverable period of delay costs incurred by One Place to reduce the amount of loss. (Doc. 151, at 25). Hence it seeks to recover this amount from Travelers under the Policy. One Place appears to have derived the $769,132 figure from an email One Place's project manager, Charles M. Shenk, sent to Mr. Becker claiming that "part of [the Concrete Structures delay claim] is partially attributable to the ERS failure." (Doc. 123-14, at 3). Mr. Shenk calculated the covered costs as follows:

| | |
|---|---|
| Total cost of [Concrete Structures] Delay Claim: | $1,428,373 |
| Divided by Total number of delay days: | 52 |
| Cost per Delay Day: | $27,469 |
| # of Weather Delay Days after Original Contract Date: | 28 |
| Total cost of Weather Delay Days attributable to ERS Failure: | $769,132 |

(*Id.*).

Based on the evidence presented, no reasonable jury could find that One Place is entitled to recover the requested $769,132.  Mr. Schenk did not then (and One Place does not now) examine the specific components of the Concrete Structures escalation claim to determine whether each expense (1) would not have been incurred absent the damage to the ERS and D Line that delayed the project completion date, and (2) accelerated the project completion (hence reducing the amount of loss otherwise payable by Travelers).  All they provide in that regard is a conclusory assertion from Mr. Karp that the "Concrete Structures invoice of $769,132 is part of the claim" for expenses to reduce amount of loss.  (Doc. 158 ¶ 44).  Yet some of the amounts sought in the lawsuit simply could not have contributed to finishing the Project more quickly, such as the $375,237 for labor escalation costs incurred due to "productivity *loss*."  On this record, no reasonable jury could find that $769,132 of the Concrete Structures escalation claim is potentially recoverable as expense to reduce amount of loss under subsection (k) of the Additional Coverages provision.

Moreover, One Place did not pay Concrete Structures anywhere near $769,132 since they settled the case for $225,000.  One Place responds with an affidavit from Mr. Karp suggesting that, in lieu of paying more money to Concrete Structures, One Place gave up come counterclaims against Concrete Structures.  Mr. Karp states that all of the amounts requested pursuant to the lawsuit were

> used as a credit against the claim One Place had against Concrete Structures.  As part of the settlement, One Place forwent recovery on its counter claim against Concrete Structures, including but not limited to

> repairs that are needed to the property that One Place will have to perform
> at a cost of $427,577.

(Doc. 153-6, at 4, H. Karp Aff. ¶ 7). Any claim One Place may have had against Concrete Structures was at best speculative, however, and is not competent proof that One Place incurred $769,132. Finally, even assuming One Place could make a claim for the $225,000, the parties did not allocate that settlement payment to any particular invoice or service provided by Concrete Structures. (Doc. 123 ¶¶ 64, 65). One Place fails to explain how a jury would determine which portion of the $225,000, if any, is properly allocable to efforts to reduce the amount of loss.

For all these reasons, Travelers' motion for summary judgment relating to the Concrete Structures claim in the lawsuit is granted.

### b.    Snow Removal

The next cost One Place seeks to recover as an expense to reduce amount of loss within Mr. Becker's category called "Period of Delay Costs Incurred to Reduce Loss" was a payment of $5,994.91 to Concrete Structures for snow removal in February 2008 and a special concrete pour in April 2008 that enabled chillers to be set earlier. (Doc. 137, at 33-34). It is at least possible that One Place could persuade a jury that these are costs they incurred due to the delay occasioned by the damage to the ERS and D Line, which pushed the Project into the winter of 2007 to 2008, and that the measures enabled them to get the Project completed faster so reduced the period of delay in completion and resulting "amount of loss" payable by Travelers. Travelers' motion for summary judgment on this amount is thus denied.

### c.      Scaffolding

Another cost that One Place seeks to recover as an expense to reduce amount of loss is $22,958 for work in March and April 2008 to hoist scaffolding and materials for the masons at Crouch-Seranko.  One Place has already sought to recover the costs associated with enclosing the scaffolding for purposes of winter conditions, and they offer no explanation as to how this additional scaffolding either was tied to the delay stemming from the ERS/D Line damage or served to accelerate the completion of the Project.  Travelers' motion for summary judgment as to this expense is granted.

### d.      Nadolna Excess Labor

The final disputed cost in this period of delay category of the expenses to reduce amount of loss is $59,533 for extra labor hours expended by Nadolna from June 4, 2008 through November 2008.  This claim is based on a December 15, 2008 letter the president of Nadolna sent to Wight Construction explaining that when they bid on the job "it was figured for a crew of 6 to 7 men, with a working foreman," but "because of the acceleration of the project in order to meet the owner's deadlines [following weather and other delays, including failure of the ERS], we were forced to use a much larger crew and a non working foreman."  (Doc. 123-17, at 30).

Once again, it is at least possible the extra manpower was required because of the delay associated with repairing the ERS/D Line and helped get the Project completed faster.  One Place should have an opportunity to try and prove this to a jury, so summary judgment is denied as to this expense.

### J.    Miscellaneous Post-August 2007 Costs

One Place next seeks to recover $172,363 in costs for labor escalation and carpentry and labor work relating to interior winter protection.  This includes amounts charged by three subcontractors as follows:

a.    Crouch-Seranko

$7,790 in added costs for labor escalation as of 6/1/08

b.    D-Three

$146,501 for carpentry work and labor costs relating to interior winter protection

c.    PES

$18,072 in added costs for labor escalation in 2008

(Doc. 123 ¶ 75; Doc. 123-7, at 35-37).  One Place does not claim that these costs are part of the expense to reduce amount of loss, and they are not costs to repair or replace the damaged property or recoverable soft costs.  At best, they constitute increased costs of construction materials and labor subject to the $100,000 limit.  Travelers' motion for summary judgment as to these costs is granted.

### K.    "Engineering" and "Testing" Costs

The "Engineering" and "Testing" costs at issue are for costs to determine the cause of the loss and to monitor the site after the repairs were completed.  Travelers objects to paying $3,330.20 to Jim Hauk of Wiss Janney Elsner for post-repair monitoring services; $12,339 to Bob Lukas from Geotechnical Consultants, who is One Place's engineering expert regarding causation, for determining the cause of loss; and $33,602 to Professionals Associated for post-repair monitoring services.  (Doc. 123 ¶¶

77-79; Doc. 23-7, at 33). More specifically, Travelers objects to the following consulting services Mr. Hauk provided to One Place:

    a. $2,280.20 for services relating to additional monitoring and testing

    b. $350 for a conference call with One Place on March 12, 2008

    c. $700 for a meeting with One Place and Bob Lukas on February 27, 2008

(Doc. 123 ¶ 77; Doc. 23-7, at 33). Travelers also challenges certain services provided by Mr. Lukas:

    a. $5,265 to review files and draft a report in August 2007

    b. $1,875 for a conference call and geotechnical calculations in December 2007

    c. $2,147 to review files and attend a meeting at Southblock in February 2008

    d. $1,125 to review Hayward Baker sheet pile calculations in April 2008

    e. $750 for sheet pile calculations in April 2008

    f. $1,177 to meet at lawyers office and review file in May 2008

(Doc. 123 ¶ 78; Doc. 23-7, at 33). Finally, Travelers takes issue with $33,602 in payments One Place made to Professionals Associated for monitoring of lateral and settlement control points on the Project. (Doc. 123 ¶ 79; Doc. 123-7, at 33).

All of these costs are related to determining the cause of the ERS/D Line damage and monitoring the site after repairs were completed. They do not constitute costs to repair or replace the damaged property or soft costs, and One Place makes no claim that they are part of the expense to reduce amount of loss. At best, the Engineering and Testing costs are increased costs of construction materials and labor subject to the $100,000 limit. Summary judgment is granted as to these amounts.

## VI.     Recovery of Financing Costs as Consequential Damages

One Place admits that the final claimed costs at issue here – financing on the unpaid amount of the insurance claim – are not recoverable under the terms of the Policy.  They instead seek these costs as consequential damages in the event that Travelers is found to have breached the contract by refusing to pay One Place all of the costs that they say are due under the Policy.  (Doc. 123 ¶ 89).  Mr. Robinson sets forth these alleged costs in his opinion, explaining that One Place incurred economic losses in the form of costs to finance the total amount allegedly remaining unpaid on the insurance claim.  His calculation reflects the fact that One Place had to modify the terms of several construction loans because they did not have sufficient funds to pay them down.  (Doc. 123-8, at 6-9).

Mr. Robinson first assumes that One Place's July 14, 2009 claim submission to Defendant should have been paid in full on August 13, 2009.  To determine the amount that he believes remains unpaid, Mr. Robinson uses the unpaid claim amounts set forth in Mr. Becker's report, which themselves vary depending on the period of delay in completion.  The period of delay will be determined by the jury at trial; the longer the period of delay, the more One Place is allegedly owed under the Policy for soft costs/rental value.   (Doc. 123 ¶¶ 89, 90).  Mr. Robinson then takes the amounts remaining unpaid on the claim, factors in the daily financing rate for construction loans on the Project based on a 5% interest rate, and takes that by the number of days he contends Defendant is "tardy" in making payment (i.e., from August 13, 2009 to May 1, 2013).  Put another way, Mr. Robinson assumes that had Defendant paid the remaining amounts in August 2009, One Place would have used that money to pay down the

principal on the construction loans to three lenders, thereby reducing its interest obligations. (*Id.* ¶ 91). Depending upon the period of delay, the financing costs claimed as consequential damages are: $1,173,667 (118 days), $1,295,853 (178 days), or $1,350,782 loss (8 months). (Doc. 123 ¶ 89).

One Place concedes that they are "not claiming that these [financing loss] damages fit within the coverage of the policy." (Doc. 151, at 28). Rather, One Place asserts that these are "consequential or direct damages resulting from Travelers' breach." (*Id.*). In moving for summary judgment on this claim, Travelers argues that One Place's only remedy for any alleged "unreasonable delay in failing to pay amounts due under the Policy" is a claim for bad faith or unreasonable or vexatious conduct under Section 155 of the Illinois Insurance Code, 215 ILCS 5/155. (Doc. 160, at 32-33). One Place did assert a Section 155 claim, but this Court found they presented insufficient evidence to defeat Travelers' motion for summary judgment. *One Place Condominium, LLC v. Travelers Prop. Cas. Co. of Am.*, No. 11 C 2520, 2014 WL 1018192 (N.D. Ill. Mar. 17, 2014). It is not clear, however, that the consequential damages One Place is seeking are intended to compensate them for the same injury as a bad faith claim under Section 155. *See John T. Doyle Trust v. Country Mut. Ins. Co.*, 2014 IL App (2d) 121238, at ¶ 28 (Sept. 25, 2013) (Section 155 "allows for an award of attorney fees and costs for an insurer's 'unreasonable and vexatious' refusal to comply with its policy obligations."); *Hartford Steam Boiler Inspection and Ins. Co. v. Quantum Chemical Corp.*, No. 91 C 6907, 1996 WL 674013, at *17-18 (N.D. Ill. Nov. 19, 1996) (insured company's claim for consequential damages, "including lost business opportunities and increased capital costs," was not preempted by Section 155). For this

reason, the Court is not convinced that the request for consequential damages is preempted by Section 155.

At the same time, One Place has not demonstrated that there is a genuine issue of triable fact as to their ability to satisfy the requirements for an award of consequential damages under the circumstances here. Citing *Heller Int'l Corp. v. Sharp*, 839 F. Supp. 1297 (N.D. Ill. 1993), One Place stresses that in Illinois, a plaintiff alleging breach of an insurance contract is entitled both to "all damages which naturally and generally result from the breach," and to "damages that are the 'consequence of special or unusual circumstances.'" *Id.* at 1302. The latter are available "'where they were reasonably foreseeable, were within the contemplation of the parties at the time the contract was entered, or arose out of special circumstances known to the parties.'" *Id.* at 1303 (quoting *Mohr v. Dix Mut. County Fire Ins. Co.*, 143 Ill. App. 3d 989, 996, 493 N.E.2d 638, 643 (4th Dist. 1986)).[12]

Once again, the only evidence One Place cites in support of their position comes from Mr. Karp, who they say "testified to the increased damage caused by Travelers' failure to pay the claim." (Doc. 153 ¶ 22) (citing Doc. 123-21, at 48-50, 53-54, Karp Dep., at 182, 187-89, 191-92, 203-06). For example, in discussing the modification fees on the construction loans, Mr. Karp stated, "if it was under the original term of the loan, the fee would have been pennies compared to what they got from us . . . [H]ad I had the

---

[12] The other cases One Place cites either have nothing to do with insurance at all or are wholly distinguishable. *See Rush Presbyterian St. Luke's Med. Ctr. v. Safeco Ins. Co. of Am.*, 722 F. Supp. 485 (N.D. Ill. 1989) (addressing a subcontractor's claim against a surety because the surety improperly settled a general contractor's claim); *Linc Equip. Servs., Inc. v. Signal Med. Servs., Inc.*, 319 F.3d 288 (7th Cir. 2003) (dispute involving a lease agreement for medical equipment); *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill.2d 306, 515 N.E.2d 61 (1987) (involving a hotel's action for lost profits because Donnelley allegedly breached an oral promise to list the hotel in the yellow pages).

money from Travelers I would have been in a completely different position." (Doc. 123-21, at 48, Karp. Dep., at 182). Mr. Karp also lamented that the loan modification documents "forced our hand and made us put [insurance proceeds] down as a loss payee. So now any money that comes up to them, it goes to them. But I can't refinance this. . . . I got completely handcuffed." (*Id.* at 50, Karp. Dep., at 192).

One Place does not explain how this testimony creates a genuine issue of fact as to whether the amounts they are seeking for financing losses constitute consequential damages. As Travelers notes, One Place has not cited any cases where an insured actually recovered these types of costs as consequential damages flowing from an insurer's breach of payment obligations in a builder's risk policy. As noted earlier, builder's risk policies generally do not cover "the delay in completion and resulting loss of business income, loss of rents, extra expense, *interest on loans and other consequential losses* incurred after an insured property loss." (Doc. 160-1, at 10, Adjusting Today) (emphasis added). *Cf. Cencula v. Keller*, 180 Ill. App. 3d 645, 648, 650, 536 N.E.2d 93, 95, 96 (2d Dist. 1989) (damages for homeowner's failure to pay amounts due under a construction contract did not include interest the contractor paid on a bank loan he took out in order to pay subcontractors on the project). For this reason, many insureds who obtain builder's risk coverage also obtain, as One Place did, separate coverage for soft costs.

Here the Policy's soft costs coverage was very specific in the four types of soft costs that would be reimbursed during the period of delay in completion, including "interest on money borrowed to finance construction." Given this agreement in the insurance contract, no reasonable jury could find that reimbursement of *other* financing

costs and other soft costs not identified in the Policy were within the contemplation of the parties at the time the contract was entered. Nor is there a basis for a jury to find that the costs arose out of special circumstances known to the parties. In that regard, Garrison P. Benson, CEO of Garrison Partners and another expert hired by Travelers, submitted a report noting that the financial crisis that started in 2007 led to many developers being "stuck with a lot of unsold condos and unable to pay off construction loans coming due." (Doc. 160-4, at 4). The parties could not have reasonably foreseen or contemplated the severe financial downturn, or the significantly reduced condo sales revenues One Place had available to pay down the construction loan.

For these reasons, One Place is unable to recover the financing losses described in Mr. Robinson's report as consequential damages even if they proved (a) Travelers breached the contract by denying payment on certain of the claimed costs, (b) had Travelers paid those costs, One Place would have immediately used those funds to pay down its loans, and (c) the loan payments would have reduced the financing costs in the amount claimed as consequential damages. Summary judgment is granted as to these losses.

In addition to seeking the financing costs described above, One Place also seeks to recover as consequential damages the economic losses on the condo sales occasioned by the delay in completing the Project. As discussed earlier, Mr. Robinson opined that One Place incurred a loss of $2,450,495 from economic losses when delay in completing the Project allegedly caused some buyers of condos to back out or default on their contracts. This Court already has granted summary judgment with respect to One Place's claim for recovery of these same economic losses under the Policy. (*See*

*supra* pp. 36-38).  Since these economic losses are not covered under the Policy, it necessarily follows that Travelers' failure to pay One Place's claim for such losses was not a breach of contract.  In the absence of any breach, there can be no damages owing to One Place, consequential or otherwise.

## **CONCLUSION**

For the reasons stated above, Defendant's Motion for Partial Summary Judgment as to Certain Claimed Costs [Doc. 118] is granted in part and denied in part.

ENTER:

Dated: April 22, 2015

SHEILA FINNEGAN
United States Magistrate Judge